# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

### No. 25-1814

**MICHAEL O'NEIL; JOSEPH PATTON; RICHARD COOK; DANIEL PATTERSON; PETER TREMENTOZZI; DONALD LABRIOLE; RICHARD LAPORT**

**Plaintiffs-Appellants**

v.

**PETER F. NERONHA, in the official capacity as Attorney General of the State of Rhode Island; STATE OF RHODE ISLAND**

**Defendants – Appellees**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

_____

### BRIEF OF PLAINTIFFS-APPELLANTS

_____

Thomas W. Lyons
Strauss, Factor, Laing & Lyons
One State Street, Suite 600
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

Frank R. Saccoccio Esq.
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

# TABLE OF CONTENTS

Table of Authorities……………………………………………………..…iii

Jurisdictional Statement……………………………………………………1

Statement of the Issues…………………………………………………...1

Statement of the Case……………………………………………………2

Summary of the Argument……………………………………………9

Standard of Review………………………………………………..11

Argument

    I.    The District Court Erred As A Matter of When It Held Defendants Could Deny Appellants An RIAG Permit for Open Carry Because They Had Municipal Permits for Concealed Carry……………………..11

    II.    The District Court Erred As A Matter Of Law When It Held That The Attorney General's Standards For Reviewing RIAG Permit Applications Complied With Due Process………………………29

    III.    The District Court Committed Erred As A Matter Of Law When Denied Appellants' Motion in Limine…………………………………40

Conclusion…………………………………………………………...47

Certificate of Compliance…………………………………………….47

Certificate of Service………………………………………………….48

Addendum……………………………………………………...49

# TABLE OF AUTHORITIES

**Supreme Court Decisions**

Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002)…………………………..29

Board of Regents v. Roth, 408 U.S. 567 (1972)……………………………………36

City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988)………….34

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)…………….45

District of Columbia v. Heller, 554 U.S. 570 (2008)…………………13, 14, 15, 20

F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239 (2012)…………………….29

Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123 (1992)………………34

General Electric Co. v. Joiner, 522 U.S. 136 (1997)………………………………44

Kolender v. Lawson, 461 U.S. 352, 357 (1983)…………………………………..30

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)……………………………45

McDonald v. City of Chicago, 561 U.S. 742 (2010)………………………………36

Minnesota Voters Alliance v. Mansky, 585 U.S. 1 (2018)………………..29, 31, 32

New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1 (2022)..passim

Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147 (1969)
…………………………………………………………………..33, 34, 37, 38, 39

U.S. v. Rahimi, 602 U.S. 680 (2024)………………………………………passim

U.S. v. Stevens, 559 U.S. 460, 473 (2010)…………………………………………31

**Other Federal Decisions**

Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97 (1st Cir. 1997)……….…..11

Antonyuk v. James, 120 F.4th 941 (2nd Cir. 2024)…………………………………27

Baird v. Bonta, 81 F.4th 1036 (9th Cir. 2023)………………………………………16

Baird v. Bonta, 709 F.Supp.3d 1091 (E.D.Cal. 2023)……………………………..16

Beam v. Watco Transloading, LLC, 639 F.Supp.3d 791 (S.D.Ill. 2022)………42, 43

Bruno v. Bozzuto's, Inc., 311 F.R.D. 124 (M.D.Penn. 2015)……………..43, 44, 45

Carroll v. Craddock, 494 F.Supp.3d 158 (D.R.I. 2020)………………………..31, 33

Child  Evangelism Fellowship of Maryland, Inc. v.
Montgomery Co. Pub. Sch. Dist., 457 F.3d 376 (4th Cir. 2006)…………………34

Culp v. Madigan, 270 F.Supp.3d 1038 (C.D.Ill. 2017)……………………………17

Cooper v. Meritor, 363 F.Supp.3d 965 (N.D.Miss. 2019)…………………………41

Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d 1115 (1st Cir. 1981)……….30

Frey v. City of New York, No. 23-365-cv, 2025 WL 2679729
(2nd Cir. Sept. 19, 2025)……………………………………………………12, 26, 27

Hightower v. City of Boston, 693 F.3d 61 (1st Cir. 2012)…………………………39

In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994)………………..45

Johnson v. Board of Regents of University of Wisconsin System,
377 F.Supp. 227 (W.D.Wisc. 1974)……………………………………………….36

Koons v. Attorney General New Jersey, Nos. 23-1900 & 23-2043,
2025 WL 2612055 (3rd Cir. Sept. 10, 2025)………………………………………17

Koons v. Platkin, 673 F.Supp.3d 515 (D.N.J. 2023)…………………....17, 19, 20, 21

LaBaurve v. Louisiana Wildlife & Fisheries Comm., 444 F.Supp. 1370
(E.D.La. 1978)……………………………………………………………………36

iv

Lara v. Commissioner Pennsylvania State Police, 125 F.4th 428
(3rd Cir. 2025)…………………………………………………………...25

Legendary Art, LLC v. Godard, 2012 WL 3550040
(M.D.Penn. Aug. 17, 2012)……………………………………………..46

Lewis v. Wilson, 253 F.3d 1077 (8th Cir. 2001)…………………………..33

Matwyuk v. Johnson, 22 F. Supp. 3d 812 (E.D. Mich. 2014)…………….…33

Medrano v. Salazar, No. 5:19-cv-00549, 2020 WL 589537
(W.D.Tex. Feb. 5, 2020)………………………………………………..17

Miller v. Bonta, 699 F.Supp.3d 656, 997 (S.D.Cal. 2023)……………….20, 21

Morgan v. Martinez, No. 3:14-02408, 2015 WL 2233214 (D.N.J. May 12, 2015)..33

O'Neil v. Neronha, No. 23-cv-070, 2025 WL 2197313
(D.R.I. Aug. 1, 2025)……………………………………………………*passim*

Skehan v. Board of Trustees of Bloomsburg State College,
431 F.Supp. 1379 (M.D.Penn. 1997)…………………………………………36

Smith v. Ford Motor Co., 749 F.Supp.2d 980 (N.D.Cal. 2010)……………….41

Sobel v. Hertz Corp., 291 F.R.D. 525 (D.Nev. 2013)……………………….41

Stender v. Lucky Stores, Inc., 803 F.Supp. 259 (N.D.Cal. 1992)………………44

Stricker v. Secretary of Health and Human Services, 170 Fed.Cl. 701
(Ct.Cl. 2024)……………………………………………………………44

Suarez v. Paris, 741 F.Supp.3d 237 (M.D.Penn. 2024)………………………..16, 17

Sutherland v. Escapa, 176 F.Supp.3d 786 (C.D.Ill. 2016)…………………....17

Swierczynski v. Arnold Foods Co., 265 F.Supp.2d 802 (E.D. Mich. 2003)………43

U.S. v. Blechman, 657 F.3d 1052 (10th Cir. 2011)………………………..41

v

U.S. v. Kimble, 54 F.4th 538 (8th Cir. 2022)…………………………………………41

U.S. v. Rom, 528 Fed.Appx. 24, 28 (7th Cir. 2023)…………………………………..41

U.S. v. Rosa-Ufred, Crim. No. 23-408, 2025 WL 815688
(D.PR. Mar. 14, 2025)…………………………………………………………………12, 13

Vars v. Citrin, 470 F.3d 413 (1st Cir. 2006)………………………………………36

Worth v. Jackson, 108 F.4th 697 (8th Cir. 2024)…………………………………..25

**State Court Decisions**

Andrews v. State, 50 Tenn. 165 (1871)……………………………………………14, 25

Aymette v. State, 21 Tenn. 154 (1840)……………………………………………..14, 26

Beacon Rest., Inc. v. Adamo, 103 R.I. 698, 241 A.2d 691 (1968)………………..36

Commonwealth v. Sumter, 2025 Pa.Super. 124, 340 A.3d 977 (2025)…………..26

Fife v. State, 31 Ark. 455 (1876)…………………………………………………..27

In re Brickey, 8 Idaho 597, 70 P. 609 (1902)………………………………………28

McDaniels v. State, No. 1D2023-0533, 2025 WL 2608688
(Fla.App. Sept. 10, 2025)……………………………………..13, 17, 21, 24, 25

Mosby v. Devine, 851 A.2d 1031 (R.I. 2004)…………………………..2, 35, 36, 37

Nunn v. State, 1 Ga. 243 (1846)…………………………………………14, 27, 28

Reed v. Commonwealth, 85 Va.App. 196, 916 S.E.2d 880 (2025)………………..26

State v. Chandler, 5 La.Ann. 489 (1850)………………………………………14, 26

State v. Hall,  265 N.E.3d 338 (Ohio.App. 2025)…………………………………26

State v. Jumel, 13 La.Ann. 399 (1858)………………………………………26, 27

State v. Keet, 269 Mo. 206 (1916)……………………………………………………27

State v. Reid, 1 Ala. 612 (1840)……………………………………………14, 27, 28

Sutton v. State, 12 Fla. 135 (1867)………………………………………………..26

**Constitutional Provisions**

Second Amendment…………………………………………………………….*passim*

Fourteenth Amendment……………………………………………………*passim*

Rhode Island Constitution, Art. 1, §22…………………………………………….35

**Statutes**

18 U.S.C. § 922(g)(8)……………………………………………………………..22

28 U.S.C. § 1291……………………………………………………………....1

28 U.S.C. § 1331……………………………………………………………1

42 U.S.C. § 1983……………………………………………………………1

R.I.Gen.L. § 11-47-8(a)…………………………………………………….3

R.I.Gen.L. § 11-47-11…………………………………………………3, 15, 32

R.I.Gen.L. § 11-47-18…………………………………………………1, 2, 3, 30, 32

**Rules**

F.R.Civ.P. 56(c)(2)……………………………………………………..40

F.R.E. 103……………………………………………………………40

F.R.E. 403……………………………………………………………40

F.R.E. 702……………………………………………………..40, 42, 43, 44

F.R.E. 703………………………………………………………………..40, 41, 43, 45

F.R.E. 801(c)……………………………………………………………..40, 41

F.R.E 802…………………………………………………………………40

F.R.E. 803(6)…………………………………………………………...41

F.R.E. 803(8)…………………………………………………………...41

F.R.E. 807………………………………………………………………41

**Other Materials**

1 John R. Bartlett, <u>Records of the Colony of Rhode Island</u>
<u>and Providence Plantations, in New England</u>, 94
(Providence, A.C. Greene & Bros. 1856)………………………………………….20

4 W. Blackstone, <u>Commentaries on the Laws of England</u>, 149 (10th ed. 1787)……24

Clayton E. Cramer, <u>Colonial Firearm Regulation</u>,
16 J. on Firearms & Pub. Pol'y 1 (2004)……………………………………………20

Stephen P. Halbrook, "To Bear Arms for Self-Defense: A 'Right of the People'
or a Privilege of the Few?", 21 Federalist Soc'y Rev. 56 (2020)………………14, 15

Rhode Island Attorney General "Weapons Carry Permit Packet"…………….3, 4, 5

<u>Webster's New World Dictionary</u>, (World Pub. Co. 1966)…………………….30, 31

William J. Brennan, "State Constitutions and the Protection of
Individual Rights," 90 Harv.L.Rev. 489 (1977)…………………………………..36

"Total and Foreign-born Population New York City, 1790 – 2000,"
<u>https://www.nyc.gov/assets/planning/download/pdf/data-maps/nyc-</u>
<u>population/historical-population/1790-2000_nyc_total_foreign_birth.pdf</u>.............28

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants sued the Attorney General of the State of Rhode Island (RIAG) and the State of Rhode Island in the District of Rhode Island based on federal question jurisdiction because Defendants denied them firearms carry permits in violation of their substantive rights under the Second Amendment and their due process rights under the Fourteenth Amendment. 28 U.S.C. § 1331 and 42 U.S.C. § 1983. The district court granted Appellees' motion for summary judgment and entered judgment on  August 1, 2025. O'Neil v. Neronha, No. 23-cv-070, 2025 WL 2197313 (D.R.I. Aug. 1, 2025) ("O'Neil"). Appellants filed a timely appeal on August 22, 2025 pursuant to 28 U.S.C. § 1291. This appeal is from a final judgment.

