# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

## No. 25-1814

**MICHAEL O'NEIL; JOSEPH PATTON; RICHARD COOK; DANIEL PATTERSON; PETER TREMENTOZZI; DONALD LABRIOLE' RICHARD LAPORT**

**Plaintiffs-Appellants**

**v.**

**PETER F. NERONHA, in the official capacity as Attorney General of the State of Rhode Island; STATE OF RHODE ISLAND**

**Defendants – Appellees**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

_____

## APPENDIX OF PLAINTIFFS-APPELLANTS

_____

Thomas W. Lyons
Strauss, Factor, Laing & Lyons
One State Street, Suite 600
Providence, RI 02908
(401) 456-0700
tlyons@straussfactor.com

Frank R. Saccoccio Esq.
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

# **TABLE OF CONTENTS**

1.  District Court Docket Report…………………………………………………………………1

2.  Notice of Appeal……………………………………………………………………………..9

3.  Second Amended Complaint………………………………………………………………10

4.  Plaintiffs' Statement of Undisputed Facts………………………………………………25

5.  O'Neil Declaration…………………………………………………………………………42

6.  Trementozzi Declaration…………………………………………………………………44

7.  Laporte Declaration………………………………………………………………………46

8.  Patterson Declaration……………………………………………………………………48

9.  Labriole Declaration……………………………………………………………………...50

10. Patton Declaration………………………………………………………………………...52

11. Cook Declaration…………………………………………………………………………...54

12. Cramer Expert Declaration………………………………………………………………56

13. Rivas Expert Declaration…………………………………………………………………69

14. Spitzer Expert Declaration………………………………………………………………...124

15. Spitzer Declaration Exhibit C……………………………………………………………...163

16. Spitzer Declaration Exhibit B……………………………………………………………...438

17. Rivas Deposition Excerpts,,,………………………………………………………………440

18. Spitzer Declaration Excerpts………………………………………………………………459

19. Cramer Daubert Declaration………………………………………………………………494

APPEAL

## U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: 1:23-cv-00070-WES-PAS

O'Neil v. Neronha et al
Assigned to: District Judge William E. Smith
Referred to: Magistrate Judge Patricia A. Sullivan
Demand: $7,500,000
Case in other court: First Circuit, 25-01814
Cause: 28:1331 Fed. Question: Civil Rights Violation

Date Filed: 02/15/2023
Date Terminated: 08/01/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 02/15/2023 | 1 | COMPLAINT ( filing fee paid $ 402.00, receipt number ARIDC-1840767 ), filed by Michael O'Neil. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit)(Lyons, Thomas) (Entered: 02/15/2023) |
| 02/15/2023 | 2 | Civil Cover Sheet filed by Michael O'Neil. Regarding New Case: 1 Complaint, . (Lyons, Thomas) (Entered: 02/15/2023) |
| 02/15/2023 |  | Case assigned to District Judge William E. Smith and Magistrate Judge Patricia A. Sullivan. (Kenny, Meghan) (Entered: 02/15/2023) |
| 02/15/2023 | 3 | CASE OPENING NOTICE ISSUED (Kenny, Meghan) (Entered: 02/15/2023) |
| 02/20/2023 | 4 | NOTICE of Appearance by Frank R. Saccoccio on behalf of All Plaintiffs (Saccoccio, Frank) (Entered: 02/20/2023) |
| 03/02/2023 | 5 | NOTICE of Appearance by Samuel Ackerman on behalf of Peter F. Neronha, State of Rhode Island (Ackerman, Samuel) (Entered: 03/02/2023) |
| 03/03/2023 | 6 | WAIVER OF SERVICE Returned Executed by Michael O'Neil. Peter F. Neronha waiver sent on 2/22/2023, answer due 4/24/2023; State of Rhode Island waiver sent on 2/22/2023, answer due 4/24/2023. (Lyons, Thomas) (Entered: 03/03/2023) |
| 04/13/2023 | 7 | MOTION for Preliminary Injunction filed by Michael O'Neil. Responses due by 4/27/2023. (Attachments: # 1 Supporting Memorandum, # 2 Exhibit Exhibit I, RIAG 2022 Gun Report)(Lyons, Thomas) (Entered: 04/13/2023) |
| 04/21/2023 | 8 | NOTICE of Appearance by Sarah Rice on behalf of Peter F. Neronha, State of Rhode Island (Rice, Sarah) (Entered: 04/21/2023) |
| 04/24/2023 | 9 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Peter F. Neronha, State of Rhode Island. Responses due by 5/8/2023. (Ackerman, Samuel) (Entered: 04/24/2023) |

| 04/26/2023 | 10 | RESPONSE In Opposition to 7 MOTION for Preliminary Injunction *with supporting memorandum* filed by Peter F. Neronha, State of Rhode Island. **Replies due by 5/3/2023.** (Attachments: # 1 Supporting Memorandum)(Ackerman, Samuel) (Entered: 04/26/2023) |
| 04/26/2023 | | NOTICE of Hearing: Chambers Conference set for 5/1/2023 at 9:30 AM before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Zoom Meeting ID: 160 400 2062, Passcode: 622537) (Urizandi, Nissheneyra) (Entered: 04/26/2023) |
| 05/01/2023 | | Minute Entry for proceedings held before District Judge William E. Smith: Chambers Conference held on 5/1/2023. (T. Lyons, F. Saccoccio, S. Ackerman, S. Rice) The parties have agreed on a briefing schedule; clerk to enter. (Zoom at 9:40 AM) (Urizandi, Nissheneyra) (Entered: 05/02/2023) |
| 05/02/2023 | | TEXT ORDER: Per the chambers conference held on 5/1/2023, the response to the 9 Motion to Dismiss is due on 5/22/2023; Replies due 6/5/2023; Replies to the 7 Motion for Preliminary Injunction also due 6/5/2023. So Ordered by District Judge William E. Smith on 5/2/2023. (Urizandi, Nissheneyra) (Entered: 05/02/2023) |
| 05/22/2023 | 11 | RESPONSE In Opposition to 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Michael O'Neil. **Replies due by 5/30/2023.** (Attachments: # 1 Exhibit Exhibit I, New Hampshire CCW application, # 2 Exhibit Exhibit K, Massachusetts CCW application)(Lyons, Thomas) (Entered: 05/22/2023) |
| 06/01/2023 | 12 | REPLY to Response re 11 Response to Motion, filed by Peter F. Neronha, State of Rhode Island. (Ackerman, Samuel) (Entered: 06/01/2023) |
| 06/05/2023 | 13 | REPLY to Response re 10 Response to Motion, *for Preliminary Injunction* filed by Michael O'Neil. (Lyons, Thomas) (Entered: 06/05/2023) |
| 06/09/2023 | | NOTICE of Hearing on 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, 7 MOTION for Preliminary Injunction: Hearing set for 6/22/2023 at 9:30 AM in Courtroom 3 before District Judge William E. Smith. (Urizandi, Nissheneyra) (Entered: 06/09/2023) |
| 06/22/2023 | | Minute Entry for proceedings held before District Judge William E. Smith: Motion Hearing held on 6/22/2023 re 7 MOTION for Preliminary Injunction filed by Michael O'Neil, 9 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by State of Rhode Island, Peter F. Neronha. (F. Saccoccio, T. Lyons, S. Rice, and S. Ackerman) Arguments heard. The Court takes the matter under advisement and will issue a ruling at a later time. (Court Reporter Lisa Schwam in Courtroom 3 at 9:35 AM) (Urizandi, Nissheneyra) (Entered: 06/22/2023) |
| 06/28/2023 | | TEXT ORDER: Before the Court are the State's Motion to Dismiss, ECF No. 9, and Plaintiff's Motion for Preliminary Injunction, ECF No. 7. For the following reasons, Plaintiff's 7 Motion is denied, and the State's 9 Motion is granted in part and denied in part; however, the Court will allow Plaintiff to amend his 1 Complaint to address the deficiencies discussed below. As currently pleaded, Plaintiff claims the State's dual-permitting system violates the Second Amendment in two ways that are harmful to him: first, that he may be impacted in his ability to obtain a permit from another state because of the Attorney General's denial of his application; and second, his municipal permit may lapse. These harms are speculative and lack the concrete and particularized character needed for standing. See Plazzi v. FedEx Ground Package Sys., Inc., 52 F.4th 1, 4 (2022). At the June 22, 2023, hearing on these Motions, however, Plaintiff appeared to refine his Second Amendment claim. Plaintiff |

claims now that the State's dual-permitting scheme violates his Second Amendment right to "open carry" both facially and as-applied. Because the Court agrees with the State that Plaintiff lacks standing based on the Complaint as drafted, see City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983), the Court gives Plaintiff leave to amend the Complaint to add the "open carry" allegation with specificity.

None of the State's remaining arguments convince the Court that dismissal is appropriate, however, except in one small respect (discussed below). With the anticipated amendment, the case will be ripe for adjudication. See Penobscot Nation v. Frey, 3 F.4th 484, 509 (1st Cir. 2021) (defining ripeness). The Rooker-Feldman doctrine has no application here where Plaintiff challenges the "statute or rule governing the decision," and is not trying to undo the adverse state court decision itself. Skinner v. Switzer, 562 U.S. 521, 532 (2011); Maymo-Melendez v. Alvarez-Ramirez, 364 F.3d 27, 34 (1st Cir. 2004). Nor does res judicata apply where there is no final judgment on the merits. See Weavers Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 583 F. Supp. 2d 259, 278 (D.R.I. 2008) (declining to apply res judicata because the administrative decisions were decided on procedural grounds and not on the merits); see also Fernandez v. Trias Monge, 586 F.2d 848, 857 (1st Cir. 1978) ("That denial of certiorari [by Supreme Court of Puerto Rico] imports no view on the merits is consistent with the United States Supreme Court's own practice."); Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 411 (1973) (Burger, C.J., dissenting) ("[I]t is elementary, of course, that a denial of a petition for certiorari decides nothing."); id. at 366 n.1 ("[T]he well-settled view [is] that denial of certiorari imparts no implication or inference concerning the Courts view of the merits"). And none of the Pullman abstention factors presently leans in favor of abstaining here. Ford Motor Co. v. Meredith Motor Co., 257 F.3d 67, 71-73 (1st Cir. 2001) (listing factors). Finally, although not dispositive, the State is correct that Plaintiff cannot recover compensatory and punitive damages; this Court has consistently dismissed claims for monetary damages against state actors in their official capacities, see Rivera v. Coyne-Fague, No. CV 19-458-WES, 2021 WL 4476833, at *6 (D.R.I. Sept. 30, 2021); Jefferson v. Raimondo, C.A. No. 17-439 WES, 2018 WL 3873233, at *17 (D.R.I. Aug. 15, 2018), and nothing would appear to compel a different result here. So, if repleaded, this request for monetary damages would seem to be ripe for dismissal.

With respect to Plaintiff's 7 Motion for a Preliminary Injunction, it is of course denied as moot. In the interest of expediency, once Plaintiff files his amended Complaint, and once the State answers within the requisite time, the Court will have a conference with counsel to craft an expedited schedule for an evidentiary hearing and briefing on Plaintiff's request for a preliminary and permanent injunction.

So Ordered by District Judge William E. Smith on 6/28/2023. (Urizandi, Nissheneyra) (Entered: 06/28/2023)

| | | |
|---|---|---|
| 07/19/2023 | 14 | AMENDED COMPLAINT against All Defendants, filed by Michael O'Neil. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Errata E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Lyons, Thomas) (Entered: 07/19/2023) |
| 07/19/2023 | 15 | NOTICE by Peter F. Neronha, State of Rhode Island *Notice of Withdrawal of Appearance* (Ackerman, Samuel) (Entered: 07/19/2023) |
| 07/19/2023 | | NOTICE of Hearing: Chambers Conference set for 7/27/2023 at 11:30 AM by Zoom before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Zoom Meeting ID: 161 512 7154, Passcode: 268829) (Urizandi, Nissheneyra) (Entered: 07/19/2023) |

| Date | # | Description |
|---|---|---|
| 07/27/2023 | | NOTICE of Hearing: Chambers Conference rescheduled for 7/27/2023 at **11:00 AM** before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Zoom Meeting ID: 161 512 7154, Passcode: 268829) (Urizandi, Nissheneyra) (Entered: 07/27/2023) |
| 07/27/2023 | | Minute Entry for proceedings held before District Judge William E. Smith: In Chambers Conference held on 7/27/2023. (F. Saccoccio, T. Lyons, S. Rice) (Zoom at 11:05 a.m.) (Urizandi, Nissheneyra) (Entered: 07/31/2023) |
| 08/02/2023 | 16 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *in the Amended Complaint*, MOTION to Dismiss for Lack of Jurisdiction *over the Amended Complaint* filed by All Defendants. **Responses due by 8/16/2023.** (Attachments: # 1 Supporting Memorandum, # 2 Affidavit)(Rice, Sarah) (Entered: 08/02/2023) |
| 08/14/2023 | 17 | STIPULATION re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *in the Amended Complaint* MOTION to Dismiss for Lack of Jurisdiction *over the Amended Complaint Enlarging Plaintiff's Time to Respond* filed by All Plaintiffs. (Lyons, Thomas) (Entered: 08/14/2023) |
| 09/01/2023 | 18 | RESPONSE In Opposition to 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *in the Amended Complaint* MOTION to Dismiss for Lack of Jurisdiction *over the Amended Complaint* filed by Michael O'Neil. **Replies due by 9/8/2023.** (Attachments: # 1 Exhibit Proposed Amended Complaint)(Lyons, Thomas) (Main Document 18 replaced on 9/28/2023) (Urizandi, Nissheneyra). (Entered: 09/01/2023) |
| 09/01/2023 | 19 | MOTION to Amend/Correct 14 Amended Complaint filed by Michael O'Neil. **Responses due by 9/15/2023.** (Attachments: # 1 Exhibit Proposed Amended Complaint, # 2 Supporting Memorandum)(Lyons, Thomas) (Entered: 09/01/2023) |
| 09/06/2023 | 20 | STIPULATION *for Enlargement of Time to Respond* filed by Peter F. Neronha, State of Rhode Island. (Rice, Sarah) (Entered: 09/06/2023) |
| 09/25/2023 | | TEXT ORDER granting Plaintiff's 19 Motion to Amend/Correct as unopposed and denying Defendants' 16 Motion to Dismiss as moot. Defendants may either answer or move to dismiss the Second Amended Complaint once it is docketed. So Ordered by District Judge William E. Smith on 9/25/2023. (Urizandi, Nissheneyra) (Entered: 09/25/2023) |
| 09/25/2023 | 21 | SECOND AMENDED COMPLAINT against Peter F. Neronha, State of Rhode Island, filed by Michael O'Neil, Joseph Patton, Richard Cook, Daniel Patterson, Peter Trementozzi, Donald Labriole, Richard Laporte. (Urizandi, Nissheneyra) (Entered: 09/25/2023) |
| 10/10/2023 | 22 | ANSWER to 21 Amended Complaint by Peter F. Neronha, State of Rhode Island.(Rice, Sarah) (Entered: 10/10/2023) |
| 10/23/2023 | | NOTICE of Hearing: Chambers Conference set for 11/1/2023 at 11:00 AM by Zoom before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Zoom Meeting ID: 160 078 3456, Passcode: 504275) (Urizandi, Nissheneyra) (Entered: 10/23/2023) |
| 11/01/2023 | | Minute Entry for proceedings held before District Judge William E. Smith: Status Conference held on 11/1/2023. (T. Lyons, S. Rice) Clerk to enter modified proposed order as discussed and set up a status conference in mid-May. (Zoom at 11:00 AM) (Urizandi, Nissheneyra) (Entered: 11/02/2023) |

ECF – District of Rhode Island

| Date Filed | # | Docket Text |
|---|---|---|
| 11/02/2023 | 23 | PRETRIAL SCHEDULING ORDER: Amended Pleadings due by 12/29/2023; Joinder of Parties due by 12/29/2023; Factual Discovery to close by 2/29/2024; Plaintiff's Expert Disclosures shall be made by 3/29/2024; Defendants' Expert Disclosures shall be made by 4/29/2024; Expert Discovery to close by 5/29/2024; Dispositive Motions due by 6/28/2024 and Pretrial Memorandum due by 6/28/2023 or 30 days after a decision on any dispositive motion. So Ordered by District Judge William E. Smith on 11/2/2023. Status Conference set for 5/16/2024 at 9:30 AM by Zoom before District Judge William E. Smith. This is a non-public conference for attorneys of record only. (Meeting ID: 160 816 0256, Passcode: 695006) (Urizandi, Nissheneyra) (Entered: 11/02/2023) |
| 02/23/2024 | 24 | NOTICE of Appearance by James J. Arguin on behalf of Peter F. Neronha, State of Rhode Island (Arguin, James) (Entered: 02/23/2024) |
| 02/28/2024 | 25 | Assented MOTION for Extension of Scheduling Order Deadlines filed by All Plaintiffs. **Responses due by 3/13/2024.** (Lyons, Thomas) (Entered: 02/28/2024) |
| 03/04/2024 | | TEXT ORDER granting 25 Motion for Extension of Scheduling Order Deadlines. Factual Discovery to close by 3/31/2024; Plaintiff Expert Disclosures shall be made by 4/30/2024; Defendant Expert Disclosures shall be made by 5/31/2024; Expert Discovery to close by 6/30/2024 Dispositive Motions due by 7/31/2024 and Pretrial Memorandum due by 7/31/2024. So Ordered by District Judge William E. Smith on 3/4/2024. (Urizandi, Nissheneyra) (Entered: 03/04/2024) |
| 04/26/2024 | 26 | Assented MOTION for Extension of Scheduling Order Deadlines filed by All Plaintiffs. **Responses due by 5/10/2024.** (Lyons, Thomas) (Entered: 04/26/2024) |
| 05/03/2024 | | TEXT ORDER granting 26 Motion for Extension of Scheduling Order Deadlines. Plaintiff's Expert Disclosures shall be made by 5/30/2024; Defendants' Expert Disclosures shall be made by 6/30/2024; Expert Discovery to close by 7/30/2024; Dispositive Motions due by 8/30/2024 and Pretrial Memorandum due by 8/30/2024. So Ordered by District Judge William E. Smith on 4/26/2024. (Urizandi, Nissheneyra) (Entered: 05/03/2024) |
| 05/13/2024 | | HEARING CANCELLED: The Status Conference previously scheduled for May 16, 2024 at 9:30 AM is hereby cancelled. (Urizandi, Nissheneyra) (Entered: 05/13/2024) |
| 06/27/2024 | 27 | DECLARATION *Spitzer-Report* by All Defendants. (Meosky, Paul) (Entered: 06/27/2024) |
| 06/27/2024 | 28 | DECLARATION *Rivas_FINAL* by All Defendants. (Meosky, Paul) (Entered: 06/27/2024) |
| 07/03/2024 | 29 | DECLARATION *supplemental* by Peter F. Neronha, State of Rhode Island. (Meosky, Paul) (Entered: 07/03/2024) |
| 07/08/2024 | 30 | Assented MOTION for Extension of Scheduling Order Deadlines filed by All Defendants. **Responses due by 7/22/2024.** (Arguin, James) (Entered: 07/08/2024) |
| 07/19/2024 | | TEXT ORDER granting 30 Motion for Extension of Scheduling Order Deadlines. Expert Discovery to close by 10/28/2024 and Dispositive Motions due by 11/29/2024. So Ordered by District Judge William E. Smith on 7/19/2024. (Urizandi, Nissheneyra) (Entered: 07/19/2024) |

| Date | # | Description |
|---|---|---|
| 11/27/2024 | 31 | MOTION for Summary Judgment filed by All Plaintiffs. **Responses due by 12/11/2024.** (Attachments: # 1 Supporting Memorandum)(Lyons, Thomas) (Entered: 11/27/2024) |
| 11/27/2024 | 32 | STATEMENT OF UNDISPUTED FACTS by All Plaintiffs re 31 MOTION for Summary Judgment. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2, # 3 Exhibit Exhibit 3, # 4 Exhibit Exhibit 4, # 5 Exhibit Exhibit 5, # 6 Exhibit Exhibit 6, # 7 Exhibit Exhibit 7, # 8 Exhibit Exhibit 8, # 9 Exhibit Exhibit 9, # 10 Exhibit Exhibit 10, # 11 Exhibit Exhibit 11, # 12 Exhibit Exhibit 12, # 13 Exhibit Exhibit 13 Part 1 of 2, # 14 Exhibit Exhibit 13 Part 2 of 2, # 15 Exhibit Exhibit 14)(Lyons, Thomas) (Entered: 11/27/2024) |
| 11/27/2024 | 33 | MOTION in Limine filed by All Plaintiffs. **Responses due by 12/4/2024.** (Attachments: # 1 Supporting Memorandum, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4)(Lyons, Thomas) (Entered: 11/27/2024) |
| 11/27/2024 | 34 | MOTION for Summary Judgment filed by All Defendants. **Responses due by 12/11/2024.** (Attachments: # 1 Supporting Memorandum, # 2 Affidavit, # 3 Affidavit, # 4 Appendix Exhibits to Spitzer Declaration)(Arguin, James) (Entered: 11/27/2024) |
| 11/27/2024 | 35 | STATEMENT OF UNDISPUTED FACTS by All Defendants re 34 MOTION for Summary Judgment . (Attachments: # 1 Appendix Exhibits A - HH)(Arguin, James) (Entered: 11/27/2024) |
| 12/02/2024 | 36 | NOTICE of Appearance by Paul Timothy James Meosky on behalf of Peter F. Neronha, State of Rhode Island (Meosky, Paul) (Entered: 12/02/2024) |
| 12/03/2024 | 37 | Joint MOTION for an Extension of Time to File Response/Reply as to 33 MOTION in Limine , 34 MOTION for Summary Judgment , 31 MOTION for Summary Judgment filed by All Plaintiffs. **Responses due by 12/17/2024.** (Lyons, Thomas) (Entered: 12/03/2024) |
| 12/04/2024 | | TEXT ORDER granting 37 Motion for Extension of Time to File Response/Reply. **Responses due by 1/6/2025. Replies due by 1/26/2025.** So Ordered by District Judge William E. Smith on 12/4/2024. (Urizandi, Nissheneyra) (Entered: 12/04/2024) |
| 01/06/2025 | 38 | RESPONSE In Opposition to 31 MOTION for Summary Judgment filed by All Defendants. **Replies due by 1/13/2025.** (Attachments: # 1 Exhibit A (Cramer Book Excerpt))(Arguin, James) (Entered: 01/06/2025) |
| 01/06/2025 | 39 | RESPONSE In Opposition to 34 MOTION for Summary Judgment filed by All Plaintiffs. **Replies due by 1/13/2025.** (Lyons, Thomas) (Entered: 01/06/2025) |
| 01/06/2025 | 40 | STATEMENT OF DISPUTED FACTS by All Plaintiffs re 35 Statement of Undisputed Facts. (Lyons, Thomas) (Entered: 01/06/2025) |
| 01/06/2025 | 41 | STATEMENT OF UNDISPUTED FACTS by All Plaintiffs re 35 Statement of Undisputed Facts. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Lyons, Thomas) (Entered: 01/06/2025) |
| 01/06/2025 | 42 | STATEMENT OF DISPUTED FACTS by All Defendants re 32 Statement of Undisputed Facts,,, (Attachments: # 1 Exhibit A Spitzer Depo Excerpt, # 2 Exhibit B Rivas Depo Excerpt)(Arguin, James) (Entered: 01/06/2025) |

ECF - District of Rhode Island

| Date | # | Description |
|---|---|---|
| 01/06/2025 | 43 | RESPONSE in Opposition to 33 MOTION in Limine filed by All Defendants. **Replies due by 1/13/2025.** (Attachments: # 1 Exhibit A Cramer Depo Excerpt, # 2 Exhibit B Fowler Declaration, # 3 Exhibit C Spitzer Supplemental Declaration)(Arguin, James) (Entered: 01/06/2025) |
| 01/06/2025 | 44 | MOTION *FOR JUDICIAL NOTICE* filed by All Defendants. **Responses due by 1/21/2025.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40)(Arguin, James) (Entered: 01/06/2025) |
| 01/23/2025 | 45 | RESPONSE In Opposition to 44 MOTION *FOR JUDICIAL NOTICE* filed by All Plaintiffs. **Replies due by 1/30/2025.** (Lyons, Thomas) (Entered: 01/23/2025) |
| 01/23/2025 | 46 | REPLY to Response re 43 Response to Motion, *in Limine* filed by All Plaintiffs. (Lyons, Thomas) (Entered: 01/23/2025) |
| 01/27/2025 | 47 | REPLY to Response re 38 Response to Motion *for Summary Judgment* filed by All Plaintiffs. (Lyons, Thomas) (Entered: 01/27/2025) |
| 01/27/2025 | 48 | REPLY to Response re 39 Response to Motion *for Summary Judgment* filed by All Defendants. (Arguin, James) (Entered: 01/27/2025) |
| 01/27/2025 | 49 | STATEMENT OF DISPUTED FACTS by All Defendants re 40 Statement of Undisputed Facts. (Attachments: # 1 Exhibit A (Troiano Deposition Excerpts)(Arguin, James) (Entered: 01/27/2025) |
| 01/27/2025 | 50 | MOTION to Strike *the Supplemental Declaration of Plaintiffs' Expert Clayton Cramer* filed by All Defendants. **Responses due by 2/10/2025.** (Arguin, James) (Entered: 01/27/2025) |
| 01/28/2025 | 51 | REPLY to Response re 45 Response to Motion *for Judicial Notice* filed by All Defendants. (Arguin, James) (Entered: 01/28/2025) |
| 02/05/2025 | 52 | RESPONSE In Opposition to 50 MOTION to Strike *the Supplemental Declaration of Plaintiffs' Expert Clayton Cramer* filed by All Plaintiffs. **Replies due by 2/12/2025.** (Attachments: # 1 Exhibit)(Lyons, Thomas) (Entered: 02/05/2025) |
| 02/11/2025 | 53 | REPLY to Response re 52 Response to Motion, *to Strike the Supplemental Declaration of Plaintiffs' Expert Clayton Cramer* filed by All Defendants. (Arguin, James) (Entered: 02/11/2025) |
| 08/01/2025 | 54 | MEMORANDUM AND ORDER granting 34 Defendants' Motion for Summary Judgment and denying 31 Plaintiffs' Motion for Summary Judgment; 33 Plaintiffs' Motion in Limine; 44 Defendants' Motion for Judicial Notice; and 50 Defendants' Motion to Strike. So Ordered by Senior Judge William E. Smith on 8/1/2025. (Simoncelli, Michael) (Entered: 08/01/2025) |
| 08/01/2025 | 55 | JUDGMENT in favor of State of Rhode Island, Peter F. Neronha against Daniel Patterson, Donald Labriole, Joseph Patton, Michael O'Neil, Peter Tremeentozzi, Richard Cook, Richard Laporte. So Ordered by Clerk of Court on 8/1/2025. (Simoncelli, Michael) (Entered: 08/01/2025) |

ECF - District of Rhode Island

| 08/22/2025 | 56 | NOTICE OF APPEAL by Richard Cook, Donald Labriole, Richard Laporte, Michael O'Neil, Daniel Patterson, Joseph Patton, Peter Tremeentozzi as to 55 Judgment, 54 Order on Motion for Summary Judgment, Order on Motion in Limine,,, Order on Motion for Miscellaneous Relief,, Order on Motion to Strike,, ( filing fee paid $ 605.00, receipt number ARIDC-2175255 ) **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf Appeal Record due by 8/29/2025. (Lyons, Thomas) (Entered: 08/22/2025)** |
| --- | --- | --- |
| 08/22/2025 | 57 | CLERK'S CERTIFICATE AND APPELLATE COVER SHEET: Abbreviated record on appeal consisting of notice of appeal, order(s) being appealed, and a certified copy of the district court docket report transmitted to the U.S. Court of Appeals for the First Circuit in accordance with 1st Cir. R. 11.0(b). 56 Notice of Appeal,,,, (Attachments: # 1 Record on Appeal)(Hill, Cherelle) (Entered: 08/22/2025) |
| 08/22/2025 | | USCA Case Number 25-1814 for 56 Notice of Appeal,,, filed by Richard Laporte, Donald Labriole, Michael O'Neil, Joseph Patton, Daniel Patterson, Richard Cook, Peter Tremeentozzi. (Hill, Cherelle) (Entered: 08/22/2025) |

### PACER Service Center

#### Transaction Receipt

10/16/2025 17:26:21

| PACER Login: | twlyons3 | Client Code: | O'Neil |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 1:23-cv-00070-WES-PAS |
| Billable Pages: | 7 | Cost: | 0.70 |

9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Michael O'Neil, et al.
_____
Plaintiff

v.                                    Case No. 23-070
                                              _____

Peter F. Neronha, et al.
_____

Defendant

**NOTICE OF APPEAL**

Notice is hereby given that Michael O'Neil, et al.
_____,
                                                    Name

the Plaintiffs              in the above-referenced matter, hereby appeals to the United States
_____
Party Type

Court of Appeals for the First Circuit from the:

☑ Final judgment entered on August 1, 2025
                              _____.
                                    Date of Judgment

                              and/or

☑ The order Memorandum and Order          entered on August 1, 2025
              _____                _____
              Description of Order                                  Date of Order

Thomas W. Lyons                        Respectfully submitted,
_____
Name
2946                                   _____
_____                Signature
Bar Number                             August 22, 2025
Strauss, Factor, Laing & Lyons         _____
_____                Date
Firm/Agency                            401-456-0700
One State Street, Ste. 600             _____
_____                Telephone Number
Address                                tlyons@straussfactor.com
Providence, RI 02908                   _____
_____                Email Address
City/State/Zip Code

[ Reset Form ]              [ Print Form ]              [ Save Form ]

9

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MICHAEL P. O'NEIL, DANIEL | : | |
| PATTERSON, DONALD LABRIOLE | : | |
| JOSEPH PATTON, RICHARD COOK | : | |
| RICHARD LAPORTE and PETER | : | |
| TREMEENTOZZI | : | |
|     Plaintiffs | : | |
| | : | |
|         v. | : | C.A. No. 23-cv-70 |
| | : | |
| PETER F. NERONHA, in his official | : | |
| capacity as Attorney General of the State | : | |
| of Rhode Island, and THE STATE OF | : | |
| RHODE ISLAND | : | |
|     Defendants | : | |

**SECOND AMENDED COMPLAINT FOR EQUITABLE RELIEF**

**PRELIMINARY STATEMENT**

Plaintiffs Michael O'Neil, Daniel Patterson, Donald Labriole, Joseph Patton, Richard

Cook, Richard Laporte and Peter Tremeentozzi, bring this action to challenge the constitutionality

of Defendants' denial of their applications to renew Plaintiffs' permits for the concealed carry of

a firearm (CCW). Plaintiffs assert that Defendants' denial violates the Second Amendment of the

United States Constitution as well as the Fourteenth Amendment and Art. 1, Sec. 2 of the Rhode

Island Constitution.

**PARTIES**

1. Plaintiff Michael O'Neil is a resident of Warwick, Rhode Island, and a citizen of the State of

   Rhode Island.

2. Plaintiff Daniel Patterson is a resident of the Town of Exeter, a Federally Licensed Firearms

   Dealer, and a citizen of the State of Rhode Island.

3.  Plaintiff Donald Labriole is a resident of the Town of Coventry and a citizen of the State of Rhode Island.

4.  Plaintiff Joseph Patton is a resident of the Town of Foster and a citizen of the State of Rhode Island.

5.  Plaintiff Richard Cook is a resident of the Town of Charlestown and a citizen of the State of Rhode Island.

6.  Plaintiff Richard Laporte is a resident of the Town of North Kingstown and a citizen of the State of Rhode Island.

7.  Plaintiff Peter Tremeentozzi is a resident of the Town of Johnston, a Federally Licensed Firearms Dealer, and a citizen of the State of Rhode Island

8.  Defendant Peter F. Neronha is sued in his official capacity as the Attorney General of the Defendant State of Rhode Island.

<p align="center">**JURISDICTION AND VENUE**</p>

9.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343, 2001, 2002, and 42 U.S.C. § 1983 and 1988.

10. The Court has ancillary jurisdiction over the claims brought under the Rhode Island Constitution and any other state law.

11. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because Defendants took their unconstitutional actions in this district.

<p align="center">**FACTS**</p>

12. Plaintiff Michael O'Neil is over the age of 21, he has not been convicted of any felony, he is not a fugitive from justice, he is not in community confinement or otherwise subject to electronic surveillance, he is not mentally incompetent, a drug addict or a drunkard, he is not

an immigrant who entered or remained in the country illegally, and he has obtained a so-called "blue card" from the Rhode Island Department of Environmental Management. In other words, O'Neil meets all the statutory requirements under the Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., to possess firearms, including handguns.

13. Plaintiff Daniel Patterson, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the country illegally, has obtained a "blue card" from the Rhode Island Department of Environmental Management, along with a Federal Firearms Dealers License from the Department of Alcohol, Tobacco, and Firearms.

14. Plaintiff, Donald Labriole, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the country illegally, and has obtained a "blue card" from the Rhode Island Department of Environmental Management.

15. Plaintiff, Joseph Patton, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the country illegally, and has obtained a "blue card" from the Rhode Island Department of Environmental Management.

16. Plaintiff, Richard Cook, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the

country illegally, and has obtained a "blue card" from the Rhode Island Department of Environmental Management.

17. Plaintiff, Richard Laporte, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the country illegally, and has obtained a "blue card" from the Rhode Island Department of Environmental Management.

18. Plaintiff, Peter Tremeentozzi, is over the age of 21, not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, not an immigrant who entered or remained in the country illegally, has obtained a "blue card" from the Rhode Island Department of Environmental Management, along with a Federal Firearms Dealers License from the Department of Alcohol, Tobacco, and Firearms.

19. Under the Firearms Act, both the Rhode Island Attorney General and municipalities have the authority to issue CCW permits, §§ 11-47-18 and 11-47-11, respectively.

20. The provision by which municipalities have authority to issue CCW permits states, in part: "The licensing authorities of any city or town **shall**, upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant

has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed." (emphasis added). R.I.Gen.L. § 11-47-11(a).

21. The Section under which the Attorney General issues CCW permits states, in part: "The attorney general **may** issue a license or permit to any person twenty-one (21) years of age or over to carry a pistol or revolver, whether concealed or not, upon his or her person **upon a proper showing of need**, subject to the provisions of §§ 11-47-12 and 11-47-15; that license or permit may be issued notwithstanding the provisions of § 11-47-7." (emphasis added). R.I.Gen.L. §11-47-18(a).

22. The Firearms Act does not define "need."

23. The Attorney General has not promulgated regulations that define "need."

24. The Attorney General has created a set of factors in its "Weapons Carry Permit Packet" which the Department purportedly uses to determine whether an applicant has made a proper showing of "need." These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb, or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb, or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training, and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8- 8.1 of the general laws?

(10) Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

25. However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit."

26. Plaintiff O'Neil has applied for and has been granted a Department of Attorney General CCW permit upon renewal every four years since 2013.

27. Plaintiff O'Neil has in the past also been granted CCW permits by the Town of Johnston and the City of Warwick.

28. On October 25, 2020, Plaintiff O'Neil filed an application with the Rhode Island Department of the Attorney General to renew his CCW permit.

29. On or about April 2022, October 2021, January 2022, April 2021, September 2021 and January 2022, the Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte and Peter Tremeentozzi, respectively, filed renewal applications with the Rhode Island Department of the Attorney General to renew his/their CCW permits.

30. On January 25, 2021, the Attorney General denied Plaintiff O'Neil's CCW renewal application, stating "you have not provided a proper showing of need for a permit to be issued" because you already have a concealed carry permit from the City of Warwick which "provides you with the ability to lawfully carry a pistol or revolver in the State of Rhode Island." However, the denial otherwise failed to articulate any reason set forth in the Defendants' factors for denial.

31. Within a few months of submitting their renewal applications, the Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte and Peter Tremeentozzi received denial letters from the Attorney General, stating that based on their city or Town permit, that there was a failure to demonstrate a need. Additionally, some of the letters stated that the Attorney General has broad discretion to issue or deny CCW licenses.

32. On March 10, 2021, Plaintiff O'Neil, along with counsel, met via telephone, with representatives from the Attorney General on his appeal and requested reconsideration of the renewal denial. During that meeting, O'Neil's counsel articulated reasons for having the Attorney General's permit in addition to the Warwick permit, including that the Attorney General's permit allows for reciprocity for concealed carry permits in other states and that having a second permit provides a "backup" in case the municipal permit expires prior to renewal.

33.  On April 1, 2021, the Attorney General again issued a denial indicating that the "need" was insufficient and decided "in its broad discretion to issue a permit…to deny your application due to the fact you have not provided a proper showing of need…"

34. On July 8, 2021, Plaintiff O'Neil filed a motion for reconsideration of this denial.

35. On July 21, 2021, Defendants denied reconsideration of the denial for substantially the same reasons as stated previously.

36. Like O'Neil, Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte, and Peter Tremeentozzi each filed appeals of their renewal denials and/or a request for reconsideration, which were later denied.

37. On August 9, 2021, Plaintiff O'Neil filed a petition for writ of certiorari with the Rhode Island Supreme Court seeking review of the Defendants' denial.

38. On December 17, 2021, the Supreme Court denied Plaintiff O'Neil's petition.

39. Like O'Neil, Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte and Peter Tremeentozzi, each filed a petition for writ of certiorari with the Rhode Island Supreme Court seeking review of the Defendants' denial. Unlike O'Neil, their petitions were each initially granted.

40. Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte and Peter Tremeentozzi each filed their 12A statements and were awaiting the scheduling conferences for a Show Cause or Full Briefing Schedule.

41. On February 15, 2023, Plaintiff O'Neil filed this action in the Federal Court.

42. On February 15, 2023, the Rhode Island Supreme Court withdrew the grants of petitions for writs of certiorari for Plaintiffs Daniel Patterson, Donald Labriole, Joseph Patton, Richard

Cook, Richard Laporte and Peter Tremeentozzi without explanation, leaving them without a determination on the CCW denials.

43. Plaintiffs have carried concealed weapons in the past pursuant to their State CCW permits.

44. At the time of Plaintiff O'Neil's denial, he had not yet secured his Federal Firearms License.

45. At the time of Plaintiff Daniel Patterson's and Peter Tremeentozzi's denials, they each had already secured and were maintaining their Federal Firearms License(s).

46. Plaintiff O'Neil wants the option to engage in "open" carry of a weapon because he has, prior to submitting his 2020 renewal application, desired and/or spoke about opening and has recently opened a firearm business in the State of Rhode Island.

47. Plaintiff O'Neil, due to the business, can and may be in possession of numerous firearms, both owned by the business and/or customers, necessitating the need for open carry.

48. Plaintiff O'Neil, due to the business, can and may be required to accept delivery of firearms, both for the business and/or for customers, necessitating the need for open carry.

49. Plaintiff O'Neil, due to the business, can and may be required to transport and/or deliver firearms, both for the business and/or for customers, necessitating the need for open carry.

50. Under R.I.Gen.L. § 11-47-18, Plaintiffs may engage in "open" carry only if they have the State CCW permit and they want the option to engage in "open" carry.

51. Plaintiff O'Neil has a CCW permit from other states. He is reasonably concerned that the denial of his application by Defendants will prejudice his ability to renew those other permits or obtain others as concealed carry permit applications typically ask whether the applicant has ever had an application denied elsewhere.

52. Specifically, the denial by the Attorney General requires Plaintiff O'Neil to disclose this denial and explain the reason for the denial in out-of-state applications.

53. Plaintiff O'Neil, in 2022, renewing his Commonwealth of Massachusetts CCW permit, did disclose in his renewal application that his renewal of the Attorney General Permit was denied.

54. Plaintiff O'Neil, in 2022, explained that the denial of the Attorney General Permit was due to a newly implemented policy, which was being appealed.

55. Plaintiff O'Neil, in 2021, renewing his New Hampshire CCW permit, did disclose in his renewal application that his renewal application of the Attorney General Permit was denied.

56. Plaintiff O'Neil, in 2021, explained that the denial of the Attorney General Permit was being appealed.

## CLAIMS

### COUNT I-VIOLATION OF THE SECOND AMENDMENT

57. Plaintiffs reallege the allegations of Paragraphs 1 through 56.

58. The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

59. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment provides individuals a right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.

60. In McDonald v. Chicago, 561 U.S. 742 (2010), the Court held that the Second Amendment applies to the states through operation of the Fourteenth Amendment.

61. In Caetano v. Massachusetts, 577 U.S. 411 (2016), the Court reiterated its conclusions in Heller and McDonald that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding …" and that this "Second Amendment right is fully applicable to the States[.]"

62. In <u>N.Y. State Rifle and Pistol Association v. Bruen</u>, 142 S.Ct. 2111 (2022), the Court held that Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home."

63. The Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

64. The Supreme Court specifically identified Rhode Island as a "shall issue" state for CCW permits because "the Rhode Island Supreme Court has flatly denied that the '[d]emonstration of a proper showing of need' is a component of [R.I.Gen.L. § 11-47-11]." <u>Bruen</u>, 142 S.Ct. at 2123, n.1, quoting <u>Godomski v. Tavares</u>, 113 A.3d 387, 392 (R.I. 2015).

65. Furthermore, the Court rejected the statutory schemes of "may issue" states whereby "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," such as when "the applicant has not demonstrated … suitability for the relevant license." Rather, the Court pointed to "'shall issue' jurisdictions" wherein licenses are issued "whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability."

66. Accordingly, subject to a few specific limitations, if a member of "the people" wishes to "keep" or "bear" a protected "arm," then the ability to do so "shall not be infringed."

67. Plaintiffs are members of "the people" who desire to "bear" a protected "arm" in public, either concealed or open.

68. Under <u>Bruen</u>, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." <u>Id</u>. at 2126.

69. <u>Bruen</u> disapproved of discretion during the permitting process, instead making clear that governments may rely only on stringent statutory criteria. Defendants' laws, factors, and actions, however, allow unbridled discretion and the abuses that stem from unbridled discretion.

70. Accordingly, the burden is on the government to justify the denial of Plaintiffs' CCW renewal applications based on the historical tradition of the activity that it is now attempting to regulate and ban.

71. Defendants' denial of Plaintiffs applications to renew their State CCW permit denies them the right to engage in "open" carry in Rhode Island.

72. Defendants' denial of Plaintiff Michael O'Neil's application to renew his State CCW permit harms his ability to obtain and renew CCW permits from other states.

73. Defendants' denial of Plaintiffs applications to renew their State CCW permit denies them the right to engage in "open" carry in Rhode Island.

74. By infringing the right to bear arms in public in these ways, the Defendants' laws and regulations violate their rights under the  Second Amendment.

75. As such, Defendant's laws, customs, practices, and policies, infringing the Second Amendment's protection of the right to "bear arms" in public, damages Plaintiffs' rights in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices, and pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiffs are entitled to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

**COUNT II-VIOLATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND ARTICLE 1, SEC. 2 OF THE RHODE ISLAND CONSTITUTION**

76. Plaintiffs reallege the allegations of Paragraphs 1 through 75.

77. Plaintiffs have a liberty interest in their Second Amendment rights and a property interest in the CCW permits previously issued by Defendants.

78. By failing to provide sufficient notice of the grounds upon which a CCW permit may be denied, the Defendants have violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 1 Section 2 of the Rhode Island Constitution.

79. Defendants have violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment and Article 1 Section 2 of the Rhode Island Constitution which require an unbiased tribunal for hearing and a decision based exclusively on the evidence submitted.

80. Defendants' application of their statute and factors is overly broad and vague because the statute imposes an overly stringent and undefined requirement of "need" in violation of the Second Amendment and the factors grant the Attorney General unbridled discretion.

81. On their face, Defendants' statute and factors are unconstitutionally vague in violation of the Fourteenth Amendment's Due Process Clause and Art. 1, § 2 of the Rhode Island Constitution because a person of ordinary intelligence would not know what showing of need is required,

and because the statute and the factors lack clear standards and objective criteria thus allowing Defendants to deny Plaintiffs' application to renew his/their CCW permit based on ambiguous, subjective, arbitrary or discriminatory reasons.

82. This arbitrary enforcement violates the Fourteenth Amendment of the United States Constitution and Article 1, Sec. 2 of the Rhode Island Constitution and pursuant to 42 U.S.C. §§ 1983 and 1988, and R.I.G.L. § 42-92-1, therefore Plaintiffs are entitled the reasonable costs of this lawsuit, including his/their reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Michael O'Neil, Daniel Patterson, Donald Labriole, Joseph Patton, Richard Cook, Richard Laporte and Peter Tremeentozzi requests that judgment be entered in their favor and against Defendants as follows:

1. An order preliminarily and permanently requiring Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, to issue a CCW permit to Plaintiffs;

2. A declaration that Defendants' statute and rules requiring an applicant to make an undefined showing of "need," as set forth, violates the Second Amendment;

3. A declaration that the Defendants' process for the consideration of concealed carry applications violates the Due Process Clause of the Fourteenth Amendment and Art. 1, Sec. 2 of the Rhode Island Constitution;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and R.I.G.L. § 42-92-1;

5. Any other relief as the Court deems just and appropriate.

**MICHAEL O'NEIL, DANIEL PATTERSON, DONALD LABRIOLE, JOSEPH PATTON, RICHARD COOK, RICHARD LAPORTE, AND PETER TREMEENTOZZI,**
By their attorneys,

/s/ Thomas W. Lyons
Thomas W. Lyons #2946
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI 02903
(401) 456-0700
tlyons@straussfactor.com

/s/ Frank R. Saccoccio
Frank R. Saccoccio Esq. #5949
Saccoccio Law Office
928 Atwood Avenue
Johnston, Rhode Island 02919
(401) 944-1600 * 942-8921 Fax
Frank.CSLawOffice@gmail.com

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2023, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL P. O'NEIL, DANIEL** | : | |
| **PATTERSON, DONALD LABRIOLE** | : | |
| **JOSEPH PATTON, RICHARD COOK** | : | |
| **RICHARD LAPORTE and PETER** | : | |
| **TREMEENTOZZI** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **C.A. No. 23-cv-70** |
| | : | |
| **PETER F. NERONHA, in his official** | : | |
| **capacity as Attorney General of the State** | : | |
| **of Rhode Island, and THE STATE OF** | : | |
| **RHODE ISLAND** | : | |
| **Defendants** | : | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

Pursuant to LR 56(a), Plaintiffs hereby set forth the following undisputed facts in support of their motion for summary judgment.

1. Plaintiffs are all Rhode Island residents and over the age of 21.  (See Plaintiffs' Declarations attached as Exhibits 1 to 7).

2. Plaintiffs are not felons or fugitives from justice.  They are not in community confinement or otherwise subject to electronic surveillance. They are not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally. (Id.)

3. Plaintiffs have all obtained a so-called "blue card" from the Rhode Island Department of Environmental Management that permits them to purchase and possess a handgun and ammunition. (Id.)

4. The Rhode Island Office of the Attorney General has previously issued concealed carry permits (CCW) to plaintiffs.  (Id.).

5.  Plaintiffs also had CCW permits issued by various municipalities in Rhode Island.  (Id.)

6.  For various reasons, including self-defense and deterring potential aggression, Plaintiffs would like the option to engage in open carry of firearms which, under Rhode Island law, they can only do if they have the RIAG permit. R.I.Gen.L. § 11-47-18.

7.  Plaintiffs attempted to renew their RIAG CCW permits but were denied because they had municipal CCW permits and the RIAG's Office said they did not need the RIAG permits.

8.  The Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., requires a showing of "need" for RIAG CCW permits, § 11-47-18, but does not define "need." The Attorney General has not promulgated regulations that define "need." The Attorney General's Department has created a set of factors in its "Weapons Carry Permit Packet" which the Department purportedly uses to determine whether an applicant has made a proper showing of "need."[1]  These factors include:

(1) Has the applicant demonstrated a specific articulable risk to life, limb, or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

(2) Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a loaded firearm, to decrease the danger to life, limb, or property?

(3) Are there means of protection available to the applicant other than the possession of a loaded firearm that will alleviate the risk to his or her person or property?

(4) Has the applicant demonstrated the skill, training, and ability to properly use a firearm in accordance with Rhode Island laws?

(5) Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

---

[1]    The current version of the Packet is available online at: file:///C:/Users/tlyons/Downloads/CARRY%20CONCEALED%20Permit%20application%20v2 30726%20.pdf.

2

(6) How greatly will the possession of a loaded firearm by the applicant increase the risk of harm to the applicant or to the public?

(7) Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for an unlawful or improper purpose in the past?

(8) Does past unlawful, dangerous, or violent conduct of the applicant justify denial at the Attorney General's discretion even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

(9) Has the applicant been issued a protective order pursuant to chapter 15-5, chapter 15-15, or chapter 8- 8.1 of the general laws?

(10) Any and all other factors deemed lawful and appropriate by the Attorney General to demonstrate that the applicant is or is not a person suitable to possess a loaded firearm in public.

However, the information packet also states there is no "set formula or criteria to limit or restrict the Attorney General's decision to issue or deny a pistol permit."

9.  Regulation of open carry of arms is rare in American history.  What few examples are often cited are usually laws that targeted a particular group regarded as dangerous, a particular dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by *Bruen*. (Cramer Declaration, ¶ 5, attached as Exhibit 8).

10. State supreme courts in the era before 1868 often upheld concealed carry regulation because bans on concealed carry did not prohibit open carry.  As long as one or the other remained

lawful, the right to armed self-defense was preserved.  This understanding persisted after 1868, sometimes with absurd results. (Cramer Declaration, ¶ 6).

11. Laws regulating *open* carrying of arms are surprisingly recent.  Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry.  (Cramer Declaration, ¶ 7).

12. Laws regulating *concealed* carry of firearms are more common in the era before 1868.  State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitution right to keep and bear arms provisions.   (In the case of Tennessee and Arkansas, these provisions including language that seems to have referred only to "common defence," and were interpreted far more narrowly than the Second Amendment.)  When the courts have upheld such concealed weapon laws, they have usually done so because open carry remained lawful. (Cramer Declaration, ¶ 8).

13. There are very few laws in the Framing Era that regulated the carrying of arms.  The East New Jersey law of 1686 prohibited dueling and its associated actions ("send any challenge in writing, by word of mouth, or message"), *concealed* carry ("privately to wear any pocket pistol, skeines, stilladers, daggers or dirks") as well as a ban on riding or going "armed with sword, pistol, or dagger."[2]  The latter was certainly a ban on open carry, but as *Bruen* observed, the law was both short-lived and limited to "planters":

> First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense — including the popular musket and carbine. … Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be

---

[2] An Act Against Wearing Swords, &c., ch. 9, in GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289-290 (2d ed. 1881).

permitted to carry any gun or pistol ... into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.[3]

(Cramer Declaration, ¶ 9).

14. The law also exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably."[4] This was a law aimed at a particular class and not a *general* ban on open carry. (Cramer Declaration, ¶10).

15. Several colonies and states passed laws that punished particular behaviors of which the carrying of arms was only *one* component of the crime. The 1786 Virginia law that ordered that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the Country*," [emphasis added] clearly requires that such action must be "in terror of the Country," analogous to, and using some of the language of the Statute of Northampton (1328). This law required not simply the carrying of arms but actions that produced terror. If the law sought to prohibit *all* open carry of arms, there would be no need to specify "in terror of the Country." Finally, the title of the law "An Act Forbidding and Punishing Affrays" establishes that the goal was to avoid causing fear. Blackstone defined "affray" as "the fighting of two or more persons in some public place, to the *terror* of his majesty's subjects."[5] [emphasis added], (Cramer Declaration, ¶ 11).

---

[3] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 2111, 2145 (2022).

[4] An Act Against Wearing Swords, &c., op cit. 290.

[5] William Blackstone, 4 COMMENTARIES ON THE LAWS OF ENGLAND 145 (1769)
https://books.google.com/books?id=Wn7PPtzK86kC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20more%20persons%20in%20some%20public%20place%2C%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&pg=PA145#v=onepage&q=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20mor

16. Case law from the early Republic continued to distinguish the carrying of arms from affray (actions that cause terror). *Simpson* v. *State* (Tenn. 1833) was a case where the defendant was indicted for "with force and arms,...being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because, citing Blackstone:

> A phrase, from a affrayer to terrify, are the fighting of two or more persons, in some public place, to the terror of His Majesty subjects; for if the fighting being in private it is no affray, but an assault. It will be observed, that according to this definition of an affray by Blackstone, three things are necessary to constitute it. First: there must be fighting. Second: this fighting must be by or between two or more persons. And, Third: it must be in some public place to cause terror to the people.[6]

(Cramer Declaration, ¶ 12).

17. Whatever fear Simpson caused, he did not fight anyone and his mere "with force and arms, being arrayed in a warlike manner" was not a crime alone. (Cramer Declaration, ¶ 13).

18. In *State* v. *Huntley* (N.C. 1843), the defendant was not simply carrying arms:

> In the investigation before the jury it appeared, among other things, that the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in

---

e%20persons%20in%20some%20public%20place,%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&f=false, last accessed November 27, 2024.

[6] *Simpson* v. *State*, 13 Tenn. (5 Yer.) 356, 357, 358 (1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground%2C%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them%2C%20this%20English%20statute%22&pg=PA357#v=onepage&q=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground,%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them,%20this%20English%20statute%22&f=false, last accessed November 27, 2024.

6

the indictment), armed with a double-barreled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him";[7]

(Cramer Declaration, ¶ 14).

19. Even in this case, the North Carolina Supreme Court distinguished the Statute of

Northampton's prohibition of "unusual weapons":

It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of "unusual weapons," for there is scarcely a man in the community who does not own and occasionally use a gun of some sort.[8]

(Cramer Declaration, ¶ 15).

20. While decrying the regular wearing of arms "in our peace-loving and law-abiding State," the

Court admitted:

But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun, per se, constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.[9]

(Cramer Declaration, ¶ 16).

21. There is a 1795 Massachusetts law that directs justices of the peace to have arrested "all

affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go *armed*

*offensively*." [emphasis added]   The law did not prohibit any of these actions but directed that

the justice of the peace "shall require of the offender to find sureties for his keeping the peace,

and being of the good behaviour." [10] Again, the law is aimed narrowly at those "armed

---

[7] *State* v. *Huntly*, 3 N.C. 418 (1843),
https://www.claytoncramer.com/primary/rkbadecisions/Huntly1843.pdf , last accessed November 27, 2024.
[8] Id. at 422.
[9] Id. at 422, 423.
[10] 2 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER, 28, 1780 TO

offensively;" a general ban on open carry would be much simpler of a law. Even then, it does not prohibit being armed; at most it makes such persons at risk of forfeiting the bond for "misbehaviour."

(Cramer Declaration, ¶ 17).

22. An 1801 Tennessee law often cited out of context is "An act for the restraint of idle and disorderly persons."[11]  Section 6 reuses the language of the Statute of Northampton to prohibit "any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person."  Even then, it only directs judges to "bind such person or persons to their good

---

FEBRUARY 28, 1807, WITH THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 652-653 (Boston: printed by J. T. Buckingham for Thomas & Andrews, 1807),
https://books.google.com/books?id=Dh8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=LA
WS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%2
0NOVEMBER%2C%2028%2C%201780%20TO%20FEBRUARY%2028%2C%201807%2C%
20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%2
0AMERICA%2C%20AND%20OF%20THE%20COMMONWEALTH%2C%20PREFIXED&p
g=PA652#v=onepage&q=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASS
ACHUSETTS%20FROM%20NOVEMBER,%2028,%201780%20TO%20FEBRUARY%2028,
%201807,%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATE
S%20OF%20AMERICA,%20AND%20OF%20THE%20COMMONWEALTH,%20PREFIXED
&f=false , last accessed November 27, 2024.  Defendants cited this law with chapter numbers and page numbers that do not show where this law appears in official session laws.  I have attempted to locate the source for the image on which Defendants rely.  That secondary source, HeinOnline, has given several erroneous sources, or sources which cannot be located with their incomplete information.  Traceability seems inadequate for any serious scholarly work.
[11] For an example of this out of context quotation, see Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources, in DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/ , last accessed July 17, 2024.

behavior, and if he or they fail to find securities, commit him or them to jail."[12] (Cramer Declaration, ¶ 18).

23. Reading the entire statute gives some context suggesting that the law targeted *one* disreputable group, and was not a general ban:

> Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons…. That any person or persons who have no apparent means of subsistence or neglect applying themselves to some honest calling for the support of themselves and families every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful any justice of the peace or court of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and caused him to be brought before such said justice…[13]

(Cramer Declaration, ¶ 19).

24. All sections of the law are directed at these "wandering, disorderly and idle persons" and attempts to prevent their wandering without permanent residence or respectable employment. (Cramer Declaration, ¶ 20).

25. The law appears narrowly focused on vagrant gamblers and even then § 6 only requires posting a bond contingent on "their good behaviour," to avoid jail. This is again, a prohibition on concealed carry and open carry only if "to the terror of the people." (Cramer Declaration, ¶ 21).

26. Another often misrepresented law is "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof." This statute prohibits "if

---

[12] 1801 Tenn. Acts ch. 22, § 6 at 260-261. There is no online copy of this law although § 6 appears in 1 STATUTE LAWS OF THE STATE OF TENNESSEE 10 (1831), https://books.google.com/books?id=OhxEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22 any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&pg=P A10#v=onepage&q=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or %20%E2%80%9D&f=false , last accessed November 27, 2024.
[13] 1801 Tenn. Acts ch. 22, § 1 at 259-260.

34

any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if

any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously,

or tumultuously assembled."[14]  It was not a crime for an individual to be armed or even eleven

to be armed.  There must be at least twelve armed to constitute a crime. (Cramer Declaration,

¶ 22).

27. Why was this law written in such a way that it only applied to bodies of twelve or more armed

men or groups of thirty or more even if not armed?  "Whereas the provision already made by

law for the preventing routs, riots, and tumultuous assemblies and the evil consequences

thereof have been found insufficient."  This law was passed October 28, 1786, shortly after

Shays' Rebellion started disrupting courts in western Massachusetts.[15]  (Cramer Declaration,

¶ 23).

28. In the antebellum period challenges to concealed weapon laws often ended up in state supreme

courts.  While these decisions almost always upheld such laws, the way in which the courts

resolved the apparent conflict between "right to keep and bear arms" provisions was quite

important for open carry. (Cramer Declaration, ¶ 24).

29. *State v. Reid* (Ala. 1840) upheld a ban on concealed carry.  The decision admitted that a ban on

gun carrying had constitutional limits:

> We do not desire to be understood as maintaining, that in regulating the manner of
> bearing arms, the authority of the Legislature has no other limit than its own
> discretion.  A statute which, under the pretence of regulating, amounts to a
> destruction of the right, or which requires arms to be so borne as to render them

---

[14] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 346-7 (1807).,
https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22
LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clu
bs&pg=PA346#v=onepage&q=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%
20MASSACHUSETTS%22%20clubs&f=false , last accessed November 27, 2024.
[15] John Bach McMaster, 5 A HISTORY OF THE PEOPLE OF THE UNITED STATES, FROM THE
REVOLUTION TO THE CIVIL WAR 306 (1884).

34

wholly useless for the purpose of defence, would be clearly unconstitutional.  But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[16]  [emphasis added].

(Cramer Declaration, ¶ 25).

30. The Georgia Supreme Court in 1846 reviewed a very unclearly written law regulating sale and

carrying of arms of many types.  Because the Georgia Constitution had no right to keep and

bear arms provision, the Georgia Supreme Court ignored *Barron v. Baltimore* (1833), and

decided the Second Amendment limited state laws:

We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void...[17] [emphasis in the original].

(Cramer Declaration, ¶ 26).

31. Several postbellum Southern states attempted to discourage not only the concealed carrying of

arms, but open carry as well.  Because the Arkansas and Tennessee state constitutions had right

to bear arms provisions that referred to "the common defence," these laws limited the

---

[16] *State* v. *Reid*, 1 Ala. 612, 615, 616, 617 (1840),
https://books.google.com/books?id=yUtNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22
A%20statute%20which%2C%20under%20the%20pretence%20of%20regulating%2C%20amoun
ts%20to%20a%20destruction%20of%20the%20right%2C%20or%20which%20requires%20arm
s%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for
%20the%20purpose%20of%20defence%2C%20would%20be%20clearly%20unconstitutional.%
22&pg=PA616#v=onepage&q=%22A%20statute%20which,%20under%20the%20pretence%20
of%20regulating,%20amounts%20to%20a%20destruction%20of%20the%20right,%20or%20wh
ich%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wh
olly%20useless%20for%20the%20purpose%20of%20defence,%20would%20be%20clearly%20
unconstitutional.%22&f=false , last accessed November 27, 2024.
[17] *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).

categories of arms that might be openly borne, often allowing only "such as are commonly used in the United States military and naval service." These could be privately owned as long as they were the same as were used by the U.S. military.

(Cramer Declaration, ¶ 27).

32. The Arkansas Supreme Court heard an appeal involving a man convicted of carrying a "large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting. The trial court refused to allow a statement either by the owner of the pistol or the defendant as to the purpose of having the revolver and refused to charge the jury that carrying "an army size pistol" could not be regulated by Arkansas law. (Cramer Declaration, ¶ 28).

33. The Arkansas Supreme Court overturned the trial judge's instructions:

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[18]

(Cramer Declaration, ¶ 29).

34. The Arkansas Legislature responded to the *Wilson* and *Holland* decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols, except uncovered and in the hand."[19] In *Haile* v. *State* (1882), the first two sections of this act (which

---

[18] *Wilson* v. *State of Arkansas*, 33 Ark. 557, 558, 559, 560 (1878), https://www.claytoncramer.com/primary/rkbadecisions/WilsonHolland1878.pdf , last accessed November 27, 2024..

[19] Quoted in *Haile* v. *State*, 28 Ark. 563, 565 (1882), https://books.google.com/books?id=emhcDci6X8QC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20carrying%20of%20army%20pistols%2C%20except%20uncovered%20and%20in%20the%20hand.%E2%80%9D%22&pg=PA565#v=onepage&q=%22%E2%80%9Cthe%2

regulated carrying of handguns) were challenged.  The defendant, Haile, was convicted in Pope County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known as the Colts army pistol, and such as is used in the army and navy of the United States..."  The Arkansas Supreme Court decided:

> The question is, can the Legislature regulate the mode of carrying any arms which the citizens have the constitutional right to keep and bear for their common defense? We have decided that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise.[20]

(Cramer Declaration, ¶ 30).

35. Ordinarily, requiring a person to carry a handgun "uncovered and in the hand" might qualify as brandishing.  The important point is that the Arkansas Legislature felt so limited by Arkansas' constitutional provision that instead of prohibiting open carry, they required revolvers to be carried in the most dangerous manner imaginable.

(Cramer Declaration, ¶ 31).

36. *State v. Wilburn* (Tenn. 1872) made much the same distinction.  An 1871 law:

> that it shall not be lawful for any person to publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.[21]

(Cramer Declaration, ¶ 32).

---

0carrying%20of%20army%20pistols,%20except%20uncovered%20and%20in%20the%20hand. %E2%80%9D%22&f=false , last accessed November 27, 2024.

[20] *Haile* v. *State*, 38 Ark. 564, 565, 566 (1882).

[21] 1871 Tenn. Acts ch. 90, quoted in *State* v. *Wilburn*, 7 Tenn. 57. 61 (1872), https://books.google.com/books?id=3XMEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%2 2State%20v.%20Robert%20Wilburn%22&pg=PA57#v=onepage&q=%22State%20v.%20Robert %20Wilburn%22&f=false , last accessed November 27, 2024..

37. The Tennessee Supreme Court upheld this very dangerous method of open carry in the same way as the Arkansas Supreme Court because the Tennessee Constitution's arms provision had the same "common defence" qualifier as Arkansas:

> The Legislature has deemed it a proper prevention of crime to regulate the use of this arm by prohibiting the wearing of it or carrying it about the person, privately or publicly, unless it be carried openly in the hands, or unless it be worn or carried by an officer or policeman engaged in his duties, or by a traveler on a journey.[22]

(Cramer Declaration, ¶ 33).

38. The Court recognized that open carry was protected so strongly that only the most absurd regulation that still allowed open carry in some form was constitutional. (Cramer Declaration, ¶ 34).

39. Some state supreme courts have ruled that concealed carry of arms could be regulated without violating both state *and* federal guarantees of the right to bear arms as long as open carry remained lawful. Idaho's Supreme Court struck down a territorial era law:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law." Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.[23]

(Cramer Declaration, ¶ 35).

---

[22] *State* v. *Wilburn*, 7 Tenn. 57. 62, 63 (1872).
[23] *In Re Brickey*, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

40. Defendants have two experts with respect to the historical tradition of firearms regulations, Dr. Brennan Rivas and Dr. Michael Spitzer. Their expert declarations are attached as Exhibits 9 and 10, respectively.

41. Rivas testified that she has found three states, Massachusetts, West Virginia and Texas, and one territory, Idaho, that passed statutes barring the open carry of firearms.  (Excerpts of Rivas deposition, pp. 93-94, 102-03, excerpts attached as Exhibit 11).

42. Rivas said that she was aware of some municipal restrictions on open carry but added that there was no authoritative, searchable database of such regulations.  (Rivas deposition, pp. 94-95).

43. Rivas found that licensing requirements for open carrying were "generally local."  (Rivas deposition, pp. 101-02).

44. Rivas found that in Tennessee and Arkansas, open carry was statutorily less restricted than concealed carry as it was thought that open carry was less dangerous than concealed carry because other people could see who had a weapon and avoid them.  (Rivas deposition, pp. 110-11, 112-13).

45. Rivas found that people engaged in public carry "in preparation for an unforeseen potential emergency." (Rivas deposition, pp. 111-12).

46. Rivas found in her research that the most common constraint on public carry was social disapproval of the practice.  She cited newspaper articles calling on people to restrain from public carry.  As a result, people more frequently engaged in concealed carry.  (Rivas deposition, pp. 104-05).

47. Defendants' other expert, Robert Spitzer, testified that he did not specifically address in his expert declaration whether or not Rhode Island's regulatory scheme is consistent with a

historical tradition of open carry regulations.  (Spitzer deposition, p. 52, excerpts attached as Exhibit 12).

48. Spitzer said he has not been asked to render an opinion on that.  (Spitzer deposition, pp. 52-53).

49. Spitzer testified he could not specifically recall a previous case in which he has previously been retained as an expert that involved either concealed carry or open carry.  (Spitzer deposition, pp. 53-54).

50. For the period from the early 1800s up to 1860, Spitzer's Declaration identifies the District of Columbia and what he says are four states that enacted laws restricting the carrying of named weapons, whether open or concealed, Georgia, Florida, the borough of York, Pennsylvania, and Hawaii.  (Exhibit 5, ¶¶ 12-15).

51. Spitzer acknowledged that the Georgia Supreme Court struck down the statute's restriction on open carry as unconstitutional.  (Spitzer deposition, pp. 83-86).

52. Spitzer agrees that the Massachusetts act passed in 1751 did not prohibit an individual from engaging in either open or concealed carry.  (Spitzer deposition, pp. 79, 81-83).

53. Spitzer created a 137-page memorandum summarizing historical state statutes purportedly affecting the right to bear arm. Spitzer attached it to his Declaration as Exhibit C.  (Exhibit 13).

54. Spitzer created a separate chart listing these statutes by state, year of enactment, and type, including those that purposedly banned "Open Carry/Any Carry."  Spitzer attached it to his Declaration as Exhibit B. (Exhibit 14).

55. The majority of the statutes that Spitzer identifies as purportedly restricting open carry of firearms were promulgated after 1868. (Exhibt 14).

56. Some of the statutes Spitzer identifies for the period 1791 to 1868 are surety laws. (Exhibit

13).

57. Some of the statutes Spitzer identifies were promulgated by U.S. Territories or a foreign

country (Hawaii).  (Exhibits 13 and 14).

58. Spitzer included in his list statutes that prohibited "brandishing" or "display" of firearms.

(Exhibit 12, pp. 34-36).

59. Spitzer agreed that a person could engage in open carry without brandishing a weapon.  (Id.,

p. 60).

60. Spitzer agreed that, depending on the language of a statute and the circumstances, a person

could engage in open carry without violating a display law.  (Id. pp. 36-37).

Respectfully submitted,
**MICHAEL O'NEIL**
By his attorneys,

| | |
|---|---|
| */s/ Thomas W. Lyons* | */s/ Frank R. Saccoccio* |
| Thomas W. Lyons          #2946 | Frank R. Saccoccio Esq. #5949 |
| Strauss, Factor, Laing & Lyons | Saccoccio Law Office |
| One Davol Square, Suite 305 | 928 Atwood Avenue |
| Providence, RI 02903 | Johnston, Rhode Island 02919 |
| (401) 456-0700 | (401) 944-1600 * 942-8921 Fax |
| tlyons@straussfactor.com | Frank.CSLawOffice@gmail.com |

CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Thomas W. Lyons

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, DANIEL          :
PATTERSON, DONALD LABRIOLE        :
JOSEPH PATTON, RICHARD COOK       :
RICHARD LAPORTE and PETER         :
TREMEENTOZZI                      :
    Plaintiffs                :
                              :
        v.              :            C.A. No. 23-cv-70
                              :
PETER F. NERONHA, in his official  :
capacity as Attorney General of the State :
of Rhode Island, and THE STATE OF  :
RHODE ISLAND                      :
    Defendants                :

DECLARATION OF PLAINTIFF MICHAEL O'NEIL

Pursuant to 28 U.S.C. §1746, Plaintiff Michael O'Neil states:

1. I live in Warwick, Rhode Island.

2. I am over the age of 21. I am not a felon, or a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in 2013. That permit was renewed in 2017.

5. In October 2020, I also held a CCW permit issued by the City of Warwick. It was issued in 2019.

6. In October 2020, I filed an application with the RIAG to renew my permit.

7.  On January 25.2021, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the City of Warwick and therefore did not need the RIAG permit.

8.  I would like the option to engage in open carry of firearms for self-defense because I operate business selling and transferring firearms which involves travelling with firearms. I would also like the option of working for a private security company.

9.  In addition, I am active with the Rhode Island Second Amendment Coalition which advocates for gun rights and I have been subject to attempted intimidation by opponents.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 22, 2024.

Michael O'Neil

44

## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, DANIEL     :
PATTERSON, DONALD LABRIOLE   :
JOSEPH PATTON, RICHARD COOK   :
RICHARD LAPORTE and PETER     :
TREMEENTOZZI               :
     **Plaintiffs**             :
                          :
         v.                   :          C.A. No. 23-cv-70
                          :
PETER F. NERONHA, in his official   :
capacity as Attorney General of the State :
of Rhode Island, and THE STATE OF   :
RHODE ISLAND             :
     **Defendants**            :

### DECLARATION OF PLAINTIFF PETER TREMENTOZZI

Pursuant to 28 U.S.C. §1746, Plaintiff Peter Trementozzi states:

1. I live in Johnston, Rhode Island.

2. I am over the age of 21. I am not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately __1998__. That permit was renewed in __2002__, __2006__, and __2010__. 2018

5. In December 2021, I also held a CCW permit issued by the Town of Scituate. It was issued in April 2020.

6. In December 2021, I filed an application with the RIAG to renew my permit.

7. On March 12, 2022, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of Scituate and therefore did not need the RIAG permit.

8. I would like the option to engage in open carry of firearms for self-defense as I am employed part-time by a store that sells firearms and we often deal with large amounts of cash. I am encouraged to carry a firearm when I work at the store.

9. I also operate a business manufacturing and selling ammunition. I carry a firearm when I am at that business.

10. I may also return to work as a private security guard which would require me to engage in open carry.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November __, 2024.

Peter Trementozzi

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **MICHAEL P. O'NEIL, DANIEL** : | |
| **PATTERSON, DONALD LABRIOLE** : | |
| **JOSEPH PATTON, RICHARD COOK** : | |
| **RICHARD LAPORTE and PETER** : | |
| **TREMEENTOZZI** : | |
|     **Plaintiffs** : | |
| : | |
|       **v.** : | **C.A. No. 23-cv-70** |
| : | |
| **PETER F. NERONHA, in his official** : | |
| **capacity as Attorney General of the State** : | |
| **of Rhode Island, and THE STATE OF** : | |
| **RHODE ISLAND** : | |
|     **Defendants** : | |

## DECLARATION OF PLAINTIFF RICHARD LAPORTE

Pursuant to 28 U.S.C. §1746, Plaintiff Richard Laporte states:

1. I live in North Kingstown, Rhode Island.

2. I am over the age of 21. I am not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately 2010. That permit was renewed in 2014, and 2018.

5. In September 2021, I also held a CCW permit issued by the Town of North Kingstown. It was issued in May 2020.

6. In September 2021, I filed an application with the RIAG to renew my permit.

7. On January 4, 2022, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of North Kingstown and therefore did not need the RIAG permit.

8. I would like the option to engage in open carry of firearms for self-defense as I travel to shooting competitions with firearms and may also be carrying large amounts of cash for a business I hope to start buying and selling used automobiles.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 21, 2024.

Richard Laporte

## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, DANIEL :
PATTERSON, DONALD LABRIOLE :
JOSEPH PATTON, RICHARD COOK :
RICHARD LAPORTE and PETER :
TREMEENTOZZI :
  Plaintiffs     :
          :
   v.      :     C.A. No. 23-cv-70
          :
PETER F. NERONHA, in his official :
capacity as Attorney General of the State :
of Rhode Island, and THE STATE OF :
RHODE ISLAND     :
  Defendants     :

### DECLARATION OF PLAINTIFF DANIEL PATTERSON

  Pursuant to 28 U.S.C. §1746, Plaintiff Daniel Patterson states:

1. I live in Exeter, Rhode Island.

2. I am over the age of 21. I pled nolo contendere to charge of possession of alcohol by a minor when I was 20 years old in 1983. Otherwise, I have no criminal record. I am not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately _2006_ . That permit was renewed every ~~two~~ Four years until 2022. owP

5. In January 2022, I also held a CCW permit issued by the Town of Exeter. It was issued in November 2021.

6. In April 2022, I filed an application with the RIAG to renew my permit.

7. On April 23, 2022, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of Exeter and therefore did not need the RIAG permit.

8. I would like the option to engage in open carry of firearms for self-defense because I operate a construction business, including the use of explosives, and sometimes work in less safe areas of the state, and because I also operate a gun shop.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November __, 2024.

Daniel Patterson

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, DANIEL          :
PATTERSON, DONALD LABRIOLE         :
JOSEPH PATTON, RICHARD COOK        :
RICHARD LAPORTE and PETER          :
TREMEENTOZZI                       :
    Plaintiffs                 :
                               :
        v.                 :          C.A. No. 23-cv-70
                               :
PETER F. NERONHA, in his official  :
capacity as Attorney General of the State :
of Rhode Island, and THE STATE OF  :
RHODE ISLAND                       :
    Defendants                 :

DECLARATION OF PLAINTIFF DONALD LABRIOLE

Pursuant to 28 U.S.C. §1746, Plaintiff Donald Labriole states:

1. I live in Coventry, Rhode Island.

2. I am over the age of 21. I am not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately 1991. That permit was renewed every two years until 2021.

5. In January 2022, I also held a CCW permit issued by the Town of West Greenwich. It was issued in November 2021.

6.  In August 2021, I filed an application with the RIAG to renew my permit.

7.  On November 7, 2021, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of West Greenwich and therefore did not need the RIAG permit.

8.  I would like the option to engage in open carry of firearms for self-defense because I operate a construction business and sometimes work in less safe areas of the state.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 21, 2024.

Donald Labriole

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MICHAEL P. O'NEIL, DANIEL PATTERSON, DONALD LABRIOLE JOSEPH PATTON, RICHARD COOK RICHARD LAPORTE and PETER TREMEENTOZZI | : : : : : | |
| Plaintiffs | : | |
| v. | : | C.A. |
| No. 23-cv-70 | : | |
| PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND | : : : : | |
| Defendants | : | |

**DECLARATION OF PLAINTIFF JOSEPH PATTON**
*Pursuant to 28 U.S.C. §1746, Plaintiff Joseph Patton states:*

1. I live in Foster, Rhode Island.

2. I am over the age of 21. I am not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately _2014_. That permit was renewed in _2018_, _____, and _____.

5. In January 2022, I also held a CCW permit issued by the Town of Foster. It was issued in _5-02-21_.

6. In January 2022, I filed an application with the RIAG to renew my permit.

7. On January 25, 2022, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of Foster and therefore did not need the RIAG

53

permit.

8. I would like the option to engage in open carry of firearms for self-defense because I AM NRA INSTRUCTOR TRAVEL WITH GUNS + AMO Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 20, 2024.

Joseph B Patton
Joseph Patton

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

MICHAEL P. O'NEIL, DANIEL        :
PATTERSON, DONALD LABRIOLE       :
JOSEPH PATTON, RICHARD COOK      :
RICHARD LAPORTE and PETER        :
TREMEENTOZZI                     :
    Plaintiffs              :

                 :

      **v.**           :                  **C.A.**
No. 23-cv-70

                 :

PETER F. NERONHA, in his official   :
capacity as Attorney General of the State :
of Rhode Island, and THE STATE OF   :
RHODE ISLAND                        :
    Defendants              :

DECLARATION OF PLAINTIFF RICHARD COOK
Pursuant to 28 U.S.C. §1746, Plaintiff Richard Cook states:

1. I live in Charlestown, Rhode Island.

2. I am over the age of 21. I am not a felon, not a fugitive from justice, not in community confinement or otherwise subject to electronic surveillance, not mentally incompetent, not a drug addict or a drunkard, and not an immigrant who entered or remained in the country illegally.

3. I have obtained a "blue card" from the Rhode Island Department of Environmental Management that permits me to purchase a handgun and ammunition in Rhode Island.

4. I first obtained a concealed carry (CCW) permit issued by the Rhode Island Attorney General (RIAG) in approximately _2009_. That permit was renewed in _2013_, _2017_, and _____.

5. In April 2021, I also held a CCW permit issued by the Town of Charlestown. It was issued in _2013, 2017, 2020_.

6. In April 2021, I filed an application with the RIAG to renew my permit.

7. On August 4, 2021, the RIAG denied the renewal of my CCW permit on the grounds that I had the CCW permit from the Town of Charlestown and therefore did not need the RIAG

55    permit.

8. I would like the option to engage in open carry of firearms for self-defense because *it is my constitutional right*

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 25, 2024.

_Richard Cook_

Richard Cook

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL P. O'NEIL, DANIEL** | : | |
| **PATTERSON, DONALD LABRIOLE** | : | |
| **JOSEPH PATTON, RICHARD COOK** | : | |
| **RICHARD LAPORTE and PETER** | : | |
| **TREMEENTOZZI** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **C.A. No. 23-cv-70** |
| | : | |
| **PETER F. NERONHA, in his official** | : | |
| **capacity as Attorney General of the State** | : | |
| **of Rhode Island, and THE STATE OF** | : | |
| **RHODE ISLAND** | : | |
| **Defendants** | : | |

DECLARATION OF CLAYTON CRAMER

Pursuant to 28 U.S.C. §1746, Clayton Cramer states:

# I.     Background and Qualifications

1. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons ownership and regulation. My 18 published articles (mostly in law reviews) have been cited in *D.C.* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *Chicago*, 561 U.S. 742 (2010); *Jones* v. *Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones* v. *Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young* v. *Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by *Young* v. *Hawaii*, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State* v. *Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna* v. *Florimont*, 196 N.J. 469 (N.J.

2008); *Mosby* v. *Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.  In several cases, my work has been cited in defense of laws limiting firearms ownership: *State* v. *Roundtree* (Wisc. 2021), *State* v. *Christen* (Wisc. 2021), *King* v. *Sessions* (E.D.Penn. 2018). My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]  I reside in Caldwell, Idaho.

3.  I have submitted expert declarations in *Association Of New Jersey Rifle & Pistol Clubs, Inc.* v. *Platkin* (D.N.J. 2023); *Arizona* v. *Bolin* (Ariz.Sup. 2023); *Arizona* v. *Coleman* (Ariz.Sup. 2023); *Baird* v. *Bonta* (E.D.Cal. 2023); *Boland* v. *Bonta* (C.D.Cal. 2023); *Brumbeck* v. *Ferguson* (E.D.Wash. 2024); *Gates* v. *Polis* (D.Colo. 2023); *City of Columbus* v. *Ohio* (O.Ct.Com.Pleas 2023); *California Rifle & Pistol Association, Inc.* v. *Los Angeles County Sheriff's Department* (C.D.Cal. 2024); *Delaware State Sportsmen's Association, Inc.* v. *Delaware Department Of Safety And Homeland Security* (D.Del. 2023); *Georgia* v. *Nichols* (Ga.Sup. 2023); *National Association For Gun Rights* v. *Lopez* (D.Haw. 2023); *Wolford* v. *Lopez* (D.Haw. 2023); *National Association For Gun Rights* v. *City of Highland Park* (E.D.Ill. 2023); *Herrera* v. *Raoul* (N.D. Ill. 2023); *May* v. *Bonta* (S.D.Cal. 2024); *New York* v. *Sullivan* (N.Y.Sup. 2023); *National Association For Gun Rights* v. *City Of Naperville* (E.D.Ill. 2023); *State of Ohio* v. *City of Columbus* (Ct.Com.Pleas 2023); *Oregon Firearms Federation* v. *Kotek* (D.Ore. 2023); *Palmer* v. *Dept. of Environmental Management* (R.I.Sup. 2023); *Rhode Island* v. *Ortiz* (R.I.Sup. 2023); *Rhode* v. *Bonta* (S.D.Cal. 2024); *Rocky Mountain Gun Owners* v. *Polis* (D.Colo. 2023); *Rupp* v. *Bonta* (C.D.Cal. 2022); *Siegel* v. *Platkin* (D.N.J. 2023); *U.S.* v. *Ayala*

---

[1] *McDonald* v. *Chicago*, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

(M.D.Fla. 2023); *U.S.* v. *Fowler* (E.D.Va. 2023); *U.S.* v. *Bailey* (E.D.Tenn. 2023); *U.S.A.* v. *Kazmende* (N.D.Ga. 2023).

4. My published books include: *For The Defense Of Themselves And The State: The Original Intent and Judicial Interpretation of the Right To Keep And Bear Arms* (1994); *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999); *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (2007); *Lock, Stock, and Barrel: The Origins of American Gun Culture* (2018).

## II.    Summary

5. Regulation of open carry of arms is rare in American history.  What few examples are often cited are usually laws that targeted a particular group regarded as dangerous, a particular dangerous action of which carrying arms was only *one* element, or where the laws were short-lived and whose relevance has been explicitly rejected by *Bruen*.

6. State supreme courts in the era before 1868 often upheld concealed carry regulation because bans on concealed carry did not prohibit open carry.  As long as one or the other remained lawful, the right to armed self-defense was preserved.  This understanding persisted after 1868, sometimes with absurd results.

## III.    Open Carry Regulation is Modern

7. Laws regulating *open* carrying of arms are surprisingly recent.  Even when such laws existed in the Framing Era, they were usually short-lived, atypical, and narrowly focused on particular abuses of carrying arms; particular groups carrying arms; or particular categories of arms; they were not general bans on open carry.

8. Laws regulating *concealed* carry of firearms are more common in the era before 1868. State supreme courts were often asked to judge the constitutionality of such laws, usually with respect to state constitution right to keep and bear arms provisions. (In the case of Tennessee and Arkansas, these provisions including language that seems to have referred only to "common defence," and were interpreted far more narrowly than the Second Amendment.) When the courts have upheld such concealed weapon laws, they have usually done so because open carry remained lawful.

## IV.    Framing Era Laws

9. There are very few laws in the Framing Era that regulated the carrying of arms. The East New Jersey law of 1686 prohibited dueling and its associated actions ("send any challenge in writing, by word of mouth, or message"), *concealed* carry ("privately to wear any pocket pistol, skeines, stilladers, daggers or dirks") as well as a ban on riding or going "armed with sword, pistol, or dagger."[2] The latter was certainly a ban on open carry, but as *Bruen* observed, the law was both short-lived and limited to "planters":

> First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense —including the popular musket and carbine. … Second, it does not appear that the statute survived for very long. By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol ... into the woods, or plantations" unless their owner accompanied them. Grants and Concessions 341. If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence. Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey. See 1 Nevill, Acts of the General Assembly of the Province of New- Jersey (1752). At most eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.[3]

---

[2] An Act Against Wearing Swords, &c., ch. 9, in GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 289-290 (2d ed. 1881).
[3] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 2111, 2145 (2022).

10. The law also exempted "all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably."[4]  This was a law aimed at a particular class and not a *general* ban on open carry.

11. Several colonies and states passed laws that punished particular behaviors of which the carrying of arms was only *one* component of the crime.  The 1786 Virginia law that ordered that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, *in terror of the Country*," [emphasis added] clearly requires that such action must be "in terror of the Country," analogous to, and using some of the language of the Statute of Northampton (1328).  This law required not simply the carrying of arms but actions that produced terror.  If the law sought to prohibit *all* open carry of arms, there would be no need to specify "in terror of the Country."  Finally, the title of the law "An Act Forbidding and Punishing Affrays" establishes that the goal was to avoid causing fear.  Blackstone defined "affray" as "the fighting of two or more persons in some public place, to the *terror* of his majesty's subjects."[5] [emphasis added]

12. Case law from the early Republic continued to distinguish the carrying of arms from affray (actions that cause terror).  *Simpson* v. *State* (Tenn. 1833) was a case where the defendant was indicted for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of

---

[4] An Act Against Wearing Swords, &c., op cit. 290.

[5] William Blackstone, 4 COMMENTARIES ON THE LAWS OF ENGLAND 145 (1769) https://books.google.com/books?id=Wn7PPtzK86kC&newbks=1&newbks_redir=0&dq=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20more%20persons%20in%20some%20public%20place%2C%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&pg=PA145#v=onepage&q=%22%E2%80%9Cthe%20fighting%20of%20two%20or%20more%20persons%20in%20some%20public%20place,%20to%20the%20terror%20of%20his%20majesty%E2%80%99s%20subjects%22&f=false, last accessed November 25, 2024.

divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because, citing Blackstone:

> A phrase, from a affrayer to terrify, are the fighting of two or more persons, in some public place, to the terror of His Majesty subjects; for if the fighting being in private it is no affray, but an assault. It will be observed, that according to this definition of an affray by Blackstone, three things are necessary to constitute it. First: there must be fighting. Second: this fighting must be by or between two or more persons. And, Third: it must be in some public place to cause terror to the people.[6]

13. Whatever fear Simpson caused, he did fight anyone and his mere "with force and arms, being arrayed in a warlike manner" was not a crime alone.

14. In *State* v. *Huntley* (N.C. 1843), the defendant was not simply carrying arms:

> In the investigation before the jury it appeared, among other things, that the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barreled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him";[7]

15. Even in this case, the North Carolina Supreme Court distinguished the Statute of Northampton's prohibition of "unusual weapons":

---

[6] *Simpson* v. *State*, 13 Tenn. (5 Yer.) 356, 357, 358 (1833), https://books.google.com/books?id=RFNI4BifGs8C&newbks=1&newbks_redir=0&dq=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground%2C%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them%2C%20this%20English%20statute%22&pg=PA357#v=onepage&q=%22But%20suppose%20it%20to%20be%20assumed%20on%20any%20ground,%20that%20our%20ancestors%20adopted%20and%20brought%20over%20with%20them,%20this%20English%20statute%22&f=false, last accessed November 25, 2024.

[7] *State* v. *Huntley*, 3 N.C. 418 (1843), https://www.claytoncramer.com/primary/rkbadecisions/Huntly1843.pdf , last accessed November 25, 2024.

> It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of "unusual weapons," for there is scarcely a man in the community who does not own and occasionally use a gun of some sort.[8]

16. While decrying the regular wearing of arms "in our peace-loving and law-abiding State," the Court admitted:

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun, *per se*, constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.[9]

17. There is a 1795 Massachusetts law that directs justices of the peace to have arrested "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go *armed offensively*." [emphasis added]   The law did not prohibit any of these actions but directed that the justice of the peace "shall require of the offender to find sureties for his keeping the peace, and being of the good behaviour." [10]  Again, the law is aimed narrowly at those "armed

---

[8] Id. at 422.

[9] Id. at 422, 423.

[10] 2 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER, 28, 1780 TO FEBRUARY 28, 1807, WITH THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 652-653 (Boston: printed by J. T. Buckingham for Thomas & Andrews, 1807), https://books.google.com/books?id=Dh8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=LA WS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%2 0NOVEMBER%2C%2028%2C%201780%20TO%20FEBRUARY%2028%2C%201807%2C% 20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%2 0AMERICA%2C%20AND%20OF%20THE%20COMMONWEALTH%2C%20PREFIXED&p g=PA652#v=onepage&q=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASS ACHUSETTS%20FROM%20NOVEMBER,%2028,%201780%20TO%20FEBRUARY%2028, %201807,%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATE S%20OF%20AMERICA,%20AND%20OF%20THE%20COMMONWEALTH,%20PREFIXED &f=false , last accessed November 25, 2024.  Defendants cited this law with chapter numbers and page numbers that do not show where this law appears in official session laws.  I have attempted to locate the source for the image on which Defendants rely.  That secondary source, HeinOnline, has given several erroneous sources, or sources which cannot be located with their incomplete information. Traceability seems inadequate for any serious scholarly work.

offensively;" a general ban on open carry would be much simpler of a law. Even then, it does not prohibit being armed; at most it makes such persons at risk of forfeiting the bond for "misbehaviour."

18. An 1801 Tennessee law often cited out of context is "An act for the restraint of idle and disorderly persons."[11]  Section 6 reuses the language of the Statute of Northampton to prohibit "any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person."  Even then, it only directs judges to "bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail."[12]

19. Reading the entire statute gives some context suggesting that the law targeted *one* disreputable group, and was not a general ban:

> Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons…. That any person or persons who have no apparent means of subsistence or neglect applying themselves to some honest calling for the support of themselves and families every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful any justice of the peace or court of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and caused him to be brought before such said justice…[13]

---

[11] For an example of this out of context quotation, see Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources, in DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/ , last accessed July 17, 2024.

[12] 1801 Tenn. Acts ch. 22, § 6 at 260-261.  There is no online copy of this law although § 6 appears in 1 STATUTE LAWS OF THE STATE OF TENNESSEE 10 (1831), https://books.google.com/books?id=OhxEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&pg=PA10#v=onepage&q=%22any%20person%20or%20persons%20shall%20publicly%20ride%20or%20%E2%80%9D&f=false , last accessed November 25, 2024.

[13] 1801 Tenn. Acts ch. 22, § 1 at 259-260.

20. All sections of the law are directed at these "wandering, disorderly and idle persons" and attempts to prevent their wandering without permanent residence or respectable employment.

21. The law appears narrowly focused on vagrant gamblers and even then § 6 only requires posting a bond contingent on "their good behaviour," to avoid jail. This is again, a prohibition on concealed carry and open carry only if "to the terror of the people."

22. Another often misrepresented law is "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof." This statute prohibits "if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."[14] It was not a crime for an individual to be armed or even eleven to be armed. There must be at least twelve armed to constitute a crime.

23. Why was this law written in such a way that it only applied to bodies of twelve or more armed men or groups of thirty or more even if not armed? "Whereas the provision already made by law for the preventing routs, riots, and tumultuous assemblies and the evil consequences thereof have been found insufficient." This law was passed October 28, 1786, shortly after Shays' Rebellion started disrupting courts in western Massachusetts.[15]

---

[14] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 346-7 (1807)., https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&pg=PA346#v=onepage&q=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&f=false , last accessed November 25, 2024.

[15] John Bach McMaster, 5 A HISTORY OF THE PEOPLE OF THE UNITED STATES, FROM THE REVOLUTION TO THE CIVIL WAR 306 (1884).

## V.     Open Carry Protections and Concealed Carry

24. In the antebellum period challenges to concealed weapon laws often ended up in state supreme courts.  While these decisions almost always upheld such laws, the way in which the courts resolved the apparent conflict between "right to keep and bear arms" provisions was quite important for open carry.

25. *State v. Reid* (Ala. 1840) upheld a ban on concealed carry.  The decision admitted that a ban on gun carrying had constitutional limits:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion.  *A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.*  But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[16]  [emphasis added]

26. The Georgia Supreme Court in 1846 reviewed a very unclearly written law regulating sale and carrying of arms of many types.  Because the Georgia Constitution had no right to keep and bear arms provision, the Georgia Supreme Court ignored *Barron v. Baltimore* (1833), and decided the Second Amendment limited state laws:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen

---

[16] *State* v. *Reid*, 1 Ala. 612, 615, 616, 617 (1840), https://books.google.com/books?id=yUtNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22A%20statute%20which%2C%20under%20the%20pretence%20of%20regulating%2C%20amounts%20to%20a%20destruction%20of%20the%20right%2C%20or%20which%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for%20the%20purpose%20of%20defence%2C%20would%20be%20clearly%20unconstitutional.%22&pg=PA616#v=onepage&q=%22A%20statute%20which,%20under%20the%20pretence%20of%20regulating,%20amounts%20to%20a%20destruction%20of%20the%20right,%20or%20which%20requires%20arms%20to%20be%20so%20borne%20as%20to%20render%20them%20wholly%20useless%20for%20the%20purpose%20of%20defence,%20would%20be%20clearly%20unconstitutional.%22&f=false , last accessed November 25, 2024.

of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[17] [emphasis in the original]

27. Several postbellum Southern states attempted to discourage not only the concealed carrying of arms, but open carry as well. Because the Arkansas and Tennessee state constitutions had right to bear arms provisions that referred to "the common defence," these laws limited the categories of arms that might be openly borne, often allowing only "such as are commonly used in the United States military and naval service." These could be privately owned as long as they were the same as were used by the U.S. military.

28. The Arkansas Supreme Court heard an appeal involving a man convicted of carrying a "large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting. The trial court refused to allow a statement either by the owner of the pistol or the defendant as to the purpose of having the revolver and refused to charge the jury that carrying "an army size pistol" could not be regulated by Arkansas law.

29. The Arkansas Supreme Court overturned the trial judge's instructions:

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.

> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[18]

30. The Arkansas Legislature responded to the *Wilson* and *Holland* decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols, except

---

[17] *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).
[18] *Wilson* v. *State of Arkansas*, 33 Ark. 557, 558, 559, 560 (1878), https://www.claytoncramer.com/primary/rkbadecisions/WilsonHolland1878.pdf , last accessed November 25, 2024..

uncovered and in the hand."[19]  In *Haile* v. *State* (1882), the first two sections of this act (which

regulated carrying of handguns) were challenged.  The defendant, Haile, was convicted in Pope

County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known

as the Colts army pistol, and such as is used in the army and navy of the United States..."  The

Arkansas Supreme Court decided:

> The question is, can the Legislature regulate the mode of carrying any arms which the citizens
> have the constitutional right to keep and bear for their common defense?  We have decided
> that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect,
> not to nullify the right, nor materially embarrass its exercise.[20]

31. Ordinarily, requiring a person to carry a handgun "uncovered and in the hand" might qualify

    as brandishing.  The important point is that the Arkansas Legislature felt so limited by

    Arkansas' constitutional provision that instead of prohibiting open carry, they required

    revolvers to be carried in the most dangerous manner imaginable.

32. State v. Wilburn (Tenn. 1872) made much the same distinction.  An 1871 law:

> that it shall not be lawful for any person to publicly or privately carry a dirk, sword- cane,
> Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are
> commonly carried and used in the United States army, and in no case shall it be lawful for
> any person to carry such army pistol publicly or privately about his person in any other
> manner than openly in his hands.[21]

---

[19] Quoted in *Haile* v. *State*, 28 Ark. 563, 565 (1882),
https://books.google.com/books?id=emhcDci6X8QC&newbks=1&newbks_redir=0&dq=%22%
E2%80%9Cthe%20carrying%20of%20army%20pistols%2C%20except%20uncovered%20and%
20in%20the%20hand.%E2%80%9D%22&pg=PA565#v=onepage&q=%22%E2%80%9Cthe%2
0carrying%20of%20army%20pistols,%20except%20uncovered%20and%20in%20the%20hand.
%E2%80%9D%22&f=false , last accessed November 25, 2024.
[20] *Haile* v. *State*, 38 Ark. 564, 565, 566 (1882).
[21] 1871 Tenn. Acts ch. 90, quoted in *State* v. *Wilburn*, 7 Tenn. 57. 61 (1872),
https://books.google.com/books?id=3XMEAAAAYAAJ&newbks=1&newbks_redir=0&dq=%2
2State%20v.%20Robert%20Wilburn%22&pg=PA57#v=onepage&q=%22State%20v.%20Robert
%20Wilburn%22&f=false , last accessed November 25, 2024..

33. The Tennessee Supreme Court upheld this very dangerous method of open carry in the same way as the Arkansas Supreme Court because the Tennessee Constitution's arms provision had the same "common defence" qualifier as Arkansas:

> The Legislature has deemed it a proper prevention of crime to regulate the use of this arm by prohibiting the wearing of it or carrying it about the person, privately or publicly, unless it be carried openly in the hands, or unless it be worn or carried by an officer or policeman engaged in his duties, or by a traveler on a journey.[22]

34. The Court recognized that open carry was protected so strongly that only the most absurd regulation that still allowed open carry in some form was constitutional.

35. Some state supreme courts have ruled that concealed carry of arms could be regulated without violating both state *and* federal guarantees of the right to bear arms as long as open carry remained lawful. Idaho's Supreme Court struck down a territorial era law:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law." Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages. We are compelled to hold this statute void.[23]

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 11, 2024.

_____

Clayton Cramer

_____

[22] *State* v. *Wilburn*, 7 Tenn. 57. 62, 63 (1872).
[23] *In Re Brickey*, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

MICHAEL P. O'NEIL, et al.
      Plaintiffs,

v.

PETER F. NERONHA, in his official
capacity as Attorney General of the State
of Rhode Island, and THE STATE OF
RHODE ISLAND,
      Defendants.

C.A. No. 1:23-cv-00070

## **EXPERT REPORT AND DECLARATION OF DR. BRENNAN RIVAS**

I, Brennan Rivas, pursuant to 28 U.S.C. § 1746 hereby declare as follows:

## INTRODUCTION

1.      I have been asked by the Rhode Island Office of the Attorney General to render an opinion about the history of firearms restrictions enacted in the nineteenth century, especially as they relate to the open and concealed carrying of weapons. I have also been asked to provide additional contextual information about the history of deadly weapons and societal attitudes about them. I am being compensated by the Rhode Island Office of the Attorney General at a rate of $225/hour for research and consultation, $250/hour for writing and editing materials, and $325/hour for deposition, testimony, and related activities.

## QUALIFICATIONS

2.      I am a historian and currently work as a Senior Postdoctoral Researcher at the Center for the Study of Guns and Society at Wesleyan University in Middletown, Connecticut. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of

1

Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

3. My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

4. I have provided expert witness testimony in the following cases: *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 1:22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, No. 21 Civ. 5334 (NSR) (S.D.N.Y.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Or. Firearms Fed'n, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Chavez v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.) (f/k/a *Jones v. Bonta*); *Nguyen v. Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Baird v. Bonta*, No. 2:19-

cv-00617-KJM-AC (E.D. Cal.); *Nichols v. Bonta*, No. 3:11-cv-09916-SJO-SS (C.D. Cal.); *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Wolford v. Lopez*, No. 1:23-cv-00265-LEK-WRP (D. Haw.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01077-JLK (D. Col.); *Kipke v. Moore*, No. 1:23-cv-01293-GRL (D. Md.); *Ohio v. City of Columbus*, No. 22-cv-00657 (Com. Pleas, Fairfield Cnty., Ohio); *Schoenthal v. Raoul*, No. 3:22-cv-50326 (N.D. Ill.); *May v. Bonta*, No. 8:23-cv-01696 CJC and No. 1:23-cv-01798 CJC (C.D. Cal.); *State of Washington v. Gator's Custom Guns, Inc.*, No. 23-2-00897-08 (Sup. Ct., Cowlitz Cty., Wash.); *California Rifle & Pistol Assoc. v. Bonta*, No. 2:23-cv-10169, C.D. Cal.); *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.); *Hartford v. Ferguson*, No. 3:23-cv-5364 (W.D. Wash.); *Birney v. Delaware Department of Safety and Homeland Security*, C.A. No. K23C-07-019 RLG (Sup. Ct., Del. St.). I am currently working on potential expert witness reports and declarations that may be provided in other jurisdictions. I have been deposed and testified at trial in one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.), and I have been deposed in *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL (S.D. Cal.).

## METHODOLOGY

5.  This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed, scholarly books and articles, in addition to law review articles and media such as blogs and news articles. I have supplemented that with additional research into the development of firearms, cartridge, and magazine technologies during the late nineteenth and early twentieth centuries. I have read or consulted many books about the development of firearms and other weapons from the early modern period to the mid-twentieth century. In addition to online repositories like Westlaw, Hein

Online, Hathi Trust, Chronicling America, and the Duke Repository of Historical Gun Laws, I have made use of digital collections housing government documents and rare newspapers.

## SUMMARY OF OPINIONS

6.     Throughout the nineteenth century, Americans defined *deadly weapons* in contradistinction to militia arms, and regulated their presence in public spaces through various policies. These ran the gamut from public carry laws to locational restrictions, sales regulations, personal or occupation taxes, and licensing procedures. Public carry laws enacted during this period were innovations upon a longstanding English tradition—present in the North American colonies—which forbade the general carrying of weapons in public.[1] Other policy measures were similarly rooted in longstanding legal and regulatory practice. Local concerns drove the passage of state and local legislation pertaining to firearms and weapons, but such policies when taken as a whole represent a response by Americans across the country to pressing concerns about public safety, gun violence, and armed criminal activity.

7.     Concerns about public safety were very real to nineteenth-century Americans, who lived through horrifying racial and political violence, and experienced the social dislocations caused by industrialization, rapid urbanization, and family farming in the shadow of a globalizing marketplace. All of these forces drove Americans apart from one another on the basis of factors like race, class, wealth, and region. Where Americans were intractably divided, there too they were more likely to experience violence committed upon them or deploy it in settling conflicts.[2] At the

---

[1] The Statute of Northampton did not apply to the king's ministers, persons assisting them, or people taking up arms in response to the hue and cry. See 2 Edw. 3, c. 3 (1328).

[2] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 300 ("Ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation. As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and the rise of industrialized cities—the patriotic faith in government that most Americans had felt so strongly after the Revolution was undermined by anger and distrust. Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.").

same time, nineteenth-century Americans witnessed rapid technological change that transformed transportation, consumer-goods production, medicine and pharmaceuticals, and firearms. At the beginning of the century, pistols were single-shot, hand-made, muzzle-loading devices primarily used by mounted soldiers in conjunction with sabres; but by century's end, dramatic developments in machine production and engineering had turned pistols into mass-produced, repeat-fire weapons available for purchase in such large numbers and in such small sizes that almost anyone with the inclination could acquire one and carry it concealed. Even though rates of homicide and crime fluctuated over time and by locale, they were generally made worse by easier access to inexpensive weapons and widely available weapons that were conducive to (if not designed for) concealment. Nineteenth-century gun and weapon regulations should be interpreted in light of this important contextual landscape.

8. Like all elements of American life and history, gun regulation has at times been entwined with this country's unenviable heritage of racial slavery and class conflict, but it would be a misreading of the historical record to attribute the entire enterprise to racist or classist intentions. Governmental bodies (tainted as they were by sentiments and beliefs we now find repugnant) embraced weapon regulations as a part of their fundamental obligation to protect the public and preserve the peace.

9. This declaration and report explores the various approaches to public carry regulation (including those that restricted open- as well as concealed-carry) in detail. The public-carry tradition set the stage for the development of licensing laws that vested local officials with the authority to issue permits for specific individuals. At times they had to follow statutory constraints in evaluating license applications, but in many instances licensing laws depended upon the discretion of local police, boards, marshals, commissioners, and mayors.

10.     This declaration and report also explains that Americans of the nineteenth century who habitually carried deadly weapons (meaning the non-militia weapons discussed below) in public spaces generally did so concealed rather than openly. Sources from nineteenth-century social history show that the open carrying or wearing of deadly weapons in populated areas carried negative connotations—indicating one's rudeness, proclivity toward violence, or embroilment in a potentially deadly conflict. To be *seen* carrying weapons invited suspicion, judgment, or even the intervention of local officials charged with keeping the peace; for this reason, weapon-carriers of the nineteenth century tended to conceal their knives and revolvers in unobtrusive parts of their bodies and clothing (within a pocket, under a coat, tucked inside a boot, etc.). The open carrying of weapons like knives and revolvers was more likely to occur in rural or isolated areas where weapon-wearers were shielded from public view, exposed to significant dangers, or on their own property. Rather than a national or even regional norm, the everyday open carrying of deadly weapons was a divergent behavior, noteworthy according to the travelers, adventurers, and commentators who encountered it. If habitual weapon-carriers usually shared a preference for concealment, they also appear to have shared a motivation of being preemptively armed in case of an unforeseen emergency. In other words, those who regularly carried weapons did so in ways (concealed) and for reasons (preemptive self-defense) that Americans today should find familiar. The difference, though, is that nineteenth-century Americans created regulations that aimed to suppress the everyday, casual carrying of deadly weapons for preemptive self-defense when there was no specific, articulable threat to the weapon-carrier. Moreover, they and their courts understood such weapon regulations to operate in harmony with both the Second Amendment and the right of self-defense. It is important to bear historical context in mind—including information about social attitudes, public opinion, dress, and popular sentiment—when evaluating historical

regulations, because they were not written and enforced in a social vacuum any more than our laws are today.

## DEFINING DEADLY WEAPONS

11.      Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as *deadly weapons*.[3] In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*, but they would have much more frequently used such weapons for hunting. Rifles, muskets, and shotguns were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[4]

12.      A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely than their eighteenth-century predecessors to take  deadly weapons such as dirks, bowie knives, and pocket pistols into public settings with them. Rates of

---

[3] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 79–80, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, et al., *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, prohibiting the carrying of any "firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblage[s]." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[4] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. The greater availability of handguns after the mid-nineteenth century facilitated, but did not cause, rising numbers of intimate-partner homicides. And gun use in homicides by family members or relatives also rose during the latter 1800s. See Roth, *American Homicide*, 115, 285-286, 294.

homicide, violence, and crime were rising in many parts of the country, while the availability and

lethality of weapons rose in tandem.[5] The greater prevalence of deadly weapons in public spaces,

and the bloody consequences of it, prompted American people across the country to turn to weapon

regulations as a solution. These regulations tended to focus upon readily concealable "deadly

weapons" like knives and pistols rather than the firearms used for militia and hunting purposes.

Deadly weapons were associated with crime and needless bloodshed, and the people habitually

carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal

difficulties with blood rather than by reason and law. The other feature shared by deadly weapons

was their suitability for concealment, and in fact, deadly weapons were often referred to as

"concealed weapons" for that very reason.[6] An 1886 law journal synthesized this point by saying:

> A statute making it indictable for one to carry concealed about his person any
> 'pistol, bowie-knife, razor, or other deadly weapon of the like kind,' embraces a
> butcher's knife. The words 'other deadly weapon of the like kind' imply similarity
> in the deadly character of weapons, such as can be conveniently concealed about
> one's person, to be used as a weapon of offence and defense.[7]

13.     During this time "deadly weapons" primarily included large knives, "pocket

pistols," and, later, revolvers ranging from 4-shot to 6-shot. The phrase could also apply to various

other small or readily concealable weapons.

---

[5] Darrell A. H. Miller and Jennifer Tucker, "Common Use, Lineage, and Lethality," *UC Davis Law Review* 55 (2022), 2495-2513 (Describing how the Theoretical Lethality Index (TLI) "shows that weapons have increased sharply in lethality from the mid-nineteenth century to the present day," at 2509-2510).

[6] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons. See also 1852 New Mexico Territory 67, § 1 (prohibiting the concealed carrying of "short arms, such as pistols, daggers, knives, and other deadly weapons.").

[7] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 410. This was quoted in *State v. Erwin*, 91 N.C. 545 (1884).

Case: 25-1181   Document: 01-1835830   Page: 279   Date Filed: 10/27/2025   Entry ID: 6760768
499

*Large Knives*

14.    Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were the most problematic deadly weapon. There were so many different styles and names of knives that Americans sometimes struggled to distinguish them from one another. To make matters even more complicated, labels and definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[8] A case arising in Tennessee during the 1840s revolved around what particular style of knife he had carried (the jury settled on Mexican pirate knife) and whether he had been indicted for carrying a bowie knife, or a knife *resembling* a bowie knife. The abundance of knife names and styles inspired lawmakers to insert catchall language into weapon regulations, like "or any other knife of the like kind," and "or any other deadly weapon."[9]

15.    By far the bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. These knives could be easily concealed within a pocket or tucked into a waistband, notwithstanding their length. In 1827, Jim Bowie, for whom the blade is named, used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[10] His death at the Alamo in 1836 cemented the legend of his namesake knife,[11] which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

---

[8] Worthen, *Arkansas Made*, I:267–268.

[9] 1839 Alabama 67, § 1 ("That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon…"). This is just one example; with additional time I can provide more examples of this catchall language, which was quite common.

[10] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up. The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/.

[11] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

16.     Fighting knives were not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address a growing problem of knife-violence. Jim Bowie's use of a fighting knife within the context of a duel exemplified a startling tolerance for brutality among residents of the backcountry and frontier. Across the eighteenth and nineteenth centuries, these pockets of settlement isolated from large population centers and far from the oversight of governing institutions fostered horrifying violence in the form of extrajudicial executions, vendettas, maiming, and more. Early settlements taking advantage of new economic opportunities, like river ports along the Ohio and Mississippi waterways, became magnets for ambitious but rough folk who could easily find themselves in a kill-or-be-killed situation. Natchez, Mississippi (near the site of Bowie's infamous duel) was just such a place—with hard-drinking, violent, illiterate boatmen passing through a bustling town that carried far greater economic significance than its frontier atmosphere would suggest. The cycle of violence prompting knife-carrying, which in turn prompted further violence, was especially notable in southern areas though not exclusive to them.[12]

17.     The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated

---

[12] See "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/. For examples of a southern association with bowie knives, see "Carrying Concealed Weapons," *Daily Picayune* (New Orleans, Louisiana), July 25, 1840 (denouncing those who "go habitually armed, making an arsenal of their persons" and that "where offence is given or injury sustained, even the code of *honor* has laid down other means of redress than an instant appeal to the Bowie knife," and questioning "incessantly carrying concealed weapons."); "The Bowie Knife," *Southern Argus* (Columbus, Mississippi), June 7, 1842 ("The small dagger worn in former times, has given place to this more formidable invention, and the Bowie knife, throughout the West, is now the most common weapon of attack or defence."); and "Bowie Knife," *The Slave's Friend* 3, no. 2 (1838), 17 ("People in slave states often carry such knives about them," and "When they get angry they draw the knife, and sometimes *stab one another!*").

the presence of knives larger than a regular pocket knife in public places.[13] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives.[14]

*Pocket Pistols and Revolvers*

18.     Over the course of the nineteenth century, revolvers eclipsed bowie knives as the most  problematic deadly weapon within American communities. During that timeframe, pistols evolved from single-shot devices to revolving repeaters, and they generally became smaller and more readily concealable as well. Not only did the full-sized pistols in use by mounted soldiers decrease in size, but manufacturers produced more models that were purposefully small and concealable.

19.     Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading devices modeled after designs that appeared in the eighteenth century.[15] After being fired, they were useful only as clubs until they could be reloaded through a process that took upwards of fifteen seconds.[16] The largest of these muzzle-

---

[13] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon,"; Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[14] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well.

[15] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.

[16] For example, see the website: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/.

loading pistols were called "horse" pistols and had been adapted to cavalry and dragoon[17] service

in the early modern era. Horse pistols measured a foot or more in length and were carried in

holsters that attached to a saddle; they were not designed to be carried on the person.[18] Mid-sized

pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm),

in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch

pistols prior to the nineteenth century was for defensive purposes while traveling.[19] The smallest

size, measuring approximately five or six inches in length, was the pocket pistol. As the name

suggests, these firearms were purposefully designed to be carried within the pockets of everyday

attire.[20] The most famous of these was the deringer pistol, named for its designer, Henry Deringer,

and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as

"derringers") were capable of firing large calibers, which made them exceedingly lethal at close

range—often more lethal than mid-sized navy revolvers.[21]

    20.    In the early nineteenth century, popular outrage and concern over bowie knives

overshadowed concerns about pocket pistols. Still, pistols lent themselves to the same violent ends

as fighting knives, and regulatory strategies attempted to discourage their presence in public

spaces. Concern about pistols grew over time as revolvers became more readily available to

American consumers. Even though Samuel Colt obtained his first patent in 1836, it took until about

midcentury for Colt revolvers be produced in sufficient numbers to begin saturating the American

---

[17] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm.

[18] Blair, *Pollard's History*, 104, 119.

[19] *Id.* at 117–118.

[20] *Id.* at 116–118; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," p. 117).

[21] Lee A. Silva, "Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.," *Wild West* (April 2002), 12–13.

market. That process accelerated as a result of two things: 1) the loss of his patent in 1857, which allowed new entrants into the market; and 2) the development of a large manufacturing capacity due to wartime production during the Civil War. These factors caused the Civil War Era, stretching from 1850 to 1870, to see a dramatic rise in the availability of these weapons. Even though it took several decades, the revolver eventually overtook dirks and bowie knives as the weapon considered most problematic in American communities.[22]

21.    The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[23] The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

22.    Revolvers were produced in the three historical sizes or styles: "horse," "belt," and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and

---

[22] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).
[23] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

postbellum eras. The "belt" or midsized pistol would have been worn in a hip holster attached to

a belt, or tucked within a belt or sash. Colt's version of it came to be called the "navy".[24] model

and may have been the most common type of revolver among civilians around the time of the Civil

War. The first pocket pistol produced by Colt was released in 1848 and had five shots.[25] In later

decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low

cost. Cheap revolvers, especially imitation brands of a lesser quality, could be had for a few dollars,

with used ones selling for even less.[26]

      23.    The tremendous increase in the number and availability of revolvers had an impact

upon Americans and their lives. If people fearful of an unforeseen encounter were more likely to

carry pistols concealed, so too were lawmaking bodies becoming increasingly likely to respond

with regulations that discouraged or penalized such behavior. The cascade of weapon regulations

in the post-Civil War decades is partially a result of ongoing bureaucratization within American

government, but it also indicates a regulatory reaction to the growing problems posed by easy

access to weapons and widespread public carrying of them in public spaces.[27]

*Slung Shots and Other Deadly Weapons*

      24.    Revolvers and bowie knives were the most notoriously problematic deadly

weapons in nineteenth-century American communities, but they were not the only ones. Others

included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks")

---

[24] The label "navy" may have been derived from the fact that the model featured an engraving of a naval battle. The name may also have been related to its having a smaller size and caliber that were more suited to being used in naval engagements. It is not entirely clear why Colt named the midsized belt pistol the "navy" model.

[25] Haven and Belden, *Colt Revolver*, 63–73.

[26] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[27] On the growth of government bureaucracy and administration in the late nineteenth century and later, see Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877-1920* (New York: Cambridge University Press, 1982).

and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was a weapon in which a weighted ball could be swung from a cord or handle in a striking motion. The Oxford English Dictionary defines it as "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon," and attributes it to the United States.[28] The phrase could describe various kinds of homemade weapons and did not have a single, nationwide definition. A commenter from the South during the 1870s described a slung shot as being "made by putting stones in woolen stockings."[29] Around the same time, a Native American "war-club" was also referred to as a type of slung-shot with "the stone ball hanging loosely from the handle in a bag of buckskin."[30] Testimony in a Texas trial (1908) offered an explanation of the slung shot's use and deadliness. "The only slung shot I ever saw was by having a ball of shot or metal covered with leather, and a band of elastic or leather, attached to such a ball, and made so that the same could be attached to the wrist or arm of a person[.] . . . [A]nd, when a person using them would strike with his fist, the ball or weight would extend beyond his fist and strike a person, and, by being covered, would cause no sound."[31]

25.    Unlike firearms and knives, which required specialized knowledge and equipment to manufacture, a slung shot could be made by just about anyone. Slung shots and other club-like instruments also had no military function and therefore did not receive the constitutional protection which certain types of firearms did (like rifles and muskets conducive to militia service, as well as horse pistols). Beginning in the 1840s, laws prohibiting the carry, use, and manufacture of slung shots began to appear in numerous states. These prohibitions usually existed in addition to public

---

[28] "Slung-shot," *Oxford English Dictionary*.
[29] Quoted in Richard Hopwood Thornton, *An American Glossary: Being an Attempt to Illustrate Certain Americanisms Upon Historical Principles*, 2 vols. (London: Francis & Company, 1912), II: 815.
[30] Otis T. Mason, "American Indian Weapons," *Nature* (June 10, 1875), 107-108, Fig. 2.
[31] *Geary v. State*, 53 Tex.Crim. 38 (1908).

15

carry laws that applied to deadly weapons more broadly. In 1849, Vermont's legislature passed a law saying, "Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose or keep for sale or gift, or part with any instrument or weapon of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of a misdemeanor."[32] The law went on to punish carrying, using, attempting to use, and being "found in the possession of" a slung shot as a felony.[33] Similar laws went into effect in New York (1849), Massachusetts (1850), Florida (1868), Dakota Territory (1883), Minnesota (1885), and Oklahoma Territory (1890) among others.[34]

## CONTEXT OF AMERICAN VIOLENCE

26.     Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with

---

[32] 1849 Vermont ch. 36, 26 § 1.

[33] 1849 Vermont ch. 36, 26 § 2.

[34] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-club, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

16

skepticism, violence tended to rise.[35] The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Across the nineteenth century, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[36]

27.     The American Civil War worsened the United States' trajectory toward rising rates of homicide and violence. The war itself claimed many thousands of lives, but the entire era stretching from the road to war in the 1850s through the collapse of southern Reconstruction state governments in the 1870s marked a horrific period of violence, turmoil, and political instability. It coincided with the United States' divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The proliferation of revolvers during this same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before. War Department patronage of gun manufacturers grew exponentially during the Civil War. By the time the conflict was over, gun-makers like Colt, Smith & Wesson, and Remington had

---

[35] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *American Homicide*, 17–26, 300.

[36] On homicide in American history, particularly as broken down into northern and southern regions, *see* Roth, *American Homicide*, 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from p. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month. [37]

28.     When the armies stopped fighting, the chief buyer of these firearms—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. Pocket pistols, designed for concealment and portability, were marketed heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol. [38] The explosion in production was all the more pronounced by the entry of imitation brands of pocket pistols sold at much lower prices.

29.     But the structural forces driving Americans to be more violent and homicidal did not go away after the Civil War. Northern states experienced a brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more dangerous places than in the antebellum era. Poverty begat crime, and the ease with which the criminally inclined could acquire pocket pistols led to more armed robberies and armed assaults. [39] In the southern states, rates of violence and homicide remained high throughout the Reconstruction and the Jim Crow eras. [40]

---

[37] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Graham Smith, *Warman's Civil War Weapons* (Iola, WI: KP Books, 2005), 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

[38] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of [robber baron Jim] Fisk").

[39] Roth, *American Homicide*, 386–88.

[40] Roth, *American Homicide*, 386–88.

30.     The introduction of pocket revolvers into these political, racial, personal, and criminal conflicts was profound. The causes and kinds of violence were largely the same—racism, classism, desperation, manly honor, etc.—but the ease with which pocket pistols could be acquired made these conflicts more likely to be *armed* conflicts. Low prices, easy access, and concealable sizes also acted to encourage men to carry a revolver in public (often contrary to law) even when they had not done so previously; having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families.[41] The situation had a significant impact upon the justice system by forcing jurists, lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of passion" defense. Eventually, the idea emerged that having deadly weapons upon one's person "raises [a] presumption of guilt,"[42] regardless of whether they were openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not.[43]

## NINETEENTH-CENTURY WEAPON REGULATIONS

31.     When Americans of the nineteenth century confronted a scenario where there were more weapons and more instances of homicide and assault related to the use of those weapons,

---

[41] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas) April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (that "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").

[42] *State v. Reams*, 121 N.C. 556 (1897) ("The offense of carrying a concealed weapon about one's person, and off his own premises, consists in the guilty intent to carry it concealed, and not in the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").

[43] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News* (Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore, Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol," *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of murder.").

they took action. Americans turned to their governments to establish new rules that would protect the public from the dangers posed by widespread weapon-carrying. The primary mode of regulation was to restrict the ways in which people could lawfully carry weapons in public spaces. Scholars today call these "public carry" regulations. Other laws prohibited the carrying of weapons in public gathering places. Nineteenth-century Americans also taxed the personal possession of deadly weapons and established rules for dealers that ran from minimum-age requirements to sales registries and occupation taxes. Prohibiting the sale of weapons was not unheard-of, with numerous states placing such restrictions upon slung-shots and a handful of other jurisdictions prohibiting the sale of other deadly weapons.

*Public Carry Laws*

32.     In the nineteenth century, state legislatures responded to rising levels of violence by enacting new laws that restricted the carrying of weapons in public spaces. These new statutes built upon a deep tradition within English common law and expressed in the medieval Statute of Northampton. During the nineteenth century, new American public carry statutes generally took two forms. The first approach, textually tied to the Statute of Northampton and broadly prohibiting "going armed," often invoked sureties and peace bonds rather than a criminal fine or imprisonment. In this "going armed" regulatory scheme, justices of the peace had the authority to stop, detain, arrest, and bind to the peace anyone who carried "offensive weapons" outside of normal circumstances, like militia or patrol service, providing assistance to authorities, taking a firearm to a gunsmith for repair, etc.[44] The second regulatory form developed in the Old Southwest and relied upon criminal penalties to restrict the carrying of certain enumerated deadly weapons.

---

[44] On the English origins of this tradition in American history, see Saul Cornell, "The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace," *Law and Contemporary Problems* 80 (2017), 30-43. The phrase "offensive weapons" referred to arms that were not, like armor and shield, strictly defensive; firearms were considered "offensive" weapon in England. Id., 20.

Taken together, the two regulatory strategies tightly restricted the public carrying of deadly weapons by prohibiting "going armed" without proper cause and forcing would-be carriers to wear their weapons in full open view—a way of carrying weapons that was not only inconvenient in light of men's dress at the time, but also reflected poorly upon the wearer as a ruffian or coward pitting himself against social norms. Ultimately, both of these forms of public carry regulation presented enforcement challenges that encouraged Americans to turn to licensing laws as a solution. Licensing policies allowed people with prior approval to carry weapons despite the continuation of broad restrictions that applied to the rest of the population.

33.     In the eighteenth and early nineteenth centuries, some American states passed laws that essentially repeated elements of the Statute of Northampton, reiterating that the rule applied within their jurisdictions.[45] A particularly illuminating example of this process is a Massachusetts law enacted in 1795, which repeated phrasing and clauses from within the Statute of Northampton, and broadly prohibited the carrying of arms into public spaces. It empowered justices of the peace to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[46] The unauthorized carrying of weapons was itself a terrifying act that struck fear or caused "terror to the people."[47] Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was

---

[45] 1786 Virginia ch. 49 "An Act forbidding and punishing Affrays;" 1792 North Carolina ch. 3 "No Man shall come before the Justices, or go or ride armed."

[46] 1795 Mass. Ch. 2, 436.

[47] On the historical significance of the phrase "to the terror of the people" and its inherent association with weapon-carrying, see Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555–56 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Patrick J. Charles, "The Fugazi Second Amendment: *Bruen's* Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (May 2023), 635 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.'").

itself part of the common law inheritance.[48] Between 1800 and 1850, Tennessee, Maine, and Delaware emulated this approach.[49]

34.     The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[50] What counted as a "reasonable" cause to carry a weapon was a question for the judicial system to decide, either by a magistrate or (in later decades) a jury.[51] The statute clarified the law by showing that "going armed" was a

---

[48] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[49] 1801 Tennessee ch. 22, § 6 "That if any person…shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice…to bind such person…to their good behavior… ." 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1. "That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish…all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State… ." *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

[50] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436.

[51] Charles, "The Fugazi Second Amendment," 648 and accompanying notations.

separate offense from disturbing the peace, riot, and affray. And it maintained the previous policy that any carrying of arms in public "without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property" was out of bounds. [52]

35.     The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. [53] It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853). [54] In all of these states, the act of "going armed" without a reasonable cause was a violation of the law. In much the same way that Massachusetts had, Maine's preexisting law followed the traditional model of the Statute of Northampton. [55] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

36.     Maine was not the only adopter of the 1836 Massachusetts statute to be updating their current weapon policy. Virginia had previously enacted a public carry law in 1838, but it diverged from the Statute of Northampton and in fact aligned with a regulatory approach that was gaining traction in the South and Old Southwest. The 1838 Virginia law explicitly prohibited the

---

[52] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16.
[53] In addition to the states listed in the following sentence, see John Purdon, et al, comps., *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 250, § 6 and accompanying notation.
[54] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.
[55] 1821 Maine ch. 76, 285, §1.

23

carrying of concealed weapons and punished such behavior by fine and/or jail time.[56] The extent

to which this 1838 statute coexisted and overlapped with the 1847 "going armed" statute remains

unknown[57], but the example of Virginia highlights the fact that there were different approaches to

public carry legislation during the antebellum nineteenth century. The other approach—which was

more common in southern states—also grew out of the Statute of Northampton, but tended to

prohibit *concealed* weapons and require criminal penalties for violation rather than sureties to keep

the peace.

37.     Tennessee presents an insightful example of the development of this concealed-

carry approach. An 1801 public carry law made use of longstanding common law language and

phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or

privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of

any person" would be required to post a bond, go to jail, or "be punished as for a breach of the

peace, or riot at common law."[58] This law was quite similar to the Statute of Northampton

derivative adopted by Massachusetts and other states, in its prohibition against the kinds of

unauthorized weapon-carrying that were intrinsically terrifying.[59] It innovated, however, by

prohibiting "privately" carrying certain enumerated weapons, which may refer to concealed-

carrying or carrying weapons within private settings as well as public ones. A separate statute from

1821 used the same public-private language, reading: "Every person so degrading himself by

carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall

---

[56] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

[57] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

[58] 1801 Tennessee ch. 22, § 6.

[59] On the inherently terrifying nature of unauthorized weapon-carrying, see above, n. 47.

pay a fine of five dollars for every such offence."[60] As compared to the earliest law from 1801, the language had been simplified substantially, and the list of prohibited weapons formed the basis for this statute rather than phrasing directly inherited from the Statute of Northampton. Still, it broadly prohibited the carrying of certain weapons in unambiguous terms, and (depending upon what lawmakers meant by carrying in "private") may have either prohibited carrying weapons in private settings or carrying them in a concealed manner. About fifteen years later and in response to the emergent fear of assaults and murders with bowie knives, Tennessee lawmakers added yet another law prohibiting the concealed carrying and sale of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansaw [sic] tooth pick."[61] This series of laws does not present with examples of superseding statutes, either. State penal code editions of 1831, 1836, and 1857 included *all* of the weapon laws then in force.[62] Tennessee's laws illustrate changes in regulatory approach over time, and taken together, they provided local officials with a suite of regulatory tools to take both preventive and remedial action to protect the peace and the public from the dangers posed by weapon-carrying.[63]

38.    Tennessee was not the only state to adopt this language to regulate public carry during the antebellum nineteenth century. Similar weapon restrictions had been enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population

---

[60] 1821 Tennessee ch. 13.

[61] 1838 Tennessee ch. 137. It is worth noting that the well-known antebellum public carry case, *Amyette v. State* (1840) concerned this knife-specific 1838 law—not the broader 1801 or 1821 prohibitions upon going armed, which remained in force until substantial policy changes occurred during Reconstruction.

[62] John Haywood, et al, *Statute Laws of the State of Tennessee* (Knoxville: F. S. Heiskell, 1831), 10-11; R. L. Caruthers, et al, *Compilation of the Statutes of Tennessee* (Nashville: Steam Press of James Smith, 1836), 99-101; Return J. Meigs, et al, eds., *Code of Tennessee Enacted by the General Assembly of 1857-8* (Nashville: E. G. Eastman and Co., 1858), 851-853.

[63] See 1825 Tennessee ch. 19, repeated in the arms- and weapon-related sections of the 1831, 1836, and 1857 penal codes.

growth and economic expansion as a result of river transportation.[64] Like Tennessee's 1838 law, their statutes provided a list of prohibited deadly weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[65] States and territories following this model included: Indiana (1819), Florida Territory (1835), Georgia (1837), Arkansas (1837); Virginia (1838), Alabama (1839), Ohio (1859), New Mexico Territory (1859); Colorado Territory (1862); California (1863); Dakota Territory (1864); Montana Territory (1865); Nebraska (1873); Missouri (1874); Wyoming Territory (1875); Mississippi (1878); North Carolina (1879); South Carolina (1880); Delaware (1881); Illinois (1881); Washington Territory (1881); Maryland (1886); Oklahoma Territory (1890); District of Columbia (1892); Rhode Island (1893); and Alaska Territory (1896).[66]

39.     New York, Texas, West Virginia, and Idaho Territory adopted slightly different policies than either the "going armed" prohibitions modeled on the 1836 Massachusetts code or the concealed-carry restrictions just described. New York's 1866 public carry law prohibited a

---

[64] *See* 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."); 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

[65] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. *See* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[66] 1819 Indiana ch. 23; 1835 Florida Territory ch. 860; 1837 Georgia, 90; 1838 Virginia ch. 101; William McK. Ball, et al, eds., *Revised Statutes of the State of Arkansas* (Boston: Weeks, Jordan, 1838), 280, § 13; 1838 Alabama ch. 77; 1859 Ohio 3:56; 1859-1860 New Mexico Territory 94–99 (English and Spanish); 1862 Colorado Territory 56 (applied to "any city, town, or village"); 1863 California ch. 485; 1864 Dakota Territory 128, § 455; 1864 Montana Territory 355; 1873 Nebraska 724, § 25; 1874 Missouri 43; Wyoming Territory ch. 52 (applied to "any city, town or village"); 1878 Mississippi ch. 46; 1879 North Carolina ch. 127; 1880 South Carolina 447-448; 1881 Delaware ch. 548; 1881 Illinois 73-74; *Code of Washington* (Olympia: C. B. Bagley, 1881), 181, § 929; 1886 Maryland ch. 375; 1890 Oklahoma Territory 476, § 20; Ch. 159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), § 1; 1893 Rhode Island ch. 1180; Fred F. Barker, *Compilation of the Acts of Congress & Treaties Relating to Alaska* (Washington, D. C.: U.S. Gov. Print Off., 1906), Appendix A, 139, § 117.

range of weapon-related activities but included phrasing that required subjective assessments of a weapon-carrier's intent. The law punished anyone who "shall…use, or attempt to use or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess" certain deadly weapons. [67] Moreover, "The having possession of any of the [restricted] weapons…by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of…this act." So, in New York, possession of certain weapons in combination with furtive movements or seemingly suspicious behavior was illegal; and the rules of evidence cast willful or secret concealment as evidence of malintent. [68] This regulatory approach derived from laws about "rogues," in which possession of burglar's tools indicated intent to burglarize and amounted to a punishable offense. Georgia's 1816 penal code included a section along these lines, which applied itself to "rogues and vagabonds." It punished anyone who "shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break into any [enumerated dwelling or structure]…or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person… ." [69]

40.      Idaho, West Virginia, and Texas emulated the structure of concealed-carry restrictions by enumerating weapons that should not be carried, but they (like the "going armed" laws) restricted open-carry as well. West Virginia's 1882 law penalized anyone who were to "carry

---

[67] 1866 New York ch. 716, § 1.
[68] 1866 New York ch. 716, § 2. The list of regulated weapons was: "any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun." Pistols were not included in this list.
[69] Lucius Q. C. Lamar, *Compilation of the Laws of the State of Georgia* (Augusta: T. S. Hannon, 1821), 599, § 19.

about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character."[70] The law did not use the word "concealed" and thereby did not limit its prohibition to weapons concealed within a person's clothing or accoutrements. The Texas public carry law, enacted in 1871, similarly declined to limit its scope to "concealed" weapons. It held "That any person carrying on or about his person, saddle, or in his saddle bags, any [enumerated deadly weapon]…, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing" would be guilty of a misdemeanor.[71] Idaho Territory took the same approach of prohibiting the carrying of deadly weapons generally, but the law also mimicked those of other Mountain West jurisdictions in that it applied only "within the limits or confines of any city, town or village or in any public assembly."[72]

41.     State-level public carry laws did not remain static across the nineteenth century, and the laws previously described or cited were in some instances modified, superseded, and supplemented. The example of Tennessee, with its separate statutes from 1801, 1821, and 1838, shows lawmakers choosing to adopt overlapping and seemingly contradictory weapon policies. Georgia's first deadly weapon law was poorly written and confusing. After the state's high court struck down certain portions of the law, the state code adopted in 1860 provided a clearer concealed-carry regulation that fell in line with what many other states were doing.[73] In Kentucky, the 1813 concealed-carry law was quite the trail-blazer in terms of weapon policy, but the high

---

[70] 1882 West Virginia ch. 135, § 1.

[71] 1871 Texas 34, § 1.

[72] 1888 Idaho Territory 23.

[73] R. H. Cobb, et al, *Code of the State of Georgia* (Atlanta: J. H. Seals, 1861), 859, § 15. The section read: Any person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol (except horseman's pistols), dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence, shall be guilty of a misdemeanor… ."). This section fell within Part 4, Title 1, which the prefatory pages of the code described as "for the Trial and Punishment of white persons." See Cobb, *Code of Georgia*, iv.

28

court also took on the role of trail-blazer by striking it down in 1822, in one of the first recorded appellate public-carry cases.[74] As caselaw on the subject developed elsewhere in the nation, Kentucky's anti-regulation policy turned it into a national outlier.[75] When state leaders gathered to draft a new constitution in 1850, they shut the door on the court's way of thinking by expressly authorizing the legislature to "pass laws to prevent persons from carrying concealed arms."[76] Freed from the regulatory shackles imposed by the 1822 decision, Kentucky lawmakers of the 1850s enacted new weapon regulations, including a concealed-carry law.[77] Arizona Territory's first law pertaining to weapons only punished the improper exhibiting and discharging of firearms, but a new enactment in 1889 prohibited arms at social gatherings while also criminalizing open- and concealed-carry within town limits.[78]

42.     Sometimes, state-level public carry restrictions coexisted with similar municipal ordinances. In Texas, some cities moved to suppress the carrying of weapons years before state lawmakers did. Galveston was a leader in that effort, prohibiting concealed-carry in 1866 amid a tumultuous and violent period that followed the Civil War.[79] Such a policy had been out of bounds before the war, but the branches of state government changed their minds in the face of the rampant lawlessness that made Texas one of the most dangerous places in the country. Other cities took

---

[74] *Bliss v. Commonwealth*, 12 Ky. 90 (1822).
[75] Charles, "Fugazi Second Amendment," 646-647 (explaining the *Bliss* decision and stating that "Subsequent Antebellum courts that examined the authority of legislatures to regulate armed carriage felt compared to square their analysis with that of *Bliss*… .").
[76] Third Constitution of Kentucky (1850), Article XIII, Sec. 25 "That the rights of the citizens to bear arms in defense of themselves and the State shall not be questioned; but the General Assembly may pass laws to prevent persons from carrying concealed arms."
[77] 1854 Kentucky ch. 1020 (punishing anyone who would "carry concealed any deadly weapons, other than an ordinary pocket knife," unless having reasonable cause to fear an attack, being a peace officer, or at night by persons "required by their business or occupation to travel during the night.").
[78] 1867 Arizona Territory 21; updated in 1883 Arizona Territory 65; 1889 Arizona Territory 30.
[79] Ordinance printed in "Proceedings of City Council," *Flake's Bulletin* (Galveston, Texas), December 28, 1865. ("…it shall not be lawful for any person or persons (United States military and civil officers of the city and county of Galveston excepted,) to carry about his or their person or body, any concealed deadly weapon—under whatever name or character the same may be designated and called… .").

similar action, and soon enough the state legislature issued new municipal charters that explicitly protected their authority to regulate weapon-carrying within city limits.[80] These municipal carry ordinances coexisted with the state's public carry law after it was passed in 1871.[81] The municipal-state overlap occurred in many places, including California. In 1863, that state enacted a concealed-carry law (which was subsequently repealed in 1870).[82] The City of Los Angeles, meanwhile, enacted its own ordinance in 1866 that prohibited the wearing and carrying of deadly weapons "concealed or otherwise, within the corporate limits of said city."[83] Other cities large and small across the country adopted public carry laws, and municipal charters from the mid- and late-nineteenth century vested local governments with such power.

*Other Weapon Restrictions*

43.    Nineteenth-century Americans employed regulatory methods other than public-carry laws. Notable policy approaches included locational restrictions, personal and occupation taxes, and point-of-sale restrictions. These laws often coexisted with public-carry laws, adding another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

44.    Regulations disarming certain sensitive places—like polling places, court buildings, and even universities—are longstanding in American history. But escalating gun violence after the mid-nineteenth century prompted an expansion of that policy to meet the needs

---

[80] For example, see "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas), March 17, 1866 ("That the carrying of deadly weapons, by civilians, within the limits of the Town proper, except in passing through the corporation, is hereby prohibited.").

[81] 1871 Texas ch. 34.

[82] 1863 California ch. 484.

[83] Ordinance printed in *Los Angeles Tri-Weekly News* (Los Angeles, California), July 22, 1865, 2. Also available in the Duke Repository of Historical Gun Laws.

of the day. Where historical laws had protected polling places and court buildings (which were the major occasions for public gatherings in rural early America—not just sites of government activity), updated laws added theaters, open-air presentations, and even private parties to the assemblies protected through disarmament.

45. In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[84] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[85] A law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[86] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it.[87] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[88] Other laws prohibited the carrying of weapons within the general vicinity of

---

[84] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," § 2. The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§ 3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."
[85] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20–50), imprisonment (10–20 days), or both.
[86] 1870 Tex. Gen. Laws 63, ch. 46 § 1.
[87] *Revised Statutes of the State of Missouri* (1879), ch. 24 § 1274; 1890 Okla. Stat. 495–96.
[88] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought,

polling places, churches, and parks.[89] In New Mexico, an 1852 sensitive-place restriction prohibited weapons at all "balls and fandangos," and held hosts accountable to "maintain good order" at their parties.[90] This policy preceded a public-carry law, which followed in 1859 and disallowed the open or concealed carrying of deadly weapons within town limits.[91]

    46.    Another mode of regulating weapons during the nineteenth century involved taxation. The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Some taxes are more about discouraging certain behaviors, such as modern day taxes on tobacco and alcohol, deemed harmful to society rather than simply to raise revenue.[92] Americans living in the antebellum period sometimes turned to taxes upon the sale, possession, and use of deadly weapons as a mode of regulating them. In the latter nineteenth and early twentieth centuries, taxes relating to deadly weapons were more likely to take the form of occupation or sales taxes.

---

received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[89] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

[90] 1852 New Mexico Territory 67.

[91] 1859 New Mexico Territory 94.

[92] For historical understandings of the taxing power, see Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396; Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), 33–34.

47.     In the antebellum period, taxes could be straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[93] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes[.]".[94] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket-pistols, sword-canes, or bowie-knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars per annum[.]".[95] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[96] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[97]

---

[93] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. *See* Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PdD diss. (Texas Christian University, 2019), 50-52; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1. https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[94] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.

[95] *Id.*; 1838 Fla., ch. 24. This tax is not included within the Duke Repository, indicating that that database captures only a portion of the occupation and personal taxes in force, even at the state/territorial level, during the nineteenth century. More research remains to be done on the subject.

[96] The amounts reach $319.14 and $6,382.73. *See:* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[97] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

48.     Some southern states also placed annual taxes upon the owners of deadly weapons. Prior to the Civil War, taxation of property was the primary vehicle for states to raise revenue. In the South, taxes upon slave property made up the lion's share of contributions, with other ad valorem taxes or poll taxes making up the difference.[98] Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[99] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[100] Municipal charters from the postbellum era indicate that weapons or their value remained taxable throughout the rest of the nineteenth century.[101]

49.     Occupation taxes and sales taxes formed another avenue of weapon regulation during the nineteenth century. As previously described, during the 1830s, lawmakers from Florida Territory levied a high tax upon weapon dealers that was clearly prohibitive in nature. Around the same, time, Alabama lawmakers taxed the sale or gift of bowie knives and the like at $100 per instance (equivalent to approximately $3,195.27 today).[102] It appears as though occupation taxes became more widespread over the course of the nineteenth century. Sticking with the example of Alabama, occupation taxes emerged in the 1870s and continued to be in force through at least the

---

[98] Robin Einhorn, *American Taxation, American Slavery* (Chicago: University of Chicago Press, 2006); Peter Wallenstein, "Rich Man's War, Rich Man's Fight: Civil War and the Transformation of Public Finance in Georgia," *Journal of Southern History* 50, no. 1 (February 1984), 15–42.

[99] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017), 175–78.

[100] For example, *see* 1850 NC, ch. 121; 1856 NC, ch. 34; 1866 NC ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting the Civil War. 1861 Miss. Ch. 125.

[101] For example, see 1888 Georgia 245-262 at 261, Act No. 103, "Amending Charter of Jesup," Sec 46.30 (requiring all owners of personal property in the city to make an annual return that answers a series of questions, including "What is the value of your guns, pistols, bowie knives and such articles?").

[102] 1837 Ala. 11, § 2 ("That for every such weapon [knife or weapon, known as Bowie Knives or Arkansaw Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie Knife or Arkansaw Tooth-pick], sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury[.]").

end of the century. The initial tax rate upon "dealers in pistols, bowie-knives and dirk-knives," was $50, but thereafter was raised to $300 through 1897.[103] This annual licensing fee of $300 amounts to nearly $10,000 today.[104] Georgia also pursued occupation taxes in the post-Civil War period, beginning with $25 per place of business in 1882, which was quickly raised to $100 per place of business in 1884.[105] Between 1886 and 1894, the rate fluctuated between $100 (equivalent to upwards $3,000.00 today) and $25 (equivalent to approximately $850.00 today).[106] Meanwhile, large hunting knives that might be deemed similar to a bowie knife or dirk (8-10 inches) cost anywhere from $3-4 in the 1880s.[107] For this tax to be money well spent, a dealer would have to sell upwards of 250 bowie knives to reach $1,000 of business. When an occupation tax also licensed the sale of pistols, the threshold of profitability could be more easily reached because

---

[103] Wade Keyes, et al., *Code of Alabama 1876* (Montgomery: Barrett & Brown, printers for the State, 1877), 292, § 494.15 ("For dealers in pistols, bowie-knives and dirk-knives, whether the principal stock in trade or not, fifty dollars."); 1886 Ala. ch. 4, § 5.17 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629.28 ("For dealers in pistols or pistol cartridges, or bowie knives, or dirk knives, whether principal stock in trade or not, three hundred dollars."); William L. Martin, *Code of Alabama* (Atlanta: Foote & Davies, 1897), 1137, § 4122.27 ("For dealers in pistols or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars."). The rate was lowered to $100 in 1898. *See* 1898 Ala. ch. 903, 190, § 16.66 ("For dealers in pistol [sic], bowie or dirk knives, whether principal stock in trade or not, one hundred dollars.").

[104] *See* 1892 Alabama ch. 95, 183; Robert C. Brickell, et al., *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[105] 1882 Ga. ch. 18, 37, § 2.18 ("And upon all dealers in pistols, revolvers, dirk or Bowie knives, the sum of twenty-five dollars for each place of business in each county where the same are sold, and said tax shall be for educational purposes. The tax provided by this paragraph shall be assessed against all dealers in the articles herein enumerated, on and after the first day of April., 1883, and such dealer shall not be liable for said tax of twenty-five dollars prior to the first of April, 1883."); 1884 Ga. ch. 52, 23, § 2.18 ("And upon all dealers in pistols, toy pistols, revolvers, pistol or revolver cartridges, dirks or bowie knives, the sum of one hundred dollars for each place of business in each county where the same are sold.").

[106] For inflation calculations, *see* https://www.in2013dollars.com/us/inflation/1890?amount=25 and https://www.in2013dollars.com/us/inflation/1890?amount=100.

[107] J. Palmer O'Neil & Company, *Illustrated Catalogue* (J. Palmer O'Neil & Co.), 40 (Showing 8-inch hunting knife listed at $3.00 each; publication date is estimated to be the 1880s, and hunting season dates make reference to 1882); Lester C. Dole and Company, *Catalogue and Price-List, 1883* (New Haven: Lester C. Dole and Co., 1883), 27 (Showing 8-inch hunting knives listed at $3.00, 9-inch at $3.50, and 10-inch at $4.00).

well-made pistols cost upwards of $5.00. [108] These high taxes likely fell upon buyers of deadly weapons, further raising their retail price; high taxes also forced retailers to weigh the cost of selling knives and pistols, potentially narrowing the pool of sellers to those who specialized in hardware or hunting equipment.

50.     Occupation taxes and personal taxes on deadly weapons carried into the twentieth century. Louisiana levied a licensing tax upon weapon dealers in 1904, and in 1912 Mississippi created a special tax of $250.00 on pawnbrokers who sold fighting knives, sword canes, and metal knuckles. [109] One North Carolina county taxed possession of pistols at rates equal to the 1915 poll tax and made "failure to list [a pistol] for taxes" a misdemeanor crime. [110] In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business. [111] The intention of the measure was to make pistols prohibitively expensive, and a constitutional challenge upheld the law. The court described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." [112] As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein." [113]

---

[108] The same catalogues include prices for certain pistols, which generally ranged from $5.00-10.00 each.
[109] 1904 Louisiana ch. 65, § 2 (Taxing dealers with gross sales of $5,000 or more in the amount of $200, gross sales of $2,000-5,000 in the amount of $150, and gross sales less than $2,000 in the amount of $100.); 1912 Mississippi ch. 98 (assessing $250.00 "On each pawnbroker or firm of such", plus $250.00 "On each pawnbroker who may receive in pawn any dirk, knife, sword, cane, brass or metallic knucks or pistol," plus $250.00 "on each person, firm or corporation who may sell or dispose of any second-hand dirk, knife, sword-cane, brass or metallic knucks or pistol" along with "the privilege tax paid by such person or firm as a pawnbroker.").
[110] This law applied to Pitt County, North Carolina. *See* 1915 N.C. ch. 51.
[111] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.
[112] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).
[113] *Id.*

51.    Nineteenth-century lawmakers placed additional restrictions upon dealers in deadly weapons beyond occupation taxes. It was quite common for states to prohibit the sale of certain weapons to persons under a state-specified minimum age—often applying to legal minors, or persons under twenty-one years of age. The age of legal majority has historically been twenty-one years, and any male under that age was considered an "infant" by law and subject to his father or guardian.[114] In 1836, Alabama declared it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol[.]"[115] Violators, including dealers in dry goods, weapons, and hardware, were fined anywhere from $300 to $1,000, which amounts to approximately $10,000 to $35,000 in 2023 dollars.[116] The same year, Tennessee adopted a similar measure that prohibited selling, loaning, or giving to "any minor" a "pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife[.]"[117] The minimum fine was dramatically lower—only $25, or about $800 today—and there was a proviso allowing the sale, loan, and gift of hunting firearms to minors.[118] The town of Harrodsburg, Kentucky, also adopted a minors law during the antebellum era. It prohibited "any person, other than the parent or guardian" to "sell, give, or loan, any pistol, dirk, bowie-knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any

---

[114] Saul Cornell, "'Infants' and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record," *Yale Law and Policy Review: Inter Alia*, October 26, 2021, https://ylpr.yale.edu/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record. The rules for women were quite different, with them never achieving the kind of legal emancipation that men obtained at age twenty-one. According to the law of coverture, unmarried women fell under the authority of their fathers or guardians, and married women fell under the authority of their husbands. *See* Linda K. Kerber, *No Constitutional Right to Be Ladies: Women and the Obligations of Citizenship* (New York: Farrar, Straus & Giroux, 1999).

[115] 1856 Alabama ch. 26, "An Act to amend the criminal law," 17.

[116] The current value of $300 in 1856 is $10,653.04, and $1,000 is $35,510.12. *See* https://www.in2013dollars.com/us/inflation/1856?amount=300 and https://www.in2013dollars.com/us/inflation/1856?amount=1000.

[117] 1856 Tennessee ch.81, "An Act to amend the Criminal Laws of this State," 92 § 2.

[118] The Tennessee fine of $25 (1856) amounts to $887.75 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1856?amount=25.

minor, or slave, or free negro[.]"[119] The penalty was a fine of $50, or about $1,800 today.[120] The movement to restrict the sale of deadly weapons to minors began in the antebellum period and accelerated in later decades, with no fewer than 22 states adopting such laws between the Civil War and the close of the century.[121]

52. Some jurisdictions also required firearm dealers to register and track their sales. The aforementioned Texas tax upon pistols functioned to some extent as a registry by tracking the quantity of pistol sales, but it did not mandate a registry of purchaser names or pistol types.[122] Illinois, however, adopted such a policy in 1881 by requiring every dealer to keep a register of all sales of deadly weapons—which included "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person[.]"[123] The law went so far as to specify the form of the register and require the serial number of the weapon.[124] The District of Columbia had a similar registration requirement, which was approved by the United

---

[119] 1859 Kentucky ch. 33, "An Act to amend an act, entitled 'An act to reduce into one the several acts in relation to the town of Harrodsburg,'" 245 § 23. The text of this local law underscores the degree to which "deadly weapons" like knives and pistols were associated with concealment and concealed carry. If the popular interpretation of concealed carry laws (that they de facto protected open carry) were applied to this particular statute, it would be read to prohibit only the sale of weapons intended for concealed carry on the part of minors, slaves, and free Blacks while implicitly protecting the sale of weapons to be openly carried by them. Of course, that is not what the statute meant. Its purpose was to prohibit the sale to minors, slaves, and free Blacks the kinds of deadly weapons that were designed for and conducive to being carried concealed.

[120] The $50 fine from 1859 would amount to $1,818.29 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1859?amount=50.

[121] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 § 2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" § 2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 § 7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,'"; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 § 3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 § 97 p. 140; N.C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

[122] 1907 Texas ch. 18, § 12.

[123] *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3. *Illinois, 32nd General Assembly, 1st Session* (1881), "Criminal Code–Deadly Weapons: Regulates Traffic and Prevents Sale to Minors," 73–74 § 2–3. There was some critique of the law as insufficiently effective, at least in part due to the fact that dealers were not required to verify the identity of the buyer and some deadly weapons were not manufactured with serial numbers. *See* "Sale of Pistols," *Chicago Daily Tribune* (Chicago, Illinois), July 7, 1881, 8.

[124] *See id.*

States Congress in 1892. Among other things, the law required all dealers in deadly weapons to be

properly licensed, and to "keep a written register of the name and residence of every purchaser,

barterer, hirer, borrower, or donee of any such weapon . . . ."[125]

      53.     At times, nineteenth-century lawmakers restricted the sale of certain problematic

weapons. As bowie knives, revolvers, and other deadly weapons were becoming more popular and

more prevalent, Tennessee and Georgia prohibited their sale. In 1837, Georgia passed a statute

combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender

of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer

to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described

weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of

wearing, or carrying the same as arms of offence or defense[.]"[126] The statute further held that

"pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols

as are known and used, as horseman's pistols[.]"[127] The following year (1838), Tennessee

lawmakers did much the same with an updated public carry law that included a section prohibiting

"any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie

knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size

resemble a Bowie knife or knives, or Arkansas tooth pick."[128] In 1849, Vermont lawmakers

prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with

---

[125] "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch.159, 52 Congress, Public Law 52-159, 27 Stat. 116 (1892), 117 § 5.
[126] Ga. 1837 ch. 90.
[127] *Id.*
[128] Tenn. 1838 ch. 137. This law was temporarily suspended during part of the Civil War. *See* Tenn. 1862 ch. 23.

organized crime and street gangs.[129] Numerous other jurisdictions did the same.[130] Kentucky lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung shot, or any imitation or substitute therefor,"—essentially adopting the policies of all these states into one catch-all statute.[131] In the post-Civil War period, Tennessee pursued a range of deadly weapon policies, ultimately adopting an extremely strict public carry law that worked in conjunction with a ban upon the sale of pocket

---

[129] 1849 Vermont ch.36, 26 § 1. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "[a] shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."

[130] 1849 N.Y. ch. 278 § 1 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, or expose, or keep for sale or gift, or part with any instrument or weapon the kind usually known as slung shot, or of any similar kinds,"); 1850 Mass. ch. 194 § 2 ("Any person who shall, within this State, hereafter manufacture, or cause to be manufactured, or sell, expose for sale, any instrument or weapon of the kind usually known as slung shot,"); *Laws of Florida – First Session* (1868), Ch. VII, § 11 ("Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles,"); *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* (1883), ch. 38, § 455 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor." Repeated during statehood, *see Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1899), ch. 40, "Crimes against the Public Health and Safety," 1461 § 7311); *Penal Code of the State of Minnesota to Take Effect January 1, A.D. 1886* (St. Paul: Pioneer Press Co., 1885), § 333 ("A person who manufactures or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles,"); *Oklahoma, 1st Regular Session*, (1890), ch. 25, 475–76 § 18 ("Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor."). This is not an exhaustive list. Political scientist Robert J. Spitzer identifies 71 state laws enacted during the nineteenth century related to slung shots, an as-yet undetermined number of which addressed manufacture. Declaration of Robert Spitzer filed in *Chavez v. Bonta*, Case No. 19-cv-1226-L-AHG (S.D. Cal.) (ECF No. 111-3) ¶ 51. Beyond that, municipal ordinances have not been preserved and digitized with the degree of comprehensiveness that state laws have, so there may be additional local regulations pertaining to the manufacture and sale of slung shots.

[131] Kentucky 1855 ch.636, 96 § 1.

pistols.[132] Lawmakers in nearby Arkansas implemented a nearly identical policy but went one step further by also prohibiting the sale of "any kind of cartridge[] for any pistol[.]".[133]

54.     When sales restrictions were challenged during the nineteenth century, they were generally upheld. The 1837 Georgia public carry law included a proscription against selling certain deadly weapons. A well-known case, *State v. Nunn*, challenged the public carry law and resulted in a defense of open-carry in Georgia. But the case did not address the accompanying sales restriction.[134] Postbellum sales restrictions in Arkansas and Tennessee were challenged, and in each case the state's high court affirmed the law as a reasonable exercise of police power. For the Tennessee court, the intent of the statewide sales restriction was to "put down the pernicious habit of going armed"[135] by declining to issue licenses to firearm dealers. In Arkansas, the sales restriction "was enacted as a measure of precaution for the prevention of crimes and calamities," and was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person."[136] Sales restrictions did not disappear at the turn of the century, and continued to coexist with indirect forms of regulation like licensing laws and tax requirements. For example, a 1911 Michigan law prohibited the sale of "any dirk, dagger, stiletto, metallic-knuckles, sand-bag or skull cracker" and made specific exception for "the selling or keeping for sale of hunting and fishing knives."[137]

---

[132] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." When the state Supreme Court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol[s.]" *See* 1870 Tenn. 13, pp. 28-29; 1871 Tenn. 90, pp.81-82; *Andrews v. State*, 50 Tenn. 165 (1871); 1879 Tenn. 96 pp.135-136.

[133] Ark. 1881 ch. 96 § 3.

[134] *Nunn v. State*, 1 Ga. 243 (1846).

[135] *State v. Burgoyne*, 75 Tenn. 173 (1881).

[136] *Dabbs v. State*, 39 Ark. 353 (1882).

[137] 1911 Michigan ch. 274, § 2. This law also laid out terms and conditions for obtaining a license to carry pistols.

55. Overall, sales restrictions, taxes, and locational restrictions, along with public carry laws, were important avenues for regulating deadly weapons that posed a danger to American communities. These policies emerged in the antebellum era and grew significantly after the Civil War. Postbellum regulatory strategies built upon policies that had gone before and harnessed the police power of the state government to address an unprecedented problem of gun violence and gun-toting in the United States.

## EMERGENCE OF LICENSING LAWS

56. As structural forces like industrialization and urbanization propelled the growth of more sophisticated governmental administration in the United States, gun policies evolved in ways that increased official oversight of weapon sales and carrying. The sales registries enumerated above placed special requirements on dealers, but the intention behind them was to empower police and other officials to solve crimes by providing them with information. In a similar vein, laws that empowered police, mayors, or other officials to issue licenses for the carrying of weapons grew out of American traditions of regulating deadly weapons. In fact, licensing promised to resolve nettlesome problems posed by public carry laws that went before.

57. There were two serious obstacles posed by public carry laws. The first was their lack of protection for people who had legitimate reason to fear an attack. Laws provided exceptions to people in imminent danger, but left it up to a jury to determine whether a defendant's decision to carry was reasonable. Allowing for an "apprehended danger" defense at trial was likely cold comfort for people whose work required them to travel with large sums of money or valuable goods. The willingness of the criminally-inclined to violate weapon laws was a constant concern, with nineteenth-century Americans voicing their frustration that weapon laws could render the law-abiding vulnerable to abuse. A second problem was the difficulty in enforcing them. Asking

42

police or civilians to see and report weapons that were purposefully hidden from view could be challenging. Did a lump in one's pocket justify a complaint? Were police empowered to search suspected weapon-carriers, and by what criteria were they allowed to identify someone as a "suspected" gun-carrier? Licensing offered a way of resolving these problems. Instead of arguing self-defense at trial, legitimate weapon-carriers could obtain permission beforehand. And anyone seen carrying or found with a revolver could reasonably be asked to show their license.

58.      One of the earliest proponents of licensing as a way of regulating the carrying of pistols was California. The state had enacted a public carry law that prohibited concealed deadly weapons, but residents grew frustrated that it did not seem to be effective. In 1866, members of the state legislature divided over what to do about the problem.[138] One camp proposed issuing licenses to people who needed a pistol for personal protection. The state did not adopt this proposal and instead repealed the public carry law. In the aftermath of that decision, California municipal governments began passing ordinances that provided for licensing in order to carry a pistol in public.[139] The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the public carry of concealed weapons.[140] Municipalities elsewhere during the nineteenth century

---

[138] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-abiding portion of the community at the mercy of night-prowlers, footpods, and garroters.").

[139] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor, *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list. See also Patrick J. Charles, "The Fugazi Second Amendment: *Bruen*'s Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2023), 660 ("Although it is impossible to state with historical precision when and where the first armed carriage licensing law was enacted, based on the historical evidence available, it appears that California was at the forefront.").

[140] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

43

implemented licensing policies: Jersey City, New Jersey did so in 1873 and the District of Columbia in 1892.[141]

59.     Nineteenth-century licensing laws tended to be discretionary in the sense that public officials exercised judgment in determining who might obtain a license. The procedures involved varied tremendously from one jurisdiction to another. For instance, Sacramento's 1876 law required a written permit from the Police Commissioners, and specified that those commissioners "may grant written permission to any peaceable person, whose profession or occupation may require him to be out at late hours of the night… ."[142] Applicants had to pass a two-part test: first, be "peaceable"—an attribute open to interpretation and likely a matter of personal history, demeanor, and reputation; and second, be required by employment to be out late at night. In other words, not all "peaceable" people were eligible for a license at all, such as a clerk whose employer did not require him to work at night; and not all nighttime workers could be considered "peaceable." In fact, a large portion of people whose occupations kept them out late at night were the very ones who appeared to threaten the physical safety of the "peaceable" people seeking concealed-carry permits in the first place.

60.     Several cities in New York, including New York City and Brooklyn, which were among the most populous cities in the country in the late-nineteenth century, also required some showing of good character from the permit applicant. A person over twenty-one (21) years "who has occasion to carry a pistol for his protection" could apply to local police, who, "if satisfied that the applicant is a proper and law-abiding person," could recommend the applicant to yet higher

---

[141] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), § 2.

[142] Ordinance No. 84, Prohibiting the Carrying of Concealed Weapons, April 24, 1876, reprinted in R. M. Clarken, ed., *Charter and Ordinances of the City of Sacramento* (1896), 173. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 2-3, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

police authorities for a permit "allowing him [the applicant] to carry a pistol of any description." [143] Assessing whether a person was "proper and law-abiding" was a matter of official determination, seemingly based upon an applicant's criminal history in addition to his/her reputation for or appearance of propriety.

61. Other jurisdictions had different rules, like Lincoln, Nebraska, whose law prohibited concealed carry except for officers of the law, "persons whose business or occupation may seem to require the carrying of weapons for their protection," and licensees. There was some discretion for people to assess their personal safety and carry weapons *based upon their business or occupation*, not their individual preferences. Other than being good for a term of one year and requiring a fee of $0.50, the procedure for obtaining a license was completely open-ended. The law held that "The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure." [144] Wide discretion for officials was common among licensing laws. Consider Coffeyville, Kansas, for example, whose 1890 deadly weapon law prohibited open- and concealed-carry "without first having obtained permission from the Mayor" without identifying any specific permitting procedure or requirements. [145]

---

[143] Pistols—Carrying Of: Ordinance to Regulate the Carrying of Pistols, October 25, 1880, reprinted in *Brooklyn Daily Eagle* (Brooklyn, New York), October 26, 1880, 1; Article XXVII: Carrying of Pistols, reprinted in Elliott F. Shepard et al, eds., *Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881* (1881), 214-216. Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 21-24, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022).

[144] Article XVI: Concealed Weapons, An Ordinance Regulating the Carrying of Concealed Weapons in the City of Lincoln, August 26, 1895, reprinted in *Revised Ordinances of Lincoln Nebraska* (1895), 209-210. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 40-42, *New York Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

[145] Ordinance No. 201: To Prohibit the Carrying of Firearms or Deadly Weapons, and Providing Penalties Therefore, February 5, 1890, reprinted in *Coffeyville Weekly Journal* (Coffeyville, Kansas), February 7, 1890, 2. Quoted in Brief of Amicus Curiae Patrick J. Charles, Appendix 1, p. 16-17, *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022). The omission of specific guidance for license-issuing officials was not uncommon. See "Ordinance No. 6," reprinted in *Fresno Weekly Republican* (Fresno, California), November 7, 1885, 3; "Ordinance No. 49: To Prohibit the Carrying of Concealed Weapons, January 5, 1892," reprinted in *The Ordinances and Charter of the City of Monterey* (Monterey, California: 1913), 112; "Ordinance No. 6," reprinted in *Delphos Carrier* (Delphos, Kansas), August 1, 1884, 2; M. J. Sullivan, ed., "Article II: Offenses Against Public Morals and Decency, undated," reprinted

45

## NINETEENTH-CENTURY ATTITUDES TOWARD WEAPON-CARRYING

62.     The fact that nineteenth-century Americans discussed *concealed* weapons and at times legislated specifically against *concealing* weapons has invited some modern readers to interpret them as de facto protecting the open carrying of pistols, knives, and other deadly weapons. This "manner-of-carry" argument arises in large measure from the fact that most historical jurisprudence surrounding public carry laws originated in southern states where concealed-carry statutes were the norm, and where appellate judges endeavored to harmonize their opinions with a foundational case out of Kentucky (*Bliss v. Commonwealth*) that cast all weapon regulation as an affront to the right to bear arms. [146] The "going armed" statutes rooted in the Massachusetts code of 1836, and the jurisdictions that statutorily restricted open-carry as well as concealed (like Texas and West Virginia) did not generate as substantial a body of antebellum caselaw. [147] Focusing on southern, concealed-carry cases without exploring the larger context of social attitudes toward weapon-carrying has led to an emphasis on judges' protection of open-carry without considering the socio-cultural factors limiting such behavior.

*63.*     Weapon-carriers of the nineteenth century (much like those today) were likely to hide their pistols and bowie knives. A commentator writing in 1877 said, "The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer

---

in *The Revised Ordinance of the City of St. Louis* (St. Louis: 1881), 611-612; "Offenses, April 12, 1881," reprinted in *Laws and Ordinances for the Government of the City of Wheeling, West Virginia* (Wheeling, WV: 1891), 204, 206; "Amendment de Ordinance de Carrying of Concealed Weapons, July 21, 1886," reprinted in *Morning Journal-Courier* (New Haven, Connecticut), July 27, 1886, 4. All quote in Ibid., 8-30. This is not an exhaustive list.
[146] Charles, "The Fugazi Second Amendment," 646-647.
[147] Of these states, Texas generated a robust body of postbellum caselaw, including two cases that upheld the constitutionality of its open-and-concealed carry restriction on Second Amendment and state analogue grounds. See *English v. State*, 35 Tex. 473 (1871); *State v. Duke*, 42 Tex. 455 (1875).

hanging from his waist belt, he would expose himself to unlimited ridicule."[148] The tendency

toward concealing deadly weapons rather than carrying them openly was in fact so strong that in

the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear

hip.[149] Southerners were at times forthright about their sectional proclivity toward carrying

weapons—but they generally did so in defiance of the law, not under its protection.[150] For

instance, Frederick Law Olmsted's famous description of his travels in the South featured a

Tennessean explaining that young southern men quite frequently hid pistols and bowie knives

under their coats and clothing.[151] Westward migrants similarly enter the twenty-first century

imagination loaded down with pistols and bowie knives; but accounts from the period show that

armed men tended to conceal their weapons, and when their revolvers were openly visible, it was

---

[148] "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore American*. Some of the manners and etiquette books of the nineteenth century also addressed the impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839), 147-149. https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&source=gbs_navlinks_s. See also "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2 ("Would the men who carry bowie-knives concealed at their backs, pistols on their hips, or sword canes in their hands, dare to walk abroad with these weapons openly displayed? Why, then, should the law not treat them as intending criminals, if it finds them menacing their fellow-citizens by wearing concealed weapons?").

[149] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried, especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket," *Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward securing an abolition of the practice of pistol-carrying, a Galveston (Tex.) paper suggests that the pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket.").

[150] For example, see "Wearing Concealed Weapons," *Prairie News* (Okolona, Mississippi), May 26, 1859, 1 (reprinted from *Nashville Banner*), ("…almost every second man one meets upon the streets, or, in public by-ways, is literally a 'walking magazine,' belted with pistols… . It is useless to attempt a denial of these facts when palpable proofs are daily presented. We stand for a moment upon a street corner, in conversation with a young man, and the first breath of wind that lifts the lapel of his coat exposes the mounting of a pistol in his waist band.").

[151] Charles E. Beveridge and Charles Capen McLaughlin, *The Papers of Frederick Law Olmsted*, 3 vols. (Baltimore: Johns Hopkins University Press, 1981), II: 232-233.

a result of their not wearing coats (a coat being a marker of social respectability during the nineteenth century). [152]

64. It was much easier then (as it is now) to hide a weapon in a pocket, or in a waistband covered by a coat, than to attach it visibly to the outside of one's clothes. This was especially true of nineteenth-century men, who wore coats on an everyday basis not just for warmth but as an indication of politeness and respectability. Prior to the widespread availability of ready-made clothing in the post-Civil War era, men's clothes were custom tailored and often fitted closely for style. A bowie knife or revolver did not belong strapped to the outside of a frock coat, and trousers might not even have pockets. Bearing in mind nineteenth-century notions of propriety and fashion, it is safe to say that middle- and upper-class men did not openly wear deadly weapons on a daily basis unless they adjusted their clothing to purposefully render a revolver butt or knife handle plainly visible. In Georgia, for instance, where there is some caselaw on partially concealed weapons, a man's wearing a revolver inserted in his waistband, at the front of his trousers, with his coat unbuttoned, and without wearing a vest, counted as carrying "openly." [153] But in Louisiana, where the law mandated that deadly weapons had to be carried "in full open view," such partial concealment was out of bounds. [154]

65. The everyday carrying of weapons—especially concealed in one's clothing—was widespread during the nineteenth century, even as Americans opposed the practice and considered

---

[152] For example, see Mark Twain, *Roughing It* (1871), II: 4, I: 25 (Describing men who visibly carried holstered pistols as "coatless" or wearing "no coat."); and J. D. Borthwick, *Three Years in California* (Edinburgh: W. Blackwood and Sons, 1857), 77-78 (Describing men removing weapons from areas of their bodies and clothing that were concealed).
[153] *Stockdale v. State*, 32 Ga. 225 (1861) (Prior history of case states: "…they saw the defendant…have a pistol sticking in his breeches waistband, nearly in front, about the suspender button; that the butt and cock of the pistol could be plainly seen, the barrel being inserted beneath the pantaloons, and that the defendant had on no vest," and that "the barrel was inserted beneath the pantaloons in front, whilst his coat was unbuttoned, and he had on no vest at the time.").
[154] *State v. Smith*, 11 La. Ann. 633 (1856) (Defendant is described as carrying "a pistol in the pocket, under the clothes, although partially exposed.").

48

it a significant societal problem. Nineteenth-century Americans (North and South) criticized the *everyday*, or *habitual* carrying of deadly weapons. Even though they were particularly opposed to the concealment of them beneath one's clothes, there was an overarching opposition to having weapons in public at all—even when carried openly. The habitual carrying of deadly weapons on one's person (openly or concealed) was the behavior of "ruffians"—bullies who imposed their will on others through force or intimidation, and who engaged in unforgivably brutal behavior in order to do so. Ruffians carried bowie knives and used them to stab someone who insulted them, and ruffians turned a minor conflict into a melee by drawing a pocket revolver and shooting their opponents.[155] To be armed was to be deemed a dangerous person, too. A Georgia judge described the protection of open-carry within the state as a way "to compel persons who carried those weapons to so wear them…that others…might see that they were armed, and dangerous persons, who were to be avoided in consequence."[156] To carry weapons was also described as a relic of barbarism—"that most barbarous of all customs, the habit of wearing concealed weapons."[157] Commentators later in the century described pistol-toting as a "relic of barbarism"[158] and rallied to the cry, "The revolver must go!"[159] Denunciations of carrying deadly weapons were

---

[155] For example, see *The 'Science of Defence,'* Public Ledger (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); *The Ruffian Foote*, Barre Patriot (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/.

[156] *Stockdale v. State*, 32 Ga. 225 (1861).

[157] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.

[158] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also Brenham Daily Banner* (Texas), March 7, 1883.

[159] *See* "The Revolver Must Go," *Clarksville Weekly Chronicle* (Tennessee) May 24, 1884, at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc. gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune, March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?"), https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step in the interests of civilization.").

widespread, with critics comparing the practice to "barbarism" and evil intent.[160] Notably, when commentators lamented the pervasive carrying of concealed weapons, they did not describe open-carry as a solution; instead, they exhorted their community members to stop carrying weapons and asked for existing laws to be more stringently enforced.[161]

66.    There were times and occasions when Americans believed that carrying a weapon was acceptable, and the exceptions to public carry laws tell us something about them. For instance, several states exempted travelers from the dictates of their laws, while the silence of others on the subject indicates that travelers who would carry deadly weapons had to do so openly rather than concealed.[162] Another common exception was for peace officers and civilians actively assisting them.[163] Potentially the most important and contentious exception to public carry restrictions, though, involved carrying weapons for defensive purposes. Several states carved out explicit

---

[160] For example, see "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17, ("The man who arms himself with a concealed weapon and carries it with him as he mingles with others assumes a quasi-belligerent position toward human society. He prepares himself for a combat beforehand.").

[161] For examples, see "Concealed Deadly Weapons," *The National Police Gazette* (New York, New York), March 26, 1881. ("These affrays generally occur in the heat of passion and often without any justification a human life is lost through the hasty use of a weapon, the possession of which is a violation of law….The carrying of concealed weapons is not only cowardly and debasing but absolutely dangerous to peacefully-disposed citizens and injurious to the interests and welfare of the city. The practice ought to be suppressed by the strict enforcement of existing laws, and if their previsions are not stringent enough the Legislature should immediately enact additional measures for the safety of the lives and limbs of the people."); "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17. ("It is simply inexcusable for men in civilized communities, and where they have police authorities, courts, and juries, and intercourse with newspapers and railroads and telegraphs—where they are under no compulsion to go to bed with their spurs on—to wear pistols or bowie-knives as part of their daily raiment. To wear them concealed is moreover cowardly in the last degree."); "Carrying Concealed Weapons," *The Daily Picayune* (New Orleans, Louisiana), July 25, 1840, 2. ("Why brave men—citizens whose duty it is to cultivate the arts of peace, should go habitually armed, making an arsenal of their persons, has always appeared to us an inscrutable mystery—we could never divine it."); "That Hip Pocket Nerve," *The Pascagoula Democrat-Star* (Pascagoula, Mississippi) November 2, 1888 (After a concealed weapon is used in a shooting, "Now the question arises, would this tragedy have happened had this young desperado been as he ought, in the habit of going constantly unarmed? We say not.").

[162] For example of explicit permission for travelers to carry *concealed* weapons otherwise prohibited, see 1875 Mississippi ch. 46 ("That any person…traveling (not being a tramp) or setting out on a journey…who carries concealed, in whole or in part, any [enumerated deadly weapon]…shall be deemed guilty of a misdemeanor… ."); 1819 Indiana ch. 23 ("Provided however, that this act shall not be so construed as to affect travellers.").

[163] For example, see 1871 Texas 34 (Public carry restriction "shall not be so construed as to…prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties.").

exceptions, and it is plausible that public-carry defendants anywhere would have been able to argue self-defense at trial. [164] But the adjudication and interpretation of this exception highlights the ways in which nineteenth-century Americans distinguished between lawful weapon-carrying for self-defense during an emergency on the one hand, versus everyday weapon-carrying as a preemptive self-defense against unforeseen threats on the other.

67.     Not only did nineteenth-century Americans carry pistols and large knives in the manner familiar to us (concealed), but they also carried them for reasons familiar to twenty-first century Americans—in preparation for an unforeseen, potential emergency. While weapon-carriers might describe their decision to conceal a pocket pistol as one undertaken for self-defense, popular opinion more broadly condemned such *preemptive* arming that was divorced from a known, articulable threat. A writer in the *Washington Post* described it as "the vicious custom of going armed so as to be 'ready for an emergency'." [165] In the words of a Georgia resident: "The habitual carrying of deadly weapons on the ground of self-defense in a peaceful and enlightened community of the nineteenth century is simply nonsense. The thousands who do not choose to load themselves down with weapons need protection on the other hand from the few who are at once a terror, a disgrace and a nuisance to the community." [166] To the retort that the right to bear arms protected such behavior, the response was that "it is certain that in no sense was that provision [the Second Amendment] intended to authorize a wanton disregard of the sacredness of human life and defiance of the laws and peacefulness of an orderly and well-disposed community," and that "such

---

[164] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 413 (reviewing cases related to weapon-carriers who "apprehended attack.").

[165] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.) January 20, 1887, 2.

[166] "Carrying Deadly Weapons," *Daily Constitution* (Atlanta, Georgia) February 13, 1879, 2. The author associates weapon carrying with barbarism saying, "Let the cowardly barbaric practice be stamped out."

a construction of the necessary right to bear arms in defense of home and country should not be tolerated."[167]

68.    There was some acceptance of the idea that a true emergency situation might justify the carrying of a deadly weapon temporarily. What counted as a sufficient emergency, though, could be ambiguous. Much of the literature about the invocation of this emergency (or self-defense) exception centers upon male interpersonal disputes. Known as "difficulties," these contests could have their origin in anything from economic or workplace conflicts to rivalries over women, but they all fundamentally threatened the perceived manliness of one or both parties. Difficulties represented an evolution in America's honor culture that, despite being more deeply entrenched in southern areas, also existed in northern and urban locales.[168] But whatever the emergency, the honest, brave, and forthright man was presumably  willing to carry his weapons openly and show the world what he was doing. In Texas, where a strict public carry law offered protection to people fearing an attack that was both "immediate and pressing, and was of such a nature as to alarm a person of ordinary courage," the weapon had to be worn openly.[169] When an Alabaman defendant argued that he needed to conceal a weapon in order to defend himself from an attack, the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[170] In Arkansas and Tennessee, postbellum weapon laws permitted the carrying of army and navy model revolvers

---

[167] "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2. This writer also stated that: "It is simply inexcusable for men in civilized communities, and where they have police authorities, courts and juries, and intercourse with newspapers and railroads and telegraphs . . . to wear pistols or bowie-knives as part of their daily raiment."

[168] On male interpersonal violence as a symptom of a growing women's rights movement, see Hendrik Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67-96.

[169] 1871 Texas ch. 34, § 2.

[170] *State v. Reid*, 1 Ala. 612 (1840).

so long as they were carried "openly in the hand" or "uncovered, and in his hand"—the way a person experiencing an immediate emergency would carry one. [171]

69.    Nineteenth-century Americans understood their public carry laws to coexist with the right of self-defense. These laws were designed to stop individuals from preemptively going armed on a habitual basis, not foreclose people in deadly emergencies from defending themselves. Where gun-toters were convicted despite a plea of self-defense, it typically resulted from a failure to demonstrate that they had actually engaged in lawful self-defense—such as occasions where personal conflicts and wounded pride led to violence.

70.    Courts today invoke a "manner-of-carry" argument that takes historical concealed-carry laws to justify current analogous regulations that proscribe one way of wearing or carrying deadly weapons in favor of another. But historical context shows us that lawful public carry in the nineteenth century was much more circumscribed than this "manner-of-carry" argument suggests. The nationwide consensus about the constitutionality of concealed-carry restrictions was essentially a nationwide consensus about the efficacy of prohibiting the most convenient and most popular manner of carrying deadly weapons. These laws defied Americans who wanted to be preemptively armed to do so openly and face the legal and personal consequences that followed, including being stopped by or reported to police, being ostracized, being denied entry into mercantile establishments, and being presumed to be a dangerous person or a ruffian. Within organized community settings (i.e., not in isolated or rural areas, or on one's own property) the open carrying of weapons was neither common nor socially acceptable. To do so evinced reactions from passersby or pointed toward an imminent emergency.

## CONCLUSIONS

---

[171] 1879 Tennessee ch. 186; 1881 Arkansas ch. 96, § 2.

71. Americans have historically distinguished arms suitable to militia service and hunting from deadly weapons suited for concealment and associated with interpersonal violence. During a period of American history when rates of homicide and crime were on the rise, so too were the number of weapons available to consumers and the lethality of firearms. More weapons and more crime produced regulations aimed at protecting the people and their peace, of which public carry regulations formed a foundational part. Americans attempted to reduce the number of weapons circulating in public by prohibiting "going armed" without good cause and outlawing the concealment of weapons that were inherently concealable and frequently concealed by their owners. Public carry laws coexisted with similar municipal ordinances and worked in harmony with other weapon regulations like minimum-age requirements, sales restrictions, weapon taxes, and locational restrictions. Licensing laws—which generally provided wide discretion to authorities—emerged during the country's epidemic of gun violence and aimed to resolve the problems posed by preexisting public carry laws. Where regulations forced lawful weapon-carriers acting in self-defense to still be arrested and defend their actions at trial; and where governmental incapacity to protect the peace led to widespread fear of armed criminal behavior; licensing provided an avenue for peaceable, law-abiding persons to make their case to administrators ahead of time and carry weapons as prescribed with assurance that they would not be arrested and tried for simply possessing a revolver or bowie knife. Public carry laws, including licensing laws, were understood to operate in harmony with both the Second Amendment and the natural right of self-defense. In the event that a man had a legitimate need to carry a weapon, he was expected to carry openly or prove the reasonability of his actions to a jury of his peers at trial. The larger historical context shows us that Americans of the nineteenth century generally disdained the habitual

carrying of deadly weapons and considered it a significant societal problem that deserved the attention of lawmakers and police.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June  26  , 2024, at Fort Worth, Texas.

_____

Dr. Brennan Rivas

55

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MICHAEL P. O'NEIL, et al.,<br>　　　Plaintiffs,<br><br>v.<br><br>PETER F. NERONHA, in his official capacity as Attorney General of the State of Rhode Island, and THE STATE OF RHODE ISLAND,<br>　　　Defendants. | C.A. No. 1:23-cv-00070 |

## DECLARATION OF PROFESSOR ROBERT SPITZER

I, Dr. Robert Spitzer, pursuant to 28 U.S.C. § 1746, declare as follows:

1.　I have been retained by the Office of the Attorney General of the State of Rhode Island to provide expert opinions and testimony in the above-entitled matter regarding the history and tradition of firearms restrictions in the United States. This expert report and declaration ("Declaration") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## PROFESSIONAL BACKGROUND AND QUALIFICATIONS

2.　I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun

---

[1] Robert J. Spitzer, *Shooting Down Gun Myths*, *America* (June 8, 1985) 468–69.

laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was recently published (2024) by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). A copy of my current curriculum vitae is attached as Exhibit A to this declaration.

3. I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, 17-cv-00746 (C.D. Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Township*, No.: 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *National Association for Gun Rights, Inc. v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott et al. v. Connor*, No. 20-00360 (D. Haw.); *National Association for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Santucci v. Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*,

No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.);

*Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, 19-cv-00617 (E.D. Cal.);

*Nichols v. Newsom*, 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v.*

*Delaware Department Of Safety And Homeland Security*, No. 1:22-cv-00951(D. Del.); *Mark*

*Fitz, Grayguns, Inc. v. Rosenblum* No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 23-141,

(S.D. Ill.); *Mitchell, et al. v. Atkins, et al*., 19-cv-5106 (W.D. Wash.); *Keneally et al., v. Raoul, et*

*al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, 2:23-cv-01130 (E.D.N.Y.); *Lane v.*

*James*, 22-cv-10989 (S.D.N.Y.)*; Rocky Mountain Gun Owners, et. al. v. The Town of Superior*,

22-cv-02680 (D. Colo.); *Wiese v. Bonta*, 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, Case No. 23-

cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, 23-cv-

209-RJD (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, 23-cv-215-NJR (S.D.

Ill.); *Herrera v. Raoul*, 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, 23-cv-00112 (E.D. Wash.);

*Hartford v. Ferguson*, 23-cv-05364 (W.D. Wash.); *Koppel v. Bonta*, 8:23-cv-00813 (C.D. Cal.);

and *Jane Doe v. Bonta*, 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, Case 1:21-cv-

08208-ER; *Richey v. Sullivan*, Case No. 1:23CV344 (AMN-DJS) (N.D.N.Y.); *D.B. v. Sullivan*

No.: 1:22-cv-00282 (MAD-CFH); *Commonwealth of Pennsylvania v. Tomlinson*; *National*

*Association for Gun Rights et al v. Polis* U.S.D.C. Colo. Case No. 1:2024cv00001; *O'Neil et al.*

*v. Neronha et al*., C.A. No. 1:23-cv-00070-WES-PAS; *State of Washington v. Gator's Custom*

*Guns* (Cowlitz County Superior Court Case No. 23-2-00897-08); *Guardian Arms, LLC, et al. v.*

*State of WA, et al.*, No.: 23-2-01761-34.

    4.   I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S.

Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,*

U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S.

742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684

(2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069

(2012).

5.    I have also presented written testimony to the U.S. Congress on "The Second

Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee,

Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington,

D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to

the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights,

U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to

Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on

Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and

Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## I.    INTRODUCTION

6.    This analysis examines three types of old weapons laws: those pertaining to

weapons carrying (spanning concealed weapons carrying, open weapons carrying and laws

restricting any weapons carrying), laws against weapons brandishing and display, and weapons

licensing laws.

7.    The carrying of weapons of all sorts, but especially guns, fighting knives (long,

thin-bladed knives), and various types of clubs has been subject to wide-ranging and varied

regulation and restriction from the seventeenth century through the early twentieth century. It is

now well known that restrictions on the concealed carrying of these weapons were ubiquitous in

America. Less well known, however, is that the open carrying of weapons was often restricted,

even extending to long guns. In addition, the states also restricted the public carrying of weapons

through laws criminalizing the brandishing and even simple public display of weapons. Further, a variety of weapons licensing laws were enacted in the nineteenth and early twentieth centuries that allowed for conditional carrying, subject to a valid license or permit issued by the government. The rise of licensing as a regulatory technique as examined later in this report often followed instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a more flexible form of government regulation of the activities and weapons in question, though carry restrictions also persisted.

8.      Taken together, these numerous and varied laws make clear that the default in American history was weapons regulation and restriction, especially once individuals left their domiciles. Perhaps most significant (and surprising) is the extensive regulation of open weapons carrying, in that more than half of the states restricted, partially or completely, open weapons carrying or any weapons carrying, as discussed below.

## II.      HISTORICAL RESTRICTIONS ON PISTOL AND GUN CARRYING

### A.  RESTRICTIONS ON CONCEALED CARRY

9.      Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law

against wearing weapons because they induced "great Fear and Quarrels."[2]  Massachusetts

followed in 1751.[3]  In the late 1700s, Virginia and North Carolina passed similar laws.[4]  In the

1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; four

more did so in the early 1900s.[5]  The enactment of laws restricting concealed weapons carrying

followed the rise of homicides and interpersonal violence described by historian Randolph Roth

who noted that restrictions on firearms from the colonial period to the start of the Revolution

were few because homicide rates were low. When homicides did occur, guns were seldom used,

in large part because of the time involved loading them, their unreliability, and (especially for

pistols) their inaccuracy.  After the Revolutionary period the spread of violence tied to

concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed

carry weapons laws.[6]  Concealed carry laws normally targeted pistols as well as the types of

fighting knives and various types of clubs discussed here. From the 1600s through the early

1900s, every single state (plus D.C.) enacted laws penalizing concealed weapons carrying (see

Exhibits B and C).

---

[2] The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686), An Act Against Wearing Swords, Etc.

[3] 1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751.

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792).

[5] Including D.C. Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017), 63-67; Exhibit C.

[6] Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

10.     In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[7] As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[8] Thus, the widespread enactment of concealed carry law restrictions was the public policy remedy to the emergent crime problems of the nineteenth century.

## B.  OPEN CARRY WEAPONS RESTRICTIONS

11.     Ubiquitous restrictions on concealed weapons carrying are now well-known. Less well-known, however, is that many of the laws enacted to restrict concealed weapons carrying also extended restrictions to open weapons carrying, or simply barring any weapons carrying. In all, at least 38 states enacted at least 72 laws restricting or extending to the open carrying of weapons (see Exhibits B and C).

12.     From the early 1800s up to 1860, at least 5 states (including D.C.) enacted laws barring or restricting the carrying of named weapons, whether concealed or open. Georgia enacted a law in 1837 restricting both the carrying and sale of named weapons:

> [I]t shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for

---

[7] Spitzer, *The Gun Dilemma*, 77-80; Robert J. Spitzer, "To Brandish or Not to Brandish: The Consequences of Gun Display," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society*, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2024), 97-114.

[8] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29 (Winter 1938): 530.

the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c.[9]

13.     Florida enacted an 1838 law that criminalized the concealed carrying of named weapons, but also added that "all persons carrying said weapons openly shall pay" a then-considerable regulatory tax of "ten dollars per annum."[10]

14.     An 1851 Pennsylvania law for the borough of York defined as a felony the willful and malicious carrying of "any pistol, gun, dirk knife, slung shot, or deadly weapon."[11] (Note that this law applied to any firearm, not just handguns.)

15.     An 1852 Hawaii law criminalized the carrying or "found armed with" any of a list of deadly weapons.[12] An 1858 measure for the District of Columbia made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles."[13]

16.     In a pattern similar to the enactment of concealed carry laws, open carry restrictions increased in frequency in the latter half of the nineteenth century. From 1860 to

---

[9] The very title of this law proclaims the justification for its enactment: 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

[10] 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838); $10 in the 1830s would equal $327 in 2023 dollars. https://www.officialdata.org/us/inflation/1830?amount=10.

[11] 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

[12] 1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons.

[13] 1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

8

1900, 24 states enacted anti-open carry laws (see Exhibits B and C), and 9 states did so in the early 1900s (a few states enacted laws in both centuries).

17.     In 1871, Texas enacted this anti-carry law: "any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife" unless for provable self-defense or in service to the government was guilty of a crime.[14] Another typical law was an 1875 Arkansas statute that said "any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor."[15] An 1871 Jersey City, New Jersey law made it unlawful for any person "to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon."[16] Similarly, an 1872 Nebraska City, Nebraska law declared it to be "unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons."[17]

---

[14] 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons; § 1.

[15] Act of Feb. 16, 1875,1874-75 Ark. Acts 156; § 1.

[16] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

[17] Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources. Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.

### C. LONG GUN/ANY GUN CARRY RESTRICTIONS

18.    In addition to anti-concealed weapons carrying laws and open weapons carrying

restrictions, at least 22 states enacted 36 laws from the early 1800s to the end of the century

specifically restricting the carrying of long guns or any kind of firearm (such as the 1851

Pennsylvania law cited above; see Exhibits B and C). Obviously, this meant that long guns, by

their nature, could not be carried in any concealed manner either. Some of these laws were

limited by applying, for example, to times and places of elections, other public gatherings, or to

any who might be intoxicated. Other laws imposed no such limitations. Some applied only to

cities and towns, but others were statewide measures. These laws generally cited exceptions for

travelers, law enforcement, the military, or justifiable instances of self-defense. Of the 22 such

laws in this category, 19 of them were passed from the 1850s to 1899; another 7 were passed in

the early 1900s (a few states passed laws in both periods). Generally speaking, these states and

laws also restricted concealed weapons carrying as well (though, as noted earlier, concealed

carry was restricted by every state in the country).

19.    An 1868 Florida law subjected to criminal penalties anyone who "shall carry arms

of any kind whatever, secretly, on or about their person, or whoever shall have about or on their

person any dirk, pistol or other arm or weapon."[18] An 1878 Los Angeles, California ordinance

said that, "except peace officers, and persons actually traveling, and immediately passing

through Los Angeles city," no person "shall wear or carry any dirk, pistol, sword in a cane,

slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate

---

[18] James F McClellan, A Digest of the Laws of the State of Florida: From the Year One
Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight
Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of
Modern Law: Primary Sources. [1868]. Offences Against Public Peace, § 13.

limits of said city."[19] An 1881 Kansas state law required cities to "prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise."[20]

20.     An 1890 Oklahoma law made it unlawful for anyone "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[21] Some of the laws did not specifically bar the carrying of every named type of firearm, but included a phrase like "or any other dangerous or deadly weapon of like kind or character."[22] One may reasonably assume that a long gun was and is a "dangerous or deadly weapon."

## III.    WEAPONS BRANDISHING AND DISPLAY LAWS

21.     Weapons brandishing and display laws are common today. Less well known is the fact that discouraging weapons brandishing and display were not only ubiquitous in our history, but date to early law-making in the 1600s.

22.     Two types of historic laws penalized the public appearance of weapons (short of their actual use), including but not limited to firearms, in two circumstances: the *brandishing* of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere *display* of weapons (i.e. that they simply can be seen) in the

---

[19] William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. Ordinances of the City of Los Angeles, § 36.

[20] 1881 Kan. Sess. Laws 92, c. 37, § 24.

[21] 1890 Okla. Laws 495, art. 47; § 2.

[22] E.g., William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878; Ordinances of the City of Los Angeles, § 36; 1882 W. Va. Acts 421–22.

11

presence of others. At least three-fourths of the states enacted laws that penalized public weapons brandishing or display. Of these, 21 states enacted brandishing laws, and 19 states enacted weapons display laws (4 states enacted both). Chronologically, at least 3 states (then colonies) did so in the 1600s, 3 in the 1700s, 28 states in the 1800s, and 2 more in the early 1900s.[23]

23.    The penalties for violating these laws generally included some combination of fines and incarceration. Needless to say, those who were incarcerated were deprived of their weapons during the length of their term.

24.    A 1642 provision in the colony of New Netherland (soon to be New York) stated: "No one shall presume to draw a knife much less to wound any person, under . . . penalty."[24] This reference did not mention firearms but allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred. Similarly, a 1786 Massachusetts law prohibited the mere assemblage of "any persons to the number of twelve, or more, being armed with clubs or other weapons." If they did not disperse within an hour of being warned, they could be subject to arrest.[25] That is, the mere appearance of such an armed assemblage in public was sufficient to justify legal action against them, although other provisions of the act also penalized such groups who also behaved in a threatening manner.

25.    Some of these American laws mirrored the British Statute of Northampton, where

---

[23] See below, and also: Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 77-80.

[24] 1642 N.Y. Laws 33, Ordinance Of The Director And Council Of New Netherland Against Drawing A Knife And Inflicting A Wound Therewith. *Young v. Hawaii*, 992 F.3d 765, 794–795 (9th Cir. 2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy* 43 (Spring 2020): 353.

[25] 1786 Mass. Sess. Laws, § 1.

"[t]he very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute."[26] For example, the 1686 New Jersey "Act against wearing Swords, &c" was adopted as a reaction to "great complaints by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines [small Irish-derived swords], or any other unusual or unlawful weapons."[27] As noted earlier, this law penalized the "private" wearing of weapons but also their open carrying. A 1694 Massachusetts law subjected to arrest any who "shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere."[28] Thus, this law encompassed those carrying weapons whether mounted on horseback or on foot. New Hampshire enacted a law in 1701 (and also in 1708 and 1744) that punished anyone who "shall go armed offensively" who "put his Majesty's subjects in fear."[29] Both the 1701 and 1708 laws stipulated as part of the penalty that "the arms or weapons so used by the offender" were "to be taken away. . . ."[30]

---

[26] Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy,* 43(Spring 2020): 353. See also Joseph Blocher and Reva B. Siegel, "When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller," *Northwestern University Law Review* 116 (2021): 164–172.

[27] An Act against Swords, &c, 1686 N.J. Laws 289, 289, ch. IX. Quoted in *Young v. Hawaii*, 992 F.3d 765, 794 (9th Cir. 2021).

[28] 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders.

[29] New Hampshire - Acts and Laws June 1701, 15; available at https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh; New Hampshire 1708, "Laws of New Hampshire," available at https://heinonline.org/HOL/Page?handle=hein.ssl/ssnh0244&id=68&collection=ssl; N.H. - Acts and Laws, 1744, 9-10, https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10.

[30] The 1744 law dialed up the penalty, saying that those convicted were to be "whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment,

26.     Virginia enacted a measure in 1786 saying that no man was to "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison."[31] North Carolina enacted a very similar measure in 1792, saying that no man shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere."[32] Massachusetts added to its existing firearms regulations in a 1795 law that authorized justices of the peace to arrest those who "ride or go armed offensively, to the fear or terror of the good citizens."[33] In 1801, Tennessee enacted a law saying that no one was to "go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person."[34] Maine's 1821 law outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens."[35]

27.     Note that Virginia, Massachusetts, Tennessee, and Maine all invoked some version of the old British phrase "to the terror of the people" with New Hampshire's law referencing the similar "fear" of the public. And in the Tennessee law, concealed weapons carrying was also identified as a source of "terror." The continued use of this phrase emphasizes the well established principle that traveling while armed was, per se, a source of "terror" to the

---

and once every three months, during said twelve months, receive the same number of stripes aforesaid."

[31] 1786 Va. Acts 33, ch. 21.

[32] Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60–61 (Newbern 1792).

[33] 1795 Mass. Acts 436, ch. 2. Quoted in *Young v. Hawaii*, 799. See also 1692 Mass. Acts 10, 11–12.

[34] 1801 Tenn. Pub. Acts 260, ch. 22, § 6. Quoted in *Young v. Hawaii*, 798.

[35] 1821 Me. Laws 285, ch. 73 § 1. Quoted in *Young v. Hawaii*, 798–799.

14

people.

28.     These laws, it turns out, were ubiquitous. Between the late 1600s and the early 1900s, a total of at least 36 states and territories enacted laws that penalized weapons brandishing or display (see Table 1, below). Of these, 21 states criminalized weapons brandishing[36] by combining two elements: the display of the weapon plus the manner of the display. For example, an 1840 Mississippi law said that "any person having or carrying any . . . deadly weapon" who "shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in self-defense" shall be subject to prosecution.[37] Note the two key elements: the "exhibit" or display of the weapon combined with doing so "in a rude, angry and threatening manner," revealing a criminal intent as invoked by the terms "rude, angry, and threatening." Of the 21 states with these laws (see Table 1 below) , 11 used the identical "in a rude, angry and threatening manner" phrase; 5 used the word "threaten," and the others used wording including "for the purpose of frightening or intimidating," "in a manner likely to cause terror," or simply "point."

---

[36] The Statutes of the State of Mississippi, 1840, § 55; 1854 Wash. Sess. Law 80, ch. 2, §30; Digest of the Laws of California, 1858; A Digest of the Laws of Pennsylvania, 1860, page 250; 1867 Ariz. Sess. Laws 21–22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, § 392; 1868 Ark. Acts 218, § 12–13; 1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1873 Nev. Stat. 118, ch. 62, § 1; A Digest of the Laws of Texas, 1873; 1875 Ind. Acts 62, § 1; The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201; The General Laws of New Mexico, 1882 Page 313; The Revised Statutes of the State of Illinois, 1883; 1884 Wyo. Sess. Laws 114, ch. 67, § 1; 1885 Mont. Laws 74; 1897 Fla. Laws 59, chap. 4532, § 1; Annotated Code of the State of Iowa, 1897, Page 1898, § 4775; 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956; Annotated Statutes of the Indian Territory (Oklahoma), 1899; 1925 W.Va. Acts 25–30, ch. 3, § 7, pt. a; 1931 Mich. Pub. Acts 670, ch. 37, § 233.

[37] The Statutes of the State of Mississippi, 1840, § 55.

# TABLE 1

## COLONIAL, STATE, AND TERRITORIAL WEAPONS BRANDISHING AND DISPLAY LAWS IN 36 STATES, 1642-1931*

| BRANDISHING LAWS IN 21 STATES AND JURISDICTIONS | DISPLAY LAWS IN 19 STATES AND TERRITORIES |
|---|---|
| -The Statutes of the State of Mississippi, 676, 1840, § 55 | -1642 N.Y. Laws 33 |
| -1854 Wash. Sess. Law 80, ch. 2, §30; 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | -1686 N.J. Laws 289, ch. IX<br><br>-1692 Mass. Acts 10, 11-12; 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134 |
| -Digest of the Laws of California, 1858: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858, and Page 34, Image 340 (1855) | -1701 N.H. Acts and Laws 15; N.H. Public Carry Prohibition (1708); N.H. - Acts and Laws, 1744, 9-10 |
| -A Digest of the Laws of Pennsylvania, 1860, page 250 | -1786 Va. Acts 33, ch. 21 |
| -1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1909 Id. Sess. Laws 6, § 1 | -Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792); 1889 N.C. Sess. Laws 502, ch. 527, § 1 |
| -1867 Ariz. Sess. Laws 21-22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, § 392 | -1801 Tenn. Pub. Acts 260, ch. 22 § 6 |
| -1868 Ark. Acts 218, § 12-13 | -1821 Me. Laws 285, ch. 73 § 1 |
| -1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956 | -Revised Statutes of the State of Delaware, 1852, § 3<br><br>-1880 Ga. Laws 151<br><br>-1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, § 448 |
| -1873 Nev. Stat. 118, ch. 62, § 1 | -1886 N.M. Laws 56, ch. 30, § 4 |
| -A Digest of the Laws of Texas, 1873, Annotated Page 1321, Image 291 (Vol. 2, | -1893 Or. Laws 29-30, § 1; 1925 Or. Laws |

16

| 1873) | 172-73, ch. 117, § 1 |
|---|---|
| -1875 Ind. Acts 62, § 1 | -The Code of Alabama, 1897, § 4342 |
| -The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201 | -Book of Ordinances of the City of Wichita, Kansas, 1899, § 1 |
| -The General Laws of New Mexico, 1882 Page 313 | -Revised Statutes of Wyoming, 1899, Page 1252-1253, Image 1252-1253 |
| -The Revised Statutes of the State of Illinois, 1883, Page 453, Image 512 (1884) | -1907 Ark. Acts 810, § 1 |
| -1884 Wyo. Sess. Laws 114, ch. 67, § 1 | -1910 S.C. Acts 694 |
| -1885 Mont. Laws 74 | -1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17. |
| -1897 Fla. Laws 59, chap. 4532, § 1 | |
| -Annotated Code of the State of Iowa, 1897, Page 1898, § 4775 | |
| -Annotated Statutes of the Indian Territory (Oklahoma), 1899, Second Session of the Fifty-fifth Congress, Page 228, Image 312 | |
| -1925 W.Va. Acts 25-30, ch. 3, § 7, pt. a | |
| -1931 Mich. Pub. Acts 670, ch. 37, § 233 | |

*Sources: Duke Center for Firearms Law digital archive of gun laws, https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline; *Young v. Hawaii,* 992 F.3d 765, 794-95 (9th Cir. 2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy,* 43(Spring 2020): 347-56. Note that four states, Arkansas, Indiana, New Mexico, and Wyoming, appear in both lists totaling 40 laws in 36 states.

29. A total of 19 states enacted laws that penalized the mere display or wearing of firearms and other "deadly weapons."[38] (While 36 states enacted one of these types of laws, at

---

[38] 1642 N.Y. Laws 33; 1686 N.J. Laws 289, ch. IX; 1692 Mass. Acts 10, 11–12; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134;

least four states—Arkansas, Indiana, New Mexico, and Wyoming—enacted both display and

brandishing laws, for a total of 40 laws in 36 states.) Several state laws in this category used the

phrase "to point," as was true for a couple of laws in the brandish category, but the laws here had

additional language that made clear that the intent of the person was irrelevant. Bearing in mind

that the definition of brandishing is "to shake or wave (something, such as a weapon)

menacingly,"[39] these latter laws contemplate a violation for the act of pointing without any

evidence of malice, and to forestall possible excuses. An 1880 Georgia law, for example, made it

a crime to "point or aim" a gun but added "loaded or unloaded,"[40] a distinction not made in the

brandishing laws. Another outlawed gun pointing "in jest or otherwise";[41] another added "with or

without malice";[42] a fourth said "in fun or otherwise."[43] The thrust of these laws is that intent

does not matter. The mere act of display is sufficient to warrant legal action.

---

1699 N.H. Laws 1, 1–2; 1786 Va. Acts 33, ch. 21; Francois Xavier Martin, *A Collection of
Statutes of the Parliament of England in Force in the State of North Carolina*, 60–61 (Newbern
1792): 1801; 1889 N.C. Sess. Laws 502, ch. 527, § 1; Tenn. Pub. Acts 260, ch. 22 § 6; 1821 Me.
Laws 285, ch. 73 § 1; Revised Statutes of the State of Delaware, 1852, § 3; 1880 Ga. Laws 151;
1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, §
448; 1886 N.M. Laws 56, ch. 30, § 4; 1893 Or. Laws 29-30, § 1; The Code of Alabama, 1897, §
4342; Book of Ordinances of the City of Wichita, Kansas, 1899, § 1; Revised Statutes of
Wyoming, 1899; 1907 Ark. Acts 810, § 1; 1910 S.C. Acts 694; 1927 Haw. Sess. Laws 209-217.

[39] https://www.merriam-webster.com/dictionary/brandish.

[40] 1880 Ga. Laws 151.

[41] Revised Statutes of Delaware, 1852, § 3.

[42] 1893 Or. Laws 29–30, § 1.

[43] 1889 N.C. Sess. Laws 502, ch. 527, § 1.

18

## IV.   HISTORICAL WEAPONS LICENSING/PERMITTING LAWS

30.     Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal . . . ."[44] Despite the difference of hundreds of years, licensing in early America functioned similarly to the way it functions today.

31.     Historical weapons licensing and permitting laws were and are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates some kind of evaluation that resembles what in modern parlance is called a background check.

32.     In addition, like background checks, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws. The analysis below demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as to every aspect of sales. With some exceptions, the primary focus was on handguns for the obvious reason that they were the weapons that posed the most significant threat to public safety and good order from the 1700s through the early 1900s.

33.     State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives,

---

[44] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

various types of clubs, and explosives (ranging from firecrackers and gunpowder to nitroglycerine after its invention).

34.  In all, a total of at least 46 states plus the District of Columbia enacted some type of licensing law from the 1700s through the early 1900s. At least 32 states enacted 72 licensing requirement laws for individuals as a pre-requisite for their weapons ownership or carry during this time (see Exhibits D and E for enacting jurisdictions and years of enactment); 16 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 22 states licensed the possession, handling, or transport of gunpowder and other explosives. And at least 17 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

35.  In addition, at least 14 states imposed licensing requirements on specified marginalized groups (variously including Native Americans, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 11 states imposed licensing on enslaved persons or free Blacks. At least 6 states enacted some kind of regulatory tax.

36.  Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied at first to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

20

Case: 25-1314 Document: 61 Page: 146 Date Filed: 10/27/2025
Case 1:23-cv-00070-WBS-PAS Document 146 Filed 11/14/24 Page 25 of 35 PageID 6760768

144

472

37.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s, every state in the country restricted or criminalized such carrying.[45] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units began to allow legal weapons carrying through licensing, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. For example, an 1881 permitting system for New York City said that permits would be issued to "a proper and law abiding person."[46] An 1898 Oregon City law called for carry permits to be issued if the magistrate believed it "necessary or prudent to grant such permission."[47] Permit laws usually set a time limit for permit duration, ranging from a month to a year.

38.     Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[48] The hunting-related laws listed here all allowed hunting as

---

[45] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67; Exhibits B and C.

[46] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority 214-215, Image 214-215 (1881).

[47] *The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order* 259, Image 261 (1898); An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

[48] Spitzer, Gun Law History in the United States and Second Amendment Rights, 73-74.

21

Case: 25-1811    Document: 6    Page: 147    Date Filed: 10/27/2025
Case 1:23-cv-00076-WBS-P33583    Document 747    Filed 10/27/2025    Page 145 of 35    PageID 6760768

145
473

permitted by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season, or hunting certain types of game). Licensing related to Indigenous people, enslaved persons, and free persons of color are also discussed in more detail below. Each of these categories of laws are detailed in Exhibits D and E.

39.     Many of these licensing laws were enacted where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The jurisdictions enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question—by tailoring prohibitions to address public-safety threats posed by firearms-related activities rather than banning those activities outright, and by utilizing regulatory techniques that require more of those involved in the licensing process, including the gathering and keeping of relevant information by governing officials or dealers or both—though traditional laws that simply penalized weapons carrying or use remained in many if not most places. Like licensing, background checks also seek to limit (and not categorically prohibit) those who may engage in certain firearms-related activities.

A.     LICENSING OF WEAPONS CARRYING OR POSSESSION

40.     In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or

deadly weapon" in St. Louis by means of "written permission from the Mayor."[49] Kansas City, Missouri enacted its own municipal version of this law in 1880.[50] A similar measure was enacted in St. Louis in 1892.[51]

41.     Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms . . . ."[52] As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[53]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[54]

---

[49] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City 491-492, Image 499-500 (1871).

[50] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[51] The Municipal Code of St. Louis (St. Louis: Woodward 1901), 738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[52] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," passed March 31, 1871, and the Supplements Thereto 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[53] https://www.thefreedictionary.com/fowling+piece.

[54] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto 86-87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[55]

42.    Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[56] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[57]

43.    New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[58]

This provision also allowed for non-residents who had occasional business in the city to apply for permits as well.

---

[55] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

[56] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[57] George W. Hess, *Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest* 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[58] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

44. An 1884 New York state law barred the carrying or possession of named weapons under the state penal code, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so.[59] Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[60] A year later, the minors permitting law was extended to all cities in the state and included "any pistol or other firearms of any kind."[61] This would have included long guns as it did not specify only concealed carry. In 1891, the state amended the city of Buffalo's Charter to extend permitting to all persons in Buffalo covering handguns and other dangerous weapons.[62]

45. Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[63]

46. Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[64]

---

[59] As early as 1866, New York State enacted a law criminalizing the concealed carrying of certain named weapons: 1866 N.Y. Laws 1523, Ch. 716.

[60] George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5* 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

[61] George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5*. Fourth Edition 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[62] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[63] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[64] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 289, Image 295 (1884) available at The Making of Modern Law:

25

148

47.     An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[65]

48.     New Haven, Connecticut enacted a general anti-carry law in 1890, extending to pistols, though it allowed concealed carry if the person first obtained a permit either from the mayor or police superintendent.[66]

49.     Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[67] The California cities of Stockton (1891)[68] and Fresno (1896)[69] did the same.

50.     A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless

---

Primary Sources. 1882.

[65] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[66] Charles Stoers Hamilton, *Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City* 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[67] Fred L. Button, ed., *General Municipal Ordinances of the City of Oakland, California* (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[68] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[69] L. W. Moultrie, *Charter and Ordinances of the City of Fresno* 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[70]

51.     Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle without first taking out a license from the County Commissioner. . . ."[71] In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[72]

52.     Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor . . . ."[73]

53.     A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[74]

---

[70] Washington D.C. 27 Stat. 116 (1892), ch. 159.

[71] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

[72] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

[73] Decius Spear Wade, *The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force* 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[74] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

27

54. The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[75]

55. Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry various otherwise barred dangerous weapons including "any pistol or colt." The city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[76]

56. In the twentieth century, permitting accelerated, spread, and broadened. In 1905, New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[77] Licensing was extended to long guns—machine guns and automatic rifles—in several states including Arkansas (1931, 1935),[78] Connecticut (1935),[79] Illinois (1931),[80] Minnesota (1933),[81] Montana (1935),[82] New Jersey in

---

[75] Rose M. Denny, ed., *The Municipal Code of the City of Spokane, Washington* (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

[76] Charles H. Hamilton, ed., *The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix* (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[77] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[78] 1931 Ark. Laws 704, 704-6; 1935 Ark. Laws 171, 171-75.

[79] 1935 Conn. 389, 389-94.

[80] 1931 Ill. Laws 452, 453.

[81] 1933 Minn. Laws 231.

[82] 1935 Mont. Laws 57, 57-60.

1927[83] and 1934,[84] Ohio (1933),[85] South Carolina (1934),[86] South Dakota (1933),[87] Virginia

(1934),[88] West Virginia (1925),[89] and Wisconsin (1933).[90] In 1906, a Massachusetts state law

noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a

license.[91] It extended licensing to a variety of guns in 1927.[92] In 1908, Virginia enacted a

dangerous weapons concealed carry permit law, with permits granted for one year "upon a

written application and satisfactory proof of the good character and necessity of the applicant to

carry concealed weapon."[93] It extended the permitting process in 1926.[94] Georgia enacted a

detailed handgun permitting system in 1910.[95] New York State established comprehensive

handgun licensing in 1911.[96]

---

[83] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[84] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[85] 1933 Ohio Laws 189-90.

[86] !934 S.C. Acts 1288, 1288-89.

[87] 1933 S.D. Sess. Laws 245, 245-47.

[88] 1934 Va. Acts 137, 137-39.

[89] 1925 W.Va. Acts 1st Extraordinary Sess. 24, 30-31.

[90] Uniform Machine Gun Act, ch. 164, Wis. Stat. 164.01 (1933).

[91] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[92] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[93] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[94] 1926 Va. Acts. 285-87, ch. 158.

[95] Orville Park, Park's *Annotated Code of the State of Georgia 1914*, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[96] 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §§1-2.

57.     A paradigmatic example of a modern permitting system was enacted in Montana

in 1918:

> [E]very person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.[97]

---

[97] 1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.

Thereafter, permitting was enacted in states including Hawaii,[98] Indiana,[99] Michigan,[100] New

Hampshire,[101] North Carolina,[102] North Dakota,[103] Ohio,[104] Oregon,[105] Pennsylvania,[106] Rhode

Island,[107] and South Carolina.[108]

## B. PERMITS FOR DISCHARGE OF FIREARMS, USE OF EXPLOSIVES, AND LICENSING OF GUNPOWDER

---

[98] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[99] 1925 Ind. Acts 495, 495-98.

[100] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[101] 1923 N.H. Laws 138.

[102] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[103] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[104] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[105] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[106] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[107] 1927 (January Session) R.I. Pub. Laws 256.

[108] 1934 S.C. Acts 1288.

58.     Historical laws pertaining to the licensing or permitting of firearm discharges, the use of explosives, and gunpowder are similar to current licensing and background check requirements.

59.     As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[109] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[110] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[111] A 1750 law did the same for the District of Southwark (Penn.),[112] as did a

---

[109] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[110] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[111] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[112] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

colony-wide law also enacted in 1750.[113] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[114]

60.    Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[115] New Hampshire enacted a discharge permit system for Portsmouth in 1823.[116] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[117] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[118] New London, Connecticut singled out "some public day of review" in an 1835

---

[113] 1750 Pa. Laws 208.

[114] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[115] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[116] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[117] *Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady* 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[118] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

law as a permissible reason for issuing a discharge permit,[119] and New Haven enacted a similar law in 1845.[120] The same was enacted for Quincy, Illinois in 1841,[121] Jeffersonville, Indiana in 1855,[122] and Richmond, Virginia in 1859.[123] Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits D and E).

61.     In addition, gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[124] One element of this regulation was gunpowder licensing; at least 22 states enacted such licensing from the 1700s through the early 1900s (see Exhibits D and E).

---

[119] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[120] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, ch. 10.

[121] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[122] W. G. Armstrong, *The Ordinances and Charter of the City of Jeffersonville* 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[123] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

[124] Mark Anthony Frassetto, "Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher & Darrell Miller, eds. (NY: Oxford University Press, 2023), 195-212; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510; Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 116-17, 286.

### C.    COMMERCIAL LICENSING AND RECORDING

62.    A number of licensing and recording laws demonstrate a tradition of placing requirements on vendors, in addition to the purchasers themselves.

63.    As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries).

64.    The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[125] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[126] An 1854 law for San Francisco, California licensed commercial shooting galleries.[127] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

### D.    WEAPONS SELLERS RECORDING PURCHASES

65.    Aside from direct licensing of weapons purchasers by a government official or entity, at least 17 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be

---

[125] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[126] Samuel A. Ettelson, *Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916* 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[127] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

maintained and subject to possible later examination. This regulatory mechanism put the burden

of information collection and maintenance on the seller or dealer, rather than directly on the

government, though it served the same purpose: to acquire and maintain information about those

who obtained the weapons in question and when, for future reference or inspection by

government officials or others. In some instances, these requirements existed along with direct

governmental licensing.

66.     In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[128]

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado

law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[129]

67.     The 1911 New York law discussed above required every person selling any

handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and

residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre,

---

[128] Merritt Starr & Russell H. Curtis, *Annotated Statutes of the State of Illinois in Force* (1885), Criminal Code, ch. 38, ¶ 90.

[129] 1911 Colo. Sess. Laws 408, Section 3.

make, model, manufacturer's number or other mark of identification on such pistol, revolver or

other firearm."[130] The purchaser also had to produce a permit at the time of the transaction, with

the seller to note the permit information.

### E.    LICENSING PERTAINING TO NAMED GROUPS

68.     The licensing of "Named Groups" referenced in Exhibit D includes the granting

of weapons licenses to non-state residents, non-citizens, minors (generally when authorized by

the guardian), and Native Americans/Indigenous people. Those found to be intoxicated could

lose their license to carry a concealed weapon. These licensing laws often did not list criteria for

granting licenses, or if they did, the criteria were very general, leaving local officials great

discretion as to the granting of licenses. Licensing the sale of weapons to Native Americans

might seem paradoxical, since white leaders fought protracted conflicts with Native tribes from

the 1600s through the end of the nineteenth century. But whites also traded arms with Native

tribes throughout this entire period, as they sought profitability, access to highly desired goods

made available by Native Americans, and security alliances with some Native tribes through the

supplying of weapons. This steady and enduring trade revealed "the high degree of

interdependence between Indians and Euro-Americans."[131]

69.     As for licensing related to enslaved persons and free African Americans (listed

separately in Exhibit D), found in Southern and border states, it is well understood that white

racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved

---

[130] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and
Carrying of Dangerous Weapons. ch. 195, § 2.

[131] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16
and passim.

persons.[132] The laws listed here are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners. And as the data presented here demonstrate, of the many weapons permitting laws enacted during this time, only a very small percent pertained to African Americans: of the 280 permitting laws listed in Exhibit D, 17 (6.1%) pertained to African Americans.

70.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

F.     THE LESSONS OF LICENSING

71.     The foregoing analysis demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as every aspect of sales. With some exceptions, the primary focus was on handguns for the obvious reason that they were the weapons that posed the most significant threat to public safety and good order from the 1700s through the early 1900s. Long guns posed no similar threat during this time, even though some anti-carry/licensing laws extended to all firearms, not just concealable handguns. (Note that firearm discharge licensing laws generally applied to all guns, not just handguns.)

---

[132] Carl T. Bogus, *Madison's Militia* (NY: Oxford University Press, 2023).

72.     Moreover, when long guns did appear in appreciable numbers in civil society and began to pose a criminal and public safety problem, prohibitions and licensing were rapidly enacted. The long guns in question—the Tommy gun, the BAR, and sawed-off shotguns (i.e. long guns modified after purchase)—were restricted in at least 32 states in the 1920s and early 1930s, and between 8 and 11 states imposed similar restrictions on semi-automatic long guns during this same time (see Exhibit F). Given the wide-ranging and extensive nature of licensing in America in the 1800s and early 1900s, the notion of extending licensing to long guns when the need or demand to do so arose is, in regulatory terms, an incrementally small step.

## V.     CONCLUSION

73.     This report examines three broad types of laws, spanning nearly 300 years of American history: laws that restricted weapons carrying (including concealed carry in 50 states, open carry in at least 30 states, and long gun carry in at least 22 states); laws that criminalized weapons brandishing and display in at least 36 states; and laws providing for the licensing of some of these activities enacted in 47 states. These numerous and varied laws, and types of laws, make clear that the default in American history was weapons regulation and restriction, especially once individuals left their domiciles with a weapon.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 25, 2024, at Williamsburg, Virginia.

*Robert J. Spitzer*

Professor Robert Spitzer

Exhibit 2
Spitzer
9/10/24   llc

# EXHIBIT C

**EXHIBIT C**

**DANGEROUS WEAPONS LAWS**

## ALABAMA

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources.  1805

Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

the General and Permanent Acts of the Session of 1876-7 have been Incorporated
Page 901, Image 917 (1877) available at The Making of Modern Law: Primary
Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending,
pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells,
gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife,
or other knife of like kind or description, must on conviction, be fined not less than
fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of
the Supreme Court of the State upon the Construction of the Statutes; and in Which
the General and Permenent Acts of the Session of 1876-7 have been Incorporated
Page 883, Image 899 (1877) available at The Making of Modern Law: Primary
Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles
and slung-shots. – Any person who carries, concealed about his person, brass
knuckles, slung-shot, or other weapon of like kind or description, shall, on
conviction thereof, be fined not less than twenty, nor more than two hundred
dollars, and may also, at the discretion of the court trying the case, be imprisoned
in the county jail, or sentenced to hard labor for the county, for a term not
exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any
person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be
fined not less than five hundred dollars, nor more than one thousand dollars, and be
imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery
[Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The
Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to
apprehend an attack, or travelling or setting out on a journey, carries concealed
about his person a bowie-knife or any other knife of like kind or description, or a
pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-
knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not
less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of
the General Assembly of the State of Alabama, Approved February 16, 1897,
Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

6

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

A DIGEST OF THE STATUTES OF ARKANSAS, Josiah Gould, Little Rock, 1858
Chap. 51, 381-382
SEC. 13. Every person who shall wear any pistol, dirk, butcher or large knife, or sword in cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twenty-five dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months. *Rev. Stat., chap. 44, div. 8, art. 1.*
https://books.googleusercontent.com/books/content?req=AKW5Qaf_vv6X7sO9Z6NtIUMLtH0VYYI_0kkdJjZi44J3x-fRshyXb-w4GoNceJqk1aEngPSsWbm_GphorW8KcXpNpJYr3imMv0MzFa74XTRuW8wYP5SsQkMv-NYF0qyrpxY4Ju93WroetKla2dEcEZ-zvHiHp1M7zCcFgVXwk_8-yRPuJFepuAgF63b6y-Vq2whoCx3JOPhGO4Z8jGvABY3O_nC75TzRd0Js_3USMF2o4JkCHtxXVMfd9ov-_--WCuMBE_AprMdG6JSlGIDoTmlKbU4bHwaWwyQ6D_8aU2Ds4zFVdDUdOfQ

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, in the Year of Our Independence the Sixty second, and of the State of Second Year Page 280, Image 295 (1838) available at The Making of Modern Law: Primary Sources.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

9

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Arkansas | 1871

City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875, 1874-75 Ark. Acts 156.

§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3.

§ 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, that officers whose duties require them to make arrests or to keep and guard prisoners, together with the persons summoned by such officers to aid them in the

10

discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. Provided, further, that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.

§ 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor.

§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.
https://cite.case.law/ark/83/26/

1923 Ark. Acts 379, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430.

Be It Enacted by the People of the State or Arkansas:

From and after the passage of this Act, it shall be unlawful for any person to own or have in his custody or possession any pistol or revolver, except as herein provided:

Section 1. Any person having in his possession or custody any pistol or revolver, shall within 60 days from the approval of this Act, present such firearm to the county clerk of the county, where he resides, and it shall be the duty of the said county clerk to enter upon a separate record provided for that purpose, the name, age, place of residence, and color of the party, together with the make, calibre and number of said pistol or revolver.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the

Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of
Independence, the Constitutions of the United States and of California, the Treaty
of Queretaro, and the Naturalization Laws of the United States Page 663-664,
Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt,
or other instrument or tool, with intent feloniously to break and enter into any
dwelling house, store, shop, warehouse, or other building containing valuable
property, or shall be found in any of the aforesaid buildings with intent to steal any
money, goods, and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the county jail not more than two years; and if any person shall
have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon,
with intent to assault any person, every such person, on conviction, shall be fined
not more than one hundred dollars or imprisoned in the county jail not more than
three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

15

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

1885 Colorado - General Assembly, 5th Session: 17-416, 170

AN ACT

TO AMEND CHAPTER TWENTY-FIVE, OF THE GENERAL STATUTES OF THE STATE OF COLORADO, ENTITLED "CRIMINAL CODE."

Be it enacted by the General Assembly of the State of Colorado:

SECTION I. Section one hundred and eighty two (182), of chapter XXV., of the General Statutes of the State of Colorado, entitled "Criminal Code," is hereby repealed, and the following shall stand in lieu thereof as section one hundred and eighty-two (182): "SEC. 182. If any person or persons shall, within any city, or town, or village in this State, whether the same be incorporated or not, carry concealed upon or about his person any pistol, bowie-knife, dagger, or other deadly weapon, such person shall, upon conviction thereof, be punished by a fine not less than fifty ($50) dollars, nor more than two hundred ($200) dollars, or imprisoned in the county jail for a term of not less than ten, nor more than sixty days, or both, in the discretion of the court; Provided, That this section shall not be construed to apply to sheriffs, constables, or other officers of the peace, while on duty."

Approved April 10, 1885.

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence

17

shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

1891 Colo. Sess. Laws 129, 130
AN ACT TO AMEND SECTION ONE HUNDRED AND EIGHTY-TWO (182) OF CHAPTER TWENTY-FIVE (25) OF THE GENERAL STATUTES OF THE STATE OF COLORADO, ENTITLED "CRIMINAL CODE" BEING GENERAL SECTION EIGHT HUNDRED AND SEVENTY (870) AS THE SAME WAS AMENDED APRIL 10, 1885.
Be it enacted by the General Assembly of the State of Colorado:
SECTION 1. That Section 182 of Chapter XXV of the General Statutes of Colorado, entitled "Criminal Code" being general section 870, as the same was amended April 10, 1885, be, and the same is hereby amended so as to read as follows: SECTION 182. If any person, or persons shall within any city, town or village in this State, whether the same is incorporated or not carry concealed upon his, her or their person any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon, such person, or persons shall upon conviction thereof before any police magistrate or justice of the peace, be punished by imprisonment in the county jail for a term not exceeding thirty days, or by a fine of not more than fifty dollars with costs or by both such fine and imprisonment, in the discretion of the court. . . .
All concealed weapons taken from parties violation [violating] this section, shall be forfeited to the county, and confiscated and sold at auction for the benefit of the school fund of the county in which the offense is committed.
Approved April 10th, 1891.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

19

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).

Carrying Weapons || 1871

Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS
SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .
SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.
PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS
SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.
CARRYING CONCEALED WEAPONS
SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.
EXCEPTIONS
SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly

appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be

securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to

make such sale has been obtained
from the superintendent of police of the District of Columbia. 4. A true record shall
be made in a book kept for the purpose the form of which may be prescribed by the
Commissioners, of pistols, machine guns, and sawed-off shotguns in the
possession of the licensee, which said record shall contain the date of purchase, the
caliber, make, model, and manufacturer's number of the weapon, to which shall be
added, when sold, the date of sale. 5. A true record in duplicate shall be made of
every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be
made in a book kept for the purpose, the form of which may be prescribed by the
Commissioners of the District of Columbia and shall be personally signed by the
purchaser and by the person effecting the sale, each in the presence of the other
and shall contain the date of sale, the name, address, occupation, color, and place
of birth of the purchaser, and, so far as applicable, the caliber, make, model, and
manufacturer's number of the weapon, and a statement signed by the purchaser that
he has never been convicted in the District of Columbia or elsewhere of a crime of
violence. One copy of said record shall, within seven days, be forwarded by mail to
the superintendent of police of the District of Columbia and the other copy retained
by the seller for six years. 6. No pistol or imitation thereof or placard advertising
the sale thereof shall be displayed in any part of said premises where it can readily
be seen from the outside. No license to sell at retail shall be granted to anyone
except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to
carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within
the District of Columbia, give false information or offer false evidence of his
identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or
obliterate the name of the maker, model, manufacturer's number, or other mark or
identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or
sawed-off shotgun upon which any such mark shall have been changed, altered,
removed, or obliterated shall be prima facie evidence that the possessor has
changed, altered, removed, or obliterated the same within the District of Columbia:
Provided, however, That nothing contained in this section shall apply to any officer
or agent of any of the departments of the United States or the District of Columbia
engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as
firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers

and retail dealers licensed under section 10 of this Act.

PENALTIES

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.

Approved, July 8, 1932.

https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## **FLORIDA**

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and

27

not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).
No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.
Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.
Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.
Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.
Passed 5th February 1838.—Approved 10th Feb. 1838.
https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.
Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.

Sentence Enhancement for Use of Weapon | Florida | 1868

Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]

Offences Against Public Peace, § 13.

Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

1885 Fla. Laws 61-62

CHAPTER 3620-[No. 65.]

AN ACT to Provide a Punishment for Carrying Concealed Weapons and for the Trial of such Offence, Giving the Circuit Court jurisdiction of the same.

SECTION 1. Whoever shall carry arms of any kind whatever secretly on or about their persons or whoever shall have concealed on or about their person any dirk, pistol or other arm or weapon, except a common pocket knife, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not exceeding one hundred dollars or imprisoned in the county jail not exceeding six months.

SEC. 2. That the Circuit Court of this State shall have exclusive original jurisdiction to try and determine all cases of violation of this act, and it shall be the duty of the Circuit Judges of the several Circuits to charge the Grand Juries specially upon the crime of carrying concealed weapons, and the State Attorneys of the several Circuits shall receive a fee of ten dollars for each and every conviction, under this act, to be paid as other conviction fees.

SEC. 3. It shall be the duty of the Sheriff or other officer making any arrest under this act to take possession of any arms found upon the person arrested under this act and retain the same until after the trial of such person, and if lie be convicted, then the said arm or arms shall be forfeited, and the Sheriff shall sell the same at

29

public sale and account for and pay over the proceeds of this sale [the] same as in case of fines collected, but if such person be acquitted then the said arm or arms shall be returned to him.

SEC. 4. That all laws and parts of laws be and the same are hereby repealed in so far they are in conflict with the provisions hereof.

Approved February 12, 1885.

https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssfl0257&id=77&men_tab=srchresults

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons. . . .

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.

Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Georgia | 1816

Offences Against the Public Peace, (1816) § 19.

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive

30

weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

1870 Ga. Laws 421

An Act to preserve the peace and harmony of the people of this State, and for other purposes.

SECTION 1. Be it enacted, etc., That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds.

SEC. 2. Be it further enacted, That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court.

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.
Approved October 18, 1870.


R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

1880 Ga. Laws 151, An Act to make Penal the Intentional Pointing, or Aiming of Fire-arms at Another, whether Loaded or Unloaded, § 1.

. . . from and after the passage of this Act, any person who shall intentionally point or aim a gun or pistol, whether loaded or unloaded, at another not in a sham-battle by the military, and not in self-defense, or in defense of habitation, property, or person, or other instances standing upon like footing of reason and justice, shall be guilty of a misdemeanor . . . .

https://heinonline.org/HOL/Page?handle=hein.ssl/ssga0183&id=151&collection=ssl&index=ssl/ssga

1884-85 Ga. Laws Ch. 457, p. 30 [state property tax valuation]
"The value of guns, pistols, bowie-knives and such articles?"[1]

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown

---

[1] Also appearing in 1886 Ga. L. chap. 101, pp. 26, 28; 1888 Ga. L. chap. 103, p. 261; 1889 Ga. L. chap. 640, p. 993; town of Jessup, 1888 Ga. L. chap. 103, p. 261; charter for Cedartown, 1889 Ga. L. chap. 640, p. 993.

for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

1864 Idaho Second Sess. Laws 298, 303-304
SEC. 40. That any person in this territory, having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall in the presence of two or more persons, draw or exhibit any of said deadly weapons, in a rude, angry, and threatening manner, not in necessary self defense, or who shall, in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisoned in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution. . . .

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894
Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or

other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1888 Idaho Fifteenth Sess. Laws 23
CARRYING DEADLY WEAPONS.
AN ACT REGULATING THE USE AND CARRYING OF DEADLY WEAPONS IN IDAHO TERRITORY.
Be it enacted by the Legislative Assembly of the Territory of Idaho, as follows: SECTION 1. That it is unlawful for any person, except United States officials, officials of Idaho Territory, County officials, Peace officers, Guards of any jail, and officers or employees of any Express Company on duty, to carry, exhibit or flourish any dirk, dirk-knife, sword, sword-cane, pistol, gun or other-deadly weapons, within the limits or confines of any city, town or village or in any public assembly of Idaho Territory. Every person so doing is guilty of a misdemeanor and is punishable by fine not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for a period of not less than twenty days nor more than fifty days, or by both such fine and imprisonment.
SEC. 2. One half of all fines collected under the provisions of this act shall be paid to the officer making the arrest, which amount shall be payment in full for his services. The other one half shall he paid into the Common School Fund of the county, after deducting the necessary costs of the prosecution of the case.
SEC. 3. All acts or parts of acts in conflict with this act are hereby repealed.
SEC. 4. This act shall take effect and be in force from and after its passage.
Approved February 4, 1889.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

35

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

1867 Ill. Act 650, Chapter VI
City Council, Powers
Thirty-eighth.-To regulate or prohibit the carrying or wearing by any person, under his clothes or concealed about his person. any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon, and to provide for the confiscation or sale of such weapons.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a

threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Ordinance No. 29: Concerning the Carrying of Concealed Weapons, THE NASHVILLE JOURNAL, Mar. 26, 1880 at 4. (Nashville, IL).
Ordinance No. 29.
Concerning the carrying of Concealed Weapons.
*Be it ordained by the City Council of the City of Nashville, Illinois:—*
SEC. 1. That it shall be unlawful for any person to weare or carry under his clothes, or concealed upon his person, or in a threatening manner display any pistol, slung-shot, cross knuckles of lead, brass or other metal, bowie knife, dirk or dagger, or any knife resembling a bowie knife, or any other dangerous, or deadly weapon, instrument or thing within the limits of the city of Nashville.

Any one violating the provision of this section shall forfit and pay to the city of Nashville a sum not less than 20.00 nor more than $200 and costs of suit for each offence.
SEC. 2. Provided that nothing in the proceeding section shall be construed so as to prohibit any United States, State, County or City Officer from carrying and wearing such weapons as may be necessary in the proper discharge of his duty, or any person aiding in the apprehension of supposed criminals. Provided however that such person have a written permit, signed by the Mayor and City Clerk, and provided, also that the Mayor may issue written permits to such persons as in his judgement he may think necessary for the safety and protection to carry such arms revocable at the pleasure of the Mayor. The same however to be signed by the Mayor and City Clerk, for which permit the person applying for the same shall pay to the City Clerk the sum of fifty cents for his own use. Permits to be good one year from the date unless sooner revoked by the Mayor.

Adopted March 24th, 1880, and filed in the Clerk's office.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]

Deadly Weapons: Selling or Giving to Minor. § 54b.

Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Article XLIII. Parks and Public Grounds, The Municipal Code of Chicago (1881). 1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks.  All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1881 Ill. Act of April 16, 1881, as codified in Ill. Stat. Ann. Crim. Code, chap. 38

REGULATING THE TRAFFIC IN DEADLY WEAPONS

1. HAVING IN POSSESSION OR SELLING. § 1. That whoever shall have in his possession, or sell**,** give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this State, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than ten dollars ($10), nor more than two hundred dollars ($200).

2. SELLING OR GIVING TO MINOR.§ 2. Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give loan, hire or barter, or shall offer to sell**,** give, loan, hire or barter to ani, minor within this State, any pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon **of** like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined In any sum not less than twenty-five dollars ($25), nor more than two hundred dollars ($200).

3. REGISTER TO BE KEPT—WHAT IT SHALL CONTAIN. § 3. All persons dealing in deadly weapons hereinbefore mentioned, at retail within this State, shall

38

keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form [number of weapon, to whom sold or given, age of purchaser, kind and description of weapon, for what purpose purchased or obtained, price of weapon]

Said register, shall be kept open for the inspection of the public, and all persons who may wish to examine the same, may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or tie keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25), nor more than two hundred dollars ($200.)

4. CARRYING CONCEALED WEAPONS. § 4. Whoever shall carry a concealed weapon upon or about his person, of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars (25), nor more than two hundred dollars ($200.)

LAKE, THE REVISED ORDINANCES OF THE TOWN, ch. 32, §§ 1-9 (Beach, Barnard & Co. 1882).

Chapter XXXII.

CONCEALED WEAPONS.

SECTION 1. It shall be unlawful for any person within the limits of the town to carry or wear under his clothes, or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, razor or dagger, or any other dangerous or deadly weapon.

§ 2. Any such weapon or weapons duly adjudged by the police magistrate, or any justice of the peace of said town, to have been worn or carried by any person, in violation of the first section of this chapter, shall be forfeited or confiscated to the said Town of Lake, and shall be so adjudged.

§ 3. Any policeman of The Town of Lake may within the limits of said town without a warrant arrest any person or persons whom such policeman may find in the act of carrying or wearing under their clothes or concealed about their persons, any pistol, or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, or dagger, or razor or any other dangerous or deadly weapon, and detain him, her or them in the town jail until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and

confiscation of such of the weapons above referred to as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

§ 4. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said town, that any person has been guilty of violating any of the provisions of section 1 of this chapter, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this chapter, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to The Town of Lake.

§ 5. Any person or persons violating any of the provisions of section 1 of this chapter shall pay a fine of not less than five dollars nor more than fifty dollars, in the discretion of the magistrate or court before whom such conviction shall be had.

§ 6. The prohibitions of this chapter shall not apply to the officers or members of the police force of said town when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrests; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the president of the board of trustees a license so to do, as hereinafter provided.

§ 7. The president may grant to so many and such persons as he may think proper licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure.

§ 8. Applications for such licenses shall be made to the clerk, and when granted, the person applying therefor shall pay to the clerk, for the use of the town, the sum of two dollars, and thereupon a license shall be issued by the town clerk, and signed by the president.

§ 9. Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirtieth day of June next following.

MONMOUTH, MUNICIPAL CODE, art. 6, §§ 654-662 (Review Book & Job Print 1883).
"ARTICLE VI.
CONCEALED WEAPONS.

654. It shall be unlawful for any person, within the corporate limits of the city, to carry or wear under his clothes, or concealed about his person, any pistol, colt or

slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, razor or dagger, or other dangerous or deadly weapon.

655. Any such weapon or weapons duly adjudged by any police magistrate or justice of the peace of said city to have been worn or carried by any person, in violation of the first section of this article, shall be forfeited or confiscated to the said city of Monmouth and shall be so adjudged.

656. Any policeman of the city of Monmouth may within the limits of said city without a warrant arrest any person or persons whom such policeman may find in the act of carrying or wearing under their clothes or concealed about their persons, any pistol, or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, or dagger, or any other dangerous or deadly weapon, and detain him, her or them in custody until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

657. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said city, that any person has been guilty of violating any of the provisions of section 656 of this article, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this article, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to the city of Monmouth.

658. Any person or persons violating any of the provisions of this article shall pay a fine of not less than three dollars nor more than fifty dollars.

659. The prohibitions of this article shall not apply to the officers or members of the police force of said city when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrests; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the mayor a permit so to do, as hereinafter provided.

660. The mayor may grant to so many, and such persons as he may think proper, permits to carry concealed weapons, and may revoke any and all of such permits at his pleasure.

661. Applications for such permits shall be made to the mayor, and when granted the person applying therefor shall pay to the city treasurer the sum of fifty cents, and thereupon a permit shall be issued by the city clerk and signed by the mayor.

41

662. Every such permit shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the first day of April next following."

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

1885 Ill. Act 771, Concealed Weapon – Flourishing weapon, ch. 38, § 4.
Whoever shall carry a concealed weapon upon or about his person of the character in this Act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such

42

offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1819 Ind. Acts 39, An Act to Prohibit the Wearing of Concealed Weapons. 1820. Be it enacted by the General Assembly of the State of Indiana, That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, by presentment or indictment, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: Provided however, that this act shall not be so construed as to affect travellers.

1831 Ind. Acts 192, Fifteenth Session, CHAPTER XXVI.
SEC. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars. https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssin0165&id=19 2&men_tab=srchresults

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.

That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

1905 Ind. Acts 688, Weapon— Furnishing to Minor, § 450.
It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed

guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air

guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.

1929 Iowa Acts 90, Carrying Firearms in Motor Vehicles, § 30.
No person shall carry a gun or any firearms, except a pistol or revolver, in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case.

## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

46

1866 Kan. Sess. Laws, 6th Legislature, Regular Session, Ch. 64, 159-160
Lawrence
Thirty-first. To prevent and restrain riots, routs, noises, disturbances or disorderly assemblies in any street, house or place in the city; to regulate, prevent and punish the discharge of fire-arms, rockets, powder, fire-works, or any other dangerously combustible material, in the streets, lots, grounds, alleys, or about or in the vicinity of any buildings; to regulate, prevent and punish the carrying of concealed weapons; to arrest, regulate, punish, fine or set at work all vagrants and persons found in said city, without visible means of support or some legitimate business

1867 Kan. Sess. Laws 25
CHAPTER XII.
ARMS.-PREVENT CARRYING OF.
AN ACT to prevent the carrying of Deadly Weapons.
Be it enacted by the Legislature of the State of Kansas:
SECTION 1. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the Government of the United States, who shall be found within the limits of this State, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor; and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court. . . .
Approved, February 23d, 1867

1868 Kan. Sess. Laws 378
The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

1872 Kan. Sess. Laws 210; Ch. 100; Cities of the second class.
SEC. 62. The council may prohibit and punish the carrying of fire arms, or other deadly weapons, concealed or otherwise, and may arrest and imprison, fine or set at work all vagrants and persons found in said city without visible means of support, or some legitimate business.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a

misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

49

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

KY. REV. STAT., ch. 375, § 33 (Johnston & Pleasants 1810) (Passed 1801).
    "Sec. 33. No person, great or small, of what condition soever he may be, except the ministers of justice in executing their office, and such as may be in their company assisting them, shall be so hardy to come before the justices of any court, or either of their ministers of justice, doing their office, with force and arms, on pain to forfeit their arms to the commonwealth, and of being fined and imprisoned at the discretion of a jury."

1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1.
Be it enacted by the General Assembly of the Commonwealth of Kentucky, that any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined . . .

1853 Ky. Acts 186, An Act to Prohibit the Carrying of Concealed Deadly Weapons, Ch. 1020. 1854.
Sec 1. Be it enacted by the General Assembly of the Commonwealth of Kentucky, That if any person shall hereafter carry concealed any deadly weapons, other than an ordinary pocket knife, except as provided in the next section, he shall be fined on the first conviction not less than fifth nor more than one hundred dollars, and on any subsequent conviction not less than one hundred nor more than five hundred dollars.
Sec. 2. That the carrying of concealed deadly weapons shall be legal in the following cases: 1. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2. Where sheriffs, constables, marshals, and policemen carry such weapons as are necessary to their protection in the efficient discharge of their duty. 3. Where

50

persons are required by their business or occupation to travel during the night, the carrying concealed deadly weapons during such travel.

Sec. 3. This act shall be given in charge by the judges to the grand juries.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.

Carrying Weapons | Louisiana | 1813

Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).

Carrying Weapons | Louisiana | 1842

[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148

Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for

one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.
https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

1821 Me. Laws 285, ch. 76, § 1.
Be it enacted by the Senate, and House of Representatives, in Legislature assembled, That it shall be within the power, and be the duty of every Justice of the Peace within this county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in this county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches; and upon view of such Justice, confession of the delinquent or other legal conviction of any such offence, shall require of the offender to fund sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county at the discretion of the Justice, and as the nature or circumstances of the case may require;

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.

Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, Title XII, § 16.
*The Revised Statutes of the State of Maine, passed October 22, 1840*
SECT. 15. Whoever, in the presence of any magistrate, mentioned in the second section of this chapter, or before any court of record, shall make any affray or threaten to kill or beat another, or commit any violence against his person or property, or shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of the good behavior for a term, not exceeding three months, and, in case of refusal, may be committed to prison as before directed.
SECT. 16. Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.
https://books.googleusercontent.com/books/content?req=AKW5QackIo9b0lWJJiw
gYw4j9rTykSiPPMmiPWWAC8qLnHfxKOCmGJI73nLNzytyCaLhZK8EAcPEG
MuUjd22tY_5j80XftZ-
J_INMZ3z2lMXJ8_iVF4ZySk6ICZrB4XYmEW251SmutYF3JKpInz_7cNt7GU6
DMgeJ3lSDGcRjrGcpvILEXJPG9_OOmt6PApz3MU57RTpIAQ2j3_Dm613aFZ
ArHK-fl0BBkU14AGTeEWGIBxXXwE8OAsSegF8NfSMm-WyW4g-
eorbGccozHvqhXnnWpdTRQdxZSCPW28fXDw0XZtHu4QRSDQ

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.

Carrying Weapons | Maryland | 1872

It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.

Sensitive Places and Times | Maryland | 1874

Election Districts–Fences. § 99.

It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and

on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886

Concealed Weapons, § 30.

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or

apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS

1 Records of the Governor and Company of the Massachusetts Bay in New England 211-12 (Nathanial B. Shurtleff ed., 1853). 1637.
Whereas the opinions & revelations of Mr. Wheeleright & Mrs. Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption vpon those that differ from them in judgment, for prevention whereof it is ordered, that all those whose names are vnderwritten shall (vpon warning given or left at their dwelling houses) before the 30th day of this month of November, deliver in at Mr. Canes house, at Boston, all such guns, pistols, swords, powder, shot, & match as they shalbee owners of, or have in their custody, vpon paine of ten pound for ev'y default to bee made therof ; which armes are to bee kept by Mr. Cane till this Court shall take further order therein. Also, it is ordered, vpon like penulty of x', that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, vntill this Court shall take further order therein. . . . The like order is taken for other townes, changing the names of those who shall deliver their armes, & keepe them. . . . It was ordered, that if any that are to bee disarmed acknowledg their siun in subscribing the seditions -libell, or do not justify it, but acknowledg it evill to two magistrates, they shalbee thereby freed from delivering in their armes according to the former order./
file:///C:/Users/Bob/Downloads/ocm3522063_vol1.pdf

1692 Mass. Laws [No. 6, at 11–12.?]
Acts and resolves passed by the General Court by Massachusetts
2D Sess. 1692-3, 52-53
Further it is enacted by the authority aforesaid^ [Sect. 6.] That every justice of the peace in the county where the offence is committed, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches ; and upon view of such justice or justices, confession of the

party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited ; and may further punish the breach of the peace in any person that shall smite or strike another, by fine to the king not exceeding twenty shillings, and require bond with sureties for the peace, or bind the offender over to answer it at the next sessions of the peace, as the nature or circumstance of the offence may be ; and may make enquiry of forcible entry and detainer, and cause the same to be removed, and make out hue and crys after runaway servants, thiefs and other criminals.

https://archive.org/details/actsresolvespass9214mass/page/52/mode/2up?q=offensively

1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders. Further it is Enacted by the authority aforesaid, That every Justice of the Peace in the County where the Offence is committed , may cause to be staid and arrested all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or

go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere.

1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751
"Whereas the Provision already made by Law has been found insufficient to prevent Routs, Riots, and tumultuous Assemblies, and the evil Consequences thereof :    Wherefore,
Be it enacted by the Lieutenant Governour Council and House of Representatives, That from and after the Publication of this Act, if any Persons to the Number of Twelve or more, being Arm'd with Clubs or other Weapons, or if any Number of Persons consisting of Fifty or upwards, whether armed or not, shall be unlawfully riotously or tumultuously assembled; any Justice of the Peace, Field-Officer or Captain of the Militia, Sheriff of the County or Under-Sheriff, or any Constable of the Town, shall among the Rioters, or as near to them as he can safely come, command Silence while Proclamation is making, and shall openly make Proclamation in these or the like Words,
Our Sovereign Lord the KING, chargeth and commandeth all Persons, being assembled, immediately to disperse themselves, and peaceably to depart to their Habitations, or to their lawful Business, upon the Pains contained in the Act of this Province made in the twenty-fourth Year of His Majesty King GEORGE the Second, for preventing and suppressing of Riots, Routs, and unlawful Assemblies. GOD save the King.
And if such Persons so unlawfully assembled, shall after Proclamation made, not disperse themselves within one Hour, it shall be lawful for every such Officer or Officers and for such other Persons as he or they shall command to be assisting, to seize such Persons, and carry them before a Justice of Peace: And if such Person shall be killed or hurt by Reason of their resisting the Persons so dispersing or seizing them, the said Officer or Officers and their Assistants shall be indemnified and held guiltless…"
The following links to a version of this law that is contemporaneous with the original session law, but seems to have been published separately as a notice: An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, 1750. https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf

1794 Mass. Acts 66-67
Chapter 26.

60

And be it further Enacted by the authority aforesaid, that every Justice of the peace, within the County for which he may be commissioned, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall . require of the offender to find sureties for his keeping the peace, and being of the good behaviour ; & in want thereof to commit him to prison, untill he shall comply with such requisition : And may further punish the breach of the peace in any person that shall assault or strike another, by fine to the Commonwealth not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender to appear and answer for his oflence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require. Approved January 29, 1795.
https://archive.org/details/actsresolvespass179495mass/page/66/mode/2up?q=armed

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.
All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.
Of Proceedings to Prevent the Commission of Crimes, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.
Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.
Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances. 1891
The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .
3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating

beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58 (1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

Carrying Weapons | Massachusetts | 1927

Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## **MICHIGAN**

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed
Weapons, And To Provide Punishment Therefore, § 1.

It shall be unlawful for any person, except officers of the peace and night-watches
legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air
gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot,
razor or other offensive and dangerous weapon or instrument concealed upon his
person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who
shall carry concealed on or about their persons, any pistol, revolver, bowie knife,
dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or
who shall lay in wait , lurk or be concealed, with intent to do injury to any person
or property, who shall threaten to beat or kill another or injure him in his person or
property . . . shall be deemed a disorderly person, and upon conviction thereof may
be punished by a fine not exceeding one hundred dollars and the costs of
prosecution, and in imposition of any such fine and costs the court may make a
further sentence that in default of payment, such offender be imprisoned in the city
prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and
Prescribing Punishment Therefor, § 1.

Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club,
brass knuckles or other dangerous weapon, but without intending to commit the
crime of murder, and without intending to inflict great bodily harm less than the
crime of murder, shall be deemed guilty of a felonious assault, and upon conviction
shall be punished by imprisonment in the State Prison for a term not exceeding
three years or by imprisonment in the county jail for a term not exceeding one
year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling,
Purchasing, Possessing and Carrying of Certain Firearms, § 3.

Dangerous or Unusual Weapons | Michigan | 1927

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess
any machine gun or firearm which can be fired more than sixteen times without
reloading, or any muffler, silencer or device for deadening or muffling the sound of
a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot,
billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a
violation of this section shall be guilty of a felony and shall be punished by a fine
not exceeding one thousand dollars or imprisonment in the state prison not more

than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

Morton Smith Wilkinson, The Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851: Printed and Published Pursuant to Law Page 528, Image 538 (Vol. 1, 1851) available at The Making of Modern Law: Primary Sources.
If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Ordinance No. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, § 3, City Charter of the City of Hastings (1870).
"Sec. 3. Any person who shall go armed within the incorporated limits of said city of Hastings with a dirk, dagger, sword, pistol or pistols, or shall carry a slung-shot or metal knuckles or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury to his person or to his family or property, shall, upon conviction before said justice, be punished by a fine not exceeding one hundred dollars, or by imprisonment not exceeding three months, or both, in the discretion of the justice."
1870, MN, Ordinance no. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, §§ 1-5

City Charter of the City of Hastings (Hastings, MN: Daily News Print, 1884), 74-75. Ordinance no. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, § 3. Passed May 24, 1870.

SAINT PAUL, MUNICIPAL CODE, art. 18, §§ 1-9 (Daily Globe 1884) (Passed 1882).

"Sec 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon.

Sec. 2. Any such weapon or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged.

Sec. 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

Sec. 4. Upon complaint made under oath or affirmation, to the municipal court of the city of St. Paul, that any person has been guilty of violating any of the provisions of section one of this ordinance, a warrant shall issue for the arrest of the offender or offenders, returnable as other warrants are returnable; upon the return of such warrant, the municipal court shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this ordnance, such court shall so adjudge, and order that the weapon or weapons concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to the city of St. Paul. And further, every such person or persons so offending, on conviction, shall be required to find sureties for keeping the peace for a term not exceeding six months.

Sec. 5. Any person or person violating any of the provisions of section one of this ordinance shall pay a fine of not less than $5 nor more than $100, or be imprisoned for a term not exceeding ninety days or both, in the discretion of the municipal judge, before whom such conviction shall be had.

Sec. 6. The prohibition of this ordinance shall not apply to the officers and members of the police force of said city, when on duty, nor to any officer of any court whose duty may be to secure warrants or to make arrests, nor to persons whose business or occupation may seem to require the carrying of weapons for protection, and who shall have obtained from the Mayor of said city a license so to do as hereinafter provided.

Sec. 7. The Mayor of the city of St. Paul may grant to so many, and to such persons as he may think proper, licenses to carry concealed weapons; and may revoke any and all of such licenses at his pleasure.

Sec. 8. Application for such licenses shall be made to the mayor of said city, in writing, and when granted, the person applying therefor, shall pay into the city treasury the sum of two dollars, and thereupon a license shall be issued by the city clerk, and signed by the mayor.

Sec. 9: Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirty-first day of December of each and every year."

1884, MN, Concealed Weapons-License, Article 18, §§ 1-9, The Municipal Code of Saint Paul

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council: Revised to December 1, 1884 (St. Paul, MN: Daily Globe, 1884), 289-290. Article 18, Concealed Weapons-License, §§ 1-9. Passed January 17, 1882.


W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.

Concealed Weapons – License, § 1.

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be

so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper

county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1854 Miss. Laws Ch. 1, p. 50
On each bowie knife, Arkansas toothpick, sword cane, duelling or pocket pistol, a tax of one dollar.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1873 Mo. Laws 328, *An Act to Incorporate The Town Of Moberly, art. III, § 1, pt. 15*: To restrain . . . any person who shall threaten quarrel, challenge or fight within said city, or any person who shall be found intoxicated, who shall carry concealed deadly weapons in said city, of any person who shall be found guilty of a misdemeanor, and to define what acts shall constitute a misdemeanor.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"
§ 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of

71

intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.

Sensitive Places and Times | Missouri | 1923

Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.

If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

Concealed Weapons, Ordinance No. 4 of The Charter and Ordinances of the City of Helena (1883).

"Sec. 1. No person shall in this city wear under his clothes, or concealed on or about his person, any pistol or revolver, except by special permission from the mayor; nor shall any person wear under his clothes, or concealed on or about his person, any slung shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person violating any provision or requirement of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof before the police magistrate shall be fined not less than five dollars nor more than one hundred dollars. Provided, however, that this section shall not be so construed as to prevent any United States, territorial, county or city officer, or any member of the city government, from carrying such weapons as may be necessary in the proper discharge of his duties."

1883, MT, Ordinance No. 4, Concealed Weapons

Alexander C. Botkin, The Charter and Ordinances of the City of Helena, Montana with the Rules of Order for the government of the City Council: 1887 (Helena, MT: Journal Publishing Company, 1887), 103-104. Ordinance No. 4: Concealed Weapons. Passed and approved June 14, 1883.

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one

month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

Guy Ashton Brown, The Compiled Statutes of the State of Nebraska, Comprising All Laws of a General Nature in Force July 1, 1881 Page 666, Image 674 (1881) available at The Making of Modern Law: Primary Sources.

Carrying Concealed Weapons, § 25. Whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie-knife, dirk, or any other dangerous weapon, on conviction of the first offense shall be fined not exceeding one hundred dollars, or imprisoned in the county jail not more than thirty days, and for the second offense not exceeding one hundred dollars or imprisoned in the county jail not more than three months, or both, a the discretion of the court; Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon or weapons as aforesaid, engaged in the pursuit of any lawful business, calling or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36; § 133 .
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.
§ 133. If any persons shall be found having upon him or her any picklock, crow-key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings, with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the State Prison not less than one year nor more than five years;

and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the County Jail not more than three months.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

City Ordinance No. 45, RENO EVENING GAZETTE, Sept. 6, 1905, at 6 (Reno, Nevada).
   "Section 7. It shall be unlawful for any person within the limits of the city of Reno, to wear, carry, or have concealed upon his person any dirk knife, pistol, sword in case, slung shot, brass knuckles, razor or other dangerous weapon without first obtaining permission from the City Council. The City Council may, upon application made in writing showing the reason of the person or the purpose for which any concealed weapon is to be carried, grant permission under the seal of the city and attested by its clerk to the person making such application authorizing such person to carry the concealed weapon described in such permission. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor and on conviction thereof shall be fined not less than twenty ($20.00) dollars, nor more than five hundred ($500.00) dollars, or imprisoned in the city jail for not less than thirty (30) days, nor more than six (6) months. This section shall not apply to peace officers in the discharge of their duties, nor to persons acting or engaged in the business of common carriers within this tsate, nor to persons traveling through the state."
Full Text: 1905, Reno Evening Gazette, September 6, City Ordinance no. 45
"City Ordinance No. 45." Reno Evening Gazette, September 6, 1905, p. 6. Volume 70, Number 46. City Ordinance no. 45—An Ordinance concerning Breaches of the Peace, Fighting, Routs, Riots, Affrays, Injury to Property, Malicious Mischief,

Disorderly Persons, Lewd or Lascivious Cohabitation or Behavior, Begging, Carrying Deadly Weapons, and Resisting an Officer within the City of Reno; to Restrain and Punish the Same and to Repeal All Ordinances or Sections Thereof in Conflict Therewith, and Other Matters Relating Thereto, § 7. Approved August 29, 1905. (Reno, NV).

## NEW HAMPSHIRE

New Hampshire - Acts and Laws June 1701:
That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is required for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry after run-away-servants, thieves, and other criminals. https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

New Hampshire Public Carry Prohibition (1708)*
And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches : And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings; and require bond with sureties for the peace, till the next court of general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.
*The original law is dated this way: "PASS'D 11 TH OF WM. 3" King William III ruled from 1689-1702, so the 11th year of his reign would be 1699. See:

https://heinonline-
org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssnh0244&id=68&
men_tab=srchresults

New Hampshire - Acts and Laws, 1743, 9-10:*
That if twelve persons or more, being armed with clubs, or other weapons; or that
if fifty persons or more, whether armed or not, shall be unlawfully, riotously,
tumultuously or routerously assembled, any of the officers aforesaid, shall make a
proclamation, in manner and form aforesaid; and if such persons so unlawfully
assembled, shall not thereupon immediately disperse themselves, according to said
proclamation, each of them, and every one who shall wilfully hinder any such
officer (who shall be known, or shall openly declare himself to be such) making
the said proclamation, shall forfeit and pay a fine not exceeding the sum of five
hundred pounds, at the discretion of the said superior court, (which only shall have
cognizance of the offense,) considering the aggravations attending the same, and
shall be whipt thirty stripes on the naked back at the publick whipping-post, and
suffer twelve months imprisonment, and once every three months, during said
twelve months, receive the same number of stripes aforesaid.
https://heinonline-
org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10
file:///C:/Users/Bob/Downloads/i-1.pdf
*This law was "made and passed in the Seventeenth Year of His present Majesty's
Reign," which would calculate in the reign of King George II (1727-1760) as the
year 1743.

1909 N.H. Laws 451-52
CHAPTER 114
AN ACT TO PROHIBIT CARRYING CONCEALED WEAPONS
SECTION 1. Whoever, except as provided by the laws of this state, carries on his
person a loaded pistol or revolver, or any stilletto, dagger, dirk-knife, slung-shot or
metallic knuckles, shall upon conviction be punished by a fine not exceeding one
hundred dollars or by imprisonment not exceeding one year or by both such fine
and imprisonment; and any such weapon or article so carried by him shall be
confiscated to the use of the state.
SECT. 2. The provisions of the preceding section shall not apply to officers of the
law, to members of military forces, to persons holding hunters' licenses, when
lawfully engaged in hunting, to employees of express companies while on duty, to
watchmen while on duty, or to persons securing a license as provided in the next
section.

SECT. 3. The selectmen of towns or the mayor or the chief of police of cities may, upon the application of any person issue a license to such person to carry a loaded pistol or revolver in this state, if it appears that the applicant is a suitable person to be so licensed.

[Approved April 6, 1909.]

1913 N.H. Laws 484

AN ACT IN AMENDMENT TO CHAPTER 111, SECTION 1, OF THE LAWS OF 1909, RELATING TO THE CARRYING OF DANGEROUS WEAPONS.

SECTION 1. Section 1, chapter 114 of the Laws of 1909 is hereby amended by striking out the word "loaded" in the second line so that said section as amended shall read: [SECTION 1.] Whoever, except as provided by the laws of this state, carries on his person a pistol or revolver, or any stiletto, dagger, dirk-knife, slungshot, or metallic knuckles, shall upon conviction be punished by a fine not exceeding one hundred dollars or by imprisonment not exceeding one year or by both such fine and imprisonment; and any such weapon or article so carried by him shall be confiscated to the use of the state.

SECT. 2. This act shall take effect upon its passage.

[Approved March 6, 1913.]

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement

officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person  property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more

than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

**NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686). Laws Passed in 1686.

Chap. IX.

An Act against wearing Swords, &c.

WHEREAS there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. *Be it therefore enacted* by the Governor, and Council, and Deputies now met in General Assembly, and by authority of the same, that no person or persons within this Province, presume to send any challenge in writing, by word of mouth, or message, to any person to fight, upon pain of being imprisoned during the space of six months, without bail or mainprize, and forfeit ten pounds ; and whosoever shall except of such challenge, and not discover the same to the Governor, or some publick officer of the peace, shall forfeit the sum of ten pounds ; the one moiety of the said forfeiture to be paid unto the Treasurer for the time being, for the public use of the Province, and the other moiety to such person or persons as shall discover the same, and make proof thereof in any court of record within this Province, to be recovered by the usual action of debt, in any of the said courts. *And be it further enacted* by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer : And if such person shall again offend against this law, he shall be in like manner committed (upon proof thereof before any justice of the peace) to the common gaol, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. *And be it further enacted* by the authority aforesaid, that no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably.

https://archive.org/details/grantsconcession00newj/page/288/mode/2up?q=swords

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

85

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons, Registration and Taxation | New Jersey | 1873
An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895).
An Ordinance Concerning Firearms and Other Deadly Weapons
The Inhabitants of the City of Plainfield, by their Common Council, do enact as follows:
    Section 1. That no person shall fire or discharge any gun, fowling piece or firearms within the limits of the City of Plainfield, under a penalty of a fine not exceeding twenty dollars for every such offence; PROVIDED, however, that this section shall not apply to the use of such weapons at any military exercise or review, or target practice duly authorized by the military authority of this State, or by the Common Council, or the Mayor, or in the lawful defence of the person, family or property of any citizen; and PROVIDED further that this section shall not apply to the discharge of blank cartridges or charges of powder on the fourth day of July.
    Sec 2. That no person shall carry within the limits of the City of Plainfield concealed upon or about his person, any pistol, dirk, butcher or bowie knife, stiletto, dagger, sword, or spear in a cane, brass or metal knuckles, razor, slug

87

shot, or other deadly weapon, under a penalty of a fine not exceeding twenty dollars for each and every offence; PROVIDED that this section shall not apply to officers of the law or persons who are threatened with bodily harm."

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895). The Charter and General Ordinances of the City of Plainfield, New Jersey: In Force May 9th, 1902 (Plainfield, NJ: The Daily Press Print, 1902), 125-126. An Ordinance Concerning Firearms and Other Deadly Weapons, §§ 1-2. Approved April 9, 1895.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .


## <u>NEW MEXICO</u>

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.

That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.

That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859/60 N.M. Laws 94, § 1-2.

§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

LeBaron Bradford Prince, The General Laws of New Mexico: Including All the Unrepealed General Laws from the Promulgation of the "Kearney Code" in 1846, to the End of the Legislative Session of 1880, with Supplement, Including the Session of 1882 Page 312-313, Image 312-313 (1882) available at The Making of Modern Law: Primary Sources. 1869.
Deadly Weapons, Act of 1869, Ch. 32, § 1. It shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory, except it be in the lawful defense of themselves, their families or their property, and the same being then and there threatened with danger, or by order of legal authority, or on their own landed property, or in execution of an order of court. § 2. Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, derringer, repeater, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives and all such weapons with which cuts can be given or by which wounds can be inflicted by thrusting, including sword canes and such sharp-pointed canes with which

deadly thrusts can be given, and all kinds of slung-shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted. § 3. The penalty for the violation of the preceding sections of this act shall not be less than ten dollars nor more than fifty dollars for each offense, or not less than ten days' imprisonment nor more than fifty days' imprisonment in the county jail, or both; such fine and imprisonment in the discretion of the jury trying the case.

Ch. 21—Deadly Weapon, §§ 1-3, ALBUQUERQUE, COMPILED ORDINANCES 81, 81-82 (1887 John Knox) (Albuquerque, New Mexico).
"CHAPTER XXI.
DEADLY WEAPON.

1. It shall be unlawful for any person to carry a deadly weapon, either concealed or unconcealed, within the limits of the town of Albuquerque, unless the same be carried in lawful defense of himself, his family or his property, the same being at the time threatened with danger, or unless by order of legal authority, or unless such person be a regularly authorized officer of the law in the discharge of his official duty.

2. Deadly weapons, within the meaning of this preceding section, shall be construed to mean any and all kinds and classes of guns, pistols and revolvers, slung-shots, loaded or sword canes or sand-bags, and all kinds and classes of weapons and instruments, by whatever name they may be called, by which a dangerous wound can be inflicted.

3. Any person convicted of a violation of Sections 1 or 2 shall be punished by a fine of not less than ten dollars nor more than fifty dollars, or by imprisonment in the county jail or town prison for a period not less than ten days nor more than sixty days, or by both such fine and imprisonment, in the discretion of the court."
Full Text: 1887, NM, Compiled Ordinances, Town of Albuquerque, ch. 21—Deadly Weapon, §§ 1-3.
 William C. Heacock, ed., Compiled Ordinances: Town of Albuquerque (Albuquerque, NM: John Knox, 1887), 81-2. Chapter 21—Deadly Weapon, §§ 1-3. (Not Dated).

## NEW YORK

1642 N.Y. Laws 33, Ordinance Of The Director And Council Of New Netherland Against Drawing A Knife And Inflicting A Wound Therewith
. . . No one shall presume to draw a knife much less to would any person, under the penalty of fl.50, to be paid immediately, or, in default, to work three months with

the Negroes in chains; this, without any respect of person. Let every one take heed against damage and be warned.

Laws And Ordinances Of New Netherland, 1638-1674 Page 35, Image 67 (A1868) available at The Making of Modern Law: Primary Sources. 1643.
Ordinance of the Director and Council of New Netherland Regulating the Burgher Guard, § 4 (1643). After the watch is duly performed, and daylight is come, and the reveille beaten, whosoever discharges any gun or musket, without orders of his Corporal, shall pay one guilder.

1645 N.Y. Laws 47, By The Director And council Of New Netherland Further Prohibiting The Sale Of Firearms, etc., To Indians
Whereas the Director General and Council of New Netherland having long ere this noticed the dangerous practice of selling Guns, Powder and Lead to the Indians, and moreover published at the time an Ordinance prohibiting the same on pain of Death, notwithstanding which some persons have yet undertaken to barter all sorts of ammunition among the Heathen, purchasing the same secretly here and then transporting it up the River and elsewhere, to the serious injury of this Country, the strengthening of the Indians and the destruction of the Christians, as We are now, also, informed with certainty, that our enemies are better provided with Powder than we, which they contrive to obtain through other Barbarians, our friends. . .There, we must expressely forbid, as we hereby do, all persons from this time forth from daring to trade any munitions of War with the Indians, or under any pretense whatsoever, to transport them from here without express permission, on pain of being punished by Death, and having the vessel confiscated in which the same shall be found laden or to have been put on board. Let everyone be warned hereby and save himself from difficulty.

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace

before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and

92

any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900

93

Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911

Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

95

# NORTH CAROLINA

Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)
Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country , shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation

Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## NORTH DAKOTA

1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128.

Sec. 453. Every person who manufactures or causes to be manufactured, or sells, or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor.

Sec. 454. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot or of any similar kind, is guilty of felony.

Sec. 455. Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His

Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon upon the showing of reasonable cause. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec. § 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars,

100

or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

Ordinance No. 8191, §§ 9 & 25, COLUMBUS, ANN. REP. OF THE VARIOUS DEP'TS OF THE CITY at 16, 16-31 (Law Passed 1894; Published 1896 by Westbote).

"AN ORDINANCE—No. 8191.

Making certain offenses therein named misdemeanors...

...Concealed Weapons.

　SEC. 9. Whoever shall wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger or any knife resembing a bowie knife or any other dangerous or deadly weapon within the corporate limits of the city of Columbus, shall, on conviction thereof, be fined not exceeding one hundred dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States marshals and their deputies, sheriffs and their deputies, and regular or special police officers of the city from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties; provided, however, if it shall be proved from the testimony on the trial of any such case that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of any lawful business, calling or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family the accused shall be acquitted...

...Firearms, Firecrackers, Etc.

　SEC. 25. Whoever shall throw, cast or let off any skyrocket, squib, cracker, firework or other thing charged with gunpowder; or discharge any common gun or pistol in this city, without a written permit from the mayor, shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than one nor more than twenty dollars, or be imprisoned not more than ten days, or both...

...Passed January 22, 1894."

## OKLAHOMA

1890 Okla. Laws 495, art. 47

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any

other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.
§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by

imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## <u>OREGON</u>

1853 Or. Laws 220, Proceedings to Prevent Commission of Crimes, ch. 16, §17.
If any person shall go armed with dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.
§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.
§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.
It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of

certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917

§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.
Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an

imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Pennsylvania | 1897

An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## **RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided

in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Rhode Island | 1896

Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws

Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

108

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748
Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such

109

child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128.

Sec. 453. Every person who manufactures or causes to be manufactured, or sells, or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor.

Sec. 454. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot or of any similar kind, is guilty of felony.

Sec. 455. Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. 1877; 1903.

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

110

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggressive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TENNESSEE**

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801

An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.

Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources. 1821

An Act of 1821, § 1. Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any justice of the peace, in the name of the county for its use, in which the offence may have been committed; and it shall be the duty of a justice to issue a warrant on the application, on oath, of any person applying; and it shall be the duty of every judge, justice of the peace, sheriff, coroner, and constable within this state, to see that this act shall have its full effect: Provided, that nothing herein contained shall affect any person that may be on a journey to any place out of his county or state.

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

114

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.

Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.

It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

115

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

116

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856

Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552&q1=bowie%20knife

1870 Tex. Gen. Laws 63, An Act Regulating The Right To Keep And Bear Arms, Chap. 46, § 1

That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same. . .

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided

further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)
Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.
Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.
Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk,

dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

The Laws of Texas 1822-1897 Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the same by Texas; Constitution of the United States; Constitutions of the State of Texas, with All the Laws, General and Special, Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress Page 1061, Image 1063 (Vol. 9, 1898) available at The Making of Modern Law: Primary Sources.

Unlawfully Carrying Arms, § 1. Be it enacted by the Legislature of the State of Texas: That Article 318 of the Penal Code shall be and the same is hereby amended so as to hereafter read as follows: Article 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other knife manufactured or sold for purposes of offence or defense, he shall be punished by fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or both by such fine and imprisonment; and during the time of such imprisonment such offender may be put to work upon any public work in the county in which said offense is committed.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## **UTAH**

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14. Any person who shall carry any slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

## VERMONT

Laws of Vermont, Public Acts, No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislature/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+and+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie+knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA95&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

1786 Va. Laws 35, ch. 49, An Act forbidding and punishing Affrays.
Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.
https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1786-VA-Ch.-49-An-Act-Forbidding-and-Punishing-Affrays.pdf

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

124

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.
Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probabily ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76
It is against the law to habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation.

1847 Va. Laws 127, c. 14, § 16.
If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

1847/48 Va. Laws 109
CHAPTER VII, OF OFFENSES AGAINST THE PUBLIC PEACE
8. Any free person who shall habitually carry about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, from the use of which the death of any person might probably ensue, shall for every offence be punished by fine not exceeding fifty dollars, and one moiety of

the recovery shall go to the person who shall voluntarily cause a prosecution for the same.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

1869/70 Va. Laws 510
§ 7. If a person habitually carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined fifty dollars, and imprisoned for not more than twelve months in the county jail. The informer shall have half of such fine.
Approved October 29, 1870

1874-75 Va. Acts Ch. 239, pp. 282-83.
Eighteenth. The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind: provided, that all fire-arms issued by the state to members of volunteer companies or for purposes of police, shall not be listed for taxation.[4]

1881/82 Va. Laws 233
§ 7. If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined not more than fifty dollars, nor less than fifteen dollars.
Approved March 6, 1882

---

[4] The same provision also appeared in 1875 Va. Acts Chap. 162, p. 164; 1881 Va. Acts Chap. 119, p. 499; 1883 Va. Acts Chap. 450, p. 563; 1889 Va. Acts Chap. 19, p. 19; 1889 Va. Acts Chap. 244, p. 200; 1893 Va. Acts Chap. 797, p. 931.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Virginia | 1887

Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

1895/96 Va. Laws 826

§ 3780. Carrying concealed weapons; how punished; forfeiture and sale of weapons.-If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot or any weapon of like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both in the discretion of the court or jury trying the case, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of like kind shall be forfeited to the commonwealth and may be seized by an officer as forfeited.

Approved March 4, 1896.


## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.

Brandishing | Washington | 1854

Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.

Brandishing | Washington | 1859

Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in

128

any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.

If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1897

Carrying Concealed Weapons, § 7084.

If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

130

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

131

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

132

**WISCONSIN**

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.

If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.

SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

https://firearmslaw.duke.edu/laws/charter-and-ordinances-of-the-city-of-la-crosse-with-the-rules-of-the-common-council-page-25-26-image-28-89-1888-available-at-the-making-of-modern-law-primary-sources

The common council has power. . . Pt. 36. To regulate or prohibit the carrying or wearing by any person, any pistol, slung-shot, knuckles, bowie knife, dirk or any other dangerous weapon, and to provide for the confiscation and sale of such weapons.

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## **WYOMING**

1876 Wyo. Comp. Laws 352, An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons, ch. 52, § 1-3.
§ 1. That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village. § 2. That if any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of the last preceding section by a proper peace officer, continue to carry or bear upon his person any fire arm or other deadly weapon, he or she, shall be deemed to be guilty of a violation of the provisions of said section and shall be punished accordingly. § 3. Any person violating any of the provisions of this act shall be deemed guilty of misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.

1876 Wyo. Comp. Laws 273, An Act Defining Crime and Providing for the Punishment Thereof, ch. 35, tit. 9, § 127.
If any person or persons shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

An Act Defining Crimes, Regulating Criminal Procedure and for Other Purposes, ch. 73, § 97, in 1890 Wyo. Sess. Laws 127, 140.
"SEC. 97. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars."

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

Attorney General Josiah A. Van Orsdel, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1252-1253, Image 1252-1253 (1899) available at The Making of Modern Law: Primary Sources.
Crimes Against Public Peace, Drawing Dangerous Weapons, § 5050. Whoever draws or threatens to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon, already drawn, upon any other person, shall be fined in a sum not more than one hundred dollars, to which may be added imprisonment in the county jail not more than six months; Provided, That the provisions of this section shall not apply to a person drawing or threatening to use such dangerous or deadly weapon in defense of his person or property, or in defense of those entitled to his protection by law.

1925 Wyo. Sess. Laws 110, An Act Prohibiting Persons not Citizens of the United States, from Possessing, Wearing or Carrying any Dangerous or Deadly Weapon. . . , ch. 106, § 1.
Every person not being a citizen of the United States, who shall own, possess, wear or carry any dirk, pistol, shot gun, rifle, or other fire arm, bowie knife, dagger, or any other dangerous or deadly weapon, shall upon conviction thereof, be adjudged guilty of a misdemeanor and shall be fined in any sum not less than twenty-five dollars ($25.00) nor more than one hundred dollars ($100.00) or imprisoned in the county jail not more than six months, or by both such fine and imprisonment.

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.

§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.

§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/; HeinOnline

Exhibit
Spitzer
9/10/24  llc

# EXHIBIT C

**EXHIBIT C**

**DANGEROUS WEAPONS LAWS**

<u>**ALABAMA**</u>

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources.  1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.

Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

8

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

A DIGEST OF THE STATUTES OF ARKANSAS, Josiah Gould, Little Rock, 1858
Chap. 51, 381-382
SEC. 13. Every person who shall wear any pistol, dirk, butcher or large knife, or sword in cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twenty-five dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months. *Rev. Stat., chap. 44, div. 8, art. 1.*
https://books.googleusercontent.com/books/content?req=AKW5Qaf_vv6X7sO9Z6NtIUMLtH0VYYI_0kkdJjZi44J3x-fRshyXb-w4GoNceJqk1aEngPSsWbm_GphorW8KcXpNpJYr3imMv0MzFa74XTRuW8wYP5SsQkMv-NYF0qyrpxY4Ju93WroetKla2dEcEZ-zvHiHp1M7zCcFgVXwk_8-yRPuJFepuAgF63b6y-Vq2whoCx3JOPhGO4Z8jGvABY3O_nC75TzRd0Js_3USMF2o4JkCHtxXVMfd9ov-_--WCuMBE_AprMdG6JSlGIDoTmlKbU4bHwaWwyQ6D_8aU2Ds4zFVdDUdOfQ

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, in the Year of Our Independence the Sixty second, and of the State of Second Year Page 280, Image 295 (1838) available at The Making of Modern Law: Primary Sources.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § §1-3.
§ 1. That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. Provided, that officers whose duties require them to make arrests or to keep and guard prisoners, together with the persons summoned by such officers to aid them in the

10

discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. Provided, further, that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.

§ 2. Any person, excepting such officers, or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor.

§ 3. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person *any person* any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.
https://cite.case.law/ark/83/26/


1923 Ark. Acts 379, An Act to Regulate the Ownership of Pistols and Revolvers, No. 430.

Be It Enacted by the People of the State or Arkansas:

From and after the passage of this Act, it shall be unlawful for any person to own or have in his custody or possession any pistol or revolver, except as herein provided:

Section 1. Any person having in his possession or custody any pistol or revolver, shall within 60 days from the approval of this Act, present such firearm to the county clerk of the county, where he resides, and it shall be the duty of the said county clerk to enter upon a separate record provided for that purpose, the name, age, place of residence, and color of the party, together with the make, calibre and number of said pistol or revolver.


## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.


S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the

11

Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.
If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

15

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

1885 Colorado - General Assembly, 5th Session: 17-416, 170

AN ACT

TO AMEND CHAPTER TWENTY-FIVE, OF THE GENERAL STATUTES OF THE STATE OF COLORADO, ENTITLED "CRIMINAL CODE."

Be it enacted by the General Assembly of the State of Colorado:

SECTION I. Section one hundred and eighty two (182), of chapter XXV., of the General Statutes of the State of Colorado, entitled "Criminal Code," is hereby repealed, and the following shall stand in lieu thereof as section one hundred and eighty-two (182): "SEC. 182. If any person or persons shall, within any city, or town, or village in this State, whether the same be incorporated or not, carry concealed upon or about his person any pistol, bowie-knife, dagger, or other deadly weapon, such person shall, upon conviction thereof, be punished by a fine not less than fifty ($50) dollars, nor more than two hundred ($200) dollars, or imprisoned in the county jail for a term of not less than ten, nor more than sixty days, or both, in the discretion of the court; Provided, That this section shall not be construed to apply to sheriffs, constables, or other officers of the peace, while on duty."

Approved April 10, 1885.

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence

17

shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

1891 Colo. Sess. Laws 129, 130
AN ACT TO AMEND SECTION ONE HUNDRED AND EIGHTY-TWO (182) OF CHAPTER TWENTY-FIVE (25) OF THE GENERAL STATUTES OF THE STATE OF COLORADO, ENTITLED "CRIMINAL CODE" BEING GENERAL SECTION EIGHT HUNDRED AND SEVENTY (870) AS THE SAME WAS AMENDED APRIL 10, 1885.
Be it enacted by the General Assembly of the State of Colorado:
SECTION 1. That Section 182 of Chapter XXV of the General Statutes of Colorado, entitled "Criminal Code" being general section 870, as the same was amended April 10, 1885, be, and the same is hereby amended so as to read as follows: SECTION 182. If any person, or persons shall within any city, town or village in this State, whether the same is incorporated or not carry concealed upon his, her or their person any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon, such person, or persons shall upon conviction thereof before any police magistrate or justice of the peace, be punished by imprisonment in the county jail for a term not exceeding thirty days, or by a fine of not more than fifty dollars with costs or by both such fine and imprisonment, in the discretion of the court. . . .
All concealed weapons taken from parties violation [violating] this section, shall be forfeited to the county, and confiscated and sold at auction for the benefit of the school fund of the county in which the offense is committed.
Approved April 10th, 1891.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

18

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

19

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).

Carrying Weapons | | 1871

Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.

DEFINITIONS
SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS
SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS
SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS
SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly

appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be

securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed -oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to

make such sale has been obtained
from the superintendent of police of the District of Columbia. 4. A true record shall
be made in a book kept for the purpose the form of which may be prescribed by the
Commissioners, of pistols, machine guns, and sawed-off shotguns in the
possession of the licensee, which said record shall contain the date of purchase, the
caliber, make, model, and manufacturer's number of the weapon, to which shall be
added, when sold, the date of sale. 5. A true record in duplicate shall be made of
every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be
made in a book kept for the purpose, the form of which may be prescribed by the
Commissioners of the District of Columbia and shall be personally signed by the
purchaser and by the person effecting the sale, each in the presence of the other
and shall contain the date of sale, the name, address, occupation, color, and place
of birth of the purchaser, and, so far as applicable, the caliber, make, model, and
manufacturer's number of the weapon, and a statement signed by the purchaser that
he has never been convicted in the District of Columbia or elsewhere of a crime of
violence. One copy of said record shall, within seven days, be forwarded by mail to
the superintendent of police of the District of Columbia and the other copy retained
by the seller for six years. 6. No pistol or imitation thereof or placard advertising
the sale thereof shall be displayed in any part of said premises where it can readily
be seen from the outside. No license to sell at retail shall be granted to anyone
except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to
carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within
the District of Columbia, give false information or offer false evidence of his
identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or
obliterate the name of the maker, model, manufacturer's number, or other mark or
identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or
sawed-off shotgun upon which any such mark shall have been changed, altered,
removed, or obliterated shall be prima facie evidence that the possessor has
changed, altered, removed, or obliterated the same within the District of Columbia:
Provided, however, That nothing contained in this section shall apply to any officer
or agent of any of the departments of the United States or the District of Columbia
engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as
firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers

and retail dealers licensed under section 10 of this Act.

PENALTIES

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.

Approved, July 8, 1932.

https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0


## **FLORIDA**

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and

27

not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.

Sentence Enhancement for Use of Weapon | Florida | 1868

Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]

Offences Against Public Peace, § 13.

Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

1885 Fla. Laws 61-62

CHAPTER 3620-[No. 65.]

AN ACT to Provide a Punishment for Carrying Concealed Weapons and for the Trial of such Offence, Giving the Circuit Court jurisdiction of the same.

SECTION 1. Whoever shall carry arms of any kind whatever secretly on or about their persons or whoever shall have concealed on or about their person any dirk, pistol or other arm or weapon, except a common pocket knife, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not exceeding one hundred dollars or imprisoned in the county jail not exceeding six months.

SEC. 2. That the Circuit Court of this State shall have exclusive original jurisdiction to try and determine all cases of violation of this act, and it shall be the duty of the Circuit Judges of the several Circuits to charge the Grand Juries specially upon the crime of carrying concealed weapons, and the State Attorneys of the several Circuits shall receive a fee of ten dollars for each and every conviction, under this act, to be paid as other conviction fees.

SEC. 3. It shall be the duty of the Sheriff or other officer making any arrest under this act to take possession of any arms found upon the person arrested under this act and retain the same until after the trial of such person, and if lie be convicted, then the said arm or arms shall be forfeited, and the Sheriff shall sell the same at

public sale and account for and pay over the proceeds of this sale [the] same as in case of fines collected, but if such person be acquitted then the said arm or arms shall be returned to him.

SEC. 4. That all laws and parts of laws be and the same are hereby repealed in so far they are in conflict with the provisions hereof.

Approved February 12, 1885.

https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssfl0257&id=77&men_tab=srchresults

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons. . . .

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.

Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Georgia | 1816

Offences Against the Public Peace, (1816) § 19.

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive

weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

1870 Ga. Laws 421

An Act to preserve the peace and harmony of the people of this State, and for other purposes.

SECTION 1. Be it enacted, etc., That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds.

SEC. 2. Be it further enacted, That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court.

SEC. 3. All laws and parts of laws militating against this act are hereby repealed. Approved October 18, 1870.

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

1880 Ga. Laws 151, An Act to make Penal the Intentional Pointing, or Aiming of Fire-arms at Another, whether Loaded or Unloaded, § 1.
. . . from and after the passage of this Act, any person who shall intentionally point or aim a gun or pistol, whether loaded or unloaded, at another not in a sham-battle by the military, and not in self-defense, or in defense of habitation, property, or person, or other instances standing upon like footing of reason and justice, shall be guilty of a misdemeanor . . . .
https://heinonline.org/HOL/Page?handle=hein.ssl/ssga0183&id=151&collection=ssl&index=ssl/ssga

1884-85 Ga. Laws Ch. 457, p. 30 [state property tax valuation]
"The value of guns, pistols, bowie-knives and such articles?"[1]

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown

---

[1] Also appearing in 1886 Ga. L. chap. 101, pp. 26, 28; 1888 Ga. L. chap. 103, p. 261; 1889 Ga. L. chap. 640, p. 993; town of Jessup, 1888 Ga. L. chap. 103, p. 261; charter for Cedartown, 1889 Ga. L. chap. 640, p. 993.

33

for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

1864 Idaho Second Sess. Laws 298, 303-304
SEC. 40. That any person in this territory, having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall in the presence of two or more persons, draw or exhibit any of said deadly weapons, in a rude, angry, and threatening manner, not in necessary self defense, or who shall, in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisoned in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution. . . .

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or

34

other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1888 Idaho Fifteenth Sess. Laws 23
CARRYING DEADLY WEAPONS.
AN ACT REGULATING THE USE AND CARRYING OF DEADLY WEAPONS IN IDAHO TERRITORY.
Be it enacted by the Legislative Assembly of the Territory of Idaho, as follows:
SECTION 1. That it is unlawful for any person, except United States officials, officials of Idaho Territory, County officials, Peace officers, Guards of any jail, and officers or employees of any Express Company on duty, to carry, exhibit or flourish any dirk, dirk-knife, sword, sword-cane, pistol, gun or other-deadly weapons, within the limits or confines of any city, town or village or in any public assembly of Idaho Territory. Every person so doing is guilty of a misdemeanor and is punishable by fine not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the county jail for a period of not less than twenty days nor more than fifty days, or by both such fine and imprisonment.
SEC. 2. One half of all fines collected under the provisions of this act shall be paid to the officer making the arrest, which amount shall be payment in full for his services. The other one half shall he paid into the Common School Fund of the county, after deducting the necessary costs of the prosecution of the case.
SEC. 3. All acts or parts of acts in conflict with this act are hereby repealed.
SEC. 4. This act shall take effect and be in force from and after its passage.
Approved February 4, 1889.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

35

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845

Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

1867 Ill. Act 650, Chapter VI

City Council, Powers

Thirty-eighth.-To regulate or prohibit the carrying or wearing by any person, under his clothes or concealed about his person. any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon, and to provide for the confiscation or sale of such weapons.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources.

Disorderly Conduct: Disturbing the Peace, § 56.

Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a

threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Ordinance No. 29: Concerning the Carrying of Concealed Weapons, THE NASHVILLE JOURNAL, Mar. 26, 1880 at 4. (Nashville, IL).
Ordinance No. 29.
Concerning the carrying of Concealed Weapons.
*Be it ordained by the City Council of the City of Nashville, Illinois:—*
SEC. 1. That it shall be unlawful for any person to weare or carry under his clothes, or concealed upon his person, or in a threatening manner display any pistol, slung-shot, cross knuckles of lead, brass or other metal, bowie knife, dirk or dagger, or any knife resembling a bowie knife, or any other dangerous, or deadly weapon, instrument or thing within the limits of the city of Nashville.
    Any one violating the provision of this section shall forfit and pay to the city of Nashville a sum not less than 20.00 nor more than $200 and costs of suit for each offence.
SEC. 2. Provided that nothing in the proceeding section shall be construed so as to prohibit any United States, State, County or City Officer from carrying and wearing such weapons as may be necessary in the proper discharge of his duty, or any person aiding in the apprehension of supposed criminals. Provided however that such person have a written permit, signed by the Mayor and City Clerk, and provided, also that the Mayor may issue written permits to such persons as in his judgement he may think necessary for the safety and protection to carry such arms revocable at the pleasure of the Mayor. The same however to be signed by the Mayor and City Clerk, for which permit the person applying for the same shall pay to the City Clerk the sum of fifty cents for his own use. Permits to be good one year from the date unless sooner revoked by the Mayor.
    Adopted March 24th, 1880, and filed in the Clerk's office.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]

Deadly Weapons: Selling or Giving to Minor. § 54b.

Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Article XLIII. Parks and Public Grounds, The Municipal Code of Chicago (1881). 1690. All persons are forbidden to carry firearms or to throw stones or other missiles within any one of the public parks.  All persons are forbidden to cut, break or in any way injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, bridges or other construction or property within or upon any of the said parks.

1881 Ill. Act of April 16, 1881, as codified in Ill. Stat. Ann. Crim. Code, chap. 38 REGULATING THE TRAFFIC IN DEADLY WEAPONS

1. HAVING IN POSSESSION OR SELLING. § 1. That whoever shall have in his possession, or sell**,** give or loan, hire or barter, or whoever shall offer to sell, give, loan, hire or barter, to any person within this State, any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than ten dollars ($10), nor more than two hundred dollars ($200).

2. SELLING OR GIVING TO MINOR.§ 2. Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give loan, hire or barter, or shall offer to sell**,** give, loan, hire or barter to ani, minor within this State, any pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon **of** like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined In any sum not less than twenty-five dollars ($25), nor more than two hundred dollars ($200).

3. REGISTER TO BE KEPT—WHAT IT SHALL CONTAIN. § 3. All persons dealing in deadly weapons hereinbefore mentioned, at retail within this State, shall

keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form [number of weapon, to whom sold or given, age of purchaser, kind and description of weapon, for what purpose purchased or obtained, price of weapon]

Said register, shall be kept open for the inspection of the public, and all persons who may wish to examine the same, may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or tie keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25), nor more than two hundred dollars ($200.)

4. CARRYING CONCEALED WEAPONS. § 4. Whoever shall carry a concealed weapon upon or about his person, of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars (25), nor more than two hundred dollars ($200.)

LAKE, THE REVISED ORDINANCES OF THE TOWN, ch. 32, §§ 1-9 (Beach, Barnard & Co. 1882).

Chapter XXXII.

CONCEALED WEAPONS.

SECTION 1. It shall be unlawful for any person within the limits of the town to carry or wear under his clothes, or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, razor or dagger, or any other dangerous or deadly weapon.

§ 2. Any such weapon or weapons duly adjudged by the police magistrate, or any justice of the peace of said town, to have been worn or carried by any person, in violation of the first section of this chapter, shall be forfeited or confiscated to the said Town of Lake, and shall be so adjudged.

§ 3. Any policeman of The Town of Lake may within the limits of said town without a warrant arrest any person or persons whom such policeman may find in the act of carrying or wearing under their clothes or concealed about their persons, any pistol, or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, or dagger, or razor or any other dangerous or deadly weapon, and detain him, her or them in the town jail until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and

confiscation of such of the weapons above referred to as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

§ 4. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said town, that any person has been guilty of violating any of the provisions of section 1 of this chapter, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this chapter, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to The Town of Lake.

§ 5. Any person or persons violating any of the provisions of section 1 of this chapter shall pay a fine of not less than five dollars nor more than fifty dollars, in the discretion of the magistrate or court before whom such conviction shall be had.

§ 6. The prohibitions of this chapter shall not apply to the officers or members of the police force of said town when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrests; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the president of the board of trustees a license so to do, as hereinafter provided.

§ 7. The president may grant to so many and such persons as he may think proper licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure.

§ 8. Applications for such licenses shall be made to the clerk, and when granted, the person applying therefor shall pay to the clerk, for the use of the town, the sum of two dollars, and thereupon a license shall be issued by the town clerk, and signed by the president.

§ 9. Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirtieth day of June next following.

MONMOUTH, MUNICIPAL CODE, art. 6, §§ 654-662 (Review Book & Job Print 1883).
"ARTICLE VI.
CONCEALED WEAPONS.

654. It shall be unlawful for any person, within the corporate limits of the city, to carry or wear under his clothes, or concealed about his person, any pistol, colt or

slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, razor or dagger, or other dangerous or deadly weapon.

655. Any such weapon or weapons duly adjudged by any police magistrate or justice of the peace of said city to have been worn or carried by any person, in violation of the first section of this article, shall be forfeited or confiscated to the said city of Monmouth and shall be so adjudged.

656. Any policeman of the city of Monmouth may within the limits of said city without a warrant arrest any person or persons whom such policeman may find in the act of carrying or wearing under their clothes or concealed about their persons, any pistol, or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk, or dagger, or any other dangerous or deadly weapon, and detain him, her or them in custody until a summons or warrant can be procured on complaint made (under oath or affirmation) for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

657. Upon complaint made, under oath or affirmation, to any magistrate or justice of the peace in said city, that any person has been guilty of violating any of the provisions of section 656 of this article, a summons or warrant shall issue for the summoning or arrest of the offender or offenders, returnable forthwith; upon the return of such summons or warrant, such magistrate or justice shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this article, such magistrate or justice of the peace shall so adjudge, and order that the weapon or weapons, concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to the city of Monmouth.

658. Any person or persons violating any of the provisions of this article shall pay a fine of not less than three dollars nor more than fifty dollars.

659. The prohibitions of this article shall not apply to the officers or members of the police force of said city when on duty, nor to any officer of any court whose duty may be to serve warrants or to make arrests; nor to persons whose business or occupation may seem to require the carrying of weapons for their protection, and who shall have obtained from the mayor a permit so to do, as hereinafter provided.

660. The mayor may grant to so many, and such persons as he may think proper, permits to carry concealed weapons, and may revoke any and all of such permits at his pleasure.

661. Applications for such permits shall be made to the mayor, and when granted the person applying therefor shall pay to the city treasurer the sum of fifty cents, and thereupon a permit shall be issued by the city clerk and signed by the mayor.

662. Every such permit shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the first day of April next following."

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

1885 Ill. Act 771, Concealed Weapon – Flourishing weapon, ch. 38, § 4.
Whoever shall carry a concealed weapon upon or about his person of the character in this Act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such

42

offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1819 Ind. Acts 39, An Act to Prohibit the Wearing of Concealed Weapons. 1820. Be it enacted by the General Assembly of the State of Indiana, That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, by presentment or indictment, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: Provided however, that this act shall not be so construed as to affect travellers.

1831 Ind. Acts 192, Fifteenth Session, CHAPTER XXVI.
SEC. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars. https://heinonline.org/HOL/Page?collection=ssl&handle=hein.ssl/ssin0165&id=19 2&men_tab=srchresults

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.

That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

1905 Ind. Acts 688, Weapon— Furnishing to Minor, § 450.
It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell¸ barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed

44

guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air

45

guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.

1929 Iowa Acts 90, Carrying Firearms in Motor Vehicles, § 30.
No person shall carry a gun or any firearms, except a pistol or revolver, in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case.

## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

1866 Kan. Sess. Laws, 6th Legislature, Regular Session, Ch. 64, 159-160
Lawrence
Thirty-first. To prevent and restrain riots, routs, noises, disturbances or disorderly
assemblies in any street, house or place in the city; to regulate, prevent and punish
the discharge of fire-arms, rockets, powder, fire-works, or any other dangerously
combustible material, in the streets, lots, grounds, alleys, or about or in the vicinity
of any buildings; to regulate, prevent and punish the carrying of concealed
weapons; to arrest, regulate, punish, fine or set at work all vagrants and persons
found in said city, without visible means of support or some legitimate business

1867 Kan. Sess. Laws 25
CHAPTER XII.
ARMS.-PREVENT CARRYING OF.
AN ACT to prevent the carrying of Deadly Weapons.
Be it enacted by the Legislature of the State of Kansas:
SECTION 1. Any person who is not engaged in any legitimate business, any
person under the influence of intoxicating drink, and any person who has ever
borne arms against the Government of the United States, who shall be found
within the limits of this State, carrying on his person a pistol, bowie-knife, dirk or
other deadly weapon, shall be subject to arrest upon charge of misdemeanor; and
upon conviction shall be fined in a sum not exceeding one hundred dollars, or by
imprisonment in the county jail not exceeding three months, or both, at the
discretion of the court. . . .
Approved, February 23d, 1867

1868 Kan. Sess. Laws 378
The General Statutes of the State of Kansas, to Which the Constitutions of the
United State of Kansas, Together with the Organic Act of the Territory of Kansas,
the Treaty Ceding the Territory of Louisiana to the United States, and the Act
Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868)
available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate
business, any person under the influence of intoxicating drink, and any person who
has ever borne arms against the government of the United States, who shall be
found within the limits of this state, carrying on his person a pistol, bowie-knife,
dirk or other deadly weapon, shall be subject to arrest upon the charge of
misdemeanor, and upon conviction shall be fined in a sum not exceeding one
hundred dollars, or by imprisonment in the county jail not exceeding three months,
or both, at the discretion of the court.

1872 Kan. Sess. Laws 210; Ch. 100; Cities of the second class.
SEC. 62. The council may prohibit and punish the carrying of fire arms, or other deadly weapons, concealed or otherwise, and may arrest and imprison, fine or set at work all vagrants and persons found in said city without visible means of support, or some legitimate business.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2. § 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a

misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

KY. REV. STAT., ch. 375, § 33 (Johnston & Pleasants 1810) (Passed 1801).
   "Sec. 33. No person, great or small, of what condition soever he may be, except the ministers of justice in executing their office, and such as may be in their company assisting them, shall be so hardy to come before the justices of any court, or either of their ministers of justice, doing their office, with force and arms, on pain to forfeit their arms to the commonwealth, and of being fined and imprisoned at the discretion of a jury."

1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89, § 1.
Be it enacted by the General Assembly of the Commonwealth of Kentucky, that any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined . . .

1853 Ky. Acts 186, An Act to Prohibit the Carrying of Concealed Deadly Weapons, Ch. 1020. 1854.
Sec 1. Be it enacted by the General Assembly of the Commonwealth of Kentucky, That if any person shall hereafter carry concealed any deadly weapons, other than an ordinary pocket knife, except as provided in the next section, he shall be fined on the first conviction not less than fifth nor more than one hundred dollars, and on any subsequent conviction not less than one hundred nor more than five hundred dollars.
Sec. 2. That the carrying of concealed deadly weapons shall be legal in the following cases: 1. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2. Where sheriffs, constables, marshals, and policemen carry such weapons as are necessary to their protection in the efficient discharge of their duty. 3. Where

persons are required by their business or occupation to travel during the night, the carrying concealed deadly weapons during such travel.

Sec. 3. This act shall be given in charge by the judges to the grand juries.

1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.

Carrying Weapons | Louisiana | 1813

Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).

Carrying Weapons | Louisiana | 1842

[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

Louisiana 1855 law 1855 La. L. Chap. 120, Sec. 115, p. 148

Sec. 115, Be it further enacted, &c., That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentnient, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for

51

one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury, specially as to this section.
https://babel.hathitrust.org/cgi/pt?id=osu.32437123281277&view=1up&seq=300&q1=Bowie

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, rioutously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

1821 Me. Laws 285, ch. 76, § 1.
Be it enacted by the Senate, and House of Representatives, in Legislature assembled, That it shall be within the power, and be the duty of every Justice of the Peace within this county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in this county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches; and upon view of such Justice, confession of the delinquent or other legal conviction of any such offence, shall require of the offender to fund sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county at the discretion of the Justice, and as the nature or circumstances of the case may require;

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.

53

Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, Title XII, § 16.
*The Revised Statutes of the State of Maine, passed October 22, 1840*
SECT. 15. Whoever, in the presence of any magistrate, mentioned in the second section of this chapter, or before any court of record, shall make any affray or threaten to kill or beat another, or commit any violence against his person or property, or shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of the good behavior for a term, not exceeding three months, and, in case of refusal, may be committed to prison as before directed.
SECT. 16. Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.
https://books.googleusercontent.com/books/content?req=AKW5QackIo9b0lWJJiw gYw4j9rTykSiPPMmiPWWAC8qLnHfxKOCmGJI73nLNzytyCaLhZK8EAcPEG MuUjd22tY_5j80XftZ-
J_lNMZ3z2lMXJ8_iVF4ZySk6ICZrB4XYmEW251SmutYF3JKpInz_7cNt7GU6 DMgeJ3lSDGcRjrGcpvILEXJPG9_OOmt6PApz3MU57RTpIAQ2j3_Dm613aFZ ArHK-fl0BBkU14AGTeEWGIBxXXwE8OAsSegF8NfSMm-WyW4g-
eorbGccozHvqhXnnWpdTRQdxZSCPW28fXDw0XZtHu4QRSDQ

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809 If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and

on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886

Concealed Weapons, § 30.

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or

apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS

1 Records of the Governor and Company of the Massachusetts Bay in New England 211-12 (Nathanial B. Shurtleff ed., 1853). 1637.

Whereas the opinions & revelations of Mr. Wheeleright & Mrs. Hutchinson have seduced & led into dangerous errors many of the people heare in Newe England, insomuch as there is just cause of suspition that they, as others in Germany, in former times, may, upon some revelation, make some suddaine irruption vpon those that differ from them in judgment, for prevention whereof it is ordered, that all those whose names are vnderwritten shall (vpon warning given or left at their dwelling houses) before the 30th day of this month of November, deliver in at Mr. Canes house, at Boston, all such guns, pistols, swords, powder, shot, & match as they shalbee owners of, or have in their custody, vpon paine of ten pound for ev'y default to bee made therof ; which armes are to bee kept by Mr. Cane till this Court shall take further order therein. Also, it is ordered, vpon like penulty of x', that no man who is to render his armes by this order shall buy or borrow any guns, swords, pistols, powder, shot, or match, vntill this Court shall take further order therein. . . . The like order is taken for other townes, changing the names of those who shall deliver their armes, & keepe them. . . . It was ordered, that if any that are to bee disarmed acknowledg their siun in subscribing the seditions -libell, or do not justify it, but acknowledg it evill to two magistrates, they shalbee thereby freed from delivering in their armes according to the former order./
file:///C:/Users/Bob/Downloads/ocm3522063_vol1.pdf

1692 Mass. Laws [No. 6, at 11–12.?]
Acts and resolves passed by the General Court by Massachusetts
2D Sess. 1692-3, 52-53
Further it is enacted by the authority aforesaid^ [Sect. 6.] That every justice of the peace in the county where the offence is committed, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches ; and upon view of such justice or justices, confession of the

party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited ; and may further punish the breach of the peace in any person that shall smite or strike another, by fine to the king not exceeding twenty shillings, and require bond with sureties for the peace, or bind the offender over to answer it at the next sessions of the peace, as the nature or circumstance of the offence may be ; and may make enquiry of forcible entry and detainer, and cause the same to be removed, and make out hue and crys after runaway servants, thiefs and other criminals.

https://archive.org/details/actsresolvespass9214mass/page/52/mode/2up?q=offensively

1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders. Further it is Enacted by the authority aforesaid, That every Justice of the Peace in the County where the Offence is committed , may cause to be staid and arrested all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or

go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere.

1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12. 1751
"Whereas the Provision already made by Law has been found insufficient to prevent Routs, Riots, and tumultuous Assemblies, and the evil Consequences thereof :      Wherefore,
Be it enacted by the Lieutenant Governour Council and House of Representatives, That from and after the Publication of this Act, if any Persons to the Number of Twelve or more, being Arm'd with Clubs or other Weapons, or if any Number of Persons consisting of Fifty or upwards, whether armed or not, shall be unlawfully riotously or tumultuously assembled; any Justice of the Peace, Field-Officer or Captain of the Militia, Sheriff of the County or Under-Sheriff, or any Constable of the Town, shall among the Rioters, or as near to them as he can safely come, command Silence while Proclamation is making, and shall openly make Proclamation in these or the like Words,
Our Sovereign Lord the KING, chargeth and commandeth all Persons, being assembled, immediately to disperse themselves, and peaceably to depart to their Habitations, or to their lawful Business, upon the Pains contained in the Act of this Province made in the twenty-fourth Year of His Majesty King GEORGE the Second, for preventing and suppressing of Riots, Routs, and unlawful Assemblies. GOD save the King.
And if such Persons so unlawfully assembled, shall after Proclamation made, not disperse themselves within one Hour, it shall be lawful for every such Officer or Officers and for such other Persons as he or they shall command to be assisting, to seize such Persons, and carry them before a Justice of Peace: And if such Person shall be killed or hurt by Reason of their resisting the Persons so dispersing or seizing them, the said Officer or Officers and their Assistants shall be indemnified and held guiltless…"
The following links to a version of this law that is contemporaneous with the original session law, but seems to have been published separately as a notice: An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, 1750. https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf

1794 Mass. Acts 66-67
Chapter 26.

And be it further Enacted by the authority aforesaid, that every Justice of the peace, within the County for which he may be commissioned, may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall . require of the offender to find sureties for his keeping the peace, and being of the good behaviour ; & in want thereof to commit him to prison, untill he shall comply with such requisition : And may further punish the breach of the peace in any person that shall assault or strike another, by fine to the Commonwealth not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender to appear and answer for his oflence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require. Approved January 29, 1795.
https://archive.org/details/actsresolvespass179495mass/page/66/mode/2up?q=armed

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.
All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances. 1891

The Board of Park Commissioners of the City of Lynn, by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating

beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell, at 58 (1903)
The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .
3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1913 Mich. Pub. Acts 452, An Act Defining the Crime of Felonious Assault and Prescribing Punishment Therefor, § 1.
Whoever shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be deemed guilty of a felonious assault, and upon conviction shall be punished by imprisonment in the State Prison for a term not exceeding three years or by imprisonment in the county jail for a term not exceeding one year, in the discretion of the court.

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more

than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

Morton Smith Wilkinson, The Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851: Printed and Published Pursuant to Law Page 528, Image 538 (Vol. 1, 1851) available at The Making of Modern Law: Primary Sources.
If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Ordinance No. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, § 3, City Charter of the City of Hastings (1870).
"Sec. 3. Any person who shall go armed within the incorporated limits of said city of Hastings with a dirk, dagger, sword, pistol or pistols, or shall carry a slung-shot or metal knuckles or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury to his person or to his family or property, shall, upon conviction before said justice, be punished by a fine not exceeding one hundred dollars, or by imprisonment not exceeding three months, or both, in the discretion of the justice."
1870, MN, Ordinance no. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, §§ 1-5

City Charter of the City of Hastings (Hastings, MN: Daily News Print, 1884), 74-75. Ordinance no. 74—An Ordinance Relating to Breaches of the Peace, Disorderly Conduct and the Carrying of Concealed Weapons, § 3. Passed May 24, 1870.

SAINT PAUL, MUNICIPAL CODE, art. 18, §§ 1-9 (Daily Globe 1884) (Passed 1882).

"Sec 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon.

Sec. 2. Any such weapon or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged.

Sec. 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

Sec. 4. Upon complaint made under oath or affirmation, to the municipal court of the city of St. Paul, that any person has been guilty of violating any of the provisions of section one of this ordinance, a warrant shall issue for the arrest of the offender or offenders, returnable as other warrants are returnable; upon the return of such warrant, the municipal court shall proceed to the hearing and determination of the matter, and if it shall be adjudged that such person or persons has or have incurred any of the penalties fixed by this ordnance, such court shall so adjudge, and order that the weapon or weapons concerning the carrying or wearing of which such penalty shall have been incurred, shall be confiscated to the city of St. Paul. And further, every such person or persons so offending, on conviction, shall be required to find sureties for keeping the peace for a term not exceeding six months.

Sec. 5. Any person or person violating any of the provisions of section one of this ordinance shall pay a fine of not less than $5 nor more than $100, or be imprisoned for a term not exceeding ninety days or both, in the discretion of the municipal judge, before whom such conviction shall be had.

Sec. 6. The prohibition of this ordinance shall not apply to the officers and members of the police force of said city, when on duty, nor to any officer of any court whose duty may be to secure warrants or to make arrests, nor to persons whose business or occupation may seem to require the carrying of weapons for protection, and who shall have obtained from the Mayor of said city a license so to do as hereinafter provided.

Sec. 7. The Mayor of the city of St. Paul may grant to so many, and to such persons as he may think proper, licenses to carry concealed weapons; and may revoke any and all of such licenses at his pleasure.

Sec. 8. Application for such licenses shall be made to the mayor of said city, in writing, and when granted, the person applying therefor, shall pay into the city treasury the sum of two dollars, and thereupon a license shall be issued by the city clerk, and signed by the mayor.

Sec. 9: Every such license shall state the name, age, occupation and residence of the person to whom it is granted, and shall expire on the thirty-first day of December of each and every year."

1884, MN, Concealed Weapons-License, Article 18, §§ 1-9, The Municipal Code of Saint Paul

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council: Revised to December 1, 1884 (St. Paul, MN: Daily Globe, 1884), 289-290. Article 18, Concealed Weapons-License, §§ 1-9. Passed January 17, 1882.

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.

Concealed Weapons – License, § 1.

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be

so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Volney Erskine Howard, The Statutes of the State of Mississippi of a Public and General Nature, with the Constitutions of the United States and of this State: And an Appendix Containing Acts of Congress Affecting Land Titles, Naturalization, &c, and a Manual for Clerks, Sheriffs and Justices of the Peace Page 676, Image 688 (1840) available at The Making of Modern Law: Primary Sources. 1840 Crimes, Misdemeanors and Criminal Prosecution, § 55. If any person having or carrying any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper

county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

1854 Miss. Laws Ch. 1, p. 50
On each bowie knife, Arkansas toothpick, sword cane, duelling or pocket pistol, a tax of one dollar.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1873 Mo. Laws 328, *An Act to Incorporate The Town Of Moberly, art. III, § 1, pt. 15*: To restrain . . . any person who shall threaten quarrel, challenge or fight within said city, or any person who shall be found intoxicated, who shall carry concealed deadly weapons in said city, of any person who shall be found guilty of a misdemeanor, and to define what acts shall constitute a misdemeanor.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of

71

intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

Concealed Weapons, Ordinance No. 4 of The Charter and Ordinances of the City of Helena (1883).

"Sec. 1. No person shall in this city wear under his clothes, or concealed on or about his person, any pistol or revolver, except by special permission from the mayor; nor shall any person wear under his clothes, or concealed on or about his person, any slung shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person violating any provision or requirement of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof before the police magistrate shall be fined not less than five dollars nor more than one hundred dollars. Provided, however, that this section shall not be so construed as to prevent any United States, territorial, county or city officer, or any member of the city government, from carrying such weapons as may be necessary in the proper discharge of his duties."

1883, MT, Ordinance No. 4, Concealed Weapons

Alexander C. Botkin, The Charter and Ordinances of the City of Helena, Montana with the Rules of Order for the government of the City Council: 1887 (Helena, MT: Journal Publishing Company, 1887), 103-104. Ordinance No. 4: Concealed Weapons. Passed and approved June 14, 1883.

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one

74

month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.
If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

Guy Ashton Brown, The Compiled Statutes of the State of Nebraska, Comprising All Laws of a General Nature in Force July 1, 1881 Page 666, Image 674 (1881) available at The Making of Modern Law: Primary Sources.

Carrying Concealed Weapons, § 25. Whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie-knife, dirk, or any other dangerous weapon, on conviction of the first offense shall be fined not exceeding one hundred dollars, or imprisoned in the county jail not more than thirty days, and for the second offense not exceeding one hundred dollars or imprisoned in the county jail not more than three months, or both, a the discretion of the court; Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon or weapons as aforesaid, engaged in the pursuit of any lawful business, calling or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34,
Image 34 (1899) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1899

Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons
and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor
and Council of the City of Fairfield, Nebraska: § 1.

It shall be unlawful for any person to carry upon his person any concealed pistol,
revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or
deadly weapons of any kind, excepting only officers of the law in the discharge or
their duties; and any person so offending shall be deemed guilty of a misdemeanor,
and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2.
Any such weapon or weapons, duly adjudged by the Police Judge of said city to
have been worn or carried by any person in violation of the first section of this
ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so
adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of
1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The
Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36; § 133 .

§ 35. If any person shall by previous appointment or agreement, fight a duel with a
rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous
weapon, and in doing shall kill his antagonist, or any person or persons, or shall
inflict such wound as that the party or parties injured shall die thereof within one
year thereafter, every such offender shall be deemed guiltily of murder in the first
degree and upon conviction thereof shall be punished accordingly.

§ 36. Any person who shall engage in a duel with any deadly weapon although no
homicide ensue or shall challenge another to fight such duel, or shall send or
deliver any verbal or written message reporting or intending to be such challenge,
although no duel ensue, shall be punished by imprisonment in the State prison not
less than two nor more than ten years, and shall be incapable of voting or holding
any office of trust or profit under the laws of this State.

§ 133. If any persons shall be found having upon him or her any picklock, crow-
key, bit, or other instrument or tool, with intent feloniously to break and enter into
any dwelling house, store, shop, warehouse, or other building containing valuable
property, or shall be found in any of the aforesaid buildings, with intent to steal any
money, goods and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the State Prison not less than one year nor more than five years;

77

and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the County Jail not more than three months.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

City Ordinance No. 45, RENO EVENING GAZETTE, Sept. 6, 1905, at 6 (Reno, Nevada).
    "Section 7. It shall be unlawful for any person within the limits of the city of Reno, to wear, carry, or have concealed upon his person any dirk knife, pistol, sword in case, slung shot, brass knuckles, razor or other dangerous weapon without first obtaining permission from the City Council. The City Council may, upon application made in writing showing the reason of the person or the purpose for which any concealed weapon is to be carried, grant permission under the seal of the city and attested by its clerk to the person making such application authorizing such person to carry the concealed weapon described in such permission. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor and on conviction thereof shall be fined not less than twenty ($20.00) dollars, nor more than five hundred ($500.00) dollars, or imprisoned in the city jail for not less than thirty (30) days, nor more than six (6) months. This section shall not apply to peace officers in the discharge of their duties, nor to persons acting or engaged in the business of common carriers within this tsate, nor to persons traveling through the state."
Full Text: 1905, Reno Evening Gazette, September 6, City Ordinance no. 45
"City Ordinance No. 45." Reno Evening Gazette, September 6, 1905, p. 6. Volume 70, Number 46. City Ordinance no. 45—An Ordinance concerning Breaches of the Peace, Fighting, Routs, Riots, Affrays, Injury to Property, Malicious Mischief,

78

Disorderly Persons, Lewd or Lascivious Cohabitation or Behavior, Begging, Carrying Deadly Weapons, and Resisting an Officer within the City of Reno; to Restrain and Punish the Same and to Repeal All Ordinances or Sections Thereof in Conflict Therewith, and Other Matters Relating Thereto, § 7. Approved August 29, 1905. (Reno, NV).

## NEW HAMPSHIRE

New Hampshire - Acts and Laws June 1701:
That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is required for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry after run-away-servants, thieves, and other criminals. https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

New Hampshire Public Carry Prohibition (1708)*
And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches : And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings; and require bond with sureties for the peace, till the next court of general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.
*The original law is dated this way: "PASS'D 11 TH OF WM. 3" King William III ruled from 1689-1702, so the 11th year of his reign would be 1699. See:

https://heinonline-
org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssnh0244&id=68&
men_tab=srchresults

New Hampshire - Acts and Laws, 1743, 9-10:*
That if twelve persons or more, being armed with clubs, or other weapons; or that
if fifty persons or more, whether armed or not, shall be unlawfully, riotously,
tumultuously or routerously assembled, any of the officers aforesaid, shall make a
proclamation, in manner and form aforesaid; and if such persons so unlawfully
assembled, shall not thereupon immediately disperse themselves, according to said
proclamation, each of them, and every one who shall wilfully hinder any such
officer (who shall be known, or shall openly declare himself to be such) making
the said proclamation, shall forfeit and pay a fine not exceeding the sum of five
hundred pounds, at the discretion of the said superior court, (which only shall have
cognizance of the offense,) considering the aggravations attending the same, and
shall be whipt thirty stripes on the naked back at the publick whipping-post, and
suffer twelve months imprisonment, and once every three months, during said
twelve months, receive the same number of stripes aforesaid.
https://heinonline-
org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10
file:///C:/Users/Bob/Downloads/i-1.pdf
*This law was "made and passed in the Seventeenth Year of His present Majesty's
Reign," which would calculate in the reign of King George II (1727-1760) as the
year 1743.

1909 N.H. Laws 451-52
CHAPTER 114
AN ACT TO PROHIBIT CARRYING CONCEALED WEAPONS
SECTION 1. Whoever, except as provided by the laws of this state, carries on his
person a loaded pistol or revolver, or any stilleto, dagger, dirk-knife, slung-shot or
metallic knuckles, shall upon conviction be punished by a fine not exceeding one
hundred dollars or by imprisonment not exceeding one year or by both such fine
and imprisonment; and any such weapon or article so carried by him shall be
confiscated to the use of the state.
SECT. 2. The provisions of the preceding section shall not apply to officers of the
law, to members of military forces, to persons holding hunters' licenses, when
lawfully engaged in hunting, to employees of express companies while on duty, to
watchmen while on duty, or to persons securing a license as provided in the next
section.

SECT. 3. The selectmen of towns or the mayor or the chief of police of cities may, upon the application of any person issue a license to such person to carry a loaded pistol or revolver in this state, if it appears that the applicant is a suitable person to be so licensed.

[Approved April 6, 1909.]

1913 N.H. Laws 484

AN ACT IN AMENDMENT TO CHAPTER 111, SECTION 1, OF THE LAWS OF 1909, RELATING TO THE CARRYING OF DANGEROUS WEAPONS.

SECTION 1. Section 1, chapter 114 of the Laws of 1909 is hereby amended by striking out the word "loaded" in the second line so that said section as amended shall read: [SECTION 1.] Whoever, except as provided by the laws of this state, carries on his person a pistol or revolver, or any stiletto, dagger, dirk-knife, slungshot, or metallic knuckles, shall upon conviction be punished by a fine not exceeding one hundred dollars or by imprisonment not exceeding one year or by both such fine and imprisonment; and any such weapon or article so carried by him shall be confiscated to the use of the state.

SECT. 2. This act shall take effect upon its passage.

[Approved March 6, 1913.]

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement

81

officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person  property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more

than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

## NEW JERSEY

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686). Laws Passed in 1686.
Chap. IX.
An Act against wearing Swords, &c.
WHEREAS there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. *Be it therefore enacted* by the Governor, and Council, and Deputies now met in General Assembly, and by authority of the same, that no person or persons within this Province, presume to send any challenge in writing, by word of mouth, or message, to any person to fight, upon pain of being imprisoned during the space of six months, without bail or mainprize, and forfeit ten pounds ; and whosoever shall except of such challenge, and not discover the same to the Governor, or some publick officer of the peace, shall forfeit the sum of ten pounds ; the one moiety of the said forfeiture to be paid unto the Treasurer for the time being, for the public use of the Province, and the other moiety to such person or persons as shall discover the same, and make proof thereof in any court of record within this Province, to be recovered by the usual action of debt, in any of the said courts. *And be it further enacted* by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer : And if such person shall again offend against this law, he shall be in like manner committed (upon proof thereof before any justice of the peace) to the common gaol, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. *And be it further enacted* by the authority aforesaid, that no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably.
https://archive.org/details/grantsconcession00newj/page/288/mode/2up?q=swords

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.

84

Sentence Enhancement for Use of Weapon | New Jersey | 1799

[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New Jersey | 1871

An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

85

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.

And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895).
An Ordinance Concerning Firearms and Other Deadly Weapons
The Inhabitants of the City of Plainfield, by their Common Council, do enact as follows:

Section 1. That no person shall fire or discharge any gun, fowling piece or firearms within the limits of the City of Plainfield, under a penalty of a fine not exceeding twenty dollars for every such offence; PROVIDED, however, that this section shall not apply to the use of such weapons at any military exercise or review, or target practice duly authorized by the military authority of this State, or by the Common Council, or the Mayor, or in the lawful defence of the person, family or property of any citizen; and PROVIDED further that this section shall not apply to the discharge of blank cartridges or charges of powder on the fourth day of July.

Sec 2. That no person shall carry within the limits of the City of Plainfield concealed upon or about his person, any pistol, dirk, butcher or bowie knife, stiletto, dagger, sword, or spear in a cane, brass or metal knuckles, razor, slug

87

shot, or other deadly weapon, under a penalty of a fine not exceeding twenty dollars for each and every offence; PROVIDED that this section shall not apply to officers of the law or persons who are threatened with bodily harm."
An Ordinance Concerning Firearms and Other Deadly Weapons, PLAINFIELD, N.J., GEN. ORDINANCES §§ 1-2 (1902 Daily Press) (approved April 9, 1895). The Charter and General Ordinances of the City of Plainfield, New Jersey: In Force May 9th, 1902 (Plainfield, NJ: The Daily Press Print, 1902), 125-126. An Ordinance Concerning Firearms and Other Deadly Weapons, §§ 1-2. Approved April 9, 1895.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .


## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859/60 N.M. Laws 94, § 1-2.

§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

LeBaron Bradford Prince, The General Laws of New Mexico: Including All the Unrepealed General Laws from the Promulgation of the "Kearney Code" in 1846, to the End of the Legislative Session of 1880, with Supplement, Including the Session of 1882 Page 312-313, Image 312-313 (1882) available at The Making of Modern Law: Primary Sources. 1869.
Deadly Weapons, Act of 1869, Ch. 32, § 1. It shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory, except it be in the lawful defense of themselves, their families or their property, and the same being then and there threatened with danger, or by order of legal authority, or on their own landed property, or in execution of an order of court. § 2. Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, derringer, repeater, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives and all such weapons with which cuts can be given or by which wounds can be inflicted by thrusting, including sword canes and such sharp-pointed canes with which

deadly thrusts can be given, and all kinds of slung-shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted. § 3. The penalty for the violation of the preceding sections of this act shall not be less than ten dollars nor more than fifty dollars for each offense, or not less than ten days' imprisonment nor more than fifty days' imprisonment in the county jail, or both; such fine and imprisonment in the discretion of the jury trying the case.

Ch. 21—Deadly Weapon, §§ 1-3, ALBUQUERQUE, COMPILED ORDINANCES 81, 81-82 (1887 John Knox) (Albuquerque, New Mexico). "CHAPTER XXI.
DEADLY WEAPON.
  1. It shall be unlawful for any person to carry a deadly weapon, either concealed or unconcealed, within the limits of the town of Albuquerque, unless the same be carried in lawful defense of himself, his family or his property, the same being at the time threatened with danger, or unless by order of legal authority, or unless such person be a regularly authorized officer of the law in the discharge of his official duty.
  2. Deadly weapons, within the meaning of this preceding section, shall be construed to mean any and all kinds and classes of guns, pistols and revolvers, slung-shots, loaded or sword canes or sand-bags, and all kinds and classes of weapons and instruments, by whatever name they may be called, by which a dangerous wound can be inflicted.
  3. Any person convicted of a violation of Sections 1 or 2 shall be punished by a fine of not less than ten dollars nor more than fifty dollars, or by imprisonment in the county jail or town prison for a period not less than ten days nor more than sixty days, or by both such fine and imprisonment, in the discretion of the court." Full Text: 1887, NM, Compiled Ordinances, Town of Albuquerque, ch. 21— Deadly Weapon, §§ 1-3.
 William C. Heacock, ed., Compiled Ordinances: Town of Albuquerque (Albuquerque, NM:  John Knox, 1887), 81-2. Chapter 21—Deadly Weapon, §§ 1-3. (Not Dated).

## NEW YORK

1642 N.Y. Laws 33, Ordinance Of The Director And Council Of New Netherland Against Drawing A Knife And Inflicting A Wound Therewith
. . . No one shall presume to draw a knife much less to would any person, under the penalty of fl.50, to be paid immediately, or, in default, to work three months with

the Negroes in chains; this, without any respect of person. Let every one take heed against damage and be warned.

Laws And Ordinances Of New Netherland, 1638-1674 Page 35, Image 67 (A1868) available at The Making of Modern Law: Primary Sources. 1643.
Ordinance of the Director and Council of New Netherland Regulating the Burgher Guard, § 4 (1643). After the watch is duly performed, and daylight is come, and the reveille beaten, whosoever discharges any gun or musket, without orders of his Corporal, shall pay one guilder.

1645 N.Y. Laws 47, By The Director And council Of New Netherland Further Prohibiting The Sale Of Firearms, etc., To Indians
Whereas the Director General and Council of New Netherland having long ere this noticed the dangerous practice of selling Guns, Powder and Lead to the Indians, and moreover published at the time an Ordinance prohibiting the same on pain of Death, notwithstanding which some persons have yet undertaken to barter all sorts of ammunition among the Heathen, purchasing the same secretly here and then transporting it up the River and elsewhere, to the serious injury of this Country, the strengthening of the Indians and the destruction of the Christians, as We are now, also, informed with certainty, that our enemies are better provided with Powder than we, which they contrive to obtain through other Barbarians, our friends. . .There, we must expressely forbid, as we hereby do, all persons from this time forth from daring to trade any munitions of War with the Indians, or under any pretense whatsoever, to transport them from here without express permission, on pain of being punished by Death, and having the vessel confiscated in which the same shall be found laden or to have been put on board. Let everyone be warned hereby and save himself from difficulty.

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace

before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1866
An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.
Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1881
Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.
Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and

any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900

93

Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

## NORTH CAROLINA

Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)
Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country , shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation

Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## NORTH DAKOTA

1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128.

Sec. 453. Every person who manufactures or causes to be manufactured, or sells, or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor.

Sec. 454. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot or of any similar kind, is guilty of felony.

Sec. 455. Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His

Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon upon the showing of reasonable cause. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6. Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec.
§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars,

or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

Ordinance No. 8191, §§ 9 & 25, COLUMBUS, ANN. REP. OF THE VARIOUS DEP'TS OF THE CITY at 16, 16-31 (Law Passed 1894; Published 1896 by Westbote).
"AN ORDINANCE—No. 8191.
Making certain offenses therein named misdemeanors...
...Concealed Weapons.
   SEC. 9. Whoever shall wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger or any knife resembing a bowie knife or any other dangerous or deadly weapon within the corporate limits of the city of Columbus, shall, on conviction thereof, be fined not exceeding one hundred dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States marshals and their deputies, sheriffs and their deputies, and regular or special police officers of the city from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties; provided, however, if it shall be proved from the testimony on the trial of any such case that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of any lawful business, calling or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family the accused shall be acquitted...
...Firearms, Firecrackers, Etc.
   SEC. 25. Whoever shall throw, cast or let off any skyrocket, squib, cracker, firework or other thing charged with gunpowder; or discharge any common gun or pistol in this city, without a written permit from the mayor, shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than one nor more than twenty dollars, or be imprisoned not more than ten days, or both...
...Passed January 22, 1894."

## OKLAHOMA

1890 Okla. Laws 495, art. 47
Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any

other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.
§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by

imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## OREGON

1853 Or. Laws 220, Proceedings to Prevent Commission of Crimes, ch. 16, §17.
If any person shall go armed with dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of

certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law. Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an

imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Pennsylvania | 1897

An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## **RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided

in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Rhode Island | 1896

Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws

Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

108

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)

§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.

§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

Act of Feb. 20, 1901, ch. 435, §1, 1901 S.C. Acts 748

Sec. 1. Be it enacted by the General Assembly of the State of South Carolina: That from and after the first day of July 1902 it shall be unlawful for any one to carry about the person whether concealed or not any pistol less than 20 inches long and 3 pounds in weight. And it shall be unlawful for any person, firm or corporation to manufacture, sell or offer for sale, or transport for sale or use into this State, any pistol of less length and weight. Any violation of this Section shall be punished by a fine of not more than one hundred dollars, or imprisonment for not more than thirty days and in case of a violation by a firm or corporation it shall forfeit the sum of one hundred dollars to and for the use of the school fund of the County wherein the violation takes place to be recovered as other fines and forfeitures: Provided, this Act shall not apply to peace officers in the actual discharge of their duties, or to persons while on their own premises.

1923 S.C. Acts 221

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such

child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128.
Sec. 453. Every person who manufactures or causes to be manufactured, or sells, or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a misdemeanor.
Sec. 454. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot or of any similar kind, is guilty of felony.
Sec. 455. Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. 1877; 1903.
§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.
§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggressive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## TENNESSEE

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801

An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13.

Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources. 1821

An Act of 1821, § 1. Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any justice of the peace, in the name of the county for its use, in which the offence may have been committed; and it shall be the duty of a justice to issue a warrant on the application, on oath, of any person applying; and it shall be the duty of every judge, justice of the peace, sheriff, coroner, and constable within this state, to see that this act shall have its full effect: Provided, that nothing herein contained shall affect any person that may be on a journey to any place out of his county or state.

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

113

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.

Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.

It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources. 1869 Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856

Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552
&q1=bowie%20knife

1870 Tex. Gen. Laws 63, An Act Regulating The Right To Keep And Bear Arms,
Chap. 46, § 1

That if any person shall go into any church or religious assembly, any school room
or other place where persons are assembled for educational, literary or scientific
purposes, or into a ballroom, social party or other social gathering composed of
ladies and gentlemen, or to any election precinct on the day or days of any election,
where any portion of the people of this State are collected to vote at any election,
or to any other place where people may be assembled to muster or to perform any
other public duty, or any other public assembly, and shall have about his person a
bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter,
gun or pistol of any kind, such person so offending shall be deemed guilty of a
misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty
or more than five hundred dollars, at the discretion of the court or jury trying the
same. . .

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly
Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person
carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk,
dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other
kind of knife manufactured or sold for the purposes of offense or defense, unless
he had reasonable grounds for fearing an unlawful attack on his person, and that
such ground of attack shall be immediate and pressing; or unless having or
carrying the same on or about his person for the lawful defense of the State, as a
militiaman in actual service, or as a peace officer or policeman, shall be guilty of a
misdemeanor, and on conviction thereof shall, for the first offense, be punished by
fine of not less then than twenty-five nor more than one hundred dollars, and shall
forfeit to the county the weapon or weapons so found on or about his person; and
for every subsequent offense may, in addition to such fine and forfeiture, be
imprisoned in the county jail for a term not exceeding sixty days; and in every case
of fine under this section the fined imposed and collected shall go into the treasury
of the county in which they may have been imposed; provided, that this section
shall not be so contrued as to prohibit any person from keeping or bearing arms on
his or her own premises, or at his or her own place of business, nor to prohibit
sheriffs or other revenue officers, and other civil officers, from keeping or bearing
arms while engaged in the discharge of their official duties, nor to prohibit persons
traveling in the State from keeping or carrying arms with their baggage; provided

further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)
Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.
Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.
Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk,

119

dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

The Laws of Texas 1822-1897 Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the same by Texas; Constitution of the United States; Constitutions of the State of Texas, with All the Laws, General and Special, Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress Page 1061, Image 1063 (Vol. 9, 1898) available at The Making of Modern Law: Primary Sources.

Unlawfully Carrying Arms, § 1. Be it enacted by the Legislature of the State of Texas: That Article 318 of the Penal Code shall be and the same is hereby amended so as to hereafter read as follows: Article 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other knife manufactured or sold for purposes of offence or defense, he shall be punished by fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or both by such fine and imprisonment; and during the time of such imprisonment such offender may be put to work upon any public work in the county in which said offense is committed.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## UTAH

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

121

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14. Any person who shall carry any slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

## VERMONT

Laws of Vermont, Public Acts, No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892.
Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.
Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.
Approved November 19, 1892.
https://www.google.com/books/edition/Acts_and_Laws_Passed_by_the_Legislatur e/DXFOAQAAIAAJ?hl=en&gbpv=1&dq=Vermont+%22while+a+member+of+an d+in+attendance+upon+any+school,%22++%22any+firearms,+dirk+knife,+bowie +knife,+dagger+or+other+dangerous+or+deadly+weapon%22%C2%A0&pg=PA9 5&printsec=frontcover

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any

weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

1786 Va. Laws 35, ch. 49, An Act forbidding and punishing Affrays.
Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.
https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1786-VA-Ch.-49-An-Act-Forbidding-and-Punishing-Affrays.pdf

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | Virginia | 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.
§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.
Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probabily ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76
It is against the law to habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation.

1847 Va. Laws 127, c. 14, § 16.
If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

1847/48 Va. Laws 109
CHAPTER VII, OF OFFENSES AGAINST THE PUBLIC PEACE
8. Any free person who shall habitually carry about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, from the use of which the death of any person might probably ensue, shall for every offence be punished by fine not exceeding fifty dollars, and one moiety of

the recovery shall go to the person who shall voluntarily cause a prosecution for the same.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.

Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

1869/70 Va. Laws 510

§ 7. If a person habitually carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined fifty dollars, and imprisoned for not more than twelve months in the county jail. The informer shall have half of such fine.

Approved October 29, 1870

1874-75 Va. Acts Ch. 239, pp. 282-83.

Eighteenth. The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind: provided, that all fire-arms issued by the state to members of volunteer companies or for purposes of police, shall not be listed for taxation.[4]

1881/82 Va. Laws 233

§ 7. If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined not more than fifty dollars, nor less than fifteen dollars.

Approved March 6, 1882

---

[4] The same provision also appeared in 1875 Va. Acts Chap. 162, p. 164; 1881 Va. Acts Chap. 119, p. 499; 1883 Va. Acts Chap. 450, p. 563; 1889 Va. Acts Chap. 19, p. 19; 1889 Va. Acts Chap. 244, p. 200; 1893 Va. Acts Chap. 797, p. 931.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Virginia | 1887

Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

1895/96 Va. Laws 826

§ 3780. Carrying concealed weapons; how punished; forfeiture and sale of weapons.-If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot or any weapon of like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both in the discretion of the court or jury trying the case, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of like kind shall be forfeited to the commonwealth and may be seized by an officer as forfeited.

Approved March 4, 1896.


## **WASHINGTON**

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.

Brandishing | Washington | 1854

Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.

Brandishing | Washington | 1859

Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956, Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in

128

any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington.
Comprising the Ordinances of the City (Excepting Ordinances Establishing Street
Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896)
available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed
Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed
weapon, consisting of either a revolver, pistol or other fire-arms, or any knife
(other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal
knuckles, or any instrument by the use of which injury could be inflicted upon the
person or property of any other person, shall be deemed guilty of a misdemeanor,
and upon conviction thereof shall be fined not less than twenty dollars, nor more
than one hundred dollars and costs of prosecution, and be imprisoned until such
fine and costs are paid; provided, that this section shall not apply to police officers
and other persons whose duty is to execute process or warrants or make arrests, or
persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of
Washington: Showing All Statutes in Force, Including the Session Laws of 1897
Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of
Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of
either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary
pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any
instrument by the use of which injury could be inflicted upon the person or
property of any other person, shall be deemed guilty of a misdemeanor, and upon
conviction thereof shall be fined not less than twenty dollars nor more than one
hundred dollars, or imprisonment in the county jail not more than thirty days, or by
both fine and imprisonment, in the discretion of the court: Provided, That this
section shall not apply to police officers and other persons whose duty it is to
execute process or warrants or make arrests.

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

131

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

## WISCONSIN

1858 Wis. Rev. Stat. 985, Of Proceedings to Prevent the Commission of Crime, ch. 175, § 18.

If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons.

SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

https://firearmslaw.duke.edu/laws/charter-and-ordinances-of-the-city-of-la-crosse-with-the-rules-of-the-common-council-page-25-26-image-28-89-1888-available-at-the-making-of-modern-law-primary-sources

The common council has power. . . Pt. 36. To regulate or prohibit the carrying or wearing by any person, any pistol, slung-shot, knuckles, bowie knife, dirk or any other dangerous weapon, and to provide for the confiscation and sale of such weapons.

Charter and Ordinances of the City of Superior; Also Harbor Act, Municipal Court Act, Rules of the Common Council and Board of Education Page 390, Image 481 (1896) available at The Making of Modern Law: Primary Sources. 1896 Ordinances of the City of Superior, Carrying Concealed Weapons, § 18. It shall be unlawful for any person, other than a policeman or other officer authorized to maintain the peace or to serve process, to carry or wear any pistol, sling-shot, knuckles, bowie knife, dirk, dagger or any other dangerous weapon within the limits of the City of Superior, and any person convicted of a violation of this section shall be punished by a fine of not less than ten (10) dollars nor more than one hundred (100) dollars.

## **<u>WYOMING</u>**

1876 Wyo. Comp. Laws 352, An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons, ch. 52, § 1-3.
§ 1. That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village. § 2. That if any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of the last preceding section by a proper peace officer, continue to carry or bear upon his person any fire arm or other deadly weapon, he or she, shall be deemed to be guilty of a violation of the provisions of said section and shall be punished accordingly. § 3. Any person violating any of the provisions of this act shall be deemed guilty of misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.

1876 Wyo. Comp. Laws 273, An Act Defining Crime and Providing for the Punishment Thereof, ch. 35, tit. 9, § 127.
If any person or persons shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

An Act Defining Crimes, Regulating Criminal Procedure and for Other Purposes, ch. 73, § 97, in 1890 Wyo. Sess. Laws 127, 140.
"SEC. 97. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars."

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

Attorney General Josiah A. Van Orsdel, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1252-1253, Image 1252-1253 (1899) available at The Making of Modern Law: Primary Sources.
Crimes Against Public Peace, Drawing Dangerous Weapons, § 5050. Whoever draws or threatens to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon, already drawn, upon any other person, shall be fined in a sum not more than one hundred dollars, to which may be added imprisonment in the county jail not more than six months; Provided, That the provisions of this section shall not apply to a person drawing or threatening to use such dangerous or deadly weapon in defense of his person or property, or in defense of those entitled to his protection by law.

1925 Wyo. Sess. Laws 110, An Act Prohibiting Persons not Citizens of the United States, from Possessing, Wearing or Carrying any Dangerous or Deadly Weapon. . . , ch. 106, § 1.
Every person not being a citizen of the United States, who shall own, possess, wear or carry any dirk, pistol, shot gun, rifle, or other fire arm, bowie knife, dagger, or any other dangerous or deadly weapon, shall upon conviction thereof, be adjudged guilty of a misdemeanor and shall be fined in any sum not less than twenty-five dollars ($25.00) nor more than one hundred dollars ($100.00) or imprisoned in the county jail not more than six months, or by both such fine and imprisonment.

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.

§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.

§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/;
HeinOnline

Exhibit 26
Spitzer
9/10/24 llc

**EXHIBIT B**

# EXHIBIT B

## TYPES OF CARRY RESTRICTION LAWS (YEARS OF ENACTMENT)

| STATE | NO CONCEALED CARRY LAWS | NO OPEN/ANY CARRY LAWS | NO CARRY LONG GUNS |
|---|---|---|---|
| Alabama | 1839, 1841 | | |
| Alaska | 1896 | | |
| Arizona | 1889 | 1889, 1901 | 1901 |
| Arkansas | 1837, 1838,1874/75, 1881 | 1875, 1881 | |
| California | 1849, 1864 | 1878,1917 | 1878,1917 |
| Colorado | 1862 | | |
| Connecticut | 1890, 1923 | 1890 | 1890 |
| Delaware | 1881,1893 | | |
| District of Columbia | 1858, 1871,1892 | 1858,1871 | 1858 |
| Florida | 1835,1868,1885,1887 | 1868[1] | 1868 |
| Georgia | 1837 | 1837,1873 | 1873 |
| Hawaii | 1913 | 1852,1913 | 1852,1913 |
| Idaho | 1909 | 1888 | |
| Illinois | 1881,1882,1883,1885 | | |
| Indiana | 1820 | | |
| Iowa | 1882, 1887,1897, 1929 | | |
| Kansas | 1862,1866,1868, 1872,1879,1887 | 1867,1868,1872, 1879,1881,1899 | 1867,1868, 1881,1899 |
| Kentucky | 1813,1853 | 1801 | |
| Louisiana | 1813 | 1870 | 1870 |
| Maine | 1840 | 1840,1883 | |
| Maryland | 1872 | 1874,1886 | 1874,1886 |
| Massachusetts | 1836 | 1836,1891, 1903,1927 | 1891,1903, 1927 |
| Michigan | 1887 | 1927,1929 | 1929 |
| Minnesota | 1870,1882,1884 | 1851,1870 | |
| Mississippi | 1878 | 1878 | |
| Missouri | 1873 | 1923 | 1923 |
| Montana | 1864, 1883 | | |
| Nebraska | 1881 | 1872 | 1872 |
| Nevada | 1881, 1905 | | |
| New Hampshire | 1909,1923 | 1909,1913 | |

---

[1] Carry weapons while committing a crime.

| New Jersey | 1686,1905 | 1871,1873 | 1871,1873 |
| New Mexico | 1852, 1853,1859/60, 1864/65,1869,1887 | 1869,1887 | |
| New York | 1891 | 1885,1911, 1913 | |
| North Carolina | 1792 | 1792 | |
| North Dakota | 1864/65[2],1895 | 1864/65, 1895 | |
| Ohio | 1859,1880,1894 | | |
| Oklahoma | 1890 | 1890,1891 | 1890,1891 |
| Oregon | 1853,1885 | 1853,1898, 1917 | |
| Pennsylvania | 1851 | 1851 | 1851 |
| Rhode Island | 1893,1896,1908 | | |
| South Carolina | 1880 | 1901 | |
| South Dakota | 1864/65,1877 | 1864/65, 1877,1903 | |
| Tennessee | 1801,1821, 1837/38,1863 | 1821,1867, 1869,1879, 1881,1893 | 1869,1881, 1893 |
| Texas | 1870 | 1871,1879, 1879 | 1871,1879 |
| Utah | 1877, 1888 | 1877 | 1877 |
| Vermont | 1892,1895,1897 | 1895 | |
| Virginia | 1838,1847/48,1870, 1877,1884,1887,1908 | 1847 | |
| Washington | 1881,1883,1892,1896 1897 | | |
| West Virginia | 1870 | 1882,1891, 1925 | 1882,1891, 1925 |
| Wisconsin | 1858,1872,1883 | 1858,1896 | 1896 |
| Wyoming | 1876,1893 | 1876,1893 | 1893 |
| TOTAL STATES | 50 (plus D.C.) | 39 | 23 |
| TOTAL LAWS | 111 | 78 | 38 |

Source: https://firearmslaw.duke.edu/repository/search-the-repository/ Note that the unit of analysis is the law, not the state; the laws are organized by state for the sake of clarity.

---

[2] The 1864-65 law was enacted for the Dakotas territory, so listed here under both North and South Dakota. The concealed carry restriction applied to pistols and "any sharp or dangerous weapon." 1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128, Sec. 455. The 1864-65 Dakota territory law separately punished any carrying, whether open or concealed: "Every person who carries upon his person, whether concealed or not. . .any instrument or weapon of the kind usually known as slung shot or of any similar kind. . . ." 1864-1865 General Laws and Private Laws, and Memorials and Resolutions, of the Territory of Dakota, of the Fourth Session of the Legislative Assembly, 4(General Laws), 30-204; 128, Sec. 454.

1          (Interruption, pause, discussion off the record.)

2              MR. LYONS:  All right.  Can everyone hear me?

3              MR. ARGUIN:  Yes.

4              THE WITNESS:  Yes.

5              MR. LYONS:  Okay.  I'm sorry; I did not hear an

6      answer to my previous question.

7          A. Oh, I believe that you -- well, my answer was,

8      yes, I believe.

9          Q. When you saw a law in the Duke Repository that

10     you wanted to cite, did you rely upon what was in the

11     repository, or did you attempt to go locate the law,

12     itself?

13         A. I always want to go and find the law, itself.

14         Q. Okay.  Were there any occasions in which you

15     found that the law, itself, was different in some way

16     from what was in the Duke Repository?

17         A. The only differences -- the only differences I

18     would say is at times the, I guess HTML on the

19     repository will have ellipses, and they will be sort of

20     highlighting the most relevant sections of a law; and

21     so one of the benefits of finding the original one is

22     that you can see the other sections, and see, you know,

23     what that -- what it's a part of.  The differences are

24     kind of like that, where I haven't seen -- I haven't

25     seen instances of, you know, there being major errors



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1  in the transcription or anything like that, not that I

2  am familiar with.

3      Q. If I understand correctly, what you are saying

4  is that sometimes the Duke Repository does not contain

5  all of the language that is in the original statute?

6      A. Yes; that's correct.

7      Q. Okay.  In other words, somebody made a decision

8  as to what they thought was most relevant, and put that

9  in the Duke Repository, and left out some other

10 language?

11     A. Yes.

12     Q. Okay.  Did you ever find that the links to the

13 original statute were to something different than what

14 was in the Duke Repository?

15     A. No, I have never seen that.

16     Q. Okay.  Would you consider the Duke Repository a

17 primary or secondary source?

18     A. Well, I would consider the laws within the

19 repository to be primary sources, because they are laws

20 and at times excerpts from laws that were written at

21 the time.

22     Q. Are you aware of any cautions or caveats that

23 are on the Duke Repository with respect to use of the

24 information?

25     A. I'm not sure.  They recently redesigned the



BRENNAN N. RIVAS, PH.D.                    September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                    30

1    website, and I probably -- I only -- I go in and just

2    use it to use it.  I don't know that I, you know, read

3    things like that with tremendous care.  You know, I am

4    mostly just going in to try to get quick access to

5    something or refresh my memory about something, so ...

6        Q. Do you recall if you have ever seen this

7    statement on the repository, quote, "Conscientious

8    users of this repository should supplement their

9    results with further legal and historical research,"

10   end quote?

11       A. I don't know if I have read that or noticed it

12   before or not.

13       Q. Okay.  Is that something you would do anyway?

14       A. Well, yes, like I said, I think it's best to go

15   and hunt down your own copy, if you can.  I will also

16   say that depending on one's knowledge and familiarity

17   with online databases and their institutional access to

18   them, at times actually finding them can be difficult,

19   if not impossible.  So I can understand how some users,

20   you know, might have to rely on the repository more so

21   than I do, because I have access to a whole suite of

22   databases where finding the pdf is not all that

23   challenging for me.

24       Q. Is part of your work on this case, or any of

25   your research on weapons legislation use any other


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

BRENNAN N. RIVAS, PH.D.                                September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                                      31

```
 1    databases other than the Duke Repository?
 2        A. Yes, I use several other databases.
 3        Q. Did you similarly confirm the information you
 4    saw on those other databases by going and attempting to
 5    locate the original statute or law?
 6        A. Well, I guess when I am saying database, I mean
 7    databases that contain historical statutes, so I use a
 8    series of, you know, databases through the university
 9    libraries, where you can include a key word search, or
10    you can browse and pull up historical statutes.
11                        (Interruption.)
12            THE WITNESS:  I, for some reason, can't hear
13    you.
14                (Discussion off the record.)
15            MR. LYONS:  I am back.  Can you hear me now?
16            THE WITNESS:  Yes.
17            MR. LYONS:  I apologize for that.  Obviously, I
18    am going to have somebody more, technically more
19    proficient than I am take a look at this, and figure
20    out what the issue is.  I did not hear your answer to
21    the question about whether you own any firearms.  I
22    will re-ask the question.
23        Q. Do you own any firearms?
24        A. Yeah, there is a firearm in my house.  I did not
25    buy it myself, though.
```



BRENNAN N. RIVAS, PH.D.                    September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                    40

```
 1       Q. Okay.  Do you know if you're scheduled to be,
 2   have your deposition taken in any of those cases?
 3       A. At the moment, I am not aware of any other
 4   depositions scheduled or looming on the horizon for me.
 5       Q. Are you aware of whether or not you are going to
 6   be testifying in court in any of those cases?
 7       A. I would say the same answer, not that I am aware
 8   of.  I don't have any reason to believe I have any sort
 9   of oral testimony coming up.
10       Q. Okay.  Going back to the Duke Repository for a
11   moment, do you know whether anybody -- let me withdraw
12   the question.  Do you have any familiarity with how the
13   Duke Repository was compiled?
14       A. I don't have any direct knowledge of that, no.
15       Q. Okay.  Have you spoken to anybody who did that
16   work, who told you about it?
17       A. Not that I know of.
18       Q. Are you aware of whether or not anybody has
19   testified in court on behalf of the Duke Repository, as
20   to how it was prepared or compiled?
21       A. I don't know anything about that.
22       Q. Okay.  Are you aware of whether any Court has
23   recognized the Duke Repository as being authoritative
24   or reliable?
25       A. I don't know.
```



1    Q. Okay.  Would you agree with me that the Duke

2   Repository does not necessarily indicate when a statute

3   that it contains has been either amended or repealed or

4   struck down by a Court?

5    A. Yes, I agree; it does not contain that

6   information generally.

7    Q. I received copies of the invoices that I

8   understand you have submitted to the Rhode Island

9   Attorney General's Office, and they indicate that you

10  charge either $225 an hour or $250 an hour; is that

11  correct?

12   A. Yes; that sounds correct.

13   Q. Why do you charge $225 an hour for some things

14  and $250 an hour for other things?

15   A. Well, when I was first brought on as an expert,

16  it was for a client who had all these different

17  categories, and they wanted prices for them.  So I

18  started, I mean, I didn't know what I was doing, so I

19  just sort of filled out amounts.  But I do often

20  distinguish between, like, consultations or record

21  reviews and research versus writing.  So I usually bill

22  less for activities like reading complaints, or having

23  a meeting; and I often bill less for research than I do

24  for actually writing and editing.

25   Q. Let me see if I can pull those up.



800.211.DEPO (3376)
EsquireSolutions.com

1    scholarship on it that has been published, and for that

2    reason, I see it as salient to understanding the laws,

3    what they meant, what they were designed with the hope

4    to do; right?

5        Q. In this section, you cite to a book by Randolph

6    Roth called, American Homicide; is that right?

7        A. Yes.

8        Q. Was he your primary source of information for

9    the facts you set forth in this section?

10       A. Yes, this section is very much influenced by

11   Dr. Roth's research, and his book, American Homicide,

12   as well as the various tables and charts and things

13   that are a part of it.

14       Q. Okay. Did you confirm any of the facts that

15   Mr. Roth has in his book, or did you rely on the book,

16   itself?

17       A. Well, I did rely on the book, itself, but to

18   confirm those facts, myself, would take decades. He

19   spent decades on this book, that is not something that

20   was feasible, like, you know, confirming something

21   that's in the Duke Repository.

22       Q. If I understand correctly, part of what you say

23   in this section is that the ownership and use of

24   concealable handguns was widespread in the post-Civil

25   War period?



1     laws showing us lawmakers wrestling with the question

2     of intent, and how to assess intent when someone is

3     carrying a weapon, and implementing different

4     strategies for adjudicating a person's intent.  In the

5     case of New York, it looks to me like they are taking

6     an older common law, an older Anglo-American tradition

7     with, you know, laws about burglar's tools, it looks to

8     me like they are taking that kind of framework and then

9     applying it to concealed weapons, like pistols, which

10    is more of -- it's maybe a newer problem, but they are

11    adopting an older framework in order to accommodate

12    regulations on that new problem.

13        Q. Going down to paragraph 40 -- and this may be

14    one of the parts you referred to earlier that would

15    answer a question I was asking earlier -- you

16    identified Idaho, the territory of Idaho, the states of

17    West Virginia and Texas as having statutes that

18    restricted open-carry, as well as conceal-carry; is

19    that right?

20        A. Yes.

21        Q. Are you aware of any other states, other than

22    those three, or territories, that restricted open

23    carry?

24        A. I am aware that there are some municipal

25    ordinances that applied themselves to open-carry, and



BRENNAN N. RIVAS, PH.D.                              September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                              94

1    there -- level ones that --
2         MR. LYONS:  You froze up again.
3         Q. My understanding is that the territory of Idaho
4    and the states of West Virginia and Texas are the
5    states of which you were aware that, who had statutes
6    restricting open-carry, and what you are saying is you
7    are aware of municipal or other lower governmental-
8    level restrictions on open-carry?
9         A. Yes.  So if we are talking about states and
10   territories, those are three that I know, and the three
11   that I wrote about here.  There may be others that I
12   didn't include, but I can't think of them off the top
13   of my head.  I'm not sure.
14        Q. Okay.  Have you compiled, or do you know of
15   anyone who has compiled a list, municipal or other
16   lower governmental-level laws that restricted public
17   carry -- open-carry?  Open-carry.
18        A. Oh, generally speaking, it's a challenge to find
19   municipal laws.  They have not been digitized and put
20   into these sort of aggregate and searchable databases
21   the way that state laws have, and for that reason, they
22   are just harder to find.  So I am not aware of any
23   master list.  The Repository has some examples of
24   municipal laws, and I think we already -- I think we
25   already talked about Patrick Charles's appendix, which



1    includes a number of municipal-level license to carry

2    laws and others.  There is no -- there is no database

3    that even approaches being authoritative when it comes

4    to local ordinances.

5         MR. ARGUIN:  Mr. Lyons, we have been going for

6    another hour and a half, and I wonder if Dr. Rivas

7    would like a break.

8         MR. LYONS:  Yes, yes.  This is not a death

9    march, Doctor.  So we can take a break whatever you

10   would like, or whatever counsel would like, if that's

11   also what he is hinting.  Those of us of a certain age,

12   unlike the witness, sometimes may want to take a break

13   more frequently.  So why don't we go ahead and do that.

14   We will take a short break, another five- or ten-minute

15   break, and then we will proceed.

16        THE WITNESS:  That's great with me.

17        (A break was taken from 1:56 to 2:02 p.m.

18        Att. Meosky not present after break.)

19     Q. (By Mr. Lyons) Dr. Rivas, in paragraph 41 of

20   your declaration, you discuss changes in state statutes

21   respecting firearms regulation; and in that, you

22   discuss how some statutes were amended or some were

23   struck down by courts.  Would you agree with that?

24     A. Yes, that's the purpose of that paragraph, to

25   show that, yes, sometimes they were struck down and



1    A. I know that the Bruen decision was specifically

2    about laws in New York, which began with the 1911 --

3    beginning with the 1911 Sullivan law, that was their

4    first big licensing law statewide. I know that the

5    Bruen decision has things to say about assessing

6    licensing programs that require, "Showing of proof for

7    probable cause," quote/unquote, yeah.

8         THE WITNESS: I am going to be honest with you

9    and say I am also -- I think I am fading a little bit

10   for you; I am trying to give you the best answers I

11   can, but I do feel like I am wearing a little thin.

12        MR. LYONS: That's all right. Well, I think the

13   good news is I am getting close to the end. Okay?

14        THE WITNESS: Okay.

15   Q. But let me ask you this: As you sit here, do

16   you recall any state statutes that required a license

17   to engage in the open carry of firearms?

18   A. You know, if I read through the laws, maybe even

19   some of the citations within this section, they may

20   include some of that. So, okay -- so the licensing,

21   the carry licensing laws from the nineteenth century

22   were generally local. Statewide licensing was more of

23   a later thing. Although, like, I do think that some

24   states had state laws that authorized or empowered

25   local jurisdictions to create their own permit

BRENNAN N. RIVAS, PH.D.                          September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                              102

1    programs.  So most of these examples are going to be
2    local, just because that's the level of government that
3    was capable of carrying out these processes of, you
4    know, reviewing applications and things like that.  It
5    was something that the local police administration was
6    more in a position to do, so the laws, themselves, are
7    more likely to be local.  They are uneven in terms of
8    whether they specifically say openly carrying weapons
9    or concealed carrying of weapons.  I don't have a chart
10   or firm numbers on that right now, but I wouldn't be
11   surprised if some of them applied to open-carry.  I
12   also wouldn't be surprised if most of them were
13   confined to conceal-carry.  I'm just not sure.
14        MR. LYONS:  Okay.  So I think this is the
15   last -- well, we are getting to the last section of
16   your declaration, anyway.  So it will be the last
17   section that I have any questions on, then I will have
18   a couple of other topics after that.
19        Q. But beginning in paragraph 62, you talk about
20   what you call nineteenth century attitudes toward
21   weapon-carry, and I think that takes you through the
22   rest of your declaration up to the conclusions; is that
23   right?
24        A. Yes, that sounds right.
25        Q. Okay.  In the first paragraph, 62, you identify



1  three specific states that statutorily restricted

2  open-carry, as well as conceal-carry, I think that's

3  Massachusetts, Texas, and West Virginia.  Do you recall

4  that, or do you see that?

5      A. Yes, I see that sentence.

6      Q. Okay.  Are you aware of any states, besides

7  Massachusetts, Texas, and West Virginia, that

8  statutorily restricted open-carry?

9      A. Well, like the sentence indicates, I said, "The

10  'going armed' statutes rooted in the Massachusetts Code

11  of 1836," so that would include the Massachusetts one,

12  as well as that list of several other states that we

13  went over earlier, like, Michigan and Wisconsin and

14  Oregon.  So there are other states that had going-armed

15  statutes that were identical or very, very similar to

16  the Massachusetts one; then later on I talked about

17  Texas, West Virginia, as well as Idaho, which was

18  territorial at the time.

19      Q. Okay.  Just so we are clear, it's your

20  understanding that those states you previously

21  identified that had statutes like Massachusetts, also

22  restricted open-carry as well as conceal-carry?

23      A. If you read the going-armed statutes,

24  themselves, they don't restrict themselves to concealed

25  carrying; they say that you should not go armed.  So



1    you say, "The everyday carrying of weapons, especially

2    concealed in one's clothing, was widespread during the

3    nineteenth century, even as Americans opposed the

4    practice and considered it a significant societal

5    problem."

6        A. Yes, I see that.

7        Q. With respect to the part about Americans

8    opposing the practice and considering it a significant

9    societal problem, what is your basis for that

10    statement?

11        A. Well, let's see, this is an opening sentence of

12    the paragraph, so beneath it; but the research, as a

13    whole, itself, as a body, everything that goes into

14    this section, and everything that I have encountered in

15    my work on this, that's the conclusion that follows

16    from the evidence, from, you know, the laws and the

17    newspaper articles and thinking about, you know, the

18    size of weapons, and just all of the work points in the

19    direction of this conclusion, which is that carrying

20    weapons, especially concealed, was happening, people

21    were doing it, even though it was often illegal.  I

22    think of it kind of like speeding, a lot of us bemoan

23    speeding, but then do it ourselves.  The most dangerous

24    thing I do every day is get in a car.  Yes, I am very

25    opposed to speeding; but, yes, I speed, too.  To some

BRENNAN N. RIVAS, PH.D.                          September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                             106

1    extent, I believe there is a little bit of that going

2    on; but as far as specific proof, the body of work,

3    itself, supports that conclusion.

4        Q. Okay.  So in this section, you referred to some

5    decisions and some statutes; okay.  Are there any other

6    decisions or statutes, other than what you have set

7    forth in this section or in prior sections, which you

8    think supports your statement that Americans opposed

9    the practice of carrying, the everyday carrying of

10   weapons, and considered it a societal problem?

11       A. I have hundreds of newspaper articles, and I

12   have only cited a handful here.  So there is also a

13   combing through of materials and, you know, pulling out

14   the best examples or the clearest examples.  So there

15   is a lot of material, there is an abundance of social

16   history sources from the nineteenth century showing

17   that Americans were opposed to the carrying of weapons.

18   You see it all over the newspapers; you see it

19   discussed by legislative bodies.  So I would say there

20   is a whole host of evidence that is not cited here that

21   this is just a way of illustrating that, and using a

22   collection of sources to do so.

23       Q. Okay.  I was making a distinction, and perhaps I

24   wasn't clear enough when I did it.  For the moment, I

25   am setting aside the newspaper articles.



BRENNAN N. RIVAS, PH.D.                          September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                            110

1   things go into choosing them.  It would be great to

2   make a giant database some day, but I will need some

3   administrative help with that.

4       Q. Okay.  On page 49, lower down in that paragraph,

5   you have a sentence which reads, "A Georgia judge

6   described the protection of open-carry within the state

7   as a way, 'to compel persons who carry those weapons to

8   so wear them ... that others ... might see they are

9   armed, and dangerous persons, who were to be avoided in

10  consequence,'" end quote.  Do you see that?

11      A. Yes.

12      Q. You actually cite an 1861 Georgia statute for

13  that.

14      A. I cite the case.

15      Q. The case; I'm sorry, yes, yes.  Are you aware

16  that, generally speaking, or do you think that,

17  generally speaking, open-carry was protected by states

18  for that reason?

19      A. My thought process and my conclusions about

20  open-carry very much move in that direction, that the

21  protection to open-carry is for emergency situations,

22  and that people were not on a regular, habitual, daily

23  basis openly carrying their weapons, that wasn't seen

24  as a social problem.  The weapons that are posing a

25  problem to American communities are the ones that are



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1  so much easier, they are very easier to put in one's

2  pocket, and some of them are even designed or made with

3  that purpose in mind.  So, also, like I said before,

4  that especially in cities and town, it was just not so

5  common to see a person openly carrying a gun, and this

6  quote is a really excellent one for showing, giving

7  some kind of insight into what a normal person might

8  conclude when they saw someone openly carrying a pistol

9  or something in a town.  It's a great source for trying

10  to get at that.

11      Q. The way the paragraph 67, the first sentence

12  says, quote, "Not only did nineteenth century Americans

13  carry pistols and large knives in the manner familiar

14  to us (concealed), but they also carried them for

15  reasons familiar to twenty-first century Americans, in

16  preparation for an unforeseen, potential emergency."

17  Do you see that?

18      A. I do, yes.

19      Q. What is your basis for saying that?

20      A. Well, again, building on everything that had

21  gone on before, and then pivoting to talk about the

22  next section, this is a transitional statement.  It's a

23  sort of topic sentence for the paragraph.  So I have

24  already established that Americans who were carrying

25  pistols and knives, especially on a regular, everyday,



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

BRENNAN N. RIVAS, PH.D.                        September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                        112

1    habitual kind of manner, that they were doing so

2    concealed.  I am also introducing the assertion that

3    they were doing so as an act of preemptive

4    self-defense, so that's where the section pivots after

5    this.

6        Q. Okay.  Then at the end of paragraph 68, you say,

7    "In Arkansas and Tennessee, postbellum weapon laws

8    permitted the carrying of Army and Navy model

9    revolvers, as long as they were carried, 'openly in the

10   hand,' or 'uncovered and in his hand,' the way a person

11   experiencing an immediate emergency would carry one."

12   Do you see that?

13       A. Yes.

14       Q. For that, you cite to the two statutes?

15       A. Yes; that's correct.

16       Q. Is that -- is that the same kind of thing you

17   were just talking about in the previous sentence we

18   discussed?

19       A. Where -- so this is not like -- I'm sorry.  Go

20   ahead.

21       Q. No.  We talked about the sentence at the

22   beginning of paragraph 67.

23       A. Uh-huh, yes.

24       Q. What I am saying is, is the paragraph at the end

25   of page 68 that I just read a specific example of the



BRENNAN N. RIVAS, PH.D.                                September 12, 2024
MICHAEL O'NEIL vs PETER F. NERONHA                                113

1    same, many of the statutes that allowed the same sort

2    of carrying of -- no; I'm sorry.  This is for

3    open-carry; is that right?

4        A. Yeah.  So, yes.

5        Q. So I withdraw my question.  Okay.  The sentence

6    at the end of paragraph 68 refers to open-carry;

7    correct?

8        A. Yes, the purpose is to show -- let's look at the

9    beginning of the sentence.  The beginning of the

10   paragraph says that there was some exception.  This is

11   paragraph 68, the beginning of the paragraph says,

12   "There was some acceptance of the idea that a true

13   emergency situation might justify the carrying of a

14   deadly weapon temporarily."  It goes on to say, "What

15   counted as a sufficient emergency, though, could be

16   ambiguous."  So I end up talking a little bit about

17   that, and then an example of that, that in their law,

18   they crafted a way of allowing open-carry that was a

19   very narrow needle to thread, and that the only people

20   who were going to thread that needle were the ones who

21   were carrying their gun in preparation to shoot it in

22   self-defense, that it didn't protect any other kind of

23   open-carry strapped on to a belt, or anything like

24   that.  It was only in one's hand, and that they crafted

25   the law that way on purpose to minimize open-carry as

ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          21

```
 1        as well.
 2   Q.   Okay.
 3        A.   Aside from those, I think those are my only
 4        such experiences.
 5   Q.   Okay.  And where did you shoot the musket, the
 6        colonial era musket?
 7        A.   It was at a shooting range someplace on the
 8        Colonial Williamsburg property.
 9   Q.   Okay.
10        A.   It's a very large property.
11   Q.   Okay.  All right.  Have you ever been the victim
12        of a crime?
13        A.   No.
14   Q.   Have any family members ever been a victim of a
15        crime?
16        A.   Not that I know of, no.
17   Q.   How about any close friends?
18        A.   Not that I can think of offhand.
19   Q.   Okay.  Now, at some point in time I gather you
20        got into studying the regulation of firearms.
21        A.   Yes.
22   Q.   Okay.  When was that?
23        A.   2013.
24   Q.   Okay.  And why did you do that?
25        A.   Duke University Law School began a project
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        22

```
 1        where they started to compile digitized copies
 2        of old gun laws, and I had studied a little bit
 3        and read a little bit about old laws.  But the
 4        Duke archive was established and made available
 5        beginning a little over 10 years ago, and it
 6        simply sounded like an interesting database to
 7        me, and I had access to it, and I started
 8        reading old laws and was frankly dumbstruck by
 9        the number, variety, and nature of these old
10        laws, and I have studied these old gun laws
11        continuously for now the last 10 or 11 years,
12        and of course it's only been since the Bruen
13        decision in 2022 where there's been much greater
14        interest and heightened awareness about the
15        nature, types, consequences of old gun laws.
16   Q.   Would you say that there was not -- I mean, are
17        you saying that -- Well, let me withdraw the
18        question.  You recall the Supreme Court rendered
19        a pair of decisions back around 2010 and 2012
20        beginning with the Heller decision on the
21        Second Amendment.
22   A.   Yes.  The Heller was 2008 and the McDonald
23        case was 2010.
24   Q.   All right.  And would you say that those
25        decisions increased an interest in the history
```



ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                               23

```
 1        of gun or firearms regulation?
 2        A.   Yes.
 3   Q.   Okay.  Do you know, is that what prompted
 4        Duke University to begin compiling this
 5        repository?
 6        A.   That I --
 7                      MR. ARGUIN:  Objection.
 8                 THE WITNESS:  Okay.
 9                      MR. ARGUIN:  Sorry.
10                      Objection.  Calls for
11        speculation.
12                      But Professor, you can proceed
13        to answer.
14        A.   I don't know.
15   Q.   Okay.  Do you know who runs the Duke repository?
16        A.   They've had a change in personnel.  I'm not
17        sure who the person at the top is.  Offhand, I'm
18        not sure, no.
19   Q.   Okay.
20        A.   I know some of the names of people
21        affiliated.
22   Q.   Were you, yourself, ever personally involved in
23        helping compile the Duke repository?
24        A.   No.
25   Q.   Do you know anybody who was?
```

ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                              24

```
 1        A.  Yes.
 2   Q.   Okay.  Who do you know who was?
 3        A.  Well, there were several faculty members that
 4        had connections to it.  I can't speak to exactly
 5        to what degree or what nature.  But
 6        Jacob Charles, Darrell Miller, Joseph Blocher,
 7        more recently Andrew Willinger, Willinger, have
 8        all been involved in one way or another, and
 9        they're faculty members.
10   Q.   Okay.
11        A.  Well, some of them have left Duke.
12   Q.   All right.  Do you know if any of those faculty
13        members have ever given any testimony either in
14        deposition or in court about how the repository
15        was created?
16        A.  I do not know.
17   Q.   Okay.  Do you know if anybody connected with the
18        repository has given any testimony in court
19        about how the repository was created?
20        A.  I do not know.
21   Q.   Okay.  When were you first retained as an expert
22        witness in any kind of weapons litigation?
23        A.  The first time was for a case in 2017 in
24        Massachusetts, and that I believe was the first
25        time.
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          34

```
 1          and restrictions on any weapons carrying, I also
 2          gathered information about old brandishing and
 3          display laws and old licensing, weapons
 4          licensing laws.
 5   Q.     Okay.  You said licensing laws, and what was the
 6          category before that?
 7   A.     Brandishing and display.
 8   Q.     Okay.
 9   A.     Weapons brandishing and display.
10   Q.     Okay.  And what do you mean by "brandishing"?
11   A.     Well, brandishing is to display a weapon in
12          public in the presence of others in a
13          threatening or menacing way.
14   Q.     Okay.  Is it your understanding that any of the
15          plaintiffs in this case have done any
16          brandishing of weapons?
17   A.     That I do not know.
18   Q.     Okay.  To your knowledge, are the plaintiffs all
19          law-abiding citizens?
20   A.     I could not say.
21   Q.     Okay.  Do you have any contrary information?
22   A.     Not that I know of.
23   Q.     Okay.  So why did you research brandishing?
24   A.     Well, all of this, all of these cluster of
25          laws pertain to what happens when individuals
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        35

1          bring weapons into the public sphere.  And so

2          the question is, in the 1600s, 1700s, 1800s, did

3          public policymakers pay any attention to these

4          matters; if so, did they legislate on these

5          matters; and if so, what was the nature of that

6          legislation, that is, what was the public policy

7          regarding that.  And I would say the brandishing

8          and display laws as one category is indicative

9          of the idea that our ancestors were keenly

10         cognizant that there was, let's call it a public

11         policy problem, whenever individuals carried

12         guns in a public setting.

13                      And it's important to remember

14         that there's two parts, there's brandishing, but

15         there are also display laws, which do not

16         incorporate sort of menacing threatening

17         behavior, but are laws that punish the mere

18         display of a weapon in public, that is, the mere

19         presentation of a weapon in public.

20         So you have really those two types of laws

21         existing as kind of one category of here is the

22         public policy of what happens when you bring a

23         weapon into a public space when other people are

24         around.

25    Q.   Well, would you agree with me that, if a person



ROBERT J. SPITZER, PH.D.                September 10, 2024
O'NEIL V. NERONHA                                          36

```
 1          is engaged in concealed carry, that they're not

 2          brandishing a weapon?

 3          A.  Yes.

 4    Q.    Okay.  And would you agree with me that you can

 5          engage in open carry without brandishing a

 6          weapon?

 7          A.  Yes.  But it could run afoul of display laws.

 8    Q.    Okay.  So is it your understanding that display

 9          laws omit open carry of firearms?

10          A.  Well, I treat these two categories separately

11          because they're separately -- they're separate

12          typically in the law, that is, there are --

13          there were states and localities that had laws

14          saying essentially you could not carry weapons

15          openly, but the display category is treated

16          somewhat differently, and so I treat them

17          differently.

18                     And again, my main purpose here

19          is to present this information.  And obviously,

20          it's up to a judge or magistrate to decide the

21          degree of relevancy of these sorts of laws with

22          respect to making analogies between the old laws

23          and the current Rhode Island law.

24    Q.    Okay.  So setting aside the brandishing laws for

25          now and focusing just on the display laws.  Is
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                        37

```
 1        it your understanding that the display laws
 2        would bar open carry of firearms or could you
 3        engage in open carry without violating display
 4        laws?
 5        A.   Depends on the state, depends on the
 6        ordinance, depends on the circumstances, but
 7        certainly the -- you can readily imagine
 8        display -- persons carrying firearms without
 9        running afoul of display laws.  Remember, it's
10        one sort of subcategory of a larger universe.
11   Q.   Okay.  So depending on the specifics of the
12        statute, you could engage in open carry without
13        violating a display law.
14        A.   I think that is possible.  Sure.
15   Q.   And I know you have a -- What was produced as
16        Exhibit B to me yesterday -- Let me see if I can
17        pull that up.  Let me pull up what was labeled
18        as Exhibit B and provided to me yesterday, the
19        first page of which just say Exhibit B and then
20        there's two pages after that which consists of a
21        table that is labeled Types of Carry
22        Restrictions (Years of Enactment).  Do you see
23        that?
24        A.   Yes, I do.
25   Q.   Okay.  And is this the Exhibit B to which you
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        38

1          refer in your declaration?

2          A.  Yes, it is.

3    Q.    Okay.  With respect to the display laws that you

4          were describing generally, would they be listed

5          on this table under one of the categories?

6          A.  Not necessarily, no.  And I think it's

7          important to keep these categories distinct.

8    Q.    Okay.  All right.  Well, then, we'll get --

9          We'll come back to this and get into this

10         separately, then.

11                   Do you have -- Have you

12         compiled a list of display laws that you believe

13         would prohibit open carry?

14         A.   Well, display laws by their nature would

15         pertain to open carry.  I should add, though,

16         that with -- for all of the information I've

17         presented in my deposition -- in my declaration,

18         the category of brandishing and display, unlike

19         the other stuff that I presented, I did not

20         present and include all of the laws because that

21         was from other sources, so it's sort of a

22         summary coming from other sources, whereas for

23         the rest that I present, that's where the

24         respective exhibits come into play.  So I did

25         not include an exhibit of all of the laws

ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        39

1   |   pertaining to brandishing and display, although

2   |   there is overlap, because that was drawn from

3   |   other sources, and I was simply referencing

4   |   those other sources to present the information

5   |   in my document.

6   Q.  Okay.  In other words, it would be fair to say

7   |   that the brandishing and display laws you have

8   |   considered as part of your work are not included

9   |   in the table that is identified as Exhibit B.

10  A.  There may be some overlap.  I have not

11  |   compared them to see, to see if there is

12  |   overlap.  There may well be.

13  Q.  Okay.  Who prepared this table?

14  A.  I did.

15  Q.  Okay.  And how did you go about doing this?

16  A.  This is a sort of digest summary of what I

17  |   believe is Exhibit C, which is a lengthy exhibit

18  |   that lists the texts organized by state and

19  |   chronologically of all kinds of laws, including

20  |   laws pertaining to the carrying of weapons.

21  Q.  Okay.  Well, let me close this up for now.

22  |   Let me pull up Exhibit C, then.  Let me show you

23  |   what has been produced as Exhibit C, which is a

24  |   multi-page document entitled Dangerous Weapons

25  |   Laws.  All right.  Is this what you're referring



ROBERT J. SPITZER, PH.D.                              September 10, 2024
O'NEIL V. NERONHA                                                    40

```
 1        to as Exhibit C?
 2        A.  Yes.
 3   Q.   Okay.  And did you compile Exhibit C?
 4        A.  Yes, I did.
 5   Q.   Okay.  And you compiled Exhibit B based on the
 6        information that you put in Exhibit C.
 7        A.  Yes.
 8   Q.   Okay.  Exhibit B referred to the Duke
 9        repository.
10        A.  Yes.
11   Q.   Okay.  Is that where you got the information
12        that you used to prepare Exhibit C?
13        A.  It is where I obtained most of the
14        information from.  I think I included in a
15        footnote at the end that I also obtained
16        information sometimes from an online source
17        called HeinOnline.  Sometimes from a simple
18        Google search.  And if I did that, I generally
19        included a link, a direct link to those sorts of
20        sources.  But most of these laws come from the
21        Duke repository.
22   Q.   Okay.  Now, when you found something in the
23        Duke repository, did you rely upon that as
24        accurate?
25        A.  Yes.
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                              42

1          a single document so that anybody can look at it
2          and see what these old laws actually said.
3    Q.    Okay.  So you considered the Duke repository to
4          be a primary source.
5          A.  To be a digest of primary sources, plural.
6    Q.    Okay.
7          A.  Because each law is a discrete thing and it
8          compiles these many discrete things.
9    Q.    When you included these laws in Exhibit C, the
10         Dangerous Weapons Laws, did you check to see
11         whether the information included in the
12         Duke repository was accurate?
13         A.  Over the space of 10 years, I have had
14         occasion to sometimes look back to find an
15         original -- to find actual, you know, the actual
16         law in a PDF version, let's say.  I've never
17         found any problems with the Duke repository and
18         I think it is generally regarded as a highly
19         reliable, extremely scrupulous compendium of old
20         laws, and of course, each and every law, as you
21         can see, begins with a citation, and that
22         citation can then take you back to a PDF or the
23         actual printed law in an old book.
24   Q.    When you say that you've done this on occasion,
25         can you estimate how many times?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                     September 10, 2024
O'NEIL V. NERONHA                                          43

```
 1          A.   Oh, I -- Not offhand, no.  I certainly have
 2          not checked most of these because I found it to
 3          be utterly scrupulous, completely reliable, and
 4          excellent research work.
 5    Q.    Have you ever found that what was included in
 6          the Duke repository was inaccurate?
 7          A.   I have found the odd typographical error.
 8          There also are sometimes disputes about how
 9          exactly to cite or what exactly the citation of
10          a law is.  So, for example, I have referenced a
11          few laws where the only date is saying something
12          like this law was enacted in the thirteenth year
13          of the reign of his royal majesty King George,
14          II.  No other date appearing.  And so one may
15          then engage in a computation, well, what was,
16          what year was the, you know, the thirteenth year
17          of the reign of George, II, who was king in the
18          early 1800s -- 1700s.  But then that raises the
19          question of, do you count the first year or do
20          you -- There are sort of ambiguities in how
21          dating was done with some of these old laws.  In
22          addition, old laws are also being discovered in
23          old reference works, et cetera.
24                     So you do find glitches of that
25          nature that raise questions about the proper --
```



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      44

```
 1          about, you know, where the law comes from and
 2          when.  And sometimes there are different
 3          publications of old laws, so you might encounter
 4          a book online off Massachusetts laws from 1652
 5          to 1740, let's say, and then you're faced with
 6          the question of, well, the actual law you're
 7          looking at, what year was that law enacted, and
 8          also comparing when the laws was enacted versus
 9          when was the law implemented, because sometimes
10          there are discrepancies there, and do you cite
11          the year that it was passed by the relevant
12          legislature or do you cite the year or the date
13          when it says this law shall go into effect on
14          such and such a date.
15                    So you have all these kinds of
16          old questions that sometimes are cause for
17          confusion.  But in terms of existence of these
18          laws, I've always been able to find them.  I've
19          always found the Duke repository to be
20          scrupulously done and accurate to the extent
21          that human beings can be.
22  Q.      Do you know if any court of law has ever cited
23          to the Duke repository as authoritative?
24          A.  I do not know that question specifically.
25  Q.      So if I understand correctly, you had some body
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                              52

1           permit law, was about that question, and I can't

2           speak here and now as to the extent to which

3           they talked about concealed carry versus

4           open carry --

5   Q.   Okay.

6        A.   -- versus simple carry.

7   Q.   That's fair enough.

8        Do you have an understanding as to whether or

9        not the New York regulatory scheme restricted

10       open carry of firearms?

11                  MR. ARGUIN:   Again, objection.

12       Calls for a legal conclusion.

13                  But Professor Spitzer, to the

14       extent you can answer, please answer.

15       A.   Yeah.   I, I would need to go back and look at

16       the law, frankly, --

17  Q.   Okay.

18       A.   -- to provide a useful answer.

19  Q.   Is part of your opinion in this case whether or

20       not Rhode Island's regulatory scheme is

21       consistent with a historical tradition of open

22       carry regulations?

23       A.   Well, that is a question that I did not

24       specifically address in my declaration.

25  Q.   Have you been asked to render an opinion on

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                              53

1         that?

2         A.   Not specifically, no.

3    Q.   Okay.   Were you involved in the Bruen case as an

4         expert of some sort?

5         A.   No.   Let me see.   No.

6    Q.   All right.   Have you rendered an opinion -- and

7         I apologize if I asked you this already, but I

8         don't recall.   -- in any other litigation as to

9         whether or not a restriction on open carry was

10        either consistent or inconsistent with a

11        historical tradition of firearms regulation?

12        A.   That question might have come up in some

13        manner with one or more of the cases I've been

14        involved with, but I can't, I cannot say here

15        and now.

16   Q.   Okay.   Since the Bruen decision, have you been

17        involved in any cases in which you rendered an

18        opinion as to whether or not a restriction on

19        concealed carry was consistent with the

20        historical tradition of regulation?

21        A.   I'm sure it must have come up in some manner.

22        But here, again, I cannot say the extent to

23        which I've addressed that specific question in a

24        given case or cases.

25   Q.   Okay.   Well, then, let me do this.   Let me



```
 1          backtrack and say, can you describe for me,

 2          generally speaking, what these approximately

 3          50 other cases you've been involved in did

 4          concern?

 5          A.  Well, it concerned a variety of questions,

 6          a variety of weapons related laws, including

 7          restrictions on assault weapons, large-capacity

 8          magazines, a few of them have involved the

 9          existing laws saying that, if you're a felon,

10          you're not allowed to have firearms, I was

11          involved in a switchblade, challenge for

12          switchblade law in California.  There have been

13          a great many.  I'm sure there have been weapons

14          carrying laws that have been at play as well.  I

15          have not categorized --

16   Q.     Okay.  As you sit here today, you can't

17          specifically recall one that involved either

18          concealed carry or open carry.

19          A.  No.

20   Q.     Okay.  Now, have you heard the phrase "long

21          guns"?

22          A.  Yes.

23   Q.     Okay.  What's your understanding of what that

24          means?

25          A.  Well, the long gun is generally understood as
```



1      A.   Yes.

2  Q.   And then have you a category which says

3       No Open/Any Carry Laws.  What do you mean by

4       that?

5       A.   Well, those are laws that impose restrictions

6       on the any carrying of weapons.  So, for

7       example, there are laws that said, if you

8       carried a pistol, whether concealed or openly,

9       it would fall under that category.

10 Q.   Okay.  But that category would not include long

11      guns; is that -- or would it?

12      A.   It would not.

13 Q.   Okay.  All right.  I'm going to pull Exhibit B

14      back up in just a minute.  But let me ask you a

15      couple more questions just about the

16      Duke repository and the information that's in

17      Exhibit B.

18                     Of the information that's in

19      Exhibit B, do you recall whether you, yourself,

20      went and confirmed that the statute cited in the

21      Duke repository in fact said what the repository

22      said they said?

23      A.   Well, again, I've been using and culling that

24      information for over a decade.  And from the

25      beginning of that time up to the present, I



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                         58

```
 1        found it to be entirely scrupulous and reliable.
 2        There may be a scattering of laws in Exhibits B
 3        and C that I obtained from other sources other
 4        than the Duke repository or where I wound up
 5        coming up with a law by different means and then
 6        found out it was in the Duke repository later.
 7        But virtually all of those laws came from the
 8        Duke repository.  Did I trace -- I did not
 9        however trace back most of the laws that I
10        reference in those two exhibits to their
11        ancestral, you know, sort of original PDF from X
12        sources.
13   Q.   Okay.  Would you agree with me that some of the
14        statutes included in the Duke repository do not
15        include all of the language in the original
16        statute?
17        A.  That is true.
18   Q.   Okay.  Would you agree with me that the
19        Duke repository -- Well, let me withdraw the
20        question.  Does the Duke repository note when a
21        statute was repealed or amended?
22        A.  Generally speaking, I believe the answer is
23        no, because it's not the purpose of the
24        repository.
25   Q.   Okay.  Does the Duke repository note when a
```



ROBERT J. SPITZER, PH.D.                      September 10, 2024
O'NEIL V. NERONHA                                           59

```
 1          court decision was made with respect to a
 2          particular statute?
 3          A.   Not that I recall, no.
 4    Q.    Okay.  So, for example, if a court were to hold
 5          any particular statute in the repository had
 6          been overturned as unconstitutional, that is not
 7          noted in the repository.
 8          A.   I do not believe so, no.  But again, that's
 9          not the purpose of the repository.
10    Q.    Okay.  Well, then why don't you tell me what you
11          understand the purpose of it to be.
12          A.   Well, the purpose of it is to present the
13          public policy enactments of legislatures
14          contemporaneously, that is, in this year they
15          enacted such and such a law.  The question of
16          what happened to that law 10 years, 50 years, a
17          hundred years down the line is beyond the reach
18          of the repository and it's also beyond the reach
19          of a historical moment when the law was enacted.
20          Because the key question is, what did lawmakers
21          intend in 1820 when they passed the law about,
22          you know, penalizing concealed carry of weapons,
23          let's say, or whatever it might be.  That is
24          certainly an interesting question, but that kind
25          of historical genealogy is a separate question
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        60

1          from what was the public policy intention of
2          lawmakers at the time that they enacted these
3          given laws.
4    Q.   Are you aware of whether the Duke repository
5          places any caveat or cautionary warning on its
6          materials with respect to its use?
7          A.  Oh.  I can't recall offhand.  Seems to me
8          there is introductory material about -- you
9          know, that describes that says where they got
10         their information.  I mean, I think there's some
11         kind of prefatory information somewhere on the
12         website, but I can't quote it to you offhand.
13   Q.   Okay.  Do you recall if the repository includes
14         the statement, and I quote, Conscientious users
15         of this repository should supplement their
16         results with further legal historical research?
17         A.  I do not recall that.  But if you say that it
18         is there, then I believe you.
19   Q.   Okay.  If I were to ask you to identify which
20         statutes you have personally, you know,
21         identified in the Duke repository and then gone
22         and located the original statutory material,
23         could you do so?
24         A.  Have I done that, you're asking?
25   Q.   Yeah.  No.  My understanding is, you have said



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                           61

```
 1    that you have found some material in Duke

 2    repository and then subsequently checked the

 3    original source of --

 4                    MR. LYONS:  My speaker just

 5    died.  Can you hear me?

 6                    THE WITNESS:  Yes, I can.

 7                    MR. LYONS:  Okay.

 8    Unfortunately, I cannot hear you --

 9                    THE WITNESS:  Oh.

10                    MR. LYONS:  -- right now.  And

11    my computer is warning me that my speaker is not

12    working.  So I'm going to sign out and sign back

13    in.  Okay?  I'll be right back.

14                    (PAUSE)

15                    MR. ARGUIN:  We've been going

16    for an hour and a half, so perhaps there's a

17    time for a break coming up.

18                    MR. LYONS:  Okay.

19                    MR. ARGUIN:  I don't want to

20    interrupt, but just factor it in.

21                    MR. LYONS:  Yes.  No.  Why

22    don't we go ahead and take the break now, since

23    we essentially took a small break anyway.  And

24    we'll resume in, what, like five, 10 minutes?

25    Is that fine?  Or do you want something longer
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                          62

```
 1        than that?
 2                        MR. ARGUIN:  Professor, it's up
 3        to you.
 4                        THE WITNESS:  That is fine.
 5                        MR. ARGUIN:  Okay.  All right.
 6        Five, 10 minutes.
 7                        MR. LYONS:  Okay.  Five or
 8        10 minutes.  We'll be right back.
 9                        (Recess taken at 11:37 a.m.
10                        (Deposition resumed at
11                         11:44 a.m.)
12   Q.   Professor, if I was to ask you which of the
13        statutes that you have listed in either
14        Exhibit B or Exhibit C you have personally
15        verified, would you be able to do so?
16   A.   No.
17   Q.   Okay.  We also received a document identified as
18        Exhibit D, which is entitled Table of Weapons
19        Licensing Laws.  Can you see that on the screen?
20   A.   Yes, I can.
21   Q.   Is this a table that you created?
22   A.   Yes.
23                        MR. LYONS:  Okay.  Why don't we
24        mark this as Exhibit 26, then.
25   Q.   Why did you create this?
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                        74

```
1        A.  I did.  Although, I have, also, in this
2        instance, I might have looked back at some point
3        to find, you know, this sort of PDF copy.
4    Q.  Okay.
5        A.  But I did rely on the Duke repository, yes.
6    Q.  Okay.  Do you recall specifically whether you in
7        fact looked back at a PDF copy for this statute?
8        A.  I may have.  I look at a great many, great
9        many old laws.
10   Q.  Okay.  I don't want to be too pedantic about it,
11       but you can't confirm whether or not this was
12       one of the ones you specifically looked at.
13       A.  I cannot say absolutely, no.
14   Q.  Okay.  And which is the part of the act that you
15       believe states that -- Well, let me withdraw the
16       question.  Is it your understanding of this act
17       that it prohibits any kind of carry of weapons,
18       including firearms?
19       A.  Yes.  Under the circumstances that it lists.
20   Q.  Okay.  And what are those circumstances?
21       A.  Well, there are at least three parts, key
22       parts to this law.  The first -- that's
23       identified by the various be it therefore
24       enacted or further enacted.  So at the top
25       you've got the -- it's addressing persons
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                          79

```
 1          maybe for dueling.  And if you have a firearm,

 2          the sensible firearm would have been a musket, a

 3          fowling piece, that sort of thing.

 4   Q.     And so this part of the act does not prohibit

 5          the public carry of long guns.

 6          A.   That would be the implication.  I wouldn't

 7          say definitively, but that would be the

 8          implication.

 9   Q.     Do you know if the Bruen decision made any

10          reference to this act?

11          A.   Offhand, I don't.

12   Q.     If we go back to your disclosure, on Page 6, the

13          first full sentence says, quote, Massachusetts

14          followed in 1751.  Do you see that?

15          A.   It's not on the screen, but I remember

16          writing it.

17   Q.     Oh, I'm sorry.  My mistake.

18          All right.  Can you see it now?

19          A.   Yes, I can.

20   Q.     All right.  And I'm referring to the first full

21          sentence on Page 6 which says, Massachusetts

22          followed in 1751.  What do you mean by

23          "Massachusetts followed"?

24          A.   Well, it enacted a similar sort of law,

25          different in particulars, but -- and also in the
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                         81

```
 1   Q.   Okay.  Have you read this statute itself or did
 2        you rely upon the Duke repository in citing it?
 3        A.  Either or both.  I certainly have -- Either
 4        or both.  I can't say with certainty whether I
 5        did either or both.
 6   Q.   Okay.
 7        A.  I think it's in the Duke compendium.
 8   Q.   Would you agree with me that this act prohibits
 9        groups of people of 12 or more from being armed
10        with weapons and unlawfully assembling?
11        A.  Well, there's two parts here.  Right?  The
12        first part says, if any persons, just as you're
13        referencing it, if any persons to the number of
14        12 or more, being armed with clubs or other
15        weapons, or -- there's the second part -- if any
16        persons 50 or more, whether armed or not, shall
17        be unlawfully, riotously, or tumultuously, et
18        cetera, behavior.
19                  So the first part is the
20        critical part for my point of view, that is to
21        say it's the mere presence of 12 or more people
22        armed with other -- armed with clubs or other
23        weapons.  And that, that particular element is
24        what I was alluding to, although the rest of it
25        is relevant as well.
```



ROBERT J. SPITZER, PH.D.                              September 10, 2024
O'NEIL V. NERONHA                                                  82

```
 1  Q.    Okay.  Would you agree with me that this act --
 2        and we can scroll through it, if you would
 3        like.  -- does not prohibit an individual from
 4        either open or concealed carry of a firearm?
 5        A.  I would have to read through the whole thing
 6        to be certain, but it is certainly correct that
 7        it talks about two categories of persons, being
 8        multiple persons, not a single person.
 9  Q.    Okay.  Well, if you'd like more time to read it,
10        I can leave it up on the screen, if you'd like.
11        A.  Well, I -- You tell me how important it is.
12  Q.    Okay.  Well, my question was, whether or not you
13        would agree with me that this does not outlaw an
14        individual from either the concealed or open
15        carry of a firearm, any public carry of a
16        firearm, and you indicated you would want to
17        read it more before you responded.  So I'm just
18        offering you the opportunity to do that.
19        A.  Okay.  If you can scroll to the second page.
20  Q.    Sure.
21                    (PAUSE)
22        A.  It does call for individual punishments, but
23        I believe your assertion is -- your question is
24        correctly stated, that there is no provision, at
25        least through Section 2, that refers to single
```



ROBERT J. SPITZER, PH.D.                                    September 10, 2024
O'NEIL V. NERONHA                                                           83

```
 1        individuals.
 2   Q.   Okay.  Are you aware whether or not there's any
 3        other section to this act?
 4   A.   I don't know offhand.
 5   Q.   Okay.  In Paragraph 12 of your declaration --
 6        which should be back up on your screen.  Do you
 7        see that?
 8   A.   Yes, I do.
 9   Q.   Okay.  And you refer from the early 1800s up
10        until 1860, at least five states, including
11        D.C., enacted laws barring or restricting the
12        carrying of named weapons, whether concealed or
13        open.  Then you go on to say, Georgia enacted a
14        law in 1837 restricting both the carrying and
15        sale of named weapons.  Do you see that?
16   A.   Yes.
17   Q.   Okay.  And then you quote the statute in your
18        declaration.
19   A.   Yes.
20   Q.   Okay.  Do you recall if you took the quote from
21        the Duke repository or did you find the original
22        statutory material and quote from that?
23   A.   I believe it came from the Duke repository.
24   Q.   Okay.  And do you know whether this statute
25        prohibited the open carry of the weapons listed?
```



ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                              84

```
 1         A.   It included an open carry provision, yes.
 2    Q.   Okay.  So it was your understanding that this
 3         prohibited the open carry of weapons?
 4         A.   As it says, yes, whether concealed or open.
 5    Q.   Okay.  And let me show you -- Well, actually --
 6         I'm sorry.  I don't have a section to show you.
 7         But do you know whether or not there was another
 8         portion of this act which also said, provided --
 9         quote, provided, also, that no person or persons
10         shall be found guilty of violating the before
11         cited act who shall openly wear externally Bowie
12         knives dirks, toothpicks, spheres, and what
13         shall be exposed plainly to view?
14         A.   Well, you have me at a disadvantage because
15         I'm not seeing the full text of the law.
16    Q.   Yup.  Nope.  I understand that.
17         Do you know whether or not the Georgia
18         Supreme Court struck down this act?
19         A.   They did not strike down the entire law, no.
20    Q.   Okay.  And what was it that you understood that
21         they struck down?
22         A.   Well, the court was upset with -- Well, there
23         were a couple of problems in the case.  One was
24         that the man was charged with the crime.  Those
25         who arrested him never indicated whether the
```



ESQUIRE
DEPOSITION SOLUTIONS

ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        85

```
 1          weapon he was carrying was being carried openly
 2          or concealed.  Particular problem.  More
 3          generally, the court was unhappy with the
 4          incongruity of the wording pertaining to what
 5          weapons were covered under the concealed carry
 6          portion versus what weapons were covered under
 7          the open carry portion, and they found that
 8          inconsistent.  And they were particularly
 9          concerned about maintaining greater protections
10          on open -- on avoiding open carry restrictions
11          so as not to impede the ability of Georgia to
12          establish and maintain its militia for military
13          purposes.
14   Q.     Okay.  Is that decision the Nunn versus State
15          decision?
16          A.  Yes.
17   Q.     Okay.  Which was decided in 1946?
18          A.  Sounds right.
19   Q.     Okay.  And generally speaking, what the court
20          said in part was that the prohibition on open
21          carry violated the Georgia constitution?
22          A.  I think the phrase is something like that
23          part which is inconsistent with blah, blah.  I
24          mean, they worded it a very particular way.  But
25          yeah.  They were more dubious about restrictions
```



ROBERT J. SPITZER, PH.D.                    September 10, 2024
O'NEIL V. NERONHA                                        86

```
 1         on open carry as compared to concealed carry.
 2    Q.   Okay.  And going back to your declaration.  Can
 3         you see that on the screen?
 4    A.   Yes.
 5    Q.   Okay.  Going down to Paragraph 15.
 6    A.   Yup.
 7    Q.   There is a -- I'm sorry.  Paragraph 14.  You
 8         refer to an 1851 Pennsylvania law for the
 9         borough of York.  Do you see that?
10    A.   Yes.
11    Q.   And it said it defined as a felony the willing
12         and malicious carrying of any pistol, among
13         other weapons, guns.  Do you see that?
14    A.   Yes.
15    Q.   Okay.  What did they mean by -- or what's your
16         understanding of what they meant by willful and
17         malicious?
18    A.   I will say that it contemplates criminality.
19         But beyond that, I would be reluctant to delve
20         into exactly what those terms meant in
21         Pennsylvania law in 1851.
22    Q.   Okay.  In other words, it may not have
23         criminalized the carry of pistols or other
24         firearms for some purpose which was not willful
25         or malicious.
```



ROBERT J. SPITZER, PH.D.                           September 10, 2024
O'NEIL V. NERONHA                                              87

```
 1         A.   Yes.  And let me make clear that these types
 2         of laws, not always, but almost always made
 3         exceptions for travelers, if you're carrying a
 4         gun just traveling through an area, for law
 5         enforcement, for militias, people serving in
 6         militias, and often for cases of justifiable
 7         self-defense.  And so those kinds of exceptions
 8         were invariably included in these laws precisely
 9         to protect people who, you know, were just
10         traveling through to go somewhere and they were
11         bringing their gun along or similar things.
12   Q.    Okay.  But with respect to the Pennsylvania law,
13         my understanding is, you do not have an
14         understanding as to what was meant by the
15         willful and malicious carrying.
16         A.   At the least, I would want to go back and
17         look at the full law.  And even then, there
18         might not be a clear answer to that question.
19         It was within the discretion of law enforcement
20         and the judicial authorities to make a
21         determination about what constituted willful and
22         malicious activity.  Those are pretty broad
23         terms.
24   Q.    And then in Paragraph 15 you refer to a Hawaii
25         law.  Do you see that?
```



ROBERT J. SPITZER, PH.D.                                September 10, 2024
O'NEIL V. NERONHA                                                      88

```
 1        A.   Sorry.  Refer to a what?
 2   Q.   Hawaii law.
 3        A.  Oh, yeah.  Right, right.
 4   Q.   1852 Hawaii law.
 5        A.  Yup.
 6   Q.   Was Hawaii independent from the United States in
 7        1852?
 8        A.  Yes.
 9   Q.   Okay.  Why is that law then relevant to the
10        American historical tradition?
11        A.  Well, for two reasons.  One is, because
12        Hawaii is today a state.  And as is the case
13        with territories that eventually become states,
14        they don't obliterate all of their laws at the
15        point in which or the day after they join the
16        union.  They carry forward historically every
17        territory, every state did this, and that is,
18        they would carry forward their, you might call
19        it common law tradition, just as in the way
20        early Americans brought within the British
21        common law tradition.  And while laws are
22        changed, amended, et cetera, over time, a great
23        deal of law carries forward.  And this is a --
24        was small, but notable additional example of the
25        same thinking that existed in other territories
```



ROBERT J. SPITZER, PH.D.
O'NEIL V. NERONHA

September 10, 2024
89

```
 1        and states within what is -- what then and
 2        later -- you know, what was the United States.
 3   Q.   In Paragraph 16, beginning at the bottom of
 4        Page 8 and going on to Page 9, you refer to
 5        states which enacted anti-carry laws from either
 6        1860 to 1900 or even thereafter.
 7   A.   Yes.
 8   Q.   Okay.  My understanding from our earlier
 9        discussion is that you understood the
10        Supreme Court to be saying that the limits -- or
11        that the end period for consideration of the
12        historical tradition would be 1868 when the
13        Fourteenth Amendment was adopted.
14   A.   No.
15                    MR. ARGUIN:  Objection.  Calls
16        for a legal conclusion and I think misstates the
17        testimony.
18   Q.   Okay.
19                    MR. ARGUIN:  Dr. Spitzer, would
20        you like to answer?
21   A.   Well, I would just say no.
22   Q.   Okay.
23   A.   That's not what I said and it's not what the
24        court said.
25   Q.   Oh, okay.  So is it your understanding that the
```



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT J. SPITZER, PH.D.                          September 10, 2024
O'NEIL V. NERONHA                                              93

```
 1        A.  Yes.
 2   Q.   Okay.  Did you confirm that there was such a
 3        Virginia statute or did you rely upon the
 4        Duke repository?
 5        A.  I confirmed that there was such a statute.
 6   Q.   Okay.
 7        A.  I think in this instance the citation from
 8        the Virginia repository was incorrect.
 9        Although, I think they've corrected it.  That
10        is, my citation in the footnote might be from --
11        might be the incorrect one, which I think has
12        been subsequently corrected on the Duke site,
13        and I have the 1786 Virginia law.
14   Q.   Okay.  And can you provide me with a copy of
15        that?
16        A.  Yes, I can.
17   Q.   Okay.
18                    MR. ARGUIN:  Tom, just to
19        interject.  I believe it's been updated in the
20        disclosures that were provided the list of
21        authorities with the correct citation.
22                    MR. MEOSKY:  Yesterday.
23                    MR. ARGUIN:  In yesterday's --
24                    MR. LYONS:  Then let me take a
25        look.
```



800.211.DEPO (3376)
EsquireSolutions.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **MICHAEL P. O'NEIL, DANIEL** | : | |
| **PATTERSON, DONALD LABRIOLE** | : | |
| **JOSEPH PATTON, RICHARD COOK** | : | |
| **RICHARD LAPORTE and PETER** | : | |
| **TREMEENTOZZI** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **C.A. No. 23-cv-70** |
| | : | |
| **PETER F. NERONHA, in his official** | : | |
| **capacity as Attorney General of the State** | : | |
| **of Rhode Island, and THE STATE OF** | : | |
| **RHODE ISLAND** | : | |
| **Defendants** | : | |

## DECLARATION OF CLAYTON CRAMER

Pursuant to 28 U.S.C. §1746, Clayton Cramer states:

### I.     Background and Qualifications

1. My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons ownership and regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C.* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *Chicago*, 561 U.S. 742 (2010); *Jones* v. *Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones* v. *Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young* v. *Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by *Young* v. *Hawaii*, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State* v. *Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna* v. *Florimont*, 196 N.J. 469 (N.J.

2008); *Mosby* v. *Devine*, 851 A.2d 1031 (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2. In several cases, my work has been cited in defense of laws limiting firearms ownership: *State* v. *Roundtree* (Wisc. 2021), *State* v. *Christen* (Wisc. 2021), *King* v. *Sessions* (E.D.Penn. 2018). My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1] I reside in Caldwell, Idaho.

3. I have submitted expert declarations in *Association Of New Jersey Rifle & Pistol Clubs, Inc.* v. *Platkin* (D.N.J. 2023); *Arizona* v. *Bolin* (Ariz.Sup. 2023); *Arizona* v. *Coleman* (Ariz.Sup. 2023); *Baird* v. *Bonta* (E.D.Cal. 2023); *Boland* v. *Bonta* (C.D.Cal. 2023); *Brumbeck* v. *Ferguson* (E.D.Wash. 2024); *Gates* v. *Polis* (D.Colo. 2023); *City of Columbus* v. *Ohio* (O.Ct.Com.Pleas 2023); *California Rifle & Pistol Association, Inc.* v. *Los Angeles County Sheriff's Department* (C.D.Cal. 2024); *Delaware State Sportsmen's Association, Inc.* v. *Delaware Department Of Safety And Homeland Security* (D.Del. 2023); *Georgia* v. *Nichols* (Ga.Sup. 2023); *National Association For Gun Rights* v. *Lopez* (D.Haw. 2023); *Wolford* v. *Lopez* (D.Haw. 2023); *National Association For Gun Rights* v. *City of Highland Park* (E.D.Ill. 2023); *Herrera* v. *Raoul* (N.D. Ill. 2023); *May* v. *Bonta* (S.D.Cal. 2024); *New York* v. *Sullivan* (N.Y.Sup. 2023); *National Association For Gun Rights* v. *City Of Naperville* (E.D.Ill. 2023); *State of Ohio* v. *City of Columbus* (Ct.Com.Pleas 2023); *Oregon Firearms Federation* v. *Kotek* (D.Ore. 2023); *Palmer* v. *Dept. of Environmental Management* (R.I.Sup. 2023); *Rhode Island* v. *Ortiz* (R.I.Sup. 2023); *Rhode* v. *Bonta* (S.D.Cal. 2024); *Rocky Mountain Gun Owners* v. *Polis* (D.Colo. 2023); *Rupp* v. *Bonta* (C.D.Cal. 2022); *Siegel* v. *Platkin* (D.N.J. 2023); *U.S.* v.

---

[1] *McDonald* v. *Chicago*, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

*Ayala* (M.D.Fla. 2023); *U.S.* v. *Fowler* (E.D.Va. 2023); *U.S.* v. *Bailey* (E.D.Tenn. 2023); *U.S.A.* v. *Kazmende* (N.D.Ga. 2023).

4.  My published books include: *For The Defense Of Themselves And The State: The Original Intent and Judicial Interpretation of the Right To Keep And Bear Arms* (1994); *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999); *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (2007); *Lock, Stock, and Barrel: The Origins of American Gun Culture* (2018).

## II.     Inexpert Work

5.  Dr. Spitzer claims expertise in the history of arms regulation.  Examination of his sources shows a lack of expertise in history and even basic scholarship.  In the following sections, I will demonstrate that:

6.  He has relied on secondary sources instead of looking at the primary sources for these laws.

7.  He has made statements of fact based on quoting out of context sections of laws rather than reading the law in full.

8.  He has cited laws that do not exist at the specified locations.  Those citations are often identical to those in the Duke University Center for Firearms Law, *Repository of Historical Gun Laws*. He cites laws in several places as if he had consulted those non-existent primary sources.  (He clearly understands that secondary sources need to be identified as such by identifying some citations in his declaration as, "Quoted in *Young v. Hawaii*, 992 F.3d 765, 794 (9th Cir. 2021)[2]

9.  He has quoted laws without awareness of the larger historical context in which they were passed and thus misses the historical significance of these laws.

---

[2] Notes 27, 33, 34, 35.

### III.    Secondary Sources

10. In ¶9 of Dr. Spitzer's declaration he claims with respect to laws restricting open carry: "In the late 1700s, Virginia and North Carolina passed similar laws."  His citation is to "A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)."  If Dr. Spitzer read the cited document, he would have seen that North Carolina passed no such law.  The citation's title alone should cause one to ask why a session law has such an odd title.  As the title makes clear, this was not a statute passed by the North Carolina Legislature.  The North Carolina Legislature tasked Martin to sift through all existing British statutes that might have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."

498



3

11. So how did Dr. Spitzer miss this?  His citation is identical to that in the Duke collection.[4]  (He

repeats this claim in ¶26.  It does not become more accurate by repetition.)

12. Dr. Spitzer's declaration references a 1795 Massachusetts law that directs justices of the peace

to have arrested "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall

ride or go armed offensively." [5]  The problem is that Dr. Spitzer's source is "1795 Mass. Acts

---

[3] Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, iii (1792).

[4] Duke University Center For Firearms Law, *Repository of Historical Gun Laws*, https://firearmslaw.duke.edu/laws/francois-xavier-martin-a-collection-of-statutes-of-the-parliament-of-england-in-force-in-the-state-of-north-carolina-60-61-newbern-1792, last accessed November 25, 2024.

[5] 2 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS FROM NOVEMBER, 28, 1780 TO FEBRUARY 28, 1807, WITH THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND OF THE COMMONWEALTH, PREFIXED 652-653 (Boston: printed by J. T. Buckingham for Thomas & Andrews, 1807), https://books.google.com/books?id=Dh8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%20FROM%20NOVEMBER%2C%2028%2C%201780%20TO%20FEBRUARY%2028%2C%201807%2C%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATES%20OF%2

436, ch. 2. Quoted in *Young v. Hawaii*, 799." Relying on a secondary source is only appropriate when the primary source is not readily available. The actual session law image is readily accessible on Google Books:



13. Dr. Spitzer and Rhode Island rely on this image from HeinOnline:

0AMERICA%2C%20AND%20OF%20THE%20COMMONWEALTH%2C%20PREFIXED&p
g=PA652#v=onepage&q=LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASS
ACHUSETTS%20FROM%20NOVEMBER,%2028,%201780%20TO%20FEBRUARY%20STATE
%201807,%20WITH%20THE%20CONSTITUTION%20OF%20THE%20UNITED%20STATE
S%20OF%20AMERICA,%20AND%20OF%20THE%20COMMONWEALTH,%20PREFIXED
&f=false, last accessed November 25, 2024.

In the Year of our LORD, 1795.

436    Criminal Offenders.

on said fence, till it comes to the land improved by *George Sumner* ; then through said land nearly the same course, till it comes to the south-west corner of said *George Sumner's* home meadow, so called ; then turning and running easterly in said meadow, as the ditch which forms the fence is made, till it comes to the south end of *Benjamin Hawes's* meadow ; then in the line between said *Hawes's* meadow, and the land of *William Richards* ; then in the line between said *Richards's* home lot, and the meadow lots, till it comes to *Cumming's* brook, so called ; thence on said brook, till it comes to the line between *Stoughton* and *Sharon* ; thence on said line till it comes to *Nepaulet* river ; thence westerly on said river, till it comes to *Traphole brook* ; thence on said brook, till it comes to the bounds first mentioned—shall be considered as *one Common and General Field* ; and that the proprietors of said lands, their heirs and successors be, and they hereby are incorporated and invested with all the powers and privileges which the proprietors of Common and General Fields by Law are invested with.

[This Act passed *January* 22, 1795.]

C H A P.  II.

An Act for repealing an Act, made and passed in the year of our Lord, one Thousand six Hundred and Ninety-two, entitled, " An Act for punishing Criminal Offenders," and for re-enacting certain Provisions therein.

*Act repealed.*   BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That the said Act be, and hereby is repealed, and made wholly null and void.

*Justices of the peace impowered.*   And be it further enacted by the authority aforesaid, That every justice of the peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behaviour ; and in want thereof, to commit him to prison until he shall comply with such requisition : And may further punish the breach of the Peace in any person that shall assault or strike another, by fine to the Commonwealth, not exceeding *twenty shillings*, and require sureties, as aforesaid, or bind the offender, to appear and answer for his offence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require.

[This Act passed *January* 29, 1795.]

C H A P.

14. From where did this image come?  I asked HeinOnline Technical Support.  Their first answer

was: *Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780*

*to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in*

*May, A.D. 1805* (Boston: Printed for the State, by Manning & Loring, 1805)[6] and *Laws of the*

---

[6] Volume 1, https://books.google.com/books?id=0Frq9-4riT8C&newbks=1&newbks_redir=0&dq=%22Private%20and%20Special%20Statutes%20of%20the%20Commonwealth%20of%20Massachusetts%22&pg=PR1#v=onepage&q=%22Private%20and%20Special%20Statutes%20of%20the%20Commonwealth%20of%20Massachusetts%22&f=false, last accessed November 25, 2024; Volume 2,

*Commonwealth of Massachusetts from November, 28, 1780 to February 28, 1807, with the*

*Constitution of the United States of America, and of the Commonwealth, Prefixed* (Boston:

printed by J. T. Buckingham for Thomas & Andrews, 1807).[7]

15. These are both three volumes sets.  Images of both are readily available.  The problem is that

neither three volume set contains this page cited as 1795 Mass. Laws 436, ch. 2.

---

https://books.google.com/books?id=GLQvAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22
Private%20and%20Special%20Statutes%20of%20the%20Commonwealth%20of%20Massachus
etts%22&pg=PP1#v=onepage&q=%22Private%20and%20Special%20Statutes%20of%20the%2
0Commonwealth%20of%20Massachusetts%22&f=false, last accessed November 25, 2024;
Volume 3, https://books.google.com/books?id=XTY7XtgV-
8MC&newbks=1&newbks_redir=0&dq=%22Private%20and%20Special%20Statutes%20of%20
the%20Commonwealth%20of%20Massachusetts%22&pg=PA1#v=onepage&q=%22Private%20
and%20Special%20Statutes%20of%20the%20Commonwealth%20of%20Massachusetts%22&f=
false, last accessed November 25, 2024..
[7] Adam J. Tramp email to Clayton Cramer Oct. 21, 2024, Volume 1, Email on file with author,
https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22L
aws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November%2C%2
028%2C%201780%20to%20February%2028%2C%201807%22&pg=PP5#v=onepage&q=%22
Laws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November,%202
8,%201780%20to%20February%2028,%201807%22&f=false, last accessed November 25,
2024; Volume 2,
https://books.google.com/books?id=bVZHAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22
Laws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November%2C
%2028%2C%201780%20to%20February%2028%2C%201807%22&pg=PA521#v=onepage&q=
%22Laws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November,
%2028,%201780%20to%20February%2028,%201807%22&f=false, last accessed November 25,
2024;
https://books.google.com/books?id=sFdHAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22L
aws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November%2C%2
028%2C%201780%20to%20February%2028%2C%201807%22&pg=PP11#v=onepage&q=%22
Laws%20of%20the%20Commonwealth%20of%20Massachusetts%20from%20November,%202
8,%201780%20to%20February%2028,%201807%22&f=false, last accessed November 25,
2024.



16. As the title suggests, *Private and Special Statutes of the Commonwealth of Massachusetts* does

not contain criminal laws.  There are no chapter numbers.  Volume 1 ends before 1795.

17. Volumes 1 and 2 of *Laws of the Commonwealth of Massachusetts* have no chapter numbers.

Examples, 1: 47 and 2:523:

## ACTS AND LAWS

### OF

## MASSACHUSETTS.

AN ACT for erecting a Town within the County of *Hampshire*, by the Name of *Montgomery*.
[This Act passed *November* 28, 1780.]

An ACT making Provision for the Accommodation of Soldiers and Seamen belonging to other States or Commonwealths, who may be taken sick and be in Want within this Commonwealth.
[This Act passed *December* 1, 1780.]

An ACT for repealing certain Parts of an Act postponing the Payment of Government Securities to a distant Period ; for the Payment of the Interest now due on said Securities ; and for altering the several acts of Government which now relate to the Currency of the State, and conforming the same to the Principles of Equality and Justice.
[This Act passed *January* 25, 1781.]

An ACT to prevent one seventh Part of the Bills of Credit of the New Emission coming into Circulation, and for directing the Treasurer to issue Gold and Silver out of the Treasury therefor.
[This Act passed *January* 25, 1781.]

Aa

## ACTS AND LAWS

### OF

## MASSACHUSETTS.

AN ACT to incorporate the Plantation of *Wales*, in the County of *Lincoln*, into a Town by the Name of *Monmouth*.
[This Act passed *January* 30, 1792.]

An ACT to regulate the taking of Fish called Alewives, in the Town of *Middleborough*, in the County of *Plymouth*, and for repealing a certain Law made for that Purpose in the Year of our LORD One thousand seven hundred and forty-nine. Feb. 8, 1798. June 19, 1801.
[This Act passed *January* 30, 1792.]

An ACT to incorporate the westerly Part of the Town of *Vassalborough*, in the County of *Lincoln*, with the Inhabitants thereof, into a Town by the Name of *Sidney*.
[This Act passed *January* 30, 1792.]

An ACT for incorporating certain Persons for the Purpose of building a Bridge over *Merrimack-River*, at *Patucket Fa'ls*, between the Towns of *Chelmsford* and *Dracut*, in the County of *Middlesex*, and for supporting the same. Feb. 25, 1796.
[This Act passed *February* 1, 1792.]

Vol. II.     A     Aa

Digitized by Google

Digitized by Google

18. Volume 1 ends in 1791, before 1795.  Vol. 2 begins in early 1792, Vol. 3 begins in 1801, after 1795.  There are no chapter numbers printed in volume 3, but someone has handwritten what might be chapter numbers in the margin:

504

ACTS AND LAWS

OF

MASSACHUSETTS.

*1800*

**37** AN Act to incorporate the Plantation heretofore called *Number-Three*, or *Reedstown*, on the west Side of *Kennebeck* River, in the County of *Kennebeck*, into a Town by the Name of *Strong*.

[This Act passed *January* 31, 1801.]

**38** An Act to alter the Times and Places for holding the Courts of General Sessions of the Peace, and Courts of Common Pleas, in the County of *Cumberland*. *Repealed June 15, 1805.*

[This Act passed *February* 6, 1801.]

**39** An Act in addition to an Act passed the nineteenth Day of *February*, *Anno Domini* One thousand seven hundred and ninety-nine, entitled, " An Act concerning the Proprietors of *Lebanon*."

[This Act passed *February* 10, 1801.]

**40** An Act to incorporate certain Persons for building a Bridge over *Belfast* River, in the County of *Hancock*.

[This Act passed *February* 10, 1801.]

VOL. III.          A

Digitized by Google

19. As discussed above, the quoted law does appear in 2 *Laws of the Commonwealth of Massachusetts* 652-3 without a chapter number and at a different page number.

20. There are several (many?) different official collections of Massachusetts session laws: 8 ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 319-20, ch. 2 (Boston: 1896) lists a 1795 session law, ch. 2 at pp. 319-20: "An ACT to change the name of William Shelden, of

11

504

Hadley, in the County of Hampshire, to the name of Giles Crouch Kellogg."[8]   The statutes on

p. 436 are similarly irrelevant to arms regulation.[9]

21. The statute Spitzer likely wants is at p. 654 of 1 GENERAL LAWS OF MASSACHUSETTS, where it

is listed as ch. 26.  It was passed during the 1794 session which extended into 1795.  It is 1794

Mass. Acts 454, ch. 26:

---

[8] 8 ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 319-20, ch. 2 (Boston: 1896), https://books.google.com/books?id=olNNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22An%20ACT%20to%20change%20the%20name%20of%20William%20Shelden%22&pg=PA319#v=onepage&q=%22An%20ACT%20to%20change%20the%20name%20of%20William%20Shelden%22&f=false, last accessed November 25, 2024.

[9] 8 ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 319-20, ch. 2 (1896), https://books.google.com/books?id=olNNAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22An%20ACT%20to%20change%20the%20name%20of%20William%20Shelden%22&pg=PA435#v=onepage&q=%22An%20ACT%20to%20change%20the%20name%20of%20William%20Shelden%22&f=false, last accessed November 25, 2024.

454                    1794. —— CHAP. 21—31.

Chap. 21.    An ACT to incorporate certain persons by the name of The Northwest Congrega-
             tional Society in North-Yarmouth. [*June 26, 1794.*] Add. act—1795 ch. 15.

Chap. 22.    An ACT to suspend the operation of an Act, entitled "An Act ascertaining the
1793 ch. 65. Quality of Stone-Lime, and the size of Lime Casks, and for repealing all Laws
             heretofore made relative thereto." [*June 27, 1794.*]  Original act repealed—
             1809 ch. 62.

Chap. 23.    An ACT to repeal all Laws of this Commonwealth imposing Duties and Excise on
             Carriages, and inflicting Penalties for selling Wines and foreign distilled Spirits,
             so far as the same respect said matters. [*June 27, 1794.*] Add. act—1796
             ch. 21.

Chap. 24.    An ACT for dividing the Commonwealth into Districts for the Choice of Represen-
             tatives in the Congress of the United States, and prescribing the Mode of Elec-
             tion. [*June 27, 1794.*]  Add. act—1796 ch. 15.  See 1801 ch. 47.  All expired.

Chap. 25.    An ACT for incorporating certain Land in Dedham and Sharon, in the County of
             Norfolk, into a Common Field. [*Jan. 22, 1795.*]

Chap. 26.    An ACT for repealing an Act, made and passed in the year of our Lord one thou-
4 W.& M.ch.6. sand six hundred and ninety-two, entitled, "An Act for punishing Criminal Of-
             fenders," and for re-enacting certain Provisions therein.

SECT. 1.  BE it enacted by the Senate and House of Representa-
Act repealed.    tives, in General Court assembled, and by the authority of the same,
             That the said Act be and hereby is repealed, and made whol-
             ly null and void.

                 SECT. 2.  And be it further enacted by the authority aforesaid,
Justices of the  That every Justice of the Peace, within the county for which
Peace empow-    he may be commissioned, may cause to be staid and arrested,
ered to stay af-
frayers, rioters, all affrayers, rioters, disturbers or breakers of the peace, and
&c. and bind    such as shall ride or go armed offensively, to the fear or terror
them to keep    of the good citizens of this Commonwealth, or such others as
the peace.      may utter any menaces or threatening speeches, and upon
             view of such justice, confession of the delinquent, or other le-
             gal conviction of any such offence, shall require of the offender
             to find sureties for his keeping the peace, and being of the
             good behaviour; and in want thereof, to commit him to prison
And to punish   until he shall comply with such requisition : And may further
breaches of the punish the breach of the peace in any person that shall assault
peace.          or strike another, by fine to the Commonwealth, not exceeding
             twenty shillings, and require sureties, as aforesaid, or bind the
             offender to appear and answer for his offence at the next Court
1803 ch.154,§3. of General Sessions of the Peace, as the nature or circumstances
             of the case may require.  [*Jan. 29, 1795.*]

Chap. 27.    An ACT to set off William Goodspeed, with his estate, from the Town of Wash-
             ington in the County of Berkshire, and annex him and his estate to the Town of
             Lenox, in the same County.  [*Jan. 31, 1795.*]

Chap. 28.    An ACT to incorporate Valentine Rathburn, and others, inhabitants of the Town of
             Pittsfield, into a religious Society, by the name of The Baptist religious Society in
             the Town of Pittsfield.  [*Feb. 10, 1795.*]

Chap. 29.    An ACT for incorporating certain persons therein named, by the name of The
             Trustees of the Church and Congregation in the second Precinct in Pembroke.
             [*Feb. 10, 1795.*]  Add. act—1816 ch. 93.

Chap. 30.    An ACT for erecting and maintaining a Bridge over Westfield-River, in the Town
             of Norwich, in the County of Hampshire.  [*Feb. 10, 1795.*]

Chap. 31.    An ACT to ascertain the Jurisdiction and Limits of the Counties of Suffolk and Mid-
             dlesex, over and upon Charles River.

             SECT. 1.  BE it enacted by the Senate and House of Represen-

                                                                              10

---

[10]  1 GENERAL LAWS OF MASSACHUSETTS 454, ch. 26 (1823),
https://books.google.com/books?id=qQ1HAQAAIAAJ&newbks=1&newbks_redir=0&dq=Mass
achusetts%20Acts%201794%20offensively&pg=PA454#v=onepage&q=Massachusetts%20Acts
%201794%20offensively&f=false, last accessed November 25, 2024.  Compare to Duke's
citation: https://firearmslaw.duke.edu/laws/1795-mass-laws-436-ch-2-an-act-for-repealing-an-
act-made-and-passed-in-the-year-of-our-lord-on-ethousand-six-hundred-and-ninty-two-entitled-
an-act-for-punishing-criminal-offenders-and-for-r, last accessed November 25, 2024.

22. There is no p. 436 or ch. 2 that matches HeinOnline's first explanation of the page they provided for Spitzer's citation of 436, ch. 2.

23. I pointed out to HeinOnline that their supposed sources lacked such a page. I asked for the title of the published volume from which their p. 436, ch. 2 came. This was their response:



24. There is no publisher, publication date, or publication city. This is not a useful, traceable title page; it is not even a title page! If Spitzer looked up a published primary source, it would be verifiable. HeinOnline is, at best, a secondary source that has no apparent idea from where their images come. Duke's citation and text of this law appear to be not even a secondary source, but a tertiary source relying on what turns out to be an unverifiable secondary source.

---

[11] Adam J. Tramp email to Clayton Cramer Oct. 23, 2024. Email on file with author.

25. This, in itself, is a sign of careless, inexpert work.  The citation matches *at best*, a secondary, perhaps tertiary source, the Duke University Center for Firearms Law, Repository of Historical Gun Laws, which provides no traceable source for this law.[12]  This suggests that Dr. Spitzer never found the primary source, which is readily accessible by any historian familiar with the extensive online sources. The Duke Repository does caution: "Conscientious users of this Repository should supplement their results with further legal and historical research."  I guess it should have said: "Persons writing expert declarations using this Repository should supplement their results with further legal and historical research."[13]  Yes.  Perhaps Dr. Spitzer does not qualify as an expert.

26. In ¶25 of his declaration, Dr. Spitzer claims "New Hampshire enacted a law in 1701 (also in 1708 and 1744) that punished anyone who 'shall go armed offensively' who 'put his Majesty's subjects in fear.'"  At least here, Dr. Spitzer admits that he is relying on a secondary source: HeinOnline ("New Hampshire - Acts and Laws June 1701, 15; available at https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh;  New Hampshire 1708, 'Laws of New Hampshire,' available at https://heinonline.org/HOL/Page?handle=hein.ssl/ssnh0244&id=68&collection=ssl;  N.H. - Acts and Laws, 1744, 9-10, https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10.")  These are behind a paywall but fortunately the primary sources are available.

---

[12] Duke University Center For Firearms Law, *Repository of Historical Gun Laws*, https://firearmslaw.duke.edu/laws/1795-mass-laws-436-ch-2-an-act-for-repealing-an-act-made-and-passed-in-the-year-of-our-lord-on-ethousand-six-hundred-and-ninty-two-entitled-an-act-for-punishing-criminal-offenders-and-for-r, last accessed November 25, 2024.

[13] Duke University Center For Firearms Law, *Historical Gun Laws*, https://firearmslaw.duke.edu/repository-of-historical-gun-laws, last accessed November 25, 2024.

27. Along with relying on a secondary source, which at least is an actual law at a location that seems non-verifiable, Dr. Spitzer cites many laws as though he actually looked them up but do not seem to appear in the published session laws.  "1701 N.H. Acts and Laws 15."  If Spitzer means p. 15, 1 Laws of New Hampshire has laws for the years 1692-1702.  On p. 15 are laws prohibiting rape, "wilfull burning," and adultery.[14]



28. Perhaps HeinOnline has an alternate universe copy of the New Hampshire session laws, but I think I will give more credit to an official primary source.

---

[14] 1 Laws Of New Hampshire 15 (1904).,
https://babel.hathitrust.org/cgi/pt?id=mdp.39015047789402&seq=121, last accessed November 25, 2024.

29. In some cases, Dr. Spitzer uses citations that have insufficient information (page number, chapter number) to check, likely because he copied these citations from a secondary source without verifying them. "N.H. Public Carry Prohibition (1708)." This is not a citation of any value for verification. It appears that Spitzer found this law in the Duke University Gun Law Repository. It appears there as Spitzer cites it and he lacked the willingness or ability to find the primary source. The Duke University Gun Law Repository gives no source for this law except a paywalled link to HeinOnline. [15] One would hope that a university law school would at least give the title from which this law came, even if they found it in a secondary source. The 1708 New Hampshire session laws has *one* law: "An Act For The Encouragement Of The Inhabitants Of Her Majesties Province Of New Hampshire In The Makeing Of Tarr To Be Transported Into Her Majesties Kingdom Of Great Brittaine And Otherwise For The Encouragement Of Trade".[16]

---

[15] Duke University Gun Law Repository, *New Hampshire Public Carry Prohibition (1708),* https://firearmslaw.duke.edu/laws/new-hampshire-public-carry-prohibition-1708, last accessed November 25, 2024.

[16] 2 LAWS OF NEW HAMPSHIRE Ch. 1 at 87 (1913).,
https://books.google.com/books?id=PbxGAQAAIAAJ&pg=PA347&dq=%22LAWS+OF+NEW+HAMPSHIRE%22+volume+2+tarr&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwij9M3s872HAxW7DjQIHemRAf8Q6AF6BAgIEAI#v=onepage&q=tarr&f=false, last accessed November 25, 2024.

# LAWS

OF

# NEW HAMPSHIRE

INCLUDING

PUBLIC AND PRIVATE ACTS AND RESOLVES AND THE
ROYAL COMMISSIONS AND INSTRUCTIONS
WITH HISTORICAL AND DESCRIPTIVE
NOTES, AND AN APPENDIX

EDITED BY ALBERT STILLMAN BATCHELLOR, LITT. D.

VOLUME TWO
PROVINCE PERIOD
1702–1745

CONCORD, N. H.
RUMFORD PRINTING COMPANY
1913

17

ADMINISTRATION OF JOSEPH DUDLEY    87

Upon reading the petition of Samuel Shippard and ——— True on behalfe of Several other Inhabitants lying neare the line of both provinces

Ordered that what goods has been restrained by the Constable of Hampton from said True be returned to him againe, the tax being taken by the Constable of Salsbury Six dayes before./ [Council order. Journal of the Council and Assembly.]

[*Sixteenth Session, Held at Portsmouth November 17, 18, 1708.*]

[CHAPTER 1.]

AN ACT FOR THE ENCOURAGEMENT OF THE INHABITANTS OF HER MAJESTIES PROVINCE OF NEW HAMPSHIRE IN THE MAKEING OF TARR TO BE TRANSPORTED INTO HER MAJESTIES KINGDOM OF GREAT BRITTAINE AND OTHERWISE FOR THE ENCOURAGEMENT OF TRADE

[Passed Nov. 18, 1708. 7 Anne. Original Acts, vol. i, p. 72; Laws, 1716 edition, p. 29; 1761 edition, p. 196; 1771 edition, p. 32; repealed June 20, 1792.]

Be it Enacted by his Excellency the Governr Council and Repr-sentatives Conven'd in General Assembly and by the Authority of the Same, that there be Annually by the Assembly of this province, a Rate sett upon all good Tarr of due Assize in Cask made in the Province and that it be received at the said Rate soe sett in the Treasury of the province for the payment of all taxes for the future, And that for the yeare next comeing after the date of this Act the price be twenty shillings pr Barrell for every barrel of good Tarr in Cask of Just Assise accordingly.

[ORDERS, RESOLVES, AND VOTES OF LEGISLATIVE NATURE PASSED DURING THIS SESSION.]

1708, Nov. 18.

Ordered that the Sheriffe take care for the Repaire of the prison and the Addition of a Leantoe for a Lodging for the Keeper and a Yard about the whole building to prevent Correspondence with the prisoners, and that he desire the advice of the Gentlemen of the Council in portsmouth for the Dimentions & manner of Building the Charge to be paid by the Treasur' [Council order. Journal of the Council and Assembly.]

Voted that the Inhabitants freeholders of Kingstown within her Majesties province of New Hampshire from this day forward have free liberty for Sending one Representative for the Said Town to Sitt in General Assembly [Concurrent vote. Journal of the Council and Assembly.]

18

30. The following page starts the next year's session laws.

---

[17]

https://books.google.com/books?id=tuopAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20NEW%20HAMPSHIRE%22%20volume%202&pg=PR1#v=onepage&q=%22LAWS%20OF%20NEW%20HAMPSHIRE%22%20volume%202&f=false, last accessed November 25, 2024

[18]

https://books.google.com/books?id=PbxGAQAAIAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20NEW%20HAMPSHIRE%22%20volume%202%20tarr&pg=PA87#v=onepage&q=tarr&f=false, last accessed November 25, 2024.

88          NEW HAMPSHIRE PROVINCE LAWS

[*Seventeenth Session, Held at Portsmouth May 4, 5, 6, 12, 13, 14, 16, 17, 18, 1709.*]

[CHAPTER 1.]

AN ACT FOR RAISEING ONE THOUSAND SEAVEN HUNDRED AND TWENTY POUNDS FOR PAYMENT OF THE PROVINCE DEBTS PROVIDEING FOR SUBSISTANCE OF OUR QUOTA OF MEN TO JOYNE WITH THE FFORCES NOW DESIGNED AGAINST CANADA AND FOR DEFRAYING THE CHARGES OF OUR AGENT FOR ENGLAND.

[Passed May 14, 1709.   8 Anne.   Original Acts, vol. i, p. 73; recorded Acts, vol. i, p. 143.]

Wee your Majesties most dutifull and Loyal Subjects the Representatives of your Majesties province of New Hampshire, Conven⁴ in General Assembly doe Chearfully and Unanimously Give and Grant unto your most Excellent Majestie, the Sum'e of one thousand Seven hundred and Twenty pounds to be applyed towards the payment of the province debts, the Substance of our Quota of men to Joyne with the fforces now designed ags⁴ Canada, for Support of the Goverment and for defraying the Charges of our Agent for England &c according to the vote of the General Assembly.

Be it therefore Enacted and Ordained by the Governour Council and Representatives Conven⁴ in· General Assembly and by the Authority of the Same that a Rate be forthwith made and laid on all persons and Estates both Real and personal throughout this province in proportion to the Several Towns (that is to Say) The Town of Portsmouth three hundred Seventy Seven pounds tenn shill The Town of Exeter three hundred twenty five pounds Eight shillings The Town of Hampton ffive hundred & five pounds thirteen shillings   The Town of Dover three hundred Sixty one pounds Nine shillings The Town of Newcastle one hundred and ffifty pounds—And that the Treasurer Send out his warranto to the Constables of the Respective Towns requiring them to Assemble the Inhabitants to make Choice of two Assessors where they are not already Chosen for the yeare to Joyne with the Select men in makeing the Rates and Assesments according to this Act to whome the Treasurer shall alsoe give warrants pursueant thereto, And the Rate and Assessment See made to be Comitted to the Constables of the Respective Towns by the first day of June next Ensueing with warrants from a Justice of the peace, and the Select men and Assessors to Collect the Same, and to pay ffour hundred and fforty pounds thereof to the Treasurer for the time being by the ffirst day of September next in mony or in the species foll' at ready mony price and  twelve hundred and  Eighty pounds by the  last day of December then next after in Mony or in the Species at the prices following; Viz Codd ffish and Skale ffish at

19

31. "N.H. - Acts and Laws, 1744, 9-10."  A volume titled New Hampshire Acts and Laws (1744) was not available.  LAWS OF NEW HAMPSHIRE: 1702-1745 has thirteen chapters passed during sessions in 1744-1745, none regulating the display or use of arms.[20]

## IV.     Secondary Source & Out of Context

---

[19] https://books.google.com/books?id=PbxGAQAAIAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20NEW%20HAMPSHIRE%22%20volume%202%20tarr&pg=PA88#v=onepage&q=tarr&f=false,  last accessed November 25, 2024.

[20] 2 LAWS OF NEW HAMPSHIRE 734-750 (1913), https://archive.org/details/lawsofnewhampshi02newh/page/88/mode/2up, last accessed November 25, 2024.

32. In ¶26, Dr. Spitzer quotes out of context § 6 of an 1801 Tennessee law: "An act for the restraint of idle and disorderly persons."  Section 6 reuses the language of the Statute of Northampton (1328) to prohibit "any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person." [21]  Quoting one *section* of this session law without examining its broader context shows a careless, unprofessional, and inexpert approach to historical analysis.

33. Reading the entire statute gives some context suggesting that the law targeted *one* disreputable group, and was not a general ban:

> Whereas it becomes necessary for the welfare of the community, to suppress *wandering, disorderly and idle persons…. That any person or persons who have no apparent means of subsistence or neglect applying themselves to some honest calling for the support of themselves and families every person so offending*, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful any justice of the peace or court of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and caused him to be brought before such said justice…[22] [emphasis added]

34. All sections of the law are directed at these "wandering, disorderly and idle persons" and attempts to prevent their wandering without permanent residence or respectable employment.

35. The law is narrowly focused on these vagrant gamblers and even then § 6 only requires posting a bond contingent on "their good behaviour," to avoid jail.  This is again, a prohibition on concealed carry and open carry only if "to the terror of the people."

---

[21] 1801 Tenn. Acts ch. 22, at 259-261, https://archive.org/details/esrp85888526/page/n267/mode/2up?q=disorderly, last accessed November 25, 2024..  Images of the full text, 1 LAWS OF THE STATE OF TENNESSEE 708-711 (1821) are now available at https://firearmslaw.duke.edu/assets/1821,-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820,-ch.-22,--6.pdf,  last accessed November 25, 2024.

[22] 1801 Tenn. Acts ch. 22, § 1 at 259-260, https://archive.org/details/esrp85888526/page/n267/mode/2up?q=disorderly,  last accessed November 25, 2024.

36. So how did Dr. Spitzer miss the broader context of § 6?  That section alone appears in the Duke University Center for Firearms Law, *Repository of Historical Gun Laws*.  It seems likely that Dr. Spitzer relied on Duke's out of context text, instead of looking up the session law.[23]  I was fortunate that a friend lived near one of the few libraries with a paper copy of the book.  If Dr. Spitzer had identified that he had not actually read the law in full, but relied only on a secondary source, it would have been more accurate, but less persuasive as evidence.

### V.    Deceptive & Out of Historical Context

37. In a section about "WEAPONS BRANDISHING AND DISPLAY LAWS,"  Dr. Spitzer quotes from "1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof."  This statute prohibits "if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."[24]  It was not a crime for an individual to be armed or even eleven to be armed.  There must be at least twelve armed to constitute a crime.  To characterize a law aimed only at armed bodies of men as a ban on carrying of arms is misleading.

---

[23] Judge Edward Scott, *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources, in DUKE CENTER FOR FIREARMS LAW REPOSITORY OF HISTORICAL GUN LAWS, https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/, last accessed July 17, 2024.

[24] 1 LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 346-7 (1807)., https://books.google.com/books?id=px8wAAAAYAAJ&newbks=1&newbks_redir=0&dq=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&pg=PA346#v=onepage&q=%22LAWS%20OF%20THE%20COMMONWEALTH%20OF%20MASSACHUSETTS%22%20clubs&f=false, last accessed November 25, 2024.

38. It also shows a lack of historical context.  Why was this law written in such a way that it only

applied to bodies of twelve or more armed men or groups of thirty or more even if not armed?

"Whereas the provision already made by law for the preventing routs, riots, and tumultuous

assemblies and the evil consequences thereof have been found insufficient."  This law was

passed October 28, 1786, shortly after Shays' Rebellion started disrupting courts in western

Massachusetts with armed mobs preventing operation of the courts.[25]  This context suggests

that this law was a response to a temporary crisis, and hardly indicative of normal operations.

## VI.    Careless, Sloppy Errors

39. In ¶9 of Spitzer's declaration, he asserts, "Concealed carry laws normally targeted pistols as

well as the types of fighting knives and various types of clubs discussed here."  Spitzer often

uses external Exhibits in declarations in other cases to obscure the fact that many of the laws

he references do not match his representation of them.  I have read every concealed weapon

law from the antebellum period that Spitzer has cited in other declarations, and none of them

prohibit concealed carry of clubs.[26]  There *are* laws prohibiting possession or carrying of clubs,

---

[25] John Bach McMaster, 1 A History of the People of the United States, from the Revolution to the Civil War 306 (1884).
https://books.google.com/books?id=moVtw9UJcuQC&newbks=1&newbks_redir=0&dq=1884%20volume%205%20%22A%20HISTORY%20OF%20THE%20PEOPLE%20OF%20THE%20UNITED%20STATES%2C%20FROM%20THE%20REVOLUTION%20TO%20THE%20CIVIL%20WAR%20%22&pg=PA306#v=onepage&q=1884%20volume%205%20%22A%20HISTORY%20OF%20THE%20PEOPLE%20OF%20THE%20UNITED%20STATES,%20FROM%20THE%20REVOLUTION%20TO%20THE%20CIVIL%20WAR%20%22&f=false, last accessed November 25, 2024.

[26] ACTS PASSED AT THE FIRST SESSION OF THE TWENTY FIRST GENERAL ASSEMBLY FOR THE COMMONWEALTH OF KENTUCKY 100-101 (1813), ("pocket pistol, dirk, large knife, or sword in a cane"); ACTS PASSED AT THE SECOND SESSION OF THE FIRST LEGISLATURE OF THE STATE OF LOUISIANA 172-175 (1813)("a dirk, dagger, knife, pistol or any other deadly weapon"); LAWS OF THE STATE OF INDIANA, PASSED AT THE FOURTH SESSION OF THE GENERAL ASSEMBLY 39 (1820)(" dirk, pistol, sword in a cane, or other dangerous weapon"); REVISED LAWS OF INDIANA,

IN WHICH ARE COMPRISED ALL SUCH ACTS OF A GENERAL NATURE AS ARE IN FORCE IN SAID STATE; ADOPTED AND ENACTED BY THE GENERAL ASSEMBLY AT THEIR FIFTEENTH SESSION 192 (1831)(" dirk, pistol, sword in a cane, or other dangerous weapon"); ACTS PASSED AT THE CALLED SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA chap. 11 at 7 (1837)(" knife or weapon, known as Bowie Knives or Arkansas Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [*sic*] Tooth-pick"); ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837 90-91 (1838),(" pistols, dirks, sword canes, spears, &c."); ACTS PASSED AT THE FIRST SESSION OF THE TWENTY-SECOND GENERAL ASSEMBLY OF THE STATE OF TENNESSEE: 1837-8 200-201 (1838)("Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick"); REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A.D. 1837 Div. VIII, Art. I, § 13, p. 280 (1838)("pistol, dirk, butcher or large knife, or a sword in a cane"); ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838 76-77 (Richmond: Thomas Ritchie, 1838)(" any species of fire arms, or any bowie knife, Arkansaw [*sic*] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon"); ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA chap. 77 at 67-68 (1838 [1839])(" any species of fire arms, or any bowie knife, Arkansaw [*sic*] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon"); Act of Feb. 2, 1860, §§ 1-9, N.M. Laws 94, 94-99("any class of pistols whatever, bowie knife (cuchillo de cinto) , Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon") This was one of the extraordinarily rare antebellum bans on open carry.

applicable in most cases only to African-Americans, slave and free,[27] that Spitzer has cited in

defense of laws banning possession or carrying of clubs by law-abiding free people.[28]

---

[27] 1680 Va. Ch. 10 at 481,
https://books.google.com/books?id=SkIVAAAAYAAJ&pg=PA481&dq=1680+club+Virginia+sl
ave&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwjtz7SK8b2HAxVtGDQIHQxc
DwQQ6AF6BAgJEAI#v=onepage&q=1680%20club%20Virginia%20slave&f=false; 1792 Va.
Ch. 103 at 123,
https://books.google.com/books?id=rV83AQAAMAAJ&pg=PA123&dq=NO+negro+or+mulatto
+what%C5%BFoever+shall+keep+or+carry+any+gun,+powder,+shot,+club,&hl=en&newbks=1
&newbks_redir=0&sa=X&ved=2ahUKEwjQmqna8L2HAxVjODQIHfmnAX0Q6AF6BAgPEAI
#v=onepage&q=NO%20negro%20or%20mulatto%20what%C5%BFoever%20shall%20keep%2
0or%20carry%20any%20gun%2C%20powder%2C%20shot%2C%20club%2C&f=false, last
accessed November 25, 2024; 1797 Del. CH. 43, § 6 at 104,
https://archive.org/details/bim_eighteenth-century_laws-of-the-state-of-
del_1797_1/page/103/mode/2up?q=club&view=theater, last accessed November 25, 2024.; 1798
Ky. Laws ch. 63 § 5 at 113,
https://books.google.com/books?id=CRhEAAAAYAAJ&pg=PA113&dq=%22Statute+Law+of+
Kentucky:+1798-
1801%22+club&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwiOrKyb7r2HAxX
mMjQIHdaoAikQ6AF6BAgDEAI#v=onepage&q=%22Statute%20Law%20of%20Kentucky%3
A%201798-1801%22%20club&f=false, last accessed November 25, 2024; 1798 Miss. Laws ch.
17 § 4 at 379,
https://books.google.com/books?id=_og0AQAAMAAJ&pg=PA379&dq=STATUTES+OF+THE
+MISSISSIPPI+TERRITORY+a+slave+shall+keep+or+carry+any+gun&hl=en&newbks=1&ne
wbks_redir=0&sa=X&ved=2ahUKEwjT8t6jgbaHAxUoOjQIHRrRDYwQ6AF6BAgFEAI#v=on
epage&q=STATUTES%20OF%20THE%20MISSISSIPPI%20TERRITORY%20a%20slave%20
shall%20keep%20or%20carry%20any%20gun&f=false, last accessed November 25, 2024; 1805
Ala. ch. 1 in A DIGEST OF THE LAWS OF THE STATE OF ALABAMA at 627 (1823),
https://books.google.com/books?id=fINPAQAAIAAJ&pg=PA627&dq=%22An+Act+Respectin
g+Slaves%22+club&hl=en&newbks=1&newbks_redir=0&sa=X&ved=2ahUKEwjuh6zAiraHAx
VHBDQIHRIXCb8Q6AF6BAgLEAI#v=onepage&q=%22An%20Act%20Respecting%20Slaves
%22%20club&f=false,  last accessed November 25, 2024; DIGEST OF THE LAWS OF MISSOURI TERRITORY 374
(1818),
https://books.google.com/books?id=NbEwAQAAMAAJ&pg=PA374&dq=%22DIGEST+OF+T
HE+LAWS+OF+MISSOURI+TERRITORY%22+1818+club&hl=en&newbks=1&newbks_redir
=0&sa=X&ved=2ahUKEwiDq43u8b2HAxVaOjQIHa_eApsQ6AF6BAgFEAI#v=onepage&q=
%22DIGEST%20OF%20THE%20LAWS%20OF%20MISSOURI%20TERRITORY%22%2018
18%20club&f=false, last accessed November 25, 2024; Slaves, in LAWS OF THE ARKANSAS TERRITORY
521 (J. Steele & J. M'Campbell, Eds., 1835)
[28] *Declaration Of Robert Spitzer*, Fouts v. Bonta (S.D.Cal. 2022).

40. His Exhibit C has the word "club" in it 41 times.  Only "1915 N.D. Laws 96" on p. 93 prohibits concealed carry of a club.  Being charitable, this misrepresentation of such laws is careless work for an expert.

41. On p. 14 Dr. Spitzer cites "1692 Mass. Acts 10, 11–12," as evidence of existing Massachusetts firearms laws.  It is unclear if he means pp. 10, 11-12 (which is the provincial charter):





or ch. 10: "An act for incorporating of Harvard College, at Cambridge, New England":

---

[29] Massachusetts Province, 1 ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 10-12 (1886), https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=1886%20%22ACTS%20AND%20RESOLVES%2C%20PUBLIC%20AND%20PRIVATE%2C%20OF%20THE%20PROVINCE%20OF%20THE%20MASSACHUSETTS%20BAY%20%22%20%22volume%201%22&pg=PA10#v=onepage&q&f=false, last accessed November 25, 2024.



or perhaps ch. 10 from volume 5:

[30] Id. at 38 https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=1886%20%22ACTS%20AND%20RESOLVES%2C%20PUBLIC%20AND%20PRIVATE%2C%20OF%20THE%20PROVINCE%20OF%20THE%20MASSACHUSETTS%20BAY%20%22%20%22volume%201%22&pg=PA38#v=onepage&q&f=false, last accessed November 25, 2024.



42. None of these make any sense for his claim.  Nor does this error come from copying and pasting Duke.  Dr. Spitzer owns this one.

43. In ¶25: "1694 Massachusetts law subjected to arrest any who 'shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere.'"  He cites this as "1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders."  Again, it is unclear if Spitzer means ch. 12, or ch. 6.  Ch. 6: "An Act For Highwayes."

---

[31] Massachusetts Province, 5 (Part 1) ACTS AND RESOLVES, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY ch. 10 at 36 (1886), https://books.google.com/books?id=2cE0AQAAMAAJ&newbks=1&newbks_redir=0&dq=%22 An%20act%20for%20impowering%20the%20trustees%20of%20the%20estates%20of%20conce aled%20and%20absconding%20debtors%22&pg=PA36#v=onepage&q&f=false,  last accessed November 25, 2024.



44. Ch. 12: "An Act For A New Establishment And Regulation Of The Chancery":

---

[32] Id. at 136, https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=For%20the%20better%20amending%20and%20keeping%20in%20repair%20and%20clear%20the%20highways%20and%20common%20roads%20acts%20and%20resolves%20of%20the%20province%20of%20massachusetts&pg=PA136#v=onepage&q=For%20the%20better%20amending%20and%20keeping%20in%20repair%20and%20clear%20the%20highways%20and%20common%20roads%20acts%20and%20resolves%20of%20the%20province%20of%20massachusetts&f=false, last accessed November 25, 2024.

45. Dr. Spitzer's incorrect citation is a direct copy from Duke.[34]

46. In ¶26 of Dr. Spitzer's declaration, Dr. Spitzer assets "Maine's 1821 law outlawed 'affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens.'"  He cites this as "1821 Me. Laws 285, ch. 73 § 1. Quoted in *Young v. Hawaii*, 798–799."  So he did not attempt to verify the accuracy of the citation.  As is typical, Spitzer is relying on Duke's Gun Law Repository instead of looking up the primary source.[35]  If he had copied their citation correctly, he would have seen they cite

---

[33] Id. at 144, https://books.google.com/books?id=ouEwYQ-FKtUC&newbks=1&newbks_redir=0&dq=%22%E2%80%9CAn%20Act%20For%20A%20Ne w%20Establishment%20And%20Regulation%20Of%20The%20Chancery.%E2%80%9D%20m assachusetts&pg=PA144#v=onepage&q=%22%E2%80%9CAn%20Act%20For%20A%20New %20Establishment%20And%20Regulation%20Of%20The%20Chancery.%E2%80%9D%20mas sachusetts&f=false,  last accessed November 25, 2024.

[34] https://firearmslaw.duke.edu/laws/1694-mass-laws-12-no-6-an-act-for-the-punishing-of-criminal-offenders, last accessed November 25, 2024.

[35] *Laws of the State of Maine; to Which are Prefixed the Constitution of the U. States and of Said State, in Two Volumes, with an Appendix Page 685-686; Image 272-273 (Vol. 2, 1821) available at The Making of Modern Law: Primary Sources*, https://firearmslaw.duke.edu/laws/laws-of-the-state-of-maine-to-which-are-prefixed-the-constitution-of-the-u-states-and-of-said-state-in-two-volumes-with-an-appendix-page-685-686-image-272-273-vol-2-1821-available-at-the-maki,  last

*volume 2.* Had he checked the primary source, he would have found that the quoted law

appears in *volume 1* as ch. 76 at 352:



.

47. In ¶29, Spitzer claims, "An 1880 Georgia law, for example, made it a crime to 'point or aim' a

gun but added 'loaded or unloaded.'" He cites "1880 Ga. Laws 151." This session law volume

contains no chapter numbers, so we must assume that he means p. 151:

---

accessed November 25, 2024.

[36] 1 LAWS OF THE STATE OF MAINE 352-353, ch. 76 (1821),

https://books.google.com/books?id=ZYc0AQAAMAAJ&newbks=1&newbks_redir=0&dq=Law
s%20of%20the%20State%20of%20Maine%20shall%20ride%20or%20go%20armed%20Offensi
vely%20before&pg=RA1-
PA352#v=onepage&q=Laws%20of%20the%20State%20of%20Maine%20shall%20ride%20or%
20go%20armed%20Offensively%20before&f=false, last accessed November 25, 2024.

PUBLIC LAWS

PASSED BY THE

GENERAL ASSEMBLY

OF THE

STATE OF GEORGIA,

AT ITS

SESSIONS OF 1880-1.

PRICE, SEVENTY-FIVE CENTS.

PUBLISHED BY W. H. HARRISON, LUMPKIN, GA.

FOR SALE AT STATE LIBRARY.

ATLANTA, GEORGIA:
JAS. P. HARRISON & CO., PRINTERS AND PUBLISHERS.
1881.

PUBLIC LAWS.    151

AN ACT

To provide for carrying into effect paragraph three, of section one, article eleven, of the Constitution of this State; and repeal an Act, entitled an Act, to carry into effect paragraph three, section one, of article eleven of the Constitution of this State, approved, October 14th, 1879.

SECTION 1. Be it enacted by the General Assembly of Georgia, and it is hereby enacted by authority of the same, That, from and after the passage of this Act, county lines shall be changed in the following manner: Whenever a citizen, or any number of citizens of any county of this State, shall desire to have the county line of the county of his or their residence changed, it shall be competent for such citizen or citizens to file in the office of the Ordinaries of the counties to be affected by such change, at least ninety days before the first day of the next term of the Superior Court of the counties whose boundaries are to be affected by the proposed change, a petition in writing, setting forth the exact character of the changes to be made, specifying particularly, the situation, direction, and existing marks and monuments, if any, of the original line, and describing particularly, the direction, location and length of the proposed new line, and setting forth the reasons for such change; the person or person applying for such change shall also give notice of the intention to apply for such change, by publishing the same for at least thirty days next preceding the terms of the Superior Court to be held in the counties to be affected by the proposed change, which terms shall be those occurring next after the filing of the petition with the Ordinaries, as above provided, by publishing such notice in a public gazette having general circulation in each of the counties to be affected by the change, and by posting at the door of the court-house in each of such counties, and at three public places in every militia district, adjacent to the line to be changed, a like notice of the intention to apply for such change, and such posting shall be for a period at least thirty days next preceding the terms of the Superior Court to be held in the counties to be affected by such change, next after the posting of the notice aforesaid.

37

48. Once again, Spitzer has copied this incorrect citation from Duke,[38] without bothering to look it up.

49. In ¶29, Spitzer claims, "A total of 19 states enacted laws that penalized the mere display or wearing of firearms and other 'deadly weapons.'" His footnote lists many statutes and

---

[37] Georgia, PUBLIC LAWS PASSED BY THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA, AT ITS SESSIONS OF 1880-1 151-52 (1881), https://books.google.com/books?id=K4lCAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22public%20laws%20passed%20by%20the%20general%20assembly%20of%20the%20State%20of%20Georgia%22%201880&pg=PA151#v=onepage&q=%22public%20laws%20passed%20by%20the%20general%20assembly%20of%20the%20State%20of%20Georgia%22%201880&f=false, last accessed November 25, 2024.

[38] https://firearmslaw.duke.edu/laws/1880-ga-laws-151-an-act-to-make-penal-the-intentional-pointing-or-aiming-of-fire-arms-at-another-whether-loaded-or-unloaded-c2a7-1, last accessed November 25, 2024.

ordinances including: "Book of Ordinances of the City of Wichita, Kansas, 1899, § 1." This is another citation that is difficult to verify. Is 1899 the year this ordinance was adopted, an ordinance number, or a page number? It appears that Spitzer is relying on the Duke Historical Gun Laws Repository again. At least Duke gives some information that might nail it down: "Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources."[39] As with so many other examples, Spitzer's citations suggest that his "research" was primarily cut and paste from Duke.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on November 20, 2024.

_____

Clayton Cramer

---

[39] https://firearmslaw.duke.edu/laws/bruce-l-keenan-book-of-ordinances-of-the-city-of-wichita-published-by-authority-of-a-resolution-adopted-by-the-city-council-april-24-1899-under-the-direction-of-judiciary-committee-and-city-attorn, last accessed November 20, 2024.

## CERTIFICATE OF SERVICE

On October 24, 2025, I caused the within motion to be filed electronically and it

is available for viewing and downloading from the ECF system.

*Thomas W. Lyons*