## STATEMENT OF THE ISSUES

1. Did the District Court err as a matter of law when it held that the RIAG could deny Appellants permits that would allow them to engage in open carry of handguns because they had municipal permits that only allow concealed carry?

2. Did the District Court err as a matter of law when it held that R.I.Gen.L. §11-47-18, which requires a "proper showing of need," and the RIAG's standards for approving handgun carry permits, which state there is no "set formula or criteria to limit or restrict the Attorney General's decision," comply with due process?

3. Did the District Court err as a matter of law in denying Appellants' Motion in Limine based on its decision not to consider the historical evidence?

## STATEMENT OF THE CASE

Appellants are all Rhode Island residents and over the age of twenty-one. (App.11-13). Appellants have all obtained a so-called "blue card" from the Rhode Island Department of Environmental Management that permits them to purchase and possess a handgun and ammunition. (Id.) The Rhode Island Office of the Attorney General has previously issued firearms carry permits to Appellants. (App.15-16). These permits allowed Appellants to engage in open or concealed carry. (R.I.Gen.L. §11-47-18). Appellants also had concealed carry (CCW) permits issued by various municipalities in Rhode Island. (App.42,44,46,48,50,52,54). Appellants attempted to renew their RIAG permits but the current Attorney General denied them because they had the municipal CCW permits and the RIAG's Office said they did not "need" the RIAG permits. (App.43,45,47,49,51,52-53,54-55). Appellants filed petitions for writ of certiorari with the Rhode Island Supreme Court seeking review of these denials pursuant to Mosby v. Devine, 851 A.2d 1031 (R.I. 2004), but that court denied the petitions without explanation. (App.8-9). Appellants would like the option to engage in open carry of firearms (App.43,45,47,49,51,53,55), which, under the Rhode Island Firearms Act, they can only do if they have the RIAG permit.

Under the Act, a person who wants to engage in concealed carry of a handgun can obtain a permit from either the Rhode Island Attorney General or a municipality,

R.I.Gen.L. §§ 11-47-18 and 11-47-11, respectively. The provision by which municipalities have authority to issue CCW permits states, in part:

> The licensing authorities of any city or town **shall**, upon application of any person twenty-one (21) years of age or over…**issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state** for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed.  (emphasis added).

R.I.Gen.L. § 11-47-11(a). However, a person who wants to engage in "open," public carry of a handgun must obtain the RIAG permit:  "The attorney general **may** issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, **whether concealed or not**, upon his or her person **upon a proper showing of need**..." (emphasis added). R.I.Gen.L. §11-47-18(a).

The Firearms Act prohibits any person from carrying any handgun in public, whether concealed or open, unless the person has a permit authorized under the Act. R.I.Gen.L. § 11-47-8(a). Violation of this prohibition is a felony punishable by up to ten years in prison and a ten thousand dollar fine. Id.

The Firearms Act does not define "need." The Attorney General has not promulgated regulations that define "need." The Attorney General's Department has created a set of factors in its "Weapons Carry Permit Packet" which the Department

uses to determine whether an applicant has made a proper showing of "need."[1] These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb, or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb, or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training, and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

---

[1] The current version of the Packet is available online at: https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/PERMIT-APPLICATION-2020.pdf.

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8- 8.1 of the general laws?

(10)    Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit."

As summarized here, Appellants' historical expert, Clayton Cramer, states that regulation of open carry of arms is rare in American history. Moreover, Appellees' two experts either agree or have no opinion on this point. Thus, it is undisputed that the historical tradition of firearms regulation supports a constitutional right to open carry.

Cramer sets forth that the few examples of open carry regulation often cited are usually laws that targeted a particular group regarded as dangerous, a particular

dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by <u>New York State Rifle & Pistol Association, Inc. v. Bruen</u>, 597 U.S. 1 (2022) ("<u>Bruen</u>"). (App.58).

Laws regulating concealed carry of firearms were more common in the era before 1868. State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitutional right to keep and bear arms provisions. When the courts upheld such concealed weapon laws, they have usually done so because open carry remained lawful. (App.59).

Laws regulating open carry of arms are mostly recent. Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry. (App.58).

Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. (Their expert declarations are at App.69, and 127, respectively). Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, which passed statutes barring the public carry of firearms. (App.94-96). Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations. (App.448-49). Rivas found that licensing requirements for open carrying were "generally local." (App.450-51).

Rivas found that in Georgia open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them. (App.455-56). Rivas thinks that open carry was not seen as a "social problem." (App.456).

Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether Rhode Island's regulatory scheme is consistent with a historical tradition of open carry regulations. (App.473). Spitzer said he was not asked to render an opinion on that. (App.473-74).

For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii (which was a foreign country at the time). (App.130-31). Spitzer said the York law barred only the "willful and malicious" carrying of arms and he did not understand what that meant. (App.489-90). Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional. (App.487-88). Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry. (App.483-85). The vast majority of the statutes that Spitzer identifies as purportedly restricting public or open carry of

firearms were promulgated after 1868. (App.438-39).[2] Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (See, e.g., App.359-60). Some of the statutes Spitzer identified were promulgated by territories or a foreign country (Hawaii). (App.438-39).

On November 27, 2024, Appellants moved for summary judgment on their Second and Fourteenth Amendment claims. They also filed a motion in limine to exclude evidence from the so-called "Duke Repository" of firearms laws as hearsay and unreliable, and to exclude Spitzer's opinions as unreliable because he relied on the Duke Repository. The Appellees also moved for summary judgment and filed two evidentiary motions, a motion to strike Cramer's supplemental declaration and a motion for judicial notice of the historical laws on which they relied.

On August 1, 2025, the District Court issued a Memorandum and Order granting Appellees' motion for summary judgment and denying Appellants' motion. The District Court interpreted <u>Bruen</u> and <u>U.S. v. Rahimi</u>, 602 U.S. 680 (2024), to hold that so long as a state provided a right to concealed carry it need not provide a right to open carry. <u>O'Neil</u>, 2025 WL 21997313 at *3. The Court also held that the RIAG's standards for reviewing carry permit applications did not violate due

---

[2] Spitzer's expert declaration includes an Exhibit B (App. App.438-39) that is a table of the statutes summarized in his Exhibit C. (App.163-437). Neither Exhibit demonstrates a historical tradition of restricting open carry during 1791-1868.

8

process. <u>Id.</u> at *4-5. The District Court addressed the Parties' arguments respecting

the historical regulation of open carry and their evidentiary motions in a footnote:

> The Court's decision rests on the binding precedent set by the Supreme
> Court in <u>Bruen</u>, 597 U.S. 1, and <u>Rahimi</u>, 602 U.S. 680. Thus, the Court
> need not undertake its own review of historical laws regulating the
> public carry of firearms. For that reason, the parties' evidentiary
> motions are not material to its decision. See Pls.' Mot. Limine, Dkt. No.
> 33; Defs.' Mot. Judicial Notice, Dkt. No. 44; Defs.' Mot. Strike, Dkt.
> No. 50.

<u>Id.</u> at *3, n.2. The Court denied the evidentiary motions. <u>Id.</u> at *6. Defendants have

not appealed the denial of their evidentiary motions.

## SUMMARY OF THE ARGUMENT

This case presents an unusual situation in that Second Amendment advocates,

such as Appellants, often oppose permitting requirements and other restrictions on

their gun rights, and gun control advocates, such as Appellee Neronha, often promote

such restrictions. Here, however, Appellants—all law-abiding citizens—are

attempting to renew permits that allow open carry and Neronha is fighting them tooth

and nail. The District Court's holding that Appellants do not have a constitutional

right to open carry is ahistorical under the Second Amendment because Appellees

do not cite any historical tradition during the relevant period between 1791 and 1868

of any state that barred open carry while permitting concealed carry. To the contrary,

the history indicates that, if anything, state legislatures and state courts permitted

open carry or upheld restrictions on concealed carry because open carry generally was not and could not be restricted.

The statutory requirement that a RIAG permit applicant make a "proper showing of need" as well as the Attorney General's guidelines respecting that showing are vague and overbroad in violation of the Fourteenth Amendment. The statute does not define that phrase. Appellees have set forth factors they will consider but none of them are that the applicant has a municipal CCW permit. They cannot constrain Appellants' Second Amendment rights by claiming no "set formula or criteria…limit[s] or restrict[s] the Attorney General's decision to issue or deny a pistol permit." Moreover, it appears it is the particular Attorney General in office at any given time who determines "a proper showing of need" because prior Attorneys General have issued RIAG permits when applicants have had municipal permits.

The District Court erred as matter of law when it denied Appellants' motion in limine respecting Appellees' historical evidence and expert testimony because it declined to consider the parties' historical evidence.  Appellants moved to exclude evidence from the so-called Duke Repository of firearms laws because it is inadmissible hearsay and otherwise unreliable evidence, and to exclude the expert testimony of Appellees' expert, Robert Spitzer, because he relied on "facts" or "data" which were not inherently reliable, particularly the Duke Repository, and his opinions are not otherwise based on a reliable methodology.

## STANDARD OF REVIEW

This Court conducts a de novo review of the district court's grant of summary judgment. Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 98 (1st Cir. 1997).

## ARGUMENT

I.     **THE DISTRICT COURT ERRED AS A MATTER OF LAW WHEN IT HELD DEFENDANTS COULD DENY APPELLANTS A RIAG PERMIT FOR OPEN CARRY BECAUSE THEY HAD MUNICIPAL PERMITS FOR CONCEALED CARRY.**

The District Court erred as a matter of law when it held that Bruen said the States could restrict open carry so long as they permitted concealed carry. Specifically, the District Court said:

> Defendants' application of the Firearms Act to regulate Plaintiffs' manner of public carry is within the Nation's historical tradition of regulation. Plaintiffs' argument to the contrary is foreclosed by Bruen itself. There, the Supreme Court concluded that "[t]he historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation." Bruen, 597 U.S. at 59. And it drew that conclusion, in part, from its finding that historically, "States could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." Id. The Firearms Act, through its permitting structure, does just this, albeit in reverse: it regulates Plaintiffs' manner of public carry in that it limits their right to open carry but leaves unaffected their right to concealed carry.

O'Neil, 2025 WL 2197313 at *3. The District Court continued:

> [T]he Second Amendment is not "a law trapped in amber." United States v. Rahimi, 602 U.S. 680, 691 (2024). Per the Supreme Court's direction in Rahimi, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to

modern circumstances.' " Id. at 692 (alteration in original) (quoting Bruen, 597 U.S. at 29). In doing so, the Court concludes that Defendants' application of the Act's permitting structure to Plaintiffs is relevantly similar to historical regulations, and thus consistent with the Second Amendment.

Id. Then, in a footnote, the Court said its "decision rests on the binding precedent set by the Supreme Court in Bruen…and Rahimi" and therefore it did not need to undertake the its own review of historical laws regulating the public carry of firearms. Id. n.2.

The District Court was mistaken for several reasons. First, the Supreme Court did not expressly rule on the right of open carry in Bruen. Rather, the issue before the Court was whether the State of New York could condition a concealed carry permit on a special showing of "need" other than just a general desire for self-defense: "Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution." Bruen, 597 U.S. at 11. The constitutionality of New York's restriction on open carry was not addressed.[3] See, U.S. v. Rosa-Ufred, Crim. No. 23-428, 2025 WL 815688 at *4 (D.P.R. Mar. 14, 2025) ("The Bruen decision did not address whether a firearms license holder can

_____

[3] Appellants acknowledge that the Second Circuit recently upheld that restriction on reasoning substantially the same as the District Court's. Frey v. City of New York, No. 23-365-cv, 2025 WL 2679729 at *13 (2nd Cir. Sept. 19, 2025). Appellants will address that decision later in this brief.

be required to carry his firearm in a concealed fashion."). Further, the issue in <u>Rahimi</u> was whether a person subject to a domestic violence restraining order could be disarmed. The constitutionality of Florida's restriction on open carry was not addressed.[4] Accordingly, neither decision was binding precedent that supports Rhode Island's denial of open carry permits.

Second, it is illogical to refer to a decision that says: "States could lawfully eliminate one kind of carry—concealed carry—so long as they left open the option to carry openly," as "binding precedent" for the exact opposite proposition, i.e., states can eliminate open carry so long as they leave open the option of concealed carry.

Third, the Supreme Court made clear in <u>Bruen</u> and <u>Rahimi</u> that courts must consider the historical tradition of firearms regulation "when the Second Amendment's plain text covers an individual's proposed conduct." <u>Bruen</u>, 597 U.S. at 17; <u>Rahimi</u>, 602 U.S. at 691. The District Court quoted this language and assumed the plain text covered the Appellants' conduct. <u>O'Neil</u>, 2025 WL 2197313 at *3. It then expressly declined to consider the historical tradition. <u>Id.</u> at n.2.

Fourth, the District Court's decision ignores the Supreme Court's extensive analysis of the history of firearms regulation in <u>District of Columbia v. Heller</u>, 554

---

[4] However, a Florida Court of Appeals recently held that restriction violated the Second Amendment. <u>McDaniels v. State</u>, No. 1D2023-0533, 2025 WL 2608688 at *11 (Fla.App. Sept. 10, 2025).

U.S. 579 (1968), upon which the Bruen decision relies. There, the Court repeatedly discussed with approval the various state court decisions which had struck down bans on open carry of firearms, sometimes while leaving intact bans on concealed carry. 554 U.S. 570, 612-14, 629, citing, Nunn v. State, 1 Ga. 243, 251 (1846) ("[T]he Georgia Supreme Court construed the Second Amendment as protecting the 'natural right of self-defense' and therefore struck down a ban on carrying pistols openly.") (emphasis original); State v. Chandler, 5 La.Ann. 489, 490 (1850) ("[L]ikewise, the Louisiana Supreme Court held that citizens had a right to carry arms openly…"); Aymette v. State, 21 Tenn. 154 (1840) ("The court then adopted a sort of middle position, whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia…"); Andrews v. State, 50 Tenn. 165, 187 (1871) ("[T]he Tennessee Supreme Court likewise held that a statute that likewise forbade openly carrying a pistol…violated the state constitutional provision."); State v. Reid, 1 Ala. 612, 616-17 (1840).  Conversely, the Court commented that "the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  554 U.S. at 626.

In Bruen, the Supreme Court again cited with approval state supreme court decisions upholding open carry. 597 U.S. at 53-54, citing, State v. Reid; State v. Chandler; Nunn v. State; and Andrews v. State. See also, Stephen P. Halbrook, "To

14

Bear Arms for Self-Defense: A 'Right of the People' or a Privilege of the Few?", 21 Federalist Soc'y Rev. 56, 56 (2020) ("By 1861, 25 of 34 states allowed the carrying of weapons both openly and concealed. In the 9 states that then restricted concealed carry, open carry was lawful; it was this right of open carry that justified the restrictions of concealed carry."). Accordingly, it makes no sense to think that the Court would have said in <u>Bruen</u> that a state can ban open carry so long as it permits concealed carry.

Fifth, the Supreme Court's comments in footnote 9 undermine the District Court's decision. First, the Court says with respect to the 43 States listed, including Rhode Island: "…it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" <u>Bruen</u>, 597 U.S. at 38, n. 9.[5] Here, there is no dispute that Appellants are law-abiding responsible citizens nor are Appellees denying their RIAG applications on the grounds that they are not. Rather, Appellees denied these applications because Appellants already had municipal CCW licenses (which require a showing that the applicant is a "suitable person"). In reality, Appellees' licensing scheme <u>penalizes</u> Appellants for trying to comply with the law.

_____

[5] For Rhode Island, the Court cited to the municipal CCW statute, §11-47-11(a).

Bruen places the burden on Appellees, first to show that Appellants' desire to engage in open carry falls beyond the scope of the Second Amendment. Second, if they cannot carry that burden, Appellees must show that their new policy effectively barring Appellants from engaging in open carry if they have a municipal CCW permit falls within the Nation's historical tradition of firearms regulation.

Clearly, open carry of handguns for self-defense is conduct within the scope of the Second Amendment. More recently, other federal and state courts have so indicated, as well. See, Baird v. Bonta, 81 F.4th 1036, 1048 (9th Cir. 2023) (commenting that ''[a]n individual's right to carry a handgun for self-defense outside the home under the Second Amendment is [a] constitutional right" and reversing and remanding that district court's denial of plaintiffs' motion for a preliminary injunction against a California statute that imposed criminal penalties for unlicensed public carry);[6] Suarez v. Paris, 741 F.Supp.3d 237, 256 (M.D.Penn. 2024) ("We find that plaintiffs' desired conduct—carrying loaded, operable firearms

---

[6] On remand, the district court upheld California's requirement of a license to engage in open carry. Baird v. Bonta, 709 F.Supp.3d 1091, 1119 (E.D.Cal. 2023). The court also upheld California's law restricting open carry to about half of its (less populated) counties by rejecting historical tradition and relying on alleged contemporary standards: "In one sense, California's regulation might seem to be the reverse of the historical tradition. Rather than placing heavier restrictions on concealed and concealable weapons, California limits open handgun carrying more strictly than concealed carrying…Today, by contrast, the open carrying by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places." Id. at 1138-39. The decision has been appealed to the Ninth Circuit.

on their person, 'whether concealed or openly,' in public for lawful purposes including self-defense…plainly is covered by the Second Amendment."); <u>Koons v. Platkin</u>, 673 F.Supp.3d 515, 655-66 (D.N.J. 2023), affirmed in part, reversed in part, on other grounds, <u>Koons v. Attorney General New Jersey</u>, Nos. 23-1900 & 23-2043, 2025 WL 2612055 (3rd Cir. Sept. 10, 2025); <u>Culp v. Madigan</u>, 270 F.Supp.3d 1038, 1053 (C.D.Ill. 2017), quoting <u>Sutherland v. Escapa</u>, 176 F.Supp.3d 786, 790 (C.D.Ill. 2016) ("finding that the acts criminalized by the Illinois statute, 'the ability to open carry any firearm, as well as the ability to carry a concealed firearm aside from pistols, revolvers, and handguns, is clearly within the scope of the Second Amendment.");[7] see also, <u>Medrano v. Salazar</u>, No. 5:19-cv-00549, 2020 WL 589537 at *6 (W.D.Tex. Feb. 5, 2020) ("Applied to the states through the Fourteenth Amendment, the Second Amendment 'encompasses a right to carry firearms openly in public for self-defense.'"); <u>McDaniels v. State</u>, No. 1D2023-0533, 2025 WL 2608688 at *11 (Fla.App. Sept. 10, 2025).

Next, the Court must consider the historical tradition of firearms regulation. As a first step of that part of the analysis, this Court must determine what history is relevant to determining the historical tradition upon which <u>Bruen</u> says the analysis must be based. <u>Bruen</u>, 597 U.S. at 26. ("The test we set forth in [<u>District of Columbia</u>

---

[7] In both <u>Culp</u> and <u>Sutherland</u>, the courts applied the interest-weighing analysis that <u>Bruen</u> subsequently rejected and upheld the statute in question.

v. Heller, 554 U.S. 570 (2008)] and apply today requires courts to assess whether

modern firearms regulations are consistent with the Second Amendment's text and

historical understanding."). The Bruen Court discussed what historical period could

be important to the issue of public carry:

> The Second Amendment was adopted in 1791; the Fourteenth in 1868.
> Historical evidence that long predates either date may not illuminate
> the scope of the right if linguistic or legal conventions changed in the
> intervening years. It is one thing for courts to "reac[h] back to the 14th
> Century" for English practices that "prevailed up to the 'period
> immediately before and after the framing of the Constitution.'" [citation
> omitted]. It is quite another to rely on an "ancient" practice that had
> become "obsolete in England at the time of the adoption of
> Constitution" and never "was acted upon or accepted in the Colonies."
> [citation omitted].

Id. at 34-35.

The Court continued: "Similarly, we must guard against giving postenactment

history more weight than it can bear."  Id. at 35. "[W]e recognize that 'where a

governmental practice has been open, widespread, and unchallenged since the early

days of the Republic, the practice should guide our interpretation of an ambiguous

constitutional provision.'" [citation omitted]. Id. at 36. "Thus, 'post-ratification

adoption or acceptance of laws that are *inconsistent* with the original meaning of the

constitutional text obviously cannot overcome or alter that text.'"  (emphasis

original) [citation omitted]. Id. "As we recognized in Heller itself, because post-Civil

War discussions of the right to keep and bear arms 'took place 75 years after the

ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" [citation omitted]. Id.

The Court concludes this part of its analysis by "acknowledg[ing] there is an ongoing scholarly debate on whether courts should rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope…" Id. at 37. The Court determined it did not need to decide the issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." Id. at 38. Thus, the most relevant history was from 1791 to 1868.

In addition, the Court discounted the significance of laws promulgated in U.S. Territories before they became states. Id. at 66-69. Presumably, a Hawaiian law passed when Hawaii was a foreign country would get even less credit. The Court also dismissed so-called "in terrorem" statutes and surety laws as these assumed a right to public carry and only made illegal some additional action by the gun bearer that turned him into a specific threat to an individual or the community. Id. at 50-51 and 55-60, respectively.

In Koons, the district court reviewed various New Jersey restrictions on both concealed and open carry. One restriction barred people from bringing firearms to public gatherings, demonstrations, or events requiring a government permit. The court considered evidence from the colonial period. "The colonial generation

required the settlers to carry weapons during public assemblies to defend against hostilities from Native Americans, protect themselves from criminals and pirate raids to curb slave rebellions, and to be ready for a potential foreign invasion." 673 F.Supp.3d at 628, citing, *inter alia*, Clayton E. Cramer, <u>Colonial Firearm Regulation</u>, 16 J. on Firearms & Pub. Pol'y 1, 6-7 (2004). It noted: "Rhode Island, in 1639, likewise ordered that no 'man shall go two miles from the Towne unarmed, [either] with Gunn or Sword; and that none shall come to any public Meeting without his weapon.'" <u>Id</u>. at 629, quoting, 1 John R. Bartlett, <u>Records of the Colony of Rhode Island and Providence Plantations, in New England</u>, 94 (Providence, A.C. Greene & Bros. 1856). The court said the colonial history was relevant because the "Second Amendment…codified a pre-existing right." <u>Id</u>. at 628, quoting, <u>Heller</u>, 554 U.S. at 592. The court found that the plaintiffs had shown a reasonable likelihood of prevailing on their Second Amendment challenge to the prohibition on bringing firearms to public gatherings. <u>Id</u>. at 636.

It also held that New Jersey's restrictions on functional firearms in vehicles violated plaintiffs' rights to open carry. <u>Id.</u> at 655-56. It commented that: "As noted above and in <u>Bruen</u>, states that historically banned concealed carry of firearms did not similarly prohibit open carry." <u>Id.</u> at 656;[8] see also, <u>Miller v. Bonta</u>, 699

---

[8] The <u>Koons</u> court specifically rejected the assertion of Brennan Rivas, Appellees' expert, that "individuals generally did not view concealed carry laws as giving

F.Supp.3d 656, 997 (S.D.Cal. 2023) ("Antebellum society was comfortable with seeing people openly armed with guns and uncomfortable with the knowledge that some people carried guns concealed.").

In <u>McDaniels</u>, the court reviewed the State's asserted analogues beginning with laws modeled after the 1328 Statute of Northampton which prohibited people from "rid[ing] or go[ing] armed in public." It commented that the Supreme Court had rejected that Statute as analogous because it "targets conduct that threatened terror or public disorder, not the ordinary carrying of arms for lawful defense," and there was no evidence that people in the early 18th century or after considered the mere carrying of a handgun to be terrifying. 2025 WL 2608688 at *7. The court deemed five statutes irrelevant mostly because they did not address the legality of open carry. <u>Id.</u> The court also rejected surety statutes because these required that a person have made a complaint that he had a reasonable basis to fear injury or a breach of the peace by the defendant. <u>Id.</u> Both <u>Heller</u> and <u>Bruen</u> dismissed the relevance of these statutes. <u>Id.</u> The Florida court also rejected statutes that banned carrying arms with criminal intent. It commented that these statutes and the surety statutes presumed a right to carry arms. <u>Id.</u>

---

permission to openly carry in populated places during a person's ordinary activities." <u>Id.</u> at 656, n. 74.

The District Court bases its decision on the Supreme Court's more recent opinion in <u>Rahimi</u>. However, <u>Rahimi</u> does not support the court's holding. In that case, Rahimi assaulted C.M., his girlfriend, who was also the mother of his child. He shot at her as she fled. He later called C.M. and threatened to shoot her if she reported the incident. Nonetheless, C.M. went to Texas state court, testified to Rahimi's conduct, including toward their son, and requested a restraining order. Rahimi had an opportunity to dispute her testimony but did not. The state court found that Rahimi had committed "family violence," that the violence "was likely to occur again," and that he posed "a credible threat" to the "physical safety" of C.M. and their son. The court prohibited Rahimi from threatening C.M. or her family for two years or contacting C.M. during that period except to discuss their son. The order suspended Rahimi's gun license for two years.

Rahimi subsequently violated the restraining order by approaching C.M.'s home at night and contacting her through social media. He also engaged in other crimes including additional shootings. The police obtained a warrant to search his residence and found a pistol, a rifle, ammunition, and a copy of the restraining order. He was indicted on a charge of violating 18 U.S.C. § 922(g)(8) which prohibits possessing a firearm while subject to a domestic violence restraining order. He moved to dismiss the indictment arguing that it violated his rights under the Second Amendment. The district court denied his motion, the circuit court affirmed, and

Rahimi petitioned for rehearing *en banc*. While his petition was pending, the Supreme Court decided <u>Bruen</u>. The circuit court withdrew its prior opinion and held that Section 922(g)(8) did not fit within the Nation's tradition of firearms regulation.

The Supreme Court granted certiorari. It said:

> When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect. Since our founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition.

<u>Id.</u> at 690. The Court then discussed how to analyze the history of firearms regulation:

> As we explained in <u>Bruen</u>, the appropriate analysis involves considering whether the challenged regulation is consistent with principles that underpin our regulatory tradition. [citation omitted]. A court must ascertain whether the new law is "relevantly similar to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." [citation omitted].

<u>Id.</u> at 692.

The Court then considered whether "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." <u>Id.</u> The Court noted that in England, "[f]rom the earliest days of the common law, firearms regulations have included provisions barring people from misusing weapons to harm or menace others." <u>Id.</u> at 693. Further, the English

developed surety laws which authorized magistrates to require individuals suspected of future misbehavior to post a bond. American colonies and states promulgated surety laws. Also, there were the so-called "going armed" laws which prohibited "riding or going armed with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." Id. at 697, quoting 4 W. Blackstone, Commentaries on the Laws of England, 149 (10th ed. 1787). "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  Id.

That was all the Court decided as it made clear in its final paragraph:

> [W]e reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." [citation omitted]. "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In Heller and Bruen we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. [citations omitted]. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

Id. at 1902. Here, Appellants are all law-abiding, responsible citizens "who undoubtedly enjoy the Second Amendment right." Id. Appellees did not deny the renewal of Appellants' RIAG permits based on character issues or that they posed a threat of harm to others. Appellees did so, for the first time, solely because Appellants also had municipal CCW permits.

The District Court correctly states that <u>Rahimi</u> held that statutory analogues need not be exact for purposes of determining the historical tradition of firearms regulation. However, lower court decisions since <u>Bruen</u> have made clear that historical regulations upon which the government would rely must be "relevantly similar." <u>Bruen</u>, 597 U.S. at 1898; see, <u>Lara v. Commissioner Pennsylvania State Police</u>, 125 F.4th 428, 443 (3rd Cir. Jan. 13, 2025) (rejecting the government's argument that a 1721 statute barring hunting on others' land without permission was an analog for contemporary statutes that barred 18-20 year olds from concealed carry); <u>Worth v. Jackson</u>, 108 F.4th 677, 692-698 (8th Cir. 2024) (analyzing Minnesota's permit-to-carry statute which requires applicants to be 21 years old and finding that the state presented no analogous law from the Founding to justify denial of the Second Amendment right to carry to 18-20 year olds).

Here, historical statutes that barred concealed carry are <u>not</u> analogues for a contemporary licensing scheme that denies permits for open carry if a person has a permit for concealed carry. The Florida Court of Appeals expressly rejects that analogy:

> The State has not shown that open carry and concealed carry were understood to be interchangeable.  To the contrary, the historical record, including the very sources the State invokes, demonstrates that the two were regarded as distinct, and that open carry was the default mode of bearing arms that preserved the core of the Second Amendment right.

McDaniels, 2025 WL 2608688 at *9. See also, Reed v. Commonwealth, 85 Va.App. 196, 214, 916 S.E.2d 880, 889 (2025) (recognizing that the Second Amendment protects a right to open carry); Commonwealth v. Sumter, 2025 Pa.Super. 124, 340 A.3d 977, 988 (2025) (same); State v. Hall, 265 N.E.3d 338, 359 (Ohio.App. 2025) (same). The McDaniels court discussed Aymette v. State, 21 Tenn. 154, 161-62 (1840); State v. Reid, 1 Ala. 612, 622 (1840); State v. Chandler, 5 La.Ann. 489, 490 (1850); and Sutton v. State, 12 Fla. 135 (1867); all of which upheld a right of open carry and/or distinguished it from concealed carry. By contrast, the District Court identified no historical law or court decision that treats open carry and concealed carry as interchangeable.

For all these reasons, the Second Circuit's decision in Frey is simply wrong. It begins by altering the Supreme Court's statement in Bruen: "The historical evidence demonstrated that 'States could lawfully eliminate one kind of public carry—[open carry or] concealed carry—so long as they left open' the other option." 2025 WL 2679729 at *12, quoting Bruen, 597 U.S. at 59.[9] The Second Circuit then identifies laws from ten states or territories enacted between 1813 and 1859 that prohibited concealed carry of pistols. Id. It discusses a Louisiana case that upheld the criminalization of concealed carry, State v. Jumel, 13 La.Ann. 399, 399-400

---

[9] The actual sentence in Bruen is: "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly." Id.

(1858). The court acknowledges that New York City's ban on open carry is the converse of these historical laws but says it was justifiable because it eliminates one kind of public carry but preserves another that does not hinder the capacity for self-protection. Id. It concludes: "New York's determination that open carry is the more dangerous mode of public carry is well within its legislative prerogative to address 'issues we face today [that] are different from those faced in Medieval England, the Founding Era, the Antebellum Era, and Reconstruction.'" Id., quoting Antonyuk v. James, 120 F.4th 941, 970 (2nd Cir. 2024).

There are several problems with this reasoning. First, a ban on open carry may in some states prohibit citizens from carrying a long gun, such as a shotgun, for self-defense and require them to have a concealable weapon. This is ahistorical because long guns were historically a popular method of self-defense. See, Bruen, 597 U.S. at 49. Regardless, Rhode Island's scheme requires that a handgun carried for self-defense be concealable. Second, concealed weapons can be less accessible than openly carried weapons, depending on the clothing worn, and, therefore, less advantageous for self-defense. Third, state legislatures and courts historically determined that concealed weapons were more dangerous than openly carried weapons, in part because other people could perceive an openly carried weapon and adjust their behavior accordingly. See, e.g., State v. Keet, 269 Mo. 206, 214 (1916); Fife v. State, 31 Ark. 455 (1876); State v. Jumel, 13 La.Ann. 399, 400 (1858); Nunn

v. State, 1 Ga. 243, 249 (1846); State v. Reid, 1 Ala. 612, 617 (1840). Fourth, while New York City is a "crowded urban setting" now, it became a crowded urban setting during the relevant period between 1791 and 1868.[10] Yet, there is no evidence that issues respecting public carry were different then than now, or that either the State or City of New York attempted to ban open carry then.

The statutes cited by Defendants' expert Rivas do not support a ban on open carry in favor of concealed carry. Rivas points to a law banning open carry from the Idaho territory but that law did not long survive Idaho becoming a state. The Idaho Supreme Court struck it down as unconstitutional under both the Second Amendment and the Idaho constitution. In re Brickey, 8 Idaho 597, 70 P. 609 (1902). The Massachusetts statute which she mentions was a surety law. (App.90-91). The West Virginia and Texas laws were concealed carry laws. (App.95-96). Defendants' expert Spitzer says he was not asked to opine on whether Rhode Island's open carry regulatory scheme was consistent with historical regulations, and he did not have an opinion on that issue. (App.473-74).

---

[10] New York City's own data indicates that during that period its population increased from approximately 33,000 to 940,000. See, "Total and Foreign-born Population New York City, 1790 – 2000," https://www.nyc.gov/assets/planning/download/pdf/data-maps/nyc-population/historical-population/1790-2000_nyc_total_foreign_birth.pdf, last visited October 3, 2025.

Accordingly, there is no historical tradition of firearms regulation that supports denying a permit for open carry while permitting concealed carry. Appellees' permitting scheme violates the Second Amendment.

## II.   THE DISTRICT COURT ERRED AS A MATTER OF LAW WHEN IT HELD THE ATTORNEY GENERAL'S STANDARDS FOR REVIEWING RIAG PERMIT APPLICATIONS COMPLIED WITH DUE PROCESS.

The statutory requirement that a State carry permit applicant make a "proper showing of need" and the Attorney General's guidelines respecting that showing are vague and overbroad in violation of the Fourteenth Amendment. See Minnesota Voters Alliance v. Mansky, 585 U.S. 1, 23 (2018) (holding that a Minnesota statute banning people from wearing "political apparel" in polling places on Election Day was unconstitutionally vague and violated the First Amendment); F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 258 (2012) (holding that the FCC's regulation on the broadcasting of "fleeting expletives" was unconstitutionally vague and violated the First Amendment); Ashcroft v. Free Speech Coalition, 535 U.S. 234, 256 (2002) (holding the Child Pornography Prevention Act of 1996 was unconstitutionally overbroad and violated the First Amendment).[11]   Moreover, Defendants cannot constrain Appellants' Second Amendment rights by claiming no

---

[11] O'Neil cites to First Amendment jurisprudence in this argument because the Supreme Court has analogized First and Second Amendment rights, Bruen, 597 U.S. at 24-25, and because there is a dearth of post-Bruen decisions applying due process analysis to firearm carry permit denials.

"set formula or criteria…limit[s] or restrict[s] the Attorney General's decision to issue or deny a pistol permit."  Bruen, 597 U.S. at 69 ("The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.").

This Court has explained the difference between "vagueness" and "overbreadth":

> While related, [the doctrines of overbreadth and vagueness] derive from somewhat different policies and look to different effects.  Overbreadth analysis looks to whether a law "sweeps within its ambit (protected) activities" as well as unprotected ones, while a vagueness inquiry focusses on whether a law states its proscriptions in terms sufficiently indefinite that persons of reasonable intelligence "must necessarily guess at its meaning."

Fantasy Book Shop, Inc. v. City of Boston, 652 F.2d 1115, 1122 n. 9 (1st Cir. 1981).

The "void-for-vagueness" doctrine derives from due process requirements that a law must be written "(1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement."  Kolender v. Lawson, 461 U.S. 352, 357 (1983). Here, Section 11-47-18(a) is unconstitutionally vague because the General Assembly has not defined "a proper showing of need" and ordinary people could not understand what that phrase means. What is a "proper showing"? Does it require a hearing with admissible evidence or are an applicant's representations sufficient? What constitutes a "need"? Webster's first two definitions for "need" are very

different: "1. necessity; compulsion; obligation…" compared to "2. a lack of something useful, required, or desired…" Webster's New World Dictionary, p. 981 (World Pub. Co. 1966). It is difficult to imagine a vaguer standard.

A statute is overbroad and unconstitutional under the First Amendment where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." U.S. v. Stevens, 559 U.S. 460, 473 (2010). In Stevens, the Supreme Court held that a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was substantially overbroad, and thus, it was invalid under the First Amendment. 559 U.S 481-82. Here, Section 11-47-18(a) is substantially overbroad because its critical terms are undefined, and the Attorney General's application of the statute is overbroad, ill-defined, and subject to "haphazard interpretations." Minnesota Voters, 585 U.S. at 16-17; Carroll v. Craddock, 494 F.Supp.3d 158, 169 (D.R.I. 2020) ("A statute is overbroad and therefore unconstitutional when it so lacks standards for application that it 'delegate[s] unlimited discretion to the government officials entrusted to enforce the regulation.'"). In the Minnesota Voters case, the Supreme Court struck down Minnesota's law  banning "political apparel" at polls. In attempting to determine examples of what "political apparel" would or would not be permissible, the Court  encountered the same kind of arbitrary distinctions that exist with respect to RIAG permits:

A shirt declaring "All Lives Matter," we are told, could be "perceived" as political. How  about a shirt bearing the name of the [NRA]? Definitely out. That said, a shirt displaying a rainbow flag could be worn "*unless* there was an issue on the ballot" that "related somehow ...to gay rights." A shirt simply displaying the text of the Second Amendment? Prohibited. But a shirt with the text of the First Amendment? "It would be allowed."

Minnesota Voters, 585 U.S. at 21. "[P]erfect clarity and precise guidance have never been required even of regulations that  restrict expressive activity. But the State's difficulties with its restriction go beyond close calls on  borderline or fanciful cases. And that is a serious matter..." Id.

Rhode Island has the same problem. The inconsistent application of Section 11-47-18(a)'s  requirement of a "proper showing of need" can  result  in  haphazard, arbitrary, and inconsistent decisions. Here, the Attorney General has articulated ten general factors on which to base the grant or denial of a RIAG permit with respect to a showing of "need."  However, the denials of Appellants' applications to renew their permits were founded on none of these. Instead, the Attorney General denied the renewal based on a new, *ad hoc* factor, i.e., that Appellants did not "need" a State-issued permit because they already had a municipal one. Notably, the Attorney General did not decide that Appellants were any kind of threat or danger if they had a RIAG permit, a decision that was presumably foreclosed by the issuances of the municipal permits which requires that the applicant be a "suitable person to be so licensed."  R.I.Gen.L. § 11-47-11(a).

Moreover, it appears it is the particular Attorney General in office at any given time who determines "a proper showing of need" because, for example, Appellant Cook originally received his RIAG permit in 2009, and it was renewed in 2013 and 2017 when the prior Attorney General was in office. He also had a municipal CCW permit he first obtained in 2013. (App.54). In other words, his RIAG permit was renewed in 2017 when he had a CCW permit but denied in 2021 because he had the CCW permit. This situation promotes arbitrary and discriminatory enforcement.

Personalized or "vanity" license plate schemes have faced similar legal challenges. See Lewis v. Wilson, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down Missouri regulation as providing unfettered discretion when state had authority to restrict plates bearing messages that are "contrary to public policy."); Carroll v. Craddock, 494 F.Supp.2d at 169-70 (striking down a statute that permitted the Director of the Division of Motor Vehicles to deny the application for a vanity license plate that was "offensive to good taste"); Morgan v. Martinez, No. 3:14-02408, 2015 WL 2233214 at *8 (D.N.J. May 12, 2015) (finding that vehicle owner seeking 8THEIST plate had stated a claim in facial challenge to New Jersey's "offensive to good taste and decency" plate regulation); Matwyuk v. Johnson, 22 F. Supp. 3d 812, 822–24 (E.D. Mich. 2014) (same, citing Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147, 150-51 (1969)). Defendants' "need" guideline that there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue

or deny a pistol permit" lacks the "narrow, objective,  and definite standards" necessary for a licensing scheme and is therefore unconstitutional.

The Attorney General's "factors" for denying a carry permit under Section 11-47-18(a) run afoul of the prohibition against unbridled discretion. "[A]dministrators may not possess unfettered discretion to burden or ban speech, because without standards governing the exercise of discretion, a government  official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 763-64 (1988). Boundless rules run the risk that the government will use seemingly innocuous standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." Child  Evangelism Fellowship of Maryland, Inc. v. Montgomery Co. Pub. Sch. Dist., 457 F.3d 376, 386  (4th Cir. 2006). Such a scheme may  not delegate overly  broad discretion to  government officials. Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130–31 (1992) (requiring "narrow, objective, and definite standards to guide the licensing authority").

The Supreme Court in Shuttlesworth v. City of Birmingham explained that "many decisions of this Court over the last 30 years, [have held] that a law subjecting  the  exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is  unconstitutional."  394 U.S. 147, 150–51 (1969). Section 11-47-18(a)

lacks objective criteria, allowing the Attorney General to deny carry permits based on ambiguous, subjective, arbitrary, and discriminatory reasons. The Attorney General has reserved for himself the unfettered ability to deny any permit because he has no "set formula or criteria to limit or restrict [his] decision to issue or deny a pistol permit."  Accordingly, the Attorney General can make unpublished and inconsistent decisions respecting carry permits, and no one will be the wiser. Here, the Attorney General denied the renewal of a permits his predecessors had previously renewed because of a supposed lack of need based on a criterion he essentially invented for these applications. Accordingly, Section 11-47-18(a) is unconstitutionally vague and overbroad and Appellees' application and enforcement of it is unconstitutionally arbitrary and capricious.

The District Court erred by selectively relying on state law to determine whether Rhode Island's licensing scheme comported with the due process requirements of the Fourteenth Amendment. O'Neil, 2025 WL 2197313 at *2, 4-5. First, the court said that: "Under Rhode Island law, permits of this nature are a privilege and there is no constitutionally protected liberty interest in protecting one." Id. at *1, citing Mosby, 851 A.2d at 1048. However, Mosby recognized that under the Rhode Island Constitution, Art. 1, §22, there was "an individual right flowing to

the people to keep and bear arms." <u>Mosby</u> 851 A.2d at 1043.[12] Regardless, <u>Bruen</u>,

<u>Heller</u>, and <u>McDonald v. City of Chicago</u>, 561 U.S. 742 (2010), establish a federal

liberty right. Accordingly, Appellants have a liberty interest in their right to open

carry.

Further, the Rhode Island Supreme Court has recognized that there can be a

property interest in the renewal of a license. See, <u>Vars v. Citrin</u>, 470 F.3d 413, 414-

15, (1st Cir. 2006), citing <u>Beacon Rest., Inc. v. Adamo</u>, 103 R.I. 698, 241 A.2d 291,

294 (1968). See also, William J. Brennan, "State Constitutions and the Protection of

Individual Rights, 90 Harv.L.Rev. 489, 492 (1977) ("[P]roperty has come to

embrace such crucial expectations as a driver's license…").

Regardless, state due process law does not determine the standards by which

due process is analyzed under the Fourteenth Amendment. See, <u>LaBaurve v.</u>

<u>Louisiana Wildlife & Fisheries Comm.</u>, 444 F.Supp. 1370, 1378 (E.D.La. 1978),

citing <u>Board of Regents v. Roth</u>, 408 U.S. 567, 571 (1972); <u>Skehan v. Board of</u>

<u>Trustees of Bloomsburg State College</u>, 431 F.Supp. 1379, 1387 (M.D.Penn. 1997);

<u>Johnson v. Board of Regents of University of Wisconsin System</u>, 377 F.Supp. 227,

235 (W.D.Wisc. 1974) ("A determination by the state courts as to what procedural

protections, if any, are required by state law…would not determine the question

---

[12] The court decided it need not determine the extent of that right in the context of
the case. <u>Id</u>.

whether the procedural requirements of the Fourteenth Amendment had been satisfied.").

Here, with respect to the Appellants' void-for-vagueness challenge to the phrase "proper showing of need," the District Court said first that the Attorney General had provided policy guidance. However, that guidance does not include whether the applicants have a municipal CCW permit. Moreover, that guidance says there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit." In other words, "need" is whatever the Attorney General says it is.

Then, the District Court quotes <u>Mosby</u> which says: "As a matter of policy, this Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency." <u>Id.</u> at 1050. But that is precisely the discretion the RIAG now asserts. The fact that the Rhode Island Supreme Court declined, without explanation, to review the denials of Appellants' renewal applications demonstrates why state court rulings on state law do not determine the due process protection afforded by the Fourteenth Amendment.

Next, the District Court asserts that the RIAG's "interpretive safeguards" mean that the law is not impermissibly vague. The District Court then cites <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S. at 155, for the proposition that a "state Supreme Court may construe a discretionary permitting provision in a way

37

that satisfied due process."

But Shuttlesworth proves Appellants' point. In that case, Shuttlesworth, an African American minister, applied to the City for a parade permit to protest the denial of civil rights to African Americans in the City. The City's ordinance said a permit would be granted unless "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." Shuttlesworth's request was refused. Nonetheless, he and others proceeded with an orderly parade, and he was convicted of violating the City's ordinance and sentenced to 90 days imprisonment at hard labor and a fine. The Alabama Court of Appeals overturned the conviction holding it was applied in a discriminatory manner and was a prior restraint. The Alabama Supreme Court interpreted the ordinance in a very narrow fashion and reinstated the conviction.  The Supreme Court granted certiorari.

The Court said the ordinance as written was undoubtedly unconstitutional:

> [I]t is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

Id. at 151. The Court then considered whether the Alabama Supreme Court's narrow interpretation of the ordinance rescued it. It said that narrow interpretation in 1967 did not make constitutionally valid the denial of the parade application in 1963. The

Court said the marchers were entitled to assume that the ordinance meant what it said in 1963 and that meaning was unconstitutional, so it did not constrain them. Id. 156-59. The Court overturned the judgment of the Alabama Supreme Court.

Here, although in Mosby the Rhode Island Supreme Court said it would not countenance an interpretation of the statute that gives an executive department unfettered discretion to deny firearms applications, that is exactly what it did when it denied Appellants' petitions for certiorari without explanation. It made no attempt to impose a constitutional interpretation on the statute or RIAG's guidelines. The statute, as interpreted by those guidelines, is unconstitutionally vague.

With respect to Appellants' challenge that the statute is overly broad, the District Court said overbreadth challenges do not apply to the Second Amendment. O'Neil, 2025 WL 2197313 at *5, citing Hightower v. City of Boston, 693 F.3d 61, 81 (1ˢᵗ Cir. 2012). Hightower distinguished First Amendment authority saying it does not apply in the context of the Second Amendment. That is a distinction the Supreme Court rejected in Bruen. 597 U.S. at 24-25. Moreover, as the District Court noted, Hightower was a facial challenge, not the as-applied challenge raised by Appellants. Lastly, and perhaps, most importantly, Hightower's application to renew her permit was denied because she had lied on her original application. Here, there is no evidence that the Appellants have been untrustworthy nor has the RIAG said so.

For these reasons, Section 11-17-18, which requires a "proper showing of need," and Appellees' firearms carry permitting scheme, which says there is "no set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit," are both overbroad and void for vagueness and violate the Fourteenth Amendment.

### III. THE DISTRICT COURT ERRED AS A MATTER OF LAW WHEN IT DENIED APPELLANTS' MOTION IN LIMINE.

The District Court erred as matter of law when it denied Appellants' Motion in limine respecting Appellees' historical evidence and expert testimony. Pursuant to F.R.E. 103, 403, 702, and 703, as well as F.R.Civ.P. 56(c)(2), Appellants moved to exclude evidence from the so-called Duke Repository of firearms laws because it is inadmissible hearsay and otherwise unreliable evidence, and to exclude the expert testimony of Appellees' expert, Robert Spitzer, because he relied on "facts" or "data" which were not inherently reliable, particularly the Duke Repository, and his opinions are not otherwise based on a reliable methodology. Appellants supported their motion with a 33-page declaration by Cramer detailing numerous methodological and factual errors in Spitzer's expert declaration, many of which resulted from his reliance on inaccurate, incomplete, or misleading information in the Duke Repository. (App.494-526).

The Repository is hearsay under F.R.E 802 because it is an out-of-court statement being offered for the truth of the matter asserted, i.e., that it is an accurate

statement of state statutes and local ordinances promulgated by various jurisdictions many years ago. F.R.E. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); Smith v. Ford Motor Co., 749 F.Supp.2d 980, 992 (N.D.Cal. 2010) (holding that customer complaints evidence from Ford's customer service databases were inadmissible hearsay).

Further, none of the exceptions in the Federal Rules of Evidence apply to it. Unlike statutes and ordinances compiled and published by a state or local government, the Repository is not a public record because it is not a record of a public office nor was it prepared under the supervision of public officers. F.R.E. 803(8); Cooper v. Meritor, 363 F.Supp.3d 965, 900 (N.D.Miss. 2019); Sobel v. Hertz Corp., 291 F.R.D. 525, 533 (D.Nev. 2013), affirmed in part, vacated in part on other grounds, 674 Fed.Appx. 663 (9th Cir. 2017). There is no indication that the Repository constitutes records of a regularly conducted activity, i.e., business records, because the records have not been authenticated by a custodian or other qualified witness as the records of a regularly conducted activity. F.R.E. 803(6); U.S. v. Kimble, 54 F.4th 538, 545 (8th Cir. 2022); U.S. v. Blechman, 657 F.3d 1052, 1065-66 (10th Cir. 2011). Nor is there any information that it would fit within a residual exception to the hearsay rule. F.R.E. 807; U.S. v. Rom, 528 Fed.Appx. 24, 28 (7th

Cir. 2023) (uncertified evidence from the Massachusetts Registry of Motor Vehicles database not admissible without the requisite circumstantial guarantees of trustworthiness).

Moreover, while experts may in some circumstances rely on evidence that is not otherwise admissible, F.R.E. 703, that does not make the Duke Repository evidence admissible. To the contrary, Rule 703 says: "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion <u>substantially outweighs</u> their prejudicial effect." (emphasis added). Here, the probative value does not substantially outweigh the prejudicial effect. See, <u>Beam v. Watco Transloading, LLC</u>, 639 F.Supp.3d 791, 800 (S.D.Ill. 2022) (database used by expert was not a reliable source of information as to reasonable and customary medical charges where the information in the database came from insurance companies, not health care providers, the information was used to determine reimbursement rates, and the data in the database was incomplete).

There are simply too many unanswered questions about the reliability of the Duke Repository:

- Why does the Repository have the caveat: "Conscientious users of this repository should supplement their results with further historical research"?

- What is the intended purpose of the Repository?

- Who obtains the purported laws that are included?

- What is known about these people's qualifications and motives?

- To what extent do those people verify the accuracy of the substantive content and citation for the material submitted?

- Does the Repository verify the purported laws that are included?

- Who edits the purported laws?

- What standards does the Repository use for determining what to include and how to edit?

- Does the Repository consider or investigate or report whether a law has been amended, repealed, or overruled?

Moreover, Cramer has pointed out numerous errors in the Repository with respect to Spitzer's citations. (App.496-97,507-08,510,514,523,525).

Spitzer's expert opinions are not admissible evidence because they are based on unreliable facts or data, i.e., the Duke Repository and HeinOnline, and are the product of an unreliable methodology. F.R.E. 702, 703; Beam v. Watco Transloading, LLC, 639 F.Supp.2d at 800 (excluding expert's opinion where she relied on information from an unreliable database); Bruno v. Bozzuto's, Inc., 311 F.R.D. 124, 144 (M.D.Penn. 2015); Swierczynski v. Arnold Foods Co., 265 F.Supp.2d 802, 811-12 (E.D. Mich. 2003) (expert's reliance on database that expressly disclaimed accuracy of information in database made expert's opinion

43

unreliable and inadmissible); <u>Stender v. Lucky Stores, Inc.</u>, 803 F.Supp. 259, 329 (N.D.Cal. 1992) (excluding expert's opinion where she relied on an unreliable database of information); <u>Stricker v. Secretary of Health and Human Services</u>, 170 Fed.Cl. 701, 717-18 (Ct.Cl. 2024) (same); see also, <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997) (Neither <u>Daubert</u> nor "the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude there is simply too great an analytic gap between the data and the opinion proffered.").

Rule 702 requires that an expert's opinion must be based on sufficient facts or data, it must be the product of reliable principles and methods, and it must reflect a reliable application of the principles and methods to the facts of the case. F.R.E. 702. Under Rule 703, an expert may rely on facts or data not otherwise admissible <u>if</u> "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." F.R.E. 703; <u>Bruno v. Bozzuto's, Inc.</u>, 311 F.R.D. 124 (M.D.Penn. 2015), is a leading case on the admissibility of expert testimony based on unreliable facts. In that case, the owner of a supermarket sued a supplier for breach of contract by which plaintiff's store would have become a store within defendants' wholesale grocery and general merchandise network, and alleged lost profits. However, the store's owners had destroyed the store's financial records before filing suit. Plaintiffs' experts relied on pro forma financial projections

respecting plaintiffs' store which had been prepared by defendant. Defendants

asserted the pro forma projections were unreliable because the projected sales

figures in them were grossly overstated relative to the sales plaintiffs' business

actually realized, defendants had internally rejected the pro forma figures, and

defendants had not used the pro forma to project sales or potential damages.

Plaintiffs' experts acknowledge that they had relied on the data in the pro forma

projections without attempting to verify their accuracy.

The court reviewed the applicable law, such as Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526

U.S. 137 (1999); and In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir.

1994), as well as another decision in the Pennsylvania federal courts with similar

facts, Legendary Art, LLC v. Godard, 2012 WL 3550040 (M.D.Penn. Aug. 17,

2012).  The court concluded:

> [F]ederal courts that have opined on this particular evidentiary issue
> have made certain important points about complete reliance on
> secondary sources. First, the expert must conduct some sort of
> independent investigations or verification to ensure that the data he or
> she plans to use is both accurate and helpful to the court in light of the
> disputed issues. Second, that investigation should be sufficiently
> thorough such that the expert has gained a working familiarity with the
> borrowed data so that the expert can demonstrate the data's reliability.
> Blind adherence to data of unknown origin does not suffice in federal
> court.

Id. at 144. The court granted the motion to exclude plaintiff's expert reports in full.

Id.

Here, Cramer sets forth, in sum, that although Spitzer claims expertise in the history of arms regulation, examination of his sources shows a lack of expertise in history and even basic scholarship. (App.496). Spitzer has relied on secondary sources, i.e., the Duke Repository and HeinOnline, instead of looking at the primary sources for these laws. (Id.). (As set forth previously, the Duke Repository is not reliable). Spitzer has made statements of fact based on quoting out-of-context sections of laws rather than reading the law in full. Spitzer has cited laws that do not exist at the specified locations. (Id.). Those citations are often identical to those in the Duke Repository. Spitzer cites laws in several places as if he had consulted those non-existent primary sources. (Id.). (He clearly understands that secondary sources need to be identified as such by identifying some citations in his declaration as, "Quoted in *Young v. Hawaii*, 992 F.3d 765, 794 (9th Cir. 2021)). Spitzer has quoted laws without awareness of the larger historical context in which they were passed and thus misses the historical significance of these laws. (Id.).

In other words, Spitzer did not use sufficient facts or data in performing his analysis, his analysis was not based on a reliable methodology, and his opinions do not reflect a reliable application of the methods to the facts of the case. For these reasons, the District Court should have excluded evidence from the Duke Repository and Spitzer's expert testimony.

# CONCLUSION

This Court should reverse the district court's order and judgment granting summary judgment for Appellees and denying the Appellants' motion for summary judgment. Alternatively, the Court should reverse the district court's grant of summary judgment for Appellees and remand the case for further proceedings.

**APPELLANTS,**
By their attorneys,

*/s/ Thomas W. Lyons*                          */s/ Frank R. Saccoccio*
Thomas W. Lyons                                Frank R. Saccoccio Esq.
Strauss, Factor, Laing & Lyons                 Saccoccio Law Office
One State Street, Suite 600                     928 Atwood Avenue
Providence, RI 02903                           Johnston, Rhode Island 02919
(401) 456-0700                                 (401) 944-1600 * 942-8921 Fax
tlyons@straussfactor.com                       Frank.CSLawOffice@gmail.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the requirements of Rule 32(g)(1) because, excluding the parts of the brief exempted by Fed.R.App. P. 32(f), this brief contains 11,306 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in a proportionally spaced typeface using Times New Roman in 14-point font.

*/s/ Thomas W. Lyons*

Attorney Plaintiffs-Appellants
Dated: October 24, 2025

## CERTIFICATE OF SERVICE

On October 24, 2025, I caused the within motion to be filed electronically and it is available for viewing and downloading from the ECF system.

*Thomas W. Lyons*

**ADDENDUM**

Memorandum and Order of the district court……………………………………...50

Final Judgment…………………………………………………………………….55

KeyCite Blue-Striped Flag

Appeal Filed by O'Neil, et al v. Neronha, et al., 1st Cir., August 28, 2025

2025 WL 2197313
Only the Westlaw citation is currently available.
United States District Court, D. Rhode Island.

Michael P. O'NEIL, et al., Plaintiffs,

v.

Peter F. NERONHA, et al., Defendants.

C.A. No. 23-070 WES
|
Signed August 1, 2025

**Attorneys and Law Firms**

Frank R. Saccoccio, Saccoccio Law Office, Johnston, RI, Thomas W. Lyons III, Strauss, Factor, Laing & Lyons, Providence, RI, for Plaintiffs Michael O'Neil, Joseph Patton, Richard Cook, Daniel Patterson, Peter Tremeentozzi, Donald Labriole, Richard Laporte.

James J. Arguin, Paul Timothy James Meosky, Sarah Rice, RI Department of Attorney General, Providence, RI, for Defendants Peter F. Neronha, State of Rhode Island.

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Senior District Judge.

**\*1** This is a case about the scope of the Second Amendment, in which Plaintiffs sue the State of Rhode Island and its Attorney General ("AG") for denying them permits to openly carry a handgun in public. Pending before the Court are the parties' cross motions for summary judgment, and three related evidentiary motions. The Court has determined that no hearing is needed. For the reasons explained below, the Court GRANTS Defendants' Motion for Summary Judgment, Dkt. No. 34; and DENIES (1) Plaintiffs' Motion for Summary Judgment, Dkt. No. 31, (2) Plaintiffs' Motion in Limine, Dkt. No. 33, (3) Defendants' Motion for Judicial Notice, Dkt. No. 44, and (4) Defendants' Motion to Strike, Dkt. No. 50.

**I. BACKGROUND**

The Rhode Island Firearms Act, R.I. Gen. Laws §§ 11-47-1 to -64, "regulate[s] the possession and use of an array of

weapons, including pistols, rifles and other deadly weapons." Mosby v. Devine, 851 A.2d 1031, 1045 (R.I. 2004). "The purpose of the Firearms Act is 'to prevent criminals and certain other persons from acquiring firearms generally and handguns in particular without at the same time making unduly difficult such acquisition for other members of society.' " Id. at 1050 (quoting State v. Storms, 308 A.2d 463, 466 (R.I. 1973)). In general, it requires a permit to publicly carry a handgun. R.I. Gen. Laws § 11-47-8.

To obtain a handgun permit, the Act establishes "[t]wo separate and distinct licensing procedures." Mosby, 851 A.2d at 1047. The first, set out in § 11-47-11, "is mandatory – an applicant who meets the criteria set forth in § 11-47-11 is entitled to a gun permit." Id. Local officials issue these permits and are limited to issuing only concealed carry permits ("restricted permits"). R.I. Gen. Laws § 11-47-11.

The second procedure, detailed in § 11-47-18, "provides for the discretionary grant of a firearms license by the [AG] 'upon a proper showing of need.' " Mosby, 851 A.2d at 1047 (quoting R.I. Gen. Laws § 11-47-18). These discretionary permits authorize both open and concealed carry ("unrestricted permits"). R.I. Gen. Laws § 11-47-18. Under Rhode Island law, permits of this nature are a privilege and there is no constitutionally protected liberty interest in obtaining one. Mosby, 851 A.2d at 1048-49.

Neither § 11-47-18 nor any other section of the Act defines the term "proper showing of need," but the AG has issued policy guidance with a non-exclusive list of factors that he considers. Defs.' Statement Undisputed Facts ("DSUF") ¶¶ 2, 4, Dkt. No. 35. But the AG retains "discretion to refuse a license even if a person makes 'a proper showing of need.' " Mosby, 851 A.2d at 1048. Although this discretion is broad, it is not unlimited; the AG "must adhere to minimum procedural requirements when rejecting an application." Id. at 1051. "A rejected applicant is entitled to know the evidence upon which the [AG] based [his] decision and the rationale for the denial." Id. The AG's decision is also subject to judicial review for legal error. Id.

\* \* \*

**\*2** Plaintiffs in this case are seven residents and citizens of Rhode Island. 2d Am. Verified Compl. ("Operative Compl.") ¶¶ 1-7, Dkt. No. 21. Each possesses a restricted permit. Pls.' Statement Undisputed Facts ("PSUF") ¶¶ 4-5, Dkt. No. 32.

And each previously possessed an additional unrestricted permit. Id. ¶ 4. But in 2021, the AG denied all their renewal applications for these unrestricted permits, finding that they did not need them because they already had restricted permits. Id. ¶ 7. Plaintiffs appealed their application denials and, following a hearing, the AG again denied their renewal applications. Pls.' Additional Statement Undisputed Facts ("PSAUF") ¶¶ 5, 7, Dkt. No. 41.

### C. Procedural History

Plaintiffs filed this lawsuit in February 2023. See generally Compl., Dkt. No. 1. Their Operative Complaint has two counts. In Count I, they allege that Defendants are liable under 42 U.S.C. § 1983 because the denial of their unrestricted permit applications violated their Second Amendment rights. Operative Compl. ¶¶ 57-75. And in Count II, they state two separate claims. First, they allege that Defendants are liable under § 1983 because the denial of their applications violated their Fourteenth Amendment due process rights. Id. ¶¶ 76-82. Second, they claim that the denial violated their due process rights under Article 1, § 2 of the Rhode Island Constitution. Id. Plaintiffs challenge the Firearms Act's permitting structure only to the extent that Defendants applied it to deny them unrestricted permits. Pls.' Obj. Defs.' Mot. ("Pls.' Obj.") 2, Dkt. No. 39.

For relief, Plaintiffs ask the Court for an order (1) enjoining Defendants to issue unrestricted permits to Plaintiffs; (2) declaring that § 11-47-18 of the Act violates the Second Amendment insofar as it requires a "proper showing of need"; (3) declaring that the process for obtaining an unrestricted permit violates the due process guarantees of the Fourteenth Amendment and Article 1, § 2 of the Rhode Island Constitution; and (4) awarding Plaintiffs costs of this lawsuit. Operative Compl. 14.

Plaintiffs and Defendants cross move for summary judgment. See generally Pls.' Mot. Summ. J. ("Pls.' Mot."), Dkt. No. 31; Defs.' Mot. Summ. J. ("Defs.' Mot."), Dkt. No. 34.

### II. LEGAL STANDARD

The Court must grant summary judgment to either party if they show "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.' " Quintana-Dieppa v. Dep't of the Army, 130 F.4th 1, 7 (1st Cir. 2025) (quoting Doe v.

Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). A fact is material when it has "the 'potential to affect the outcome of the suit under the applicable law.' " Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)).

The Court must view " 'the entire record in the light most hospitable to the [nonmoving party],' " drawing " 'all reasonable inferences in that party's favor.' " Id. (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). But it shall not rely on " 'conclusory allegations, improbable inferences, [or] unsupported speculation.' " Id. (alteration in original) (quoting Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### III. DISCUSSION

Applying this standard to the applicable law and facts, the Court finds that Defendants are entitled to summary judgment on Counts I and II.

### A. Count I: Section 1983 Second Amendment Claim

The Court begins with Count I, Plaintiffs' § 1983 Second Amendment claim. Plaintiffs move for summary judgment, arguing that they "have a constitutional right to engage in open carry of firearms," which cannot be lawfully conditioned upon their ability to show sufficient "need." Pls.' Mem. Supp. Pls.' Mot. ("Pls.' Mem.") 17, 29, Dkt. No. 31-1. Defendants also move for summary judgment, contending that the Act's permitting structure – as applied to Plaintiffs – satisfies the Second Amendment because it provides Plaintiffs the right to concealed carry. Defs.' Mem. Reasons Supp. Defs.' Mot. ("Defs.' Mem.") 17, Dkt. No. 34-1.

**\*3** Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held that this provision "confer[s] an individual right to keep and bear arms," District of Columbia v. Heller, 554 U.S. 570, 595 (2008); and further that the term "bear Arms" includes "carrying handguns publicly," N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 32 (2022).

"To assess plaintiffs' claim that Rhode Island's [permitting structure] violates the Second Amendment," the Court must first "consider whether 'the Second Amendment's plain text covers' the [plaintiffs' proposed conduct]." Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 43 (1st Cir. 2024) (quoting Bruen, 597 U.S. at 17). "If it does, the

Court] then consider[s] whether Rhode Island's [permitting structure] is 'consistent with this Nation's historical tradition of firearm regulation' and thus permissible under the Second Amendment." Id. (quoting Bruen, 597 U.S. at 17).

The parties disagree as to the threshold question of whether the text of the Second Amendment covers open public carry of firearms. Pls.' Mem. 17-29; Defs.' Mem. 19-22. And while Bruen held that the Second Amendment's plain text protects "carrying handguns publicly for self-defense," 597 U.S. at 32, it did not go so far as to declare that the text requires open carry. See Baird v. Bonta, 709 F. Supp. 3d 1091, 1125 (E.D. Cal. 2023).

But the Court need not dive too deeply into this question because, even assuming the text covers open carry, Defendants' application of the Firearms Act to regulate Plaintiffs' manner of public carry is within the Nation's historical tradition of regulation. Plaintiffs' argument to the contrary is foreclosed by Bruen itself. There, the Supreme Court concluded that "[t]he historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation." Bruen, 597 U.S. at 59. And it drew that conclusion, in part, from its finding that historically, "States could lawfully eliminate one kind of public carry – concealed carry – so long as they left open the option to carry openly." Id. The Firearms Act, through its permitting structure, does just this, albeit in reverse: it regulates Plaintiffs' manner of public carry in that it limits their right to open carry but leaves unaffected their right to concealed carry.[1]

[1]    The Court also notes that in Bruen, the Supreme Court counted forty-three states in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." 597 U.S. at 13. It included Rhode Island in this list. Id. at 13 n.1 (first citing R.I. Gen. Laws § 11-47-11; and then citing Gadomski v. Tavares, 113 A.3d 387, 392 (R.I. 2015)). Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately "to underscore" the fact that "the Court's decision does not affect" these forty-three state permitting structures. Id. at 79 (Kavanaugh, J., concurring).

Plaintiffs make much of the fact that the Act's permitting structure reverses common historical regulations allowing open carry and limiting concealed carry. See Pls.' Mem.

17-29. But the Second Amendment is not "a law trapped in amber." United States v. Rahimi, 602 U.S. 680, 691 (2024). Per the Supreme Court's direction in Rahimi, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' " Id. at 692 (alteration in original) (quoting Bruen, 597 U.S. at 29). In doing so, the Court concludes that Defendants' application of the Act's permitting structure to Plaintiffs is relevantly similar to historical regulations, and thus consistent with the Second Amendment.[2]

[2]    The Court's decision rests on the binding precedent set by the Supreme Court in Bruen, 597 U.S. 1, and Rahimi, 602 U.S. 680. Thus, the Court need not undertake its own review of historical laws regulating the public carry of firearms. For that reason, the parties' evidentiary motions are not material to its decision. See Pls.' Mot. Limine, Dkt. No. 33; Defs.' Mot. Judicial Notice, Dkt. No. 44; Defs.' Mot. Strike, Dkt. No. 50.

**B. Count II**

**\*4**  The Court now turns to Count II, in which Plaintiffs sue Defendants for allegedly violating their due process rights under (1) the Fourteenth Amendment (via § 1983) and (2) Article 1, § 2 of the Rhode Island Constitution.

**1. Section 1983 Fourteenth Amendment Due Process Claim**

Plaintiffs move for summary judgment on their § 1983 Fourteenth Amendment claim, arguing that § 11-47-18 is unconstitutionally "vague and overbroad," insofar as it requires them to make a "proper showing of need." Pls.' Mem. 32-37. Defendants also seek summary judgment, claiming that Plaintiffs (1) do not have a protected liberty or property interest in an unrestricted permit, Defs.' Mem. 39-40, and (2) even if they do, "the statutory procedures relating to the [AG's] denial of their § 11-47-18 applications" were sufficient, id. at 41.

The parties' arguments seem to reflect a lack of shared understanding as to the nature of Plaintiffs' due process challenge. Plaintiffs, in their Operative Complaint, appeared to frame their lawsuit as making procedural due process, vagueness, and overbreadth challenges. Operative Compl. ¶¶ 77-82. Further, Plaintiffs initially appeared to raise both as-

applied and facial challenges to the Firearms Act's permitting structure. Id. ¶¶ 80-81.

But Plaintiffs' responsive briefing to Defendants' Motion resolves at least some of this confusion, clarifying that they are not attempting to make a procedural due process challenge or a facial challenge. Pls.' Obj. 2. Rather, they raise only "an as-applied challenge" to Defendants' denial of their unrestricted permit applications for being allegedly "unconstitutionally vague and overbroad." Id.

Plaintiffs' vagueness challenge falls short. "The vagueness inquiry ... incorporates two basic concerns: 1) concerns about fair notice, and about the related danger of chilling expression, and 2) concerns about excessive discretion being invested in administering and enforcing officials." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir. 2004) (collecting cases). The first concern "classically arises where the government imposes criminal sanctions for conduct or speech." Id. at 94. "And the concern over subjective decision making has most effect in government licensing schemes." Id.

Plaintiffs argue that neither § 11-47-18 nor the AG's policy guidance sufficiently defines the phrase "proper showing of need." Pls.' Obj. 29. They also say that Defendants' denial of their unrestricted permit applications was "arbitrary and capricious." Id. These claims clearly implicate the vagueness doctrine's concern with vesting excessive discretion to government officials.

As an initial matter, it is not clear that the void for vagueness doctrine applies to permit denials such as those at issue in this case. To the Court's knowledge, its application to permitting procedures has only occurred in the First Amendment context. See Ridley, 390 F.3d at 93-95 (collecting cases).

But even assuming the vagueness doctrine applies to a permitting scheme in the Second Amendment context, the AG's application of § 11-47-18 survives scrutiny. The Court agrees that the phrase "proper showing of need" in § 11-47-18, "if read in a vacuum, might be problematic." URI Student Senate v. Town of Narragansett, 631 F.3d 1, 14 (1st Cir. 2011). But the phrase here does not occur in a vacuum. Rather, the AG provides policy guidance interpreting the phrase. DSUF Ex. A, at 3-5, Dkt. No. 35-1. And further, the Rhode Island Supreme Court has construed the phrase to find that, in exercising his discretion, the AG is "a finder of fact, not a master of puppets." Mosby, 851 A.2d at 1050. Indeed, the Mosby court went out of its way to explain that:

*5   As a matter of policy, this Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency. Although the court's authority to review the decision is limited, it is not nonexistent. One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon. The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of an unreviewable unrestricted licensing scheme. Such review is available through a common-law writ of certiorari.

Id. at 1050-51. And to facilitate judicial review, the Mosby court held that "the [AG] must adhere to minimum procedural requirements when rejecting an application filed under § 11-47-18," including informing a denied permit applicant of "the evidence upon which the department based its decision and the rationale for the denial." Id. at 1051.

Considering that, in Rhode Island, an unrestricted license is a privilege and not a right, these interpretive safeguards add clarity to the statute and do not mean that the law is impermissibly vague. See Ridley, 390 F.3d at 94-95 (collecting cases showing that "[e]xcessive discretion and vagueness inquiries ... are not static inquiries, impervious to context"); see also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 155 (1969) (accepting that a state Supreme Court may construe a discretionary permitting provision in a manner that satisfies due process).

Plaintiffs' overbreadth challenge fares no better. "The overbreadth doctrine is 'a ... type of facial challenge,' under which a law may be invalidated under the First Amendment 'as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " Hightower v. City of Boston, 693 F.3d 61, 81 (1st Cir. 2012) (quoting United States v. Stevens, 559 U.S. 460, 473 (2010)) (internal quotation marks omitted). In harmony with these principles, the First Circuit has explicitly held that there is no overbreadth challenge in the context of the Second Amendment. Id. at 82-83 (collecting cases). True, Plaintiffs say that their claim is as-applied challenge, and Hightower dealt with a facial challenge. Id. But to the extent, if any, that an overbreadth challenge exists on an as-applied basis, the Court sees no reason why it would apply in the Second Amendment context.

**2. Rhode Island Constitutional Due Process Claim**

Defendants ask for summary judgment on Plaintiffs' Article 1, § 2 due process claim. They argue that the claim fails "because no direct cause of action exists [to enforce it] under the state constitution." Defs.' Mem. 43. While the Court does not necessarily agree with that proposition, Defendants are entitled to summary judgment nonetheless.

Article 1, § 2 states in relevant part: "No person shall be deprived of life, libery or property without due process of law ...." R.I. Const. art. 1, § 2. This provision provides due process protections similar to those provided by the Fourteenth Amendment. See Doe v. Brown Univ., 253 A.3d 389, 399 (R.I. 2021). But Rhode Island law does not provide a separate, private cause of action to enforce this provision, as federal law does to enforce the Fourteenth Amendment via § 1983.

The Rhode Island Supreme Court has held that Article 1, § 2 does not create a private cause of action for money damages. Doe, 253 A.3d at 401. But as Plaintiffs note, this case differs from Doe because they seek equitable relief and not damages. Pls.' Obj. 34. And they cite numerous cases which appear to show that Rhode Island case law places no bar to constitutional claims seeking equitable relief. Id. at 31-32 (collecting cases); see, e.g., Moreau v. Flanders, 15 A.3d 565,

574, 581-82 (R.I. 2011) (finding plaintiffs had standing to raise constitutional claims to state action, including an Article 1, § 2 claim, in a case where plaintiffs sought declaratory and injunctive relief).

**\*6** But interesting as the issue may be, whether Plaintiffs have the right to sue on the state constitutional claim is little more than academic: Because Plaintiffs' claim here mirrors their § 1983 Fourteenth Amendment claim, it fails on the merits for the same reasons discussed above.

## IV. CONCLUSION

For the reasons explained above, Defendants are entitled to summary judgment on Counts I and II of Plaintiffs' Operative Complaint. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment, Dkt. No. 34; and DENIES (1) Plaintiffs' Motion for Summary Judgment, Dkt. No. 31, (2) Plaintiffs' Motion in Limine, Dkt. No. 33, (3) Defendants' Motion for Judicial Notice, Dkt. No. 44, and (4) Defendants' Motion to Strike, Dkt. No. 50.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 2197313

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF RHODE ISLAND

MICHAEL O'NEIL, ET AL.

      Plaintiffs,

      v.                      1:23-cv-00070-WES

PETER F. NERONHA, ET AL.

      Defendants.

## JUDGMENT

This action came to be heard before the Court and a decision has been rendered. Upon consideration whereof, it is now hereby ordered, adjudged, and decreed as follows:

Pursuant to this Court's Memorandum and Order entered on August 1, 2025, and in accordance with Fed. R. Civ. P. 58, judgment is entered in favor of the Defendants Peter F. Neronha, et al. and against Plaintiffs Michael O'Neil, et al.

It is so ordered.

August 1, 2025           By the Court:

                          /s/ Hanorah Tyer-Witek
                          Clerk of Court