# United States Court of Appeals for the First Circuit

MICHAEL O'NEIL; JOSEPH PATTON; RICHARD COOK; DANIEL PATTERSON; PETER TREMEENTOZZI; DONALD LABRIOLE; and RICHARD LAPORTE,

*Plaintiffs-Appellants*,

v.

PETER F. NERONHA, in the official capacity as Attorney General of the State of Rhode Island; and the STATE OF RHODE ISLAND,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Rhode Island
No. 1:23-cv-00070-WES

**BRIEF FOR DEFENDANTS-APPELLEES
PETER F. NERONHA AND THE STATE OF RHODE ISLAND**

JAMES J. ARGUIN (#39225)
PAUL MEOSKY (#1210551)
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400, ext. 2064 | 2480
(401) 222-2995 (Fax)
pmeosky@riag.ri.gov | jarguin@riag.ri.gov

Dated: January 5, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE..................................................................2

    I.    Statement of Facts.....................................................................2

        A.  Relevant Law and Guidelines ............................................2

        B.  The Attorney General's Denial of O'Neil's Permit Application .........4

        C.  The Denial of Other Plaintiffs' Permit Applications ...........................6

    II.   Procedural History .....................................................................7

STANDARD OF REVIEW ....................................................................9

SUMMARY OF ARGUMENT ..............................................................9

ARGUMENT .......................................................................................11

    I.    The District Court Correctly Held that Plaintiffs have no second amendment right to openly carry firearms in public. ................................11

        A.  The Plain Text of the Second Amendment Does Not Cover the Open Carrying Firearms in Public. ...............................................12

        B.  Rhode Island's Open Carry Permitting Regime Is Consistent with the Nation's Tradition of Firearms Regulation. ........................................17

            1.  The district court correctly applied the *Bruen* Court's historical analysis in upholding Rhode Island's restrictions on open carry. ...............17

            2.  The district court correctly found that Rhode Island's restrictions on open carry are "relevantly similar" to historical laws restricting concealed carry. ..................................................................................23

    II.   The district court correctly denied the parties' evidentiary motions as immaterial to its decision..........................................................................37

A.   Plaintiffs' Motion Lacks Merit Because Legal Sources Are Not Inadmissible Hearsay. ..........................................................................38

B.   The Legal Materials Targeted by Plaintiff's Motion Were Subject to Judicial Notice. ......................................................................40

C.   The State's Expert Was Otherwise Entitled to Use the Legal Materials as Evidence Reasonably Relied Upon in His Field............................41

III.   The District Court Correctly Held That the Plaintiffs Have Failed to Establish Any Violation of due process. ....................................................42

A.   The District Court Correctly Held That the Overbreadth Doctrine Does Not Apply to Plaintiffs' As-Applied Second Amendment Challenge. ....
...............................................................................................43

B.   The District Court Correctly Held That the Attorney General's Permitting Process Is Not Unconstitutionally Vague. ......................45

1.   The district court correctly found that Plaintiffs do not have a protected liberty interest in expired permits. ...............................................46

2.   The district court correctly found that the "proper showing of need" requirement was not unconstitutionally vague as applied to Plaintiffs' permit applications. .......................................................................48

3.   The district court correctly found that the State afforded Plaintiffs multiple levels of review to ensure against arbitrary enforcement of the "proper showing of need" standard. ...........................................................49

CONCLUSION ....................................................................................51

CERTIFICATE OF COMPLIANCE....................................................53

CERTIFICATE OF SERVICE ..............................................................54

<u>**TABLE OF AUTHORITIES**</u>

**Federal Cases**

*Abed v. United States*, 278 A.3d 114 (D.C. 2022)....................................................24

*Albright v Oliver*, 510 U.S. 266 (1994) ...................................................................46

*Amber Intern. Nav., Inc. v. Reprinter Intern. Shipping Co., S.A.*, 2009 WL 1883251 (S.D.N.Y. June 30, 2009)...............................................................................40

*Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022)...................................39

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ...................................................13

*Ashwander v. TVA*, 297 U.S. 288 (1936)..................................................................33

*Baird v. Bonta*, 2026 WL 17404 (9th Cir. Jan. 2, 2026) .................................. 36, 45

*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023)..........................................................14

*Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24 (1st Cir. 2011) ............................................................................................... 38, 40

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ....................................................39

*Bin-Jiang Tao v. Citibank, N.A.*, 445 Fed. Appx. 951 (9th Cir. 2011)....................39

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ............................................... 46, 47

*Bruen*, 597 U.S. at 24...............................................................................................11

*Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42 (1st Cir. 2023)................................9

*California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610 (C.D. Cal. 2022)..................................................................................................45

*Canna Provisions, Inc. v. Bondi*, 138 F.4th 602 (1st Cir. 2025) ............................33

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025)............................................ 18, 34

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)...................................50

*Clukey v. Town of Camden*, 717 F.3d 52 (1st Cir. 2013) ........................................47

iv

*Culp v. Madigan*, 270 F. Supp. 3d 1038 (C.D. Ill. 2017) ........................................14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... 18, 34

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016)...........................................................48

*Draper v. Healey*, 98 F. Supp. 3d 77 (D. Mass. 2015) .............................................49

*Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025) ................................. 24, 41

*Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411 (1st Cir. 2017).............37

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012).............................. passim

*Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178 (1st Cir. 1999) .......9

*Jones v. Bonta*, 35 F.4th 704 (9th Cir. 2022)...........................................................39

*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J 2023) .............................................14

*Lamar v. Micou*, 114 U.S. 218 (1885) .....................................................................40

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024) .............39

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) .....................19

*McClelland v. Katy Independent School District*, 63 F.4th 996 (5th Cir. 2023).....46

*McDaniels v. State*, 419 So. 3d 1180 (Fla. Dist. Ct. App. 2025).............................15

*Medrano v. Salazar*, 2020 WL 589537 (W.D. Tex. Feb. 5, 2020).........................15

*National Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63 (D. Conn. 2023)....25

*National Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) .............................31

*New York State Firearms Ass'n v. James*, 157 F.4th 232 (2d Cir. 2025).................11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .......... passim

*New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310 (S.D.N.Y. 2024)...................24

*Nichols v. Newsom*, No. 2:11-CV-09916-SSS-KES, 2022 WL 22867377 (C.D. Cal. Dec. 7, 2022).........................................................................................................24

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024)... 24, 35, 39

*Pleasantdale Condominiums., LLC v. Wakefield*, 37 F.4th 728 (1st Cir. 2022) .......9

*Ridley v. Massachusetts Bay Transportation Auth.*, 390 F.3d 65 (1st Cir. 2004) ...48

*Roemer v. Board of Public Works of Maryland*, 426 U.S. 736 (1976)...................40

*Rossiter v. Potter*, 357 F.3d 26 (1st Cir. 2004).......................................................19

*Sabri v. United States*, 541 U.S. 600 (2004)............................................................44

*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) ........................................ 24, 31

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).......................................18

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346 (Ill. 2024) ...............30

*Suarez v. Paris*, 741 F. Supp. 3d 237 (M.D. Pa. 2024) ...........................................15

*Teamsters Union, Local No. 59 v. Superline Transp.*, 953 F.2d 17 (1st Cir. 1992)16

*Town of Castle Rock v. Gonzalez*, 545 U.S. 748 (2005).........................................47

*United States v. Alexander*, 467 Fed. Appx. 335 (6th Cir. 2012)...........................40

*United States v. Beasley*, 702 F. Supp. 3d 1243 (M.D. Fla. 2023)........................44

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ...........................................39

*United States v. Hansen*, 599 U.S. 762 (2023) ................................................. 44, 45

*United States v. Harrison*, 153 F.4th 998 (10th Cir. 2025) .....................................18

*United States v. Jordan*, 680 F. Supp. 3d 850 (N.D. Ohio 2023)...........................45

*United States v. Kantengwa*, 781 F.3d 545 (1st Cir. 2015) .....................................42

*United States v. Lewis*, 40 F.3d 1325 (1st Cir. 1994).........................................9, 38

*United States v. Mount*, 896 F.2d 612 (1st Cir. 1990).............................................39

*United States v. Nguyen*, 542 F.3d 275 (1st Cir. 2008) .............................................9

*United States v. Pérez-Vásquez*, 6 F.4th 180 (1st Cir. 2021)...................................41

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) .............................................13

*United States v. Rahimi*, 602 U.S. 680 (2024)................................................. passim

*United States v. Rios*, 830 F.3d 403 (6th Cir. 2016) .................................................41

*United States v. Rosa-Ufred*, No. CR 23-428 (RAM), 2025 WL 815688 (D.P.R. Mar. 14, 2025) .........................................................................................................25

*United States v. Sandoval*, 6 F.4th 63 (1st Cir. 2021) .............................................41

*URI Student Senate v. Town of Narragansett*, 631 F.3d 1 (1st Cir. 2011) .............48

*We the Patriots USA Inc., et al., v. Doyle*, No. 3:24-cv-01054 (D. Conn. Aug. 15, 2025) .........................................................................................................23

*Wilkinson v. Austin*, 545 U.S. 209 (2005)................................................................46

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024)....................................................32

**State Cases**

*Commonwealth v. Sumpter*, 340 A.3d 977 (Pa. Super. 2025) .................................16

*Montaquila v. Neronha*, 289 A.3d 568 (R.I. 2023) ......................................... 50, 51

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) ................................................. passim

*Nelson v. Town of Johnsbury Selectboard*, 198 Vt. 277 (2015) .............................39

*Nunn v. State*, 1 Ga. 243 (1846)................................................................... 21, 22

*Reed v. Commonwealth*, 85 Va. App. 196 (2025) ...................................................16

*State v. Chandler*, 5 La. Ann. 489 (1850)................................................................27

*State v. Hall*, 265 N.E.3d 338 (Ohio 2025)..............................................................16

*State v. Jumel*, 13 La. Ann. 399 (1858) ......................................................... 22, 29

*State v. Reid*, 1 Ala. 612 (1840)..............................................................................22

**Statutes**

430 Ill. Comp. Stat. Ann. 66/10 (West) .....................................................................29

Cal. Penal Code § 25850 (West)................................................................36

Cal. Penal Code § 26350................................................................36

Cal. Penal Code § 26350 (West)................................................................28

Conn. Gen. Stat. Ann. § 29-35 (West)................................................................29

D.C. Code §§ 22-4504.04-4506................................................................29

Fla. Stat. Ann. § 790.053 (West) ................................................................29

N.J. Stat. Ann. § 2C:58-4 (West)................................................................29

N.Y. Penal Code § 400.00 (West)................................................................29

R.I. Gen. Laws § 11-47-10................................................................35

R.I. Gen. Laws § 11-47-11................................................................2, 13

R.I. Gen. Laws § 11-47-18................................................................2, 28

R.I. Gen. Laws § 11-47-2(14) ................................................................34, 35

R.I. Gen. Laws § 11-47-51................................................................35

R.I. Gen. Laws § 11-47-8(a) ................................................................2

U.S. Const. amend. XIV ................................................................46

**Rules**

Fed. R. Evid. 703 ................................................................41

Fed. R. Evid. 803(17)................................................................38

**Other Authorities**

Clayton Cramer, *Concealed Weapon Laws of the Early Republic*................... 31, 32

Rhode Island State Law Library, Library Services for the Legal Community (2024), https://www.courts.ri.gov/programs-services/Documents/LibraryServicesForTheLegalCommunity.pdf ...................40

Written Testimony of Joseph Blocher, Lanty L. Smith Professor of Law, Duke University Law School, After the Highland Park Attack: Protecting Our Communities from Mass Shootings: Hearing Before the Sen. Comm. on the Judiciary, 117th Cong. (July 20, 2022), https://www.judiciary. senate.gov/committee-activity/hearings/after-the-highland-park-attack-protecting-our-communities-from-mass-shootings ............................................40

## STATEMENT OF THE ISSUES

1. The Supreme Court has repeatedly held that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever." *United States v. Rahimi*, 602 U.S. 680, 691 (2024). The Supreme Court has further clarified that States may restrict or even prohibit one form of public carry so long as another form of public carry remains available for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 59 (2022). Given this precedent, did the district court properly grant summary judgment denying Plaintiffs-Appellants' applications for permits allowing open carry when they already held permits allowing concealed carry?

2. Where the district court relied on binding Supreme Court precedent to decide the Second Amendment issue, did the court abuse its discretion in denying Plaintiff-Appellants' Motion in Limine seeking to exclude portions of an expert report that the district court found immaterial to its decision?

3. Did the district court properly grant summary judgment against Plaintiff-Appellants' due process claims where (a) their First Amendment doctrinal arguments do not apply in this Second Amendment context, (b) they have no protected liberty interest in renewal of their expired public carry permits, and (c) the Attorney General provided guidance and explanations for why their

renewal applications failed to demonstrate the "proper showing of need" that state law requires for an Attorney General's permit?

## STATEMENT OF THE CASE

I. **STATEMENT OF FACTS**

A. **Relevant Law and Guidelines**

Rhode Island requires a permit to publicly carry firearms, R.I. Gen. Laws § 11-47-8(a), and offers two types of permits to do so.[1] The first is a municipal permit, which allows holders to carry concealed firearms. R.I. Gen. Laws § 11-47-11. Municipal permits must be issued to any qualified, suitable applicant who is at least twenty-one years old and either (1) has a bona fide residence or place of business within the municipality or (2) has a permit to carry concealed firearms from another U.S. jurisdiction. *Id.*; *Mosby v. Devine*, 851 A.2d 1031, 1047 (R.I. 2004) (confirming that § 11-47-11(a) is a "mandatory licensing provision"). The second type is an Attorney General's permit, which allows holders to carry both concealed and non-concealed firearms. R.I. Gen. Laws § 11-47-18. The Attorney General has discretion to issue licenses to anyone who is at least twenty-one years old "upon a proper showing of need." *Id.*

---

[1] When deciding *Bruen*, the Supreme Court characterized Rhode Island's permitting system as one of the "shall-issue" jurisdictions that are presumptively constitutional under the Second Amendment. *Id.* at 13 n.1.

The Attorney General has published a "Weapons Carry Permit Packet" with guidance on the application process. State Defs.' Statement Undisputed Facts App. 2-5, ECF No. 35-1. The guidance states that the "Attorney General will exercise his discretion in a manner designed to protect the public at large as well as the individual applicant" and lays out the procedure for submitting and reviewing an application packet. *Id*. at 4. The guidance then lists ten factors the Attorney General considers when evaluating a "proper showing of need," including whether the applicant articulated a risk to life, limb or property, whether the applicant demonstrated how the permit would decrease that risk, and whether the applicant could take alternative measures to decrease that risk. *Id.* at 5. While an applicant's possession of a municipal permit may inform the Attorney General's decision as to the applicant's needs, the Office does not have a blanket policy against issuing permits to anyone with municipal or other firearms permits. *Id.* at 45, 57-58, 65-66. Ultimately, the touchstone of the Attorney General permit determination is whether the applicant has demonstrated a "proper showing of need." *Id*. at 6.

When the Attorney General denies permits, the applicant is "entitled to know the evidence upon which the [office] based its decision and the rationale for the denial." *Mosby*, 851 A.2d at 1051. Specifically, the Attorney General or his representative sends the denied applicant a letter explaining the decision and notifying the applicant of the right to request a meeting and further review from the

Attorney General's Office. Any denial is also subject to judicial review upon certiorari to the Rhode Island Supreme Court. *Id*. at 1048, 1050-51.

## B. The Attorney General's Denial of O'Neil's Permit Application

Plaintiffs all applied to the Attorney General for permits to carry and were all denied for failing to demonstrate any need for the permit. Plaintiff O'Neil's case is representative of all Plaintiffs.

O'Neil filed an application to the Attorney General's Office for a permit to carry a pistol or revolver. Pls.' App. 15. In a letter accompanying his application, O'Neil represented that he carried firearms, targets, and ammunition while traveling to different "clubs," which statement the Attorney General's Office interpreted as the basis for Mr. O'Neil's alleged need for the permit. State Defs.' Statement Undisputed Facts App. 68, ECF No. 35-1.[2] A preliminary review of O'Neil's application revealed that he already held a concealed carry permit from the City of Warwick, valid through November 26, 2023, which allowed O'Neil to carry a pistol or revolver throughout Rhode Island. *Id.* O'Neil did not identify any other reasons why he needed an additional public carry permit from the Attorney General. *Id.*

_____

[2] Defendant-Appellees were not consulted about the Appendix and did not receive a designation of the parts of the record to be included as required by Federal Rule of Appellate Procedure 30(b)(1). Thus, Defendant-Appellees cite the record on appeal for materials not included in Plaintiff-Appellees' Appendix.

The Attorney General informed O'Neil by letter that his application was denied. *Id.* After noting the relevant laws and guidelines, the Attorney General's letter explained that O'Neil's application was denied because he failed to make a proper showing of need for an Attorney General permit, particularly as he already had a municipal permit. *Id.* at 68-69. The letter advised O'Neil that he could request an opportunity to meet with representatives of the Attorney General to present any additional information warranting reconsideration of his application. *Id.* at 69.

O'Neil and his attorney met with the Attorney General's Office to discuss his application. *Id.* at 71. O'Neil raised several additional reasons why he allegedly required an Attorney General's permit, including (1) his concern for his safety as the vice-president of the Rhode Island Second Amendment Coalition; (2) his desire to carry in states that may grant reciprocity for the Attorney General's permit; (3) his desire for a "backup" in case his municipal permit expires; (4) his desire to bypass background checks and waiting periods for new permits; and (5) his concerns about disclosing the denial on future applications. *Id.* at 71-72.

By letter, the Attorney General reaffirmed the denial of O'Neil's application. The letter explained (1) that O'Neil had not explained how his safety concerns required a second permit; (2) that other states' policies were not the concern of the Rhode Island Attorney General's Office and there was no evidence that other states would not honor a municipal permit; (3) that it was O'Neil's responsibility to renew

his municipal permit in a timely manner; (4) that a municipal permit—but not an Attorney General's permit—allowed O'Neil to bypass the background check and waiting period; and (5) the impact of the decision on other applications has no bearing on the Office's review of the instant application. *Id*. at 71-72.

O'Neil submitted a "Motion to Reconsider" noting that he "secured and maintained a permit from the Rhode Island Department of the Attorney General for approximately 12 years" and "[t]hat there was no substantial and/or material changes in his circumstances since his last application." *Id*. at 75. O'Neil's Motion also claimed "[t]hat a 'denial' from the AG will negatively affect him in his renewal applications from the Commonwealth of Massachusetts, the State of Connecticut and other state(s) from which Mr. O'Neil has [Concealed Carry Weapons (CCW)] permits." *Id*. The Attorney General responded by letter, explaining that O'Neil still had not demonstrated a proper showing of need. *Id*. at 77.

Thereafter, O'Neil filed a petition of certiorari to the Rhode Island Supreme Court. Docket in O'Neil v. Rhode Island Department of the Attorney General. *Id*. at 79. The Rhode Island Supreme Court denied the petition. *Id.* at 80.

## C.    The Denial of Other Plaintiffs' Permit Applications

The experience of the other Plaintiffs was substantively the same. Only one Plaintiff noted that the Attorney General's permit would allow open carry, though he did not explain why concealed carry was insufficient for his needs. *Id*. at 64-65.

On appeal, Plaintiffs uniformly express a desire to open carry, but they never explained to the district court how their right to self-defense was impaired by the denial of their application for an additional permit from the Attorney General. Indeed, several Plaintiffs testified that they didn't know why they would open carry or that they wouldn't open carry even if they could. *Id*. at 87 (Cook), 136 (Patton), 195 (Laporte). Another Plaintiff mentioned a vague worry about exposing his gun when his shirt rides up in the summer, but he didn't explain why he couldn't address that problem by simply changing his clothing. *See id.* at 202-04 (Patterson). And two others speculated that they might, one day, apply for a job that requires open carry. *Id*. at 178-79 (Tremeentozzi); 211-12 (O'Neil). The only Plaintiff who testified that he might open carry in specific situations also admitted that he would not open carry if it made others uncomfortable. *Id.* at 100-01, 153-54 (Labriole).

## II.    PROCEDURAL HISTORY

O'Neil filed his original complaint on February 15, 2023, alleging Second Amendment and Due Process violations. Pls.' App. 1. The State moved to dismiss, and the Court found that O'Neil's standing was "speculative," but allowed him to amend. *Id*. at 2. On September 25, 2023, O'Neil filed a Second Amended Complaint, joined by the other Plaintiffs, alleging that they required Attorney General's permits to openly carry firearms in public and that the statutory requirement for a "proper showing of need" violated their Second Amendment and Due Process rights. *Id*. at

21-23. The Plaintiffs requested a permanent injunction requiring the Attorney General to issue them permits and declarations that the statutory scheme violates the Second Amendment and the due process clauses of the Fourteenth Amendment and the Rhode Island Constitution. *Id.* at 23.

The parties filed cross-motions for summary judgment, *id.* at 6, as well as several evidentiary motions, including Plaintiffs' Motion in Limine to exclude evidence from the nationally renowned Duke Repository of Historical Gun Laws as well as the expert testimony of one of the State's experts, Professor Spitzer, because he cited to historical laws found within the Duke Repository, Pls.' Mot. Lim. 1, ECF No. 33.

On August 1, 2025, the district court granted summary judgment in favor of the State, finding no Second Amendment or Due Process violations in the Rhode Island dual-track permitting regime. Pls.' Br. Add. 50. Specifically, the district court held that the State's discretionary permitting of open carry was well within the nation's history and tradition of firearms regulation, as set out by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Id*. at 52. The court further held that the Attorney General provided sufficient guidance to satisfy the void-for-vagueness doctrine, even assuming that doctrine applied to the Second Amendment, and that the Plaintiffs' overbreadth challenge did not apply to the Second Amendment under this Court's decision in *Hightower v. City of Boston*,

693 F.3d 61, 81 (1st Cir. 2012). *Id*. at 53. The district court also denied all outstanding evidentiary motions as immaterial given its reliance on the Supreme Court's historical analysis. *Id*. at 52.

## STANDARD OF REVIEW

This Court reviews a districts court's ruling on summary judgment *de novo*. *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 54 (1st Cir. 2023) (citing *Pleasantdale Condominiums., LLC v. Wakefield*, 37 F.4th 728, 732 (1st Cir. 2022). Furthermore, the Court is not constrained to the district court's reasoning and "may affirm the entry of summary judgment on any ground supported by the record." *Burt*, 84 F.4th at 54 *(citing Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 184 (1st Cir. 1999).

This Court reviews rulings admitting or excluding evidence for abuse of discretion. *United States v. Nguyen*, 542 F.3d 275, 279 (1st Cir. 2008). Furthermore, this Court will not reverse an erroneous evidentiary ruling where the error "was ultimately harmless." *United States v. Lewis*, 40 F.3d 1325, 1340 (1st Cir. 1994).

## SUMMARY OF ARGUMENT

This Court should affirm the district court's grant of summary judgment since the Plaintiffs do not need Attorney General permits to exercise their Second Amendment right to carry firearms in public for self-defense. There is no question that all Plaintiffs can carry firearms in public with the municipal permits they were

issued as a matter of course. The Second Amendment requires nothing more. In upholding the Rhode Island permitting regime, the district court correctly applied the *Bruen* Court's express finding that States have long enjoyed the authority to regulate or even prohibit one manner of public carry—whether open or concealed— so long as an alternative means of public carry remains available. 597 U.S. at 59; *see infra* Argument Section I.A. The discretion given to the Rhode Island Attorney General to issue permits for open as well as concealed carry easily falls within that tradition. *See infra* Argument Section I.B.

Additionally, the district court did not abuse its discretion in denying Plaintiffs' Motion in Limine once the court determined that the State was entitled to judgment as a matter of law under *Bruen*. *See infra* Argument Section II. Moreover, any error in denying the Motion in Limine was harmless since the legal materials it sought to exclude were (1) not hearsay, *see infra* Argument Section II.A; (2) subject to judicial notice, *see infra* Argument Section II.B; and (3) properly incorporated into the State's expert report as evidence reasonably relied upon by experts in the field, *see infra* Argument Section II.C.

Lastly, the district court correctly rejected Plaintiffs' due process claims as the First Amendment's void-for-vagueness and overbreadth doctrines do not apply in this Second Amendment context. *See infra* Argument Section III.A. But even if they did, the district court correctly concluded that the Attorney General provided

Plaintiffs with all the process that was due by issuing guidance on what constituted a "proper showing of need," as well as by providing tailored explanations to Plaintiffs about why they failed to meet that standard. *See infra* Argument Section III.B.

**ARGUMENT**

## I. THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS HAVE NO SECOND AMENDMENT RIGHT TO OPENLY CARRY FIREARMS IN PUBLIC.

In *Bruen*, the Supreme Court announced a framework for evaluating Second Amendment claims "centered on constitutional text and history." 597 U.S. 1, 22 (2022). Under the *Bruen* framework, Plaintiffs bear the initial burden to prove that their proposed conduct comes within the plain text of the Second Amendment. *New York State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025) (citing *Bruen*, 597 U.S. at 24). If the plain text covers the proposed conduct, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. "[I]f a firearm regulation is consistent with this Nation's historical tradition," it is constitutional. *Id.* at 17.

The district court correctly concluded that Plaintiff's Second Amendment claim failed at step one because the plain text of the Second Amendment does not guarantee a right to *openly* carry firearms in public. However, even assuming that

11

the Second Amendment's text covers open carry, Rhode Island's discretionary permitting system for open carry comports with a tradition of regulating the manner of public carry dating back to this nation's founding. Thus, under *Bruen*, the district court correctly granted the State summary judgment on Plaintiffs' Second Amendment claims.

## A. The Plain Text of the Second Amendment Does Not Cover the Open Carrying Firearms in Public.

The Second Amendment protects the right to "carry[] handguns publicly for self-defense," *Bruen*, 597 U.S. at 32, but as the Supreme Court has repeatedly emphasized, it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever," *United States v. Rahimi*, 602 U.S. 680, 691 (2024). The right to "bear arms" refers to the "right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket." *Bruen*, 597 U.S. at 32. As the district court correctly held, the Supreme Court has never defined that right to guarantee a particular manner of carry—whether concealed or open. Pls.' Br. Add. 52. Rather, the Supreme Court in *Bruen* held that the text of the Second Amendment, as understood through the lens of our nation's history and tradition of gun regulation, could not support a permitting scheme where law-abiding citizens were prohibited from publicly carrying firearms without demonstrating a special need to do so. 597 U.S. at 70-71. Rhode Island allows law-abiding citizens to publicly carry firearms with a municipal permit, which does not require any demonstration of a special need.  R.I. Gen. Laws § 11-

47-11(a); *Mosby v. Devine*, 851 A.2d 1031, 1047 (R.I. 2004). Thus, Rhode Island has a constitutional "shall issue" regime, as the *Bruen* Court expressly recognized, 597 U.S. at 13 n.1, and the district court correctly granted summary judgment on that basis.

So long as one form of public carry for self-defense is allowed, the Second Amendment right to bear arms is satisfied. There is no Second Amendment right to carry openly when carrying concealed is already permitted. Plaintiffs' contention that open carry is somehow more protected than concealed carry contradicts the historical understanding of the Second Amendment's text, which must control this Court's interpretation of the right to "keep and bear arms." *See Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024) ("*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as *historically* understood . . . .") (emphasis added); *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) ("[W]e can *only* properly apply step one of the *Bruen* framework by looking to the historical scope of the Second Amendment right."). In other words, courts must decide whether the Plaintiffs' "proposed course of conduct," carrying guns *openly* in public, falls within the historical understanding of the phrase "keep and bear arms." *See Price*, 111 F.4th at 401 (summarizing *Bruen*'s textual analysis at 597 U.S. at 31-32).

The *Bruen* Court's extensive review of the historical record explicitly found no such right, rendering Plaintiffs' Second Amendment claim meritless. Based on its review of the historical record, the *Bruen* Court held that "States could lawfully eliminate one kind of public carry" so long as another kind of public carry remained available. 597 U.S. at 59. Thus, under *Bruen*'s analysis, the Second Amendment's text does not cover open carry so long as another form of public carry, e.g., concealed carry, is available.

Plaintiffs' smattering of case citations do not support their ahistorical claim that the Second Amendment somehow protects open carry more than concealed carry. Most of the cases cited merely echo the Supreme Court's understanding that the Second Amendment guarantees the right to carry firearms in public. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (commenting that "an 'individual's right to carry a handgun for self-defense outside the home' under the Second Amendment is [a] constitutional right"); *Koons v. Platkin*, 673 F. Supp. 3d 515, 562, 586, 636-64 (D.N.J 2023) ("The Second Amendment's text covers the [] Plaintiff's proposed course of conduct of carrying a handgun in public for self-defense."), *aff'd in part, vacated in part, rev'd in part*, 156 F.4th 210 (3d Cir. 2025), *vacated and reh'g en banc granted*, 2025 WL 3552513 (3d Cir. Dec. 11, 2025); *see also Culp v. Madigan*, 270 F. Supp. 3d 1038, 1053 (C.D. Ill. 2017) (a pre-*Bruen* decision cited by Plaintiffs concerning the right to publicly carry handguns in the only manner (concealed)

permitted by Illinois at that time). Likewise, *Medrano* and *Suarez* address the right to publicly (not necessarily *openly*) carry firearms. *Medrano* involved a law prohibiting gang members from "carrying any firearm in public," and thus did not specifically find that the Second Amendment guarantees a particular manner of carry, whether concealed or open. *Medrano v. Salazar*, 2020 WL 589537, at *6 (W.D. Tex. Feb. 5, 2020). In the same way, *Suarez* clarified that the "protected conduct at issue is *public* carry," not open carry. *Suarez v. Paris*, 741 F. Supp. 3d 237, 257 (M.D. Pa. 2024).

Plaintiffs cite only one authority that directly found a Second Amendment right to open carry: a Florida state intermediate court decision, *McDaniels*, which inverted *Bruen*'s logic by reading into the Second Amendment rights that are not expressly covered by the text simply because they are not expressly *excluded* by the text. *See McDaniels v. State*, 419 So. 3d 1180, 1188 (Fla. Dist. Ct. App. 2025). This Court should ignore *McDaniels* as an outlier inconsistent with the explicit findings of the Supreme Court in *Bruen*, and in so doing, affirm *Bruen*'s conclusion that the text of the Second Amendment does not cover open carry when other forms of public carry are available.[3]

_____

[3] Elsewhere, Plaintiffs' brief includes a string cite to a handful of other state cases purportedly finding a Second Amendment right to open carry under *Bruen*. Pls.' Br. 26. Plaintiffs misconstrue these cases.

Lastly, Plaintiffs' claim that they were somehow "penalize[d]" because they allegedly cannot obtain an open carry permit from the Attorney General in addition to a concealed carry permit issued by municipal authorities, Pls.' Br. 15, was not raised before the district court and so is waived. *Teamsters Union, Local No. 59 v. Superline Transp.*, 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

Even if they had raised the argument, it is based on a false premise. An applicant may acquire an Attorney General's permit in addition to a municipal permit when they demonstrate a "special need" for open carry. State Defs.'

---

*Reed v. Commonwealth*, 85 Va. App. 196, 214 (2025), states that a law criminalizing the "mere[] carrying or possessing [of] a firearm on one's person" would violate the Second Amendment. It does not speak directly to open carry, and it even suggests that open carry could violate the brandishing law the court upheld in that case. *Id*. at 215 n.9 (finding that the "proscribed behavior is [carrying firearms] 'in such manner as to reasonably induce fear'" while observing that "[i]t is reasonable to assume that observing the open carrying of firearms in any location may cause some individuals to be concerned or apprehensive.").

*Commonwealth v. Sumpter*, 340 A.3d 977, 988 (Pa. Super. 2025), struck down a statute requiring a license to openly carry firearms in Philadelphia under the Equal Protection Clause of the Fourteenth Amendment since no license is required to openly carry firearms elsewhere in Pennsylvania. The court explicitly declined to decide anything under the Second Amendment. *Id*.

*State v. Hall*, 265 N.E.3d 338, 359 (Ohio 2025), echoed *Bruen*'s finding that antebellum state courts "upheld regulations on the manner in which arms could be carried, so long as those arms could be kept readily available for self-defense." It did not find a standalone Second Amendment right to open carry.

16

Statement Undisputed Facts App. 45, 57-58, 65-66, ECF 35-1. Applicants who fail to make that showing are denied, whether or not they already have municipal permits. *Id*. The inverse is also true: applicants who show a special need for open carry are granted Attorney General's permits, whether or not they already have municipal permits. *Id*. at 66 (stating that at least one applicant has received an Attorney General's permit in addition to a municipal permit upon demonstrating a need to open carry). Thus, contrary to Plaintiffs' argument, they were not disadvantaged by Rhode Island's dual-permitting scheme. The fact that Plaintiffs already had municipal permits allowing concealed carry simply illustrates how their Second Amendment right to bear arms publicly was not infringed by denying them an additional permit allowing open carry.

**B.     Rhode Island's Open Carry Permitting Regime Is Consistent with the Nation's Tradition of Firearms Regulation.**

1.     The district court correctly applied the *Bruen* Court's historical analysis in upholding Rhode Island's restrictions on open carry.

The district court correctly found that restrictions on the manner of public carry are well supported by the nation's historical tradition of firearms regulation, and in so finding, the court was free to rely on the historical analysis in binding Supreme Court precedent. *Bruen* may require courts to consider the historical record, Pls.' Br. 13, but it does not require courts to recreate that record or consider it in a vacuum. In applying step two of the *Bruen* analysis, courts may look to "primary

sources, the work of professional historians, widely cited legal scholarship, and the decisions of other courts that have studied the historical evidence . . . ." *United States v. Harrison*, 153 F.4th 998, 1023 n.20 (10th Cir. 2025); *see also United States v. Rahimi*, 602 U.S. 680, 694 (2024) (referencing the Court's "extensive[]" history of gun laws in *Heller* and *Bruen*); *Capen v. Campbell*, 134 F.4th 660, 675 n.9 (1st Cir. 2025) (citing Fourth, Ninth, and D.C. Circuit findings regarding the history and tradition of regulating assault weapons and large capacity magazines). And where the Supreme Court has already performed the relevant historical analysis, lower courts need look no further since they are bound by "not only the result" of Supreme Court precedent "but also those portions of the opinion necessary to that result." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996).

Here, the district court was bound by the Supreme Court's conclusion, after an extensive historical analysis, that "States could lawfully eliminate one kind of public carry" so long as another option for public carry remained available. *Bruen*, 597 U.S. at 59. While the historical record did not support "prohibitions on *all* public carry," such as the New York statute at issue, the Supreme Court affirmed that prohibitions on certain types of public carry—e.g., concealed or open carry—were integral to our nation's history of firearms regulation. *Bruen*, 597 U.S. at 52-59, 68; *see also Rahimi*, 602 U.S. at 691 ("Other[ jurisdictions] forbade carrying concealed firearms.") (citing *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Thus,

the Supreme Court's conclusion that "the manner of public carry was subject to reasonable regulation," *Bruen*, 597 U.S. at 5, was "essential to the result reached in the case" and therefore binding, *see Rossiter v. Potter*, 357 F.3d 26, 31 (1st Cir. 2004). The district court was not required or even permitted to second-guess that precedent. *Id*.; *see also Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (affording "substantial, if not controlling deference" to *Bruen*'s "clear guidance" that "'shall-issue' permitting laws are presumptively constitutional). The historical record confirms that there is a historical tradition regulating the mode of public carry, including open carry.

The district court was not required to revisit the well-trod history of manner-of-carry restrictions just to go through the motions, but had it engaged in yet another extensive review of the nation's tradition of gun regulation, it would have confirmed *Bruen*'s findings. The record before this Court demonstrates a long history of state and local authorities restricting the manner of public carry, including prohibitions on open carry, dating back to before the Founding. In addition to a tradition of various permit requirements, documented in the State's summary judgment briefing and accompanying exhibits, Pls.' App. 72-73, 142-43, the State's experts traced the English tradition of limiting public carry through the Colonial Era and into the Early Republic, *id*. at 88-89, 128-34. Rhode Island continues this tradition with its dual-

permitting regime, guaranteeing the right to publicly carry handguns in a concealed manner while requiring a special need and separate permit for open carry.

This tradition is rooted in some of the earliest laws governing the American colonies, many of which went further in restricting the public carry of firearms than Rhode Island goes today. For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives, creating a precedent for restricting the open carry, or display, of weapons. *Id*. at 135. Likewise, a 1686 New Jersey law adopted "An Act Against Wearing Swords" set penalties against the wearing of "pistols" and certain other weapons. *Id.* at 136. And several colonial governments adopted laws "mirror[ing] the British Statute of Northampton, where the very fact of carrying a firearm was considered to be in terror of the people and was therefore prohibited by that statute." *Id.* at 12-13 (internal quotation marks and brackets omitted); *see also id.* at 89. Those colonial statutes outlawed "go[ing] armed offensively" in public places such as fairs or markets and in "the presence of the King's Justices.'" *Id*. at 136-37 (quoting a 1694 Massachusetts law, a 1701 New Hampshire law, and a North Carolina 1792 collection of statutes). Thus, the historical record demonstrates a tradition of regulating the mode of public carry, including prohibitions on open or concealed carry, dating back to nation's earliest settlements.

This tradition continued through the Founding Era, when, as the Supreme Court has recognized, "public-carry restrictions proliferate[d]" in the period "after the ratification of the Second Amendment in 1791." *Bruen*, 597 U.S. at 50. Many of those restrictions proscribed or penalized certain forms of public carry in various jurisdictions across the United States. *Id*. at 52 n.16; Pls.' App. 128-34. For example, many jurisdictions passed laws penalizing the mere display of firearms on one's person while in public, a form of open-carry restriction that survived well into the twentieth century. Pls.' App. 140-41. In fact, from the late 1600s through the early 1900s, at least 36 states and territories enacted such laws. *Id*. at 138. Other jurisdictions imposed taxes to discourage open carry, *id*. at 131, or simply prohibited open carry outright, *id*. at 130. In total, at least 38 states enacted at least 72 laws restricting open carry. *Id*.

There is also a well-established history of restricting concealed carry, as Plaintiffs acknowledge in their brief. Pls.' Br. at 6, 9-10, 25-26. Indeed, concealed carry restrictions were "widely enacted from the 1600s through the start of the twentieth century," and in that time, every single state and the District of Columbia enacted laws penalizing concealed carry. Pls.' App. 128-29. Moreover, state courts reviewing the constitutionality of antebellum public carry laws expressly blessed such restrictions so long as some form of public carry was allowed. The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), is "particularly

instructive." *Bruen*, 597 U.S. at 54. There, the state court weighed a challenge to the 1837 law mentioned above, which "broadly prohibited 'wearing' or 'carrying' pistols . . . without distinguishing between concealed and open carry." *Id.* The Georgia court held that "[a] law which merely inhibits the wearing of certain weapons in a concealed manner is valid," "[b]ut so far as it cuts off the exercise of the right of the citizen altogether to bear arms, or, under the color of prescribing the mode, renders the right itself useless," "it is in conflict with the Constitution, and void." *Nunn*, 1 Ga. at 243. Other state courts reached similar conclusions. *See State v. Jumel*, 13 La. Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."); *State v. Reid*, 1 Ala. 612, 616 (1840) (holding that the right to bear arms did not deny "the Legislature[] the right to enact laws in regard to the manner in which arms shall be borne"). The lesson the Supreme Court took from these and other state-court decisions is that—although "it was considered beyond the constitutional pale . . . to altogether prohibit public carry"—"the manner of public carry was subject to reasonable regulation." *Bruen*, 597 U.S. at 54, 59.

In sum, the State's experts have identified in our national tradition "the extensive regulation of open weapons carrying," Pls.' App. 128, which alongside a parallel tradition of "ubiquitous" concealed carry restrictions, *id*. at 127-28,

establishes a heritage of States permitting public carry but restricting the means of doing so without violating the Second Amendment. This evidence is supported by experts in related cases, which have identified at least 79 laws enacted in at least 39 states restricting the open carrying of weapons in various ways from the seventeenth through the twentieth centuries. *See We the Patriots USA Inc., et al., v. Doyle*, No. 3:24-cv-01054 (D. Conn. Aug. 15, 2025), Defs.' Mem. Law Supp. Mot. Summ. J. 43-44, ECF 32-1. Rhode Island's permitting requirement for open carry neatly falls within this tradition.

2.    <u>The district court correctly found that Rhode Island's restrictions on open carry are "relevantly similar" to historical laws restricting concealed carry.</u>

Plaintiffs try to distance themselves from the Supreme Court's explicit, and repeated, approval of manner-of-carry regulations by adopting a cramped interpretation of the Court's historical analysis. In *Bruen*, the Supreme Court found a national tradition of restricting "the manner of public carry," 597 U.S. at 59, and Plaintiff's view that historical restrictions on concealed carry somehow guarantee a right to open carry is incompatible with that finding. Indeed, the Supreme Court expressly rejected Plaintiffs' overly literal approach to history in *Rahimi*. 602 U.S. at 691. There, the Supreme Court clarified that *Bruen* does not require a "dead ringer" or a "historical twin" for a regulation to withstand Second Amendment scrutiny. *Id*. at 692. Rather, courts need only "identify a well-established and

representative historical analogue," one that is "relevantly similar" by "impos[ing] a comparable burden on the right of armed self-defense" that is "comparably justified." *Bruen*, 597 U.S. at 29-30. Applying such analogical reasoning, courts including this one have found constitutional restrictions on large-capacity magazines, *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 41 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025), 3D-printed guns, *New York v. Arm or Ally, LLC*, 718 F. Supp. 3d 310, 335 (S.D.N.Y. 2024), *appeal docketed*, No. 24-773 (2d Cir. Mar. 26, 2023), and firearms on subways, *Schoenthal v. Raoul*, 150 F.4th 889, 920 (7th Cir. 2025). By comparison, the analogical leap from concealed carry to open carry restrictions is hardly any leap at all.

Indeed, applying *Bruen*, almost every federal court to consider the issue has affirmed the constitutionality of open-carry restrictions under the Second Amendment. *Frey v. City of New York*, 157 F.4th 118, 139 (2d Cir. 2025) (summarizing laws and precedent "evinc[ing] a strong historical tradition of regulating, and often criminalizing, one manner of public carry, so long as the government does not 'altogether prohibit public carry.'"); *Abed v. United States*, 278 A.3d 114, 129 (D.C. 2022) ("[N]othing in the [Bruen] opinion implies that a State must allow open carry," so long as it does not "broadly prohibit concealed carry."); *Nichols v. Newsom*, No. 2:11-CV-09916-SSS-KES, 2022 WL 22867377, at *1 (C.D. Cal. Dec. 7, 2022) ("[T]he Second Amendment does not secure the right to a

particular *mode* of carry, i.e., open carry . . . ."); *United States v. Rosa-Ufred*, No. CR 23-428 (RAM), 2025 WL 815688, at *4 (D.P.R. Mar. 14, 2025) (rejecting argument that open carry ban would violate Second Amendment under *Bruen*); *National Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023) (discussing *Bruen* and reasoning that "the government . . . can ban different types of carry so long as others are left available"). *But see Baird v. Bonta*, 2026 WL 17404, at *2 (9th Cir. Jan. 2, 2026) (finding Second Amendment violation where California law allowed concealed carry throughout the state but restricted open carry only to counties with lower populations and other limited circumstances). This Court should find the same.

The Nation's historical tradition does not reflect a preference for one form of public carry over another. Plaintiffs' argument to the contrary relies on Mr. Cramer's distorted historical perspective on the Second Amendment's alleged preference for open carry over concealed carry. Pls.' Br. 5. The American history of public carry reveals two broad, largely regional, approaches to manner-of-carry restrictions. Pls.' App. 88-89. While the approaches varied, both traditions uniformly recognized the role of governments in regulating the manner of public carry. *Id.* at 89 ("Taken together, the two regulatory strategies tightly restricted the public carrying of weapons. . . .").

Some states adopted the existing English model based on the Statute of Northampton, which broadly prohibited carrying weapons in populated public areas. *Id.* at 88-92 (gathering statutes). This approach often created statutory exemptions for people who had a specific need to carry weapons in public, while broadly prohibiting most carry. *See id.* The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835 (Dutton & Wentworth 1836), ch. 134, § 16, illustrates this approach. *Id.* at 90-91. This statute restricted the carrying of a "dirk, dagger, sword, pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury." *Id.* "[N]umerous states adopted verbatim the penal code version of the Massachusetts public carry law." Pls.' App. 91 (collecting examples from Wisconsin (1939), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853)). All of these states restricted "going armed" in public without reasonable cause to fear harm.[4] *Id.*

Southern states adopted a different approach by broadly prohibiting concealed carry but leaving open carry largely unregulated. *See* Pls.' App. 23-26. These laws generally "provided a list of prohibited deadly weapons that could not be concealed

---

[4] These examples are just some of the restrictions on open carry that are part of our Nation's history. Additional examples are discussed in the State's motion for summary judgment, ECF No. 34-1 at 28-29, and opposition to Plaintiffs' motion for summary judgment, ECF No. 38 at 8-21. *See also* Pls.' App. 72 (summarizing manner of carry restrictions); *id*. at 163-299 (compiling historical statutes that restricted open carry).

on the person and penalized violators with a fine and/or jail time." *Id.* at 26 (collecting examples from Indiana (1819), Florida Territory (1835), Georgia (1837), Arkansas (1837), Virginia (1838), Alabama (1839) and other states and territories). Under this approach, prohibitions on concealed carry were regarded as necessary to "counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *State v. Chandler*, 5 La. Ann. 489, 490 (1850). Open carry, in contrast, was seen as "calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations." *Id.*

Idaho (1888), West Virginia (1882), and Texas (1871) enacted laws that fell somewhere in between these two approaches. Like the Southern states' approach, these states broadly prohibited the carrying of enumerated weapons but, unlike the Southern states' approach, did not distinguish between the manner of carry. Pls.' App. 27-28. Like the Northern states' approach, the restrictions enacted by these states generally applied to both open and concealed carry of enumerated weapons, and Texas provided an exception, like the Massachusetts law, for those with "reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *Id.*

The variances in state approaches to regulating the manner of public carry does not mean, as Plaintiffs mistakenly contend, that there was a historical tradition of protecting open carry more than concealed carry. Pls.' Br. 7. This assertion is based on a distorted view of history focused predominantly on the Southern states' approach to manner of carry restrictions. Pls.' App. 114 ("Focusing on southern, concealed carry cases without exploring the larger context of social attitudes toward weapon-carrying has led to an emphasis on judges' protection of open-carry without considering socio-cultural factors limiting such behavior."). An objective review of the Nation's historical tradition shows that states retained broad authority to regulate the manner of public carry, regardless of whether the carry was open or concealed, provided states did not completely ban both forms.

Rhode Island's permitting regime fits neatly into this history, imposing a burden comparable to those imposed by its antecedents throughout American history. Law-abiding, responsible citizens are free to publicly carry handguns for self-defense with a municipal permit for concealed carry. The Second Amendment requires nothing more, as demonstrated by the centuries of regulation, summarized *supra*, prohibiting (at least) one form of public carry. Indeed, Rhode Island's approach is less burdensome than many of its historical and modern analogues since individuals may have a permit to open carry upon showing a need to do so. *Contrast* R.I. Gen. Laws § 11-47-18 *with* Cal. Penal Code § 26350 (West) (open carry allowed

only in certain counties with relatively low populations); Conn. Gen. Stat. Ann. § 29-35 (West); Fla. Stat. Ann. § 790.053 (West); 430 Ill. Comp. Stat. Ann. 66/10 (West) (issuing concealed carry permits only); N.J. Stat. Ann. § 2C:58-4 (West); D.C. Code §§ 22-4504.04-4506 (issuing concealed carry permits only); N.Y. Penal Code § 400.00 (West) (issuing concealed carry permits only).

Moreover, Rhode Island's permitting regime is justified by reasons comparable to those underpinning historical manner-of-carry restrictions. For centuries, jurisdictions adopted permitting regimes for reasons of public safety. The permitting authorities sought to restrict possession of arms by individuals deemed to be dangerous or irresponsible or sought to curtail activities that were unusually dangerous (like firing weapons in cities or storing gunpowder in populated areas). Pls.' App. at 130, 143, 161-62 (describing public safety concerns); *id.* at 117 (describing concerns about dangerous persons). Similar concerns animated early Americans' decisions to impose "manner of carry" restrictions as governments hoped to mitigate the risk of "interpersonal violence." *Id.* at 7. Lawmakers therefore adopted restrictions or outright bans on those forms of public carry considered "a particular mode of bearing arms which [was] found dangerous to the peace of society." *Jumel*, 13 La. Ann. at 400. Likewise, the open display of weaponry has long been considered threatening or intimidating and thus regulated by laws punishing "affrayers, rioters, disturbers or breakers of the peace" and all others who

would "go armed offensively, to the fear or terror of the good citizens." Pls.' App. at 137; *see also Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346, 356 (Ill. App. Ct. 2024), *appeal denied*, 270 N.E.3d 808 (Ill. Sept. 24, 2025). Rhode Island fits within this tradition by restricting open carry to protect the general peace and peace of mind. Thus, considered alongside "laws at the founding [that] regulated firearm use to address particular problems," Rhode Island's permitting scheme "impos[es] similar restrictions for similar reasons" and thereby "fall[s] within a permissible category of regulations." *Rahimi*, 602 U.S. at 692.

In fact, all three proffered experts in this case agreed that openly carrying weapons in public likely caused alarm throughout history. Dr. Brennan Rivas reported that "[t]o be seen carrying weapons invited suspicion, judgment, or even the intervention of local officials" since "the everyday open carrying of deadly weapons was a divergent behavior, noteworthy according to the travelers, adventurers, and commentators who encountered it." Pls.' App. 74. Professor Robert Spitzer similarly opined that openly carrying in public places "caused great alarm, fear, what we might call disruption of public order," leading state and local authorities "to regulate this practice." Defs.' Statement Disputed Facts 40, ECF No. 42. Even Plaintiffs' expert, Mr. Clayton Cramer, wrote in his book "that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying." Clayton Cramer,

*Concealed Weapon Laws of the Early Republic* 86 (available at Defs.' Mem. Opp'n Pls.' Mot. Summ. J. Attach. 1 at 9, ECF No. 38-1). At his deposition, Mr. Cramer confirmed that "[t]here might well have been some social stigma" against carrying deadly weapons openly in the Early Republic, Defs.' Mem. Opp'n Pls.' Mot. Summ. J. Attach. 1 at 29, ECF No. 38-1, and he further observed that such stigma continues to this day, *id.* at 27 (admitting that "A lot of people" continue to feel "disturb[ed]" by open carry, amounting to a "certain level of disapproval where people are clearly uncomfortable").

The longstanding stigma against open carry is not only evidence of the shared "general societal problem," *Bruen*, 597 U.S. at 26, addressed by Rhode Island's permitting regime and its predecessors; that stigma is also a mode of regulation in and of itself. The *Bruen* Court signaled that private rules should be considered part of the national tradition informing the courts' understanding of the Second Amendment, citing practices at private universities as evidence that schools should be considered "sensitive places" subject to weapon prohibitions. *Schoenthal v. Raoul*, 150 F.4th 889, 920 (7th Cir. 2025) (citing *Bruen*, 597 U.S. at 30) (also noting that Eleventh Circuit has consulted private university rules in *National Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1120 (11th Cir. 2025)). Following that example, the Seventh and Ninth Circuits have looked to rules set by private railroads as support for firearms regulations on public transit. *Id.* at 920-21 (citing *Wolford v. Lopez*, 116

F.4th 959, 1002 (9th Cir. 2024), *reh'g en banc denied*, 125 F.4th 1230, *cert. granted in part*, 2025 WL 2808808). This Court should likewise consider the eighteenth- and nineteenth-century taboos against open carry as part of the historical framework regulating firearms behavior. Dr. Rivas, for instance, explained how stigma made concealed carry restrictions particularly effective, protecting communities by "def[ying] Americans who wanted to be preemptively armed to do so openly and face the legal and personal consequences that followed, including being stopped by or reported to the police, being ostracized, being denied entry into mercantile establishments, and being presumed to be a dangerous person or a ruffian." Pls.' App. 121. Mr. Cramer went even further, proposing that stigma against open carry effectively made a ban against concealed carry a ban against all carry. Cramer, *Concealed Weapon Laws* 86. Thus, Plaintiffs' and the State's experts agreed that the story of manner-of-carry restrictions in American history featured laws and regulations against a backdrop of stigma and social norms further limiting open carry at various times and places throughout the country. Rhode Island's discretionary permitting of open carry is a continuation of that tradition.

Thus, the tradition of concealed carry restrictions, taken in conjunction with the open-carry restrictions identified by the State's experts, demonstrated that manner-of-carry restrictions are an established part of the nation's history of firearms regulation.

Plaintiffs' suggestion that restrictions on open carry might burden the right to carry depending on one's choice of weapon or clothing does not change the analysis. First, Plaintiffs brought an as-applied challenge to the denial of their Attorney General's permits, Pls.' Br. 39, and thus they bear the burden of demonstrating that the denial, as applied to their conduct, violated the Second Amendment. *See Canna Provisions, Inc. v. Bondi*, 138 F.4th 602, 607 (1st Cir. 2025) (reiterating the standard that plaintiffs bear the burden of proof for their as-applied challenges). Furthermore, when considering as-applied challenges, courts refuse to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Hightower*, 693 F.3d at 77 (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J. concurring)). The precise facts of this case did not allow the district court to pronounce any constitutional rules regarding the Plaintiffs' right to carry certain, allegedly unconcealable, firearms since the Plaintiffs produced no evidence that the guns they would carry with an Attorney General's permit could not be carried with a municipal permit. Indeed, when deposed, several Plaintiffs testified that the firearms they carry for self-defense are handguns, which they can freely carry concealed with their municipal permits, State Defs.' Statement Undisputed Facts App. 201, ECF No. 35-1 (Patterson); *id*. at 161, 164 (Tremeentozzi); and no Plaintiff testified that the firearms they carry could not be concealed. Moreover, Plaintiffs submitted no evidence that the weapons they would carry openly with an

Attorney General's permit could not also be carried concealed with a municipal permit, and it is hard to see how they could since neither permit allows one to carry any firearm that is twenty-six inches or more in length, R.I. Gen. Laws § 11-47-2(14) (defining "pistol" as including any "pistol or revolver, and any shotgun, rifle, or similar weapon with overall length less than twenty-six inches"). Thus, as applied to this record, Plaintiffs have not demonstrated that the denial of their Attorney General's permits obstructed their right to carry firearms in public for self-defense.

Plaintiffs' further suggestion that they cannot carry long guns in a concealed manner, Pls.' Br. 27, fails because there is nothing in the record to show that it is impossible to carry long guns in a case or other concealed manner. In all events, the Supreme Court has emphasized time and again, the Second Amendment does not guarantee the right to "carry any weapon whatsoever." *Rahimi*, 602 U.S. at 691 (quoting *Heller*, 554 U.S. at 626). Citing that precept, this Court has already recognized "limited self-defense utility" of long guns compared to handguns, which the Supreme Court has designated the "quintessential self-defense weapon." *Capen v. Campbell*, 134 F.4th 660, 670, 674 (1st Cir. 2025) (quoting *Heller*, 554 U.S. at 629). Indeed, as this Court noted in *Ocean State*, the Supreme Court has "detailed several reasons why handguns are more conducive to self-defense than long guns," including how much easier it is to store and access handguns, to aim and fire handguns with limited strength, and to use handguns with one hand while calling the

police with the other. 95 F.4th 38, 48 (1st Cir. 2024). For these reasons, the handgun has become the touchstone of the Second Amendment right for self-defense. *See id.* at 48-49 (comparing semiautomatic weapons to the "traditional handguns" protected by the Second Amendment). Thus, even if the Attorney General's permit denial impacted their ability to carry long guns in public,[5] Plaintiffs' Second Amendment right to bear arms for self-defense is secured by the municipal concealed carry permits they hold for public carry of handguns.

Plaintiffs' suggestion that concealed weapons are somehow less accessible than openly carried weapons, "depending on the clothing worn," Plfs.' Br. at 27, is similarly in tension with this Court's and the Supreme Court's precedent. The *Bruen* Court specifically upheld the *concealed* carry permit regimes found in the "vast majority of States" as effectively guaranteeing the right to carry for self-defense, 597 U.S. at 14, 60, and the Plaintiffs have produced no evidence to the contrary. Plaintiffs' fashion choices notwithstanding, they are free to bear arms in public through their municipal permits and do not require a second permit to do the same.

---

[5] Plaintiffs have the right to own and transport long guns in Rhode Island without needing any permit to do so. R.I. Gen. Laws § 11-47-10, -51. Additionally, as noted above, any shotgun or rifle 26 inches or longer is not a "pistol" or revolver subject to the Attorney General's permitting authority. R.I. Gen. Laws § 11-47-2(14); § 11-47-11. Plaintiffs produced no evidence demonstrating that long guns they proposed to carry openly were subject to the Attorney General's permitting authority at all.

*See Baird*, 709 F. Supp. 3d at 1139-40 (rejecting claim that some weapons "might be difficult to conceal in tight clothing" where Plaintiffs could not explain "why those who wish to defend themselves with handguns cannot choose *not* to wear tight clothing") (emphasis added).

The recent, nonbinding decision by a Ninth Circuit panel finding a Second Amendment violation in *Baird v. Bonta*, 2026 WL 17404, at * 2 (9th Cir. Jan. 2, 2026), does not alter *Bruen*'s holding, rooted in this nation's history and tradition, that States may regulate the mode of public carry. The Ninth Circuit's decision, which remains subject to *en banc* review, is fundamentally at odds with the *Bruen* Court's historical analysis, as well as with the consensus reached by other courts, including the Second Circuit. The errors that led the Ninth Circuit astray are discussed by Circuit Judge Smith's opinion, dissenting in relevant part, which properly adheres to both Supreme Court and historical precedent. *See id.* at *23 (Smith, J., concurring in part, dissenting in part). In all events, even if the Ninth Circuit majority decision comes under consideration, the California statute at issue in *Baird* is easily distinguishable from the Rhode Island permitting system as California prohibits open carry in its most populous counties and offers no permit to do so, *id*. at *5 (citing Cal. Penal Code §§ 25850, 26350). Rhode Island has no similar blanket prohibition on open carry; it merely requires applicants to

demonstrate a need for open carry in addition to the concealed carry already allowed by municipal permit.

In the end, the Second Amendment analysis comes down to a simple question: whether Plaintiffs have the right in Rhode Island to publicly carry handguns for self-defense. The answer, as even the Plaintiffs admit, is "yes." Therefore, their Second Amendment claims must fail.

## II. THE DISTRICT COURT CORRECTLY DENIED THE PARTIES' EVIDENTIARY MOTIONS AS IMMATERIAL TO ITS DECISION.

The district court relied on binding precedent to decide the Second Amendment claims as a matter of law, and thus the district court correctly found Plaintiffs' evidentiary motions immaterial to its decision. Pls.' Br. Add. 52. On appeal, Plaintiffs fail to show how that common-sense finding amounted to an abuse of discretion. *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) ("[W]e review the district court's evidentiary rulings made as part of its decision on summary judgment for abuse of discretion.").

As explained *supra*, the district court was entitled and even required to decide Plaintiffs' Second Amendment claims on the basis of the Supreme Court's historical analysis. Nonetheless, even if the court had conducted an independent—and redundant—review of the nation's history and tradition of gun regulation, Plaintiffs' Motion in Limine would not have impacted the analysis because (1) Plaintiff's Motion lacks merit; (2) the legal materials they attempt to exclude were subject to

judicial notice; and (3) the State's expert was entitled to rely on the contested evidence, even if inadmissible, since such sources are reasonably relied upon by experts in his field. Thus, any error by the District Court in not considering the Motion would be harmless error not warranting reversal. *See United States v. Lewis*, 40 F.3d 1325, 1339-40 (1st Cir. 1994) (finding any error in a lower court's admissibility decision harmless and reversal inappropriate "in light of the strong case presented by the government").

## A. Plaintiffs' Motion Lacks Merit Because Legal Sources Are Not Inadmissible Hearsay.

Plaintiffs' Motion fundamentally misunderstood hearsay, which does not include the types of legal sources underpinning Professor Spitzer's expert opinion. Professor Spitzer was free to pull those sources from the Duke Repository and HeinOnline, two widely regarded legal databases, much as this Court is free to access laws and cases on WestLaw or Lexis. The laws Professor Spitzer retrieved from these databases cannot be hearsay because "when a copy of a [law] is placed in the record, it is not 'evidence' nor is it fact." *Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011).

Even if citations to an online compendium of laws, which would include such trusted sources as WestLaw or Lexis, were hearsay, the laws would still be admissible under Federal Rule of Evidence 803(17) as a "compilation[] that [is] generally relied on by the public or by persons in particular occupations." This Court

has admitted similar historical sources under this exception where the expert has testified that the repository is generally regarded as highly reliable within the field. *United States v. Mount*, 896 F.2d 612, 625 (1st Cir. 1990) (admitting *The Collected Works of Abraham Lincoln*); *see* Pls.' Mot. Lim. Attach. 2 at 6, ECF No. 33-2 (Spitzer testimony that the Duke Repository is "highly reliable"). Under the same logic, there should be no barrier to admitting Professor Spitzer's compilation of historical legal sources, especially where numerous experts and courts—including this one—have cited the Duke Repository and HeinOnline, *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 n.17 (1st Cir. 2024) (citing Duke Repository); *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 147 (3d Cir. 2024) (Restrepo, J., dissenting) (same), *vacated on other grounds and remanded sub nom.*, *Paris v. Lara*, 2024 WL 4486348; *Bianchi v. Brown*, 111 F.4th 438, 465 n.3 (4th Cir. 2024) (same); *United States v. Daniels*, 77 F.4th 337, 344 (5th Cir. 2023) (same), *vacated on other grounds and remanded*, 144 S. Ct. 2707 (2024); *Jones v. Bonta*, 35 F.4th 704, 753 (9th Cir. 2022) (Stein, J., dissenting in part) (same); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 297 n.72 (N.D.N.Y. 2022), *vacated in part on other grounds and remanded*, 120 F.4th 941 (2d Cir. 2024) (same); *Bin-Jiang Tao v. Citibank, N.A.*, 445 Fed. Appx. 951, 956 (9th Cir. 2011) (citing HeinOnline); *Nelson v. Town of Johnsbury Selectboard*, 198 Vt. 277, 285 n.5 (2015) (same); *Amber Intern. Nav., Inc. v. Reprinter Intern. Shipping Co., S.A.*, 2009 WL 1883251, at *4

n.8, *5 n.9 (S.D.N.Y. June 30, 2009) (same); Written Testimony of Joseph Blocher, Lanty L. Smith Professor of Law, Duke University Law School, After the Highland Park Attack: Protecting Our Communities from Mass Shootings: Hearing Before the Sen. Comm. on the Judiciary, 117th Cong. at 2 n.7 (July 20, 2022) (same), https://www.judiciary. senate.gov/committee-activity/hearings/after-the-highland-park-attack-protecting-our-communities-from-mass-shootings; Rhode Island State Law Library, Library Services for the Legal Community (2024) (recommending HeinOnline), https://www.courts.ri.gov/programs-services/Documents/LibraryServicesForTheLegalCommunity.pdf.

## B. The Legal Materials Targeted by Plaintiff's Motion Were Subject to Judicial Notice.

In any case, Plaintiffs' hearsay arguments would have had no impact on the historical evidence before the district court since the legal materials were subject to judicial notice. Courts "may take judicial notice of law at any time," *Berrios-Romero*, 641 F.3d at 27, and indeed, is "bound to take judicial notice" of "[t]he law of any state of the Union," *Lamar v. Micou*, 114 U.S. 218, 223 (1885). Courts may also take notice of state regulations, *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742 n.4 (1976), and city ordinances, *United States v. Alexander*, 467 Fed. Appx. 335, 360-61 (6th Cir. 2012). Other courts considering Second Amendment challenges have taken judicial notice of similar laws, including many of the same laws referenced in Professor Spitzer's report. *E.g., Frey*, 157 F.4th at

138-39 (summarizing legal tradition of manner-of-carry restrictions). The district court could have done likewise, had it been necessary to fact-check the *Bruen* Court's historical analysis—which it was not—again demonstrating that any error in denying the motion in limine was harmless.

## C. The State's Expert Was Otherwise Entitled to Use the Legal Materials as Evidence Reasonably Relied Upon in His Field.

The district court's denial of Plaintiffs' motion is also harmless because Professor Spitzer could cite the legal materials even if they were hearsay—which they were not—as evidence reasonably relied upon by experts in the field of history. Federal Rule of Evidence 703 allows experts to rely on inadmissible evidence, including hearsay, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *United States v. Pérez-Vásquez*, 6 F.4th 180, 198 (1st Cir. 2021) ("'properly qualified experts whose work is based on reliable principles and methods may rely on inadmissible hearsay evidence in forming an expert opinion'" as long as they "'relay that opinion, once formed, through their own testimony.'") (quoting *United States v. Sandoval*, 6 F.4th 63, 86 (1st Cir. 2021)). "[I]t is the process of amalgamating the potentially testimonial statements . . . that separates admissible [expert] opinion . . . from an inadmissible transmission of testimonial statements." *Id*. (quoting *United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016)) (alterations in the original).

Professor Spitzer's report is precisely the amalgamation permitted under Rule 703. He cites the Duke Repository and HeinOnline as two of several repositories used to access the laws compiled in his tables and exhibits. Pls.' App. 140. He also cites various secondary sources, including Carl T. Bogus's *Madison's Militia*, *id*. at 161, Randolph Roth's *American Homicide*, *id.* at 129, Sam B. Warner's "The Uniform Pistol Act," *id*. at 130, and his own scholarship, *id*. at 124, 129, 130. Professor Spitzer's review of the sources led him to conclude that, "[t]aken together, these numerous and varied laws make clear that the default in American history was weapons regulation and restriction." *Id*. at 128. Thus, Professor Spitzer has "fulfilled the historian's role of 'surveying a daunting amount of historical sources,' evaluating their reliability, and providing a basis for a 'reliable narrative[] about the past.'" *United States v. Kantengwa*, 781 F.3d 545, 562 (1st Cir. 2015).

In sum, the district court did not abuse its discretion in denying Plaintiffs' Motion in Limine because it was irrelevant to the court's Second Amendment analysis, but any error was harmless since the challenged legal materials would have been admissible in all events.

## III. THE DISTRICT COURT CORRECTLY HELD THAT THE PLAINTIFFS HAVE FAILED TO ESTABLISH ANY VIOLATION OF DUE PROCESS.

As the district court correctly held, Plaintiffs' due process claims fail because, even assuming the First Amendment doctrines they cite apply to this Second

Amendment context, (1) the Plaintiffs do not have a protected liberty interest in discretionary permits they have not yet acquired; (2) the Attorney General has published guidance on the "proper showing of need" required for a permit; and (3) the Plaintiffs received extensive explanations with their denials and multiple levels of review to protect against arbitrary enforcement.

## A.   The District Court Correctly Held That the Overbreadth Doctrine Does Not Apply to Plaintiffs' As-Applied Second Amendment Challenge.

As a threshold matter, the district court was right to reject Plaintiffs' overbreadth theory as outside the bounds of their Second Amendment claims. Pls.' Br. Add. 53. The district court correctly relied on this Court's binding precedent in *Hightower*, which refused to extend the First Amendment's overbreadth doctrine to the Second Amendment context. *Hightower*, 693 F.3d at 82-83. Thus, the district court rightly relied on this Court's precedent barring void-for-vagueness and overbreadth challenges for renewal of gun permits.

Plaintiffs attempt to distinguish *Hightower* as limited to the facial challenge brought in that case instead of the as-applied challenge brought in this case. However, that argument is nonsensical since the overbreadth doctrine is, by definition, a facial challenge. *Id*. at 81. There is no such thing as an "as-applied overbreadth doctrine" since the overbreadth doctrine "essentially argues that a 'statute could not be enforced against [a plaintiff], because it could not be enforced against someone else.'" *Id*. (quoting *Sabri v. United States*, 541 U.S. 600, 609

(2004)). Thus, by its very terms, the overbreadth doctrine is incompatible with Plaintiffs' as-applied challenge, which only pertains to how the Attorney General exercised his discretion with these Plaintiffs.

Plaintiffs further suggest that *Hightower* was somehow overruled by *Bruen*, but that argument ignores the Supreme Court's post-*Bruen* precedent strictly limiting the overbreadth doctrine. In *United States v. Hansen*, the Supreme Court reiterated that overbreadth challenges are "unusual" and "strong medicine" justified only by the need to "provide[] breathing room for free expression." 599 U.S. 762, 769-70 (2023). Based on that understanding, the Supreme Court refused to apply the overbreadth doctrine to "nonexpressive conduct—which does not implicate the First Amendment at all." *Id*. at 782. The Supreme Court thus affirmed this Court's reasoning in *Hightower* that "[The overbreadth] rationale is particular to the First Amendment" and should not be expanded to new contexts, such as the nonexpressive conduct protected by the Second Amendment. 693 F.3d at 80. Moreover, extending the overbreadth doctrine would be inconsistent with the spirit of *Bruen*, which grounded the application of the Second Amendment in the constitution's text and history and rejected judge-made doctrines such as overbreadth. *United States v. Beasley*, 702 F. Supp. 3d 1243, 1247 (M.D. Fla. 2023) ("Indeed, it would be absurd for *Bruen*—a decision rooted in constitutional text, history, and tradition—to expand the overbreadth doctrine to new constitutional

rights . . . ."). Indeed, *Bruen*'s author, Justice Thomas, concurring in *Hansen*, rejected the overbreadth doctrine as "lack[ing] any basis in the text or history of the First Amendment." 599 U.S. at 785 (Thomas, J., concurring); *see also Baird*, 2026 WL 17404, at *29 (Smith, J., concurring in part, dissenting in part) (noting recent opinions by Justices Thomas and Alito casting doubt on the overbreadth doctrine). It is no surprise, then, that every court to consider the issue has refused to apply the overbreadth doctrine to laws allegedly impacting plaintiffs' Second Amendment rights. *Hightower*, 693 F.3d at 82 (summarizing caselaw); *California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610, 620 (C.D. Cal. 2022) (finding no authority to extend overbreadth into the Second Amendment context); *United States v. Jordan*, 680 F. Supp. 3d 850, 854 (N.D. Ohio 2023) (same).

**B.** **The District Court Correctly Held That the Attorney General's Permitting Process Is Not Unconstitutionally Vague.**

The district court was also correct in rejecting Plaintiffs' void-for-vagueness challenge to the Attorney General's permitting application process because (1) Plaintiffs have no protected property or liberty interest in their expired permits; (2) the Attorney General provided sufficient guidance on how applicants can make a "proper showing of need" for a permit; and (3) the State provided multiple levels of review to protect against arbitrary enforcement.

1.     <u>The district court correctly found that Plaintiffs do not have a protected liberty interest in expired permits.</u>

The Due Process Clause prohibits deprivations of liberty or property by a state without due process of law. U.S. Const. amend. XIV. Evaluating whether a law violates this prohibition requires a two-prong analysis. First, the Court must ask whether there is a protected liberty or property interest at stake. *Board of Regents v. Roth*, 408 U.S. 564, 569-72 (1972); *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023) ("Since a void-for-vagueness challenge is ultimately a due-process claim, a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest."). Second, if a protected interest exists, the Court must decide whether the procedures afforded amount to "due process of law." *Roth*, 408 U.S. at 569-72.

As recognized by the district court, an Attorney General's permit "is a privilege and not a right," Pls.' Br. Add. 53, and thus Plaintiffs' due process claims fall at the first step. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the [plaintiffs] establish a constitutionally protected liberty interest."). Where, as here, a due process violation is premised on an alleged right established by another constitutional provision "that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v Oliver*, 510 U.S. 266, 273 (1994).

Thus, by correctly finding no Second Amendment right to open carry, the district court also disposed of Plaintiffs' due process claims.

Moreover, Plaintiffs have no independent property interest in permits they do not yet possess. To have a property interest under the Fourteenth Amendment, a person must have a "legitimate claim of entitlement" to the property under state law. *Roth*, 408 U.S. at 577. The Rhode Island Supreme Court already has determined that no such legitimate claim of entitlement exists in a § 11-47-18 permit, which by its terms automatically expires four years after issuance. *Mosby*, 851 A.2d at 1048 (holding that denial of a § 11-47-18 permit "has no impact on any constitutionally protected liberty interest"). There likewise is no legitimate claim of entitlement to reissuance of an expired § 11-47-18 permit absent a showing of need, which is a matter committed to the Attorney General's discretion. *See id*. An application for a permit that can be granted or denied in the exercise of a government official's discretion creates no protected property interest. *Clukey v. Town of Camden*, 717 F.3d 52, 56 (1st Cir. 2013) ("a benefit is not a protected entitlement if government officials may grant or deny it in their discretion") (quoting *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005)).

Thus, Plaintiffs' vague-as-applied challenge cannot pass the initial hurdle, and the district court did not need to give the due process claims further consideration.

2.     The district court correctly found that the "proper showing of need" requirement was not unconstitutionally vague as applied to Plaintiffs' permit applications.

Nonetheless, even if Plaintiffs could claim a protected interest in the Attorney General's permits, the district court correctly held that the standard for denying those permits was not unconstitutionally vague. To win their vague as-applied challenge, the Plaintiffs must prove that the State failed to provide a person of ordinary intelligence fair notice of what is required to obtain a permit. *See Draper v. Healey*, 827 F.3d 1, 3-4 (1st Cir. 2016). A regulatory regime is not unconstitutionally vague merely because it "requires interpretation," *Ridley v. Massachusetts Bay Transportation Auth.*, 390 F.3d 65, 93 (1st Cir. 2004), since this Court understands that "words are rough-hewn tools, not surgically precise instruments" and "some degree of inexactitude is acceptable," *Draper*, 827 F.3d at 4 (quoting *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011)). "Reasonable breadth in the terms employed by [the State] does not require that it be invalidated on vagueness grounds." *Id.* (quoting same).

Requiring applicants to make a "proper showing of need" for an Attorney General's permit easily falls within that constitutional standard. The district court acknowledged that the phrase "if read in a vacuum, might be problematic," Pls.' Br. Add. 53 (quoting *URI Student Senate*, 631 F.3d at 14), but as the district court recognized, "the phrase here does not occur in a vacuum," *id*. The Attorney General

48

has long published guidance detailing factors it considers when evaluating need, and those factors were available to Plaintiffs as part of the application process. These "interpretative safeguards" clarify the statute and dispel any fears that a person of ordinary intelligence would be unable to understand the requirements for an Attorney General's permit. *Id*.

Furthermore, the Attorney General's interpretation of the requirement, as applied to each Plaintiff's individual application, was communicated to each Plaintiff through letters and even meetings with the Attorney General's representatives. Plaintiffs thus had actual knowledge of how the "proper showing of need" standard applied to their applications, and that alone would defeat their vague-as-applied challenge. *See Draper v. Healey*, 98 F. Supp. 3d 77, 83 (D. Mass. 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016) (rejecting vague-as-applied challenge where dealers had "actual knowledge" that their pistols violated the regulation).

For these reasons, the Plaintiffs' vague-as-applied challenge must fail.

3.    The district court correctly found that the State afforded Plaintiffs multiple levels of review to ensure against arbitrary enforcement of the "proper showing of need" standard.

Finally, as the district court recognized in its opinion, the State provides a review framework guarding against the specter of arbitrary enforcement raised by Plaintiffs. The Rhode Island Supreme Court has explicitly held that denials of Attorney General's permits are subject to Supreme Court review. Plaintiffs exercised

49

their opportunity to challenge the Attorney General's decision via writs of certiorari to the Rhode Island Supreme Court, State Defs.' Statement Undisputed Facts App. 80 (O'Neil), 96 (Cook), 111 (Labriole), 120 (Laporte), 129 (Patterson), 145 (Patton), 189 (Tremeentozzi) ECF No. 35-1, the judicial review mechanism provided to ensure that the Attorney General's decision was supported by "legally competent evidence." *Mosby*, 851 A.2d at 1050-51. This opportunity for judicial review serves as a meaningful check against any allegedly unreasoned exercise of administrative decision-making. *See Montaquila v. Neronha*, 289 A.3d 568, 574 (R.I. 2023) (setting aside § 11-47-18 permit denial where decision was not supported by "legally competent evidence"). Due process required nothing more. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.").

Moreover, as mentioned *supra*, Plaintiffs also received advance individual notice of those criteria, along with tailored explanations of the Attorney General's reasoning in support of his decisions denying their applications, which was itself subject to judicial review. Plaintiffs, in short, received notice of the statutory requirements and an explanation of the grounds on which the Attorney General based his denials. Accordingly, the state administrative process provided Plaintiffs with fair notice of the statutory requirements, created no risk of arbitrary or

standardless enforcement, and additionally provided opportunity for judicial review of any perceived error. *See Mosby*, 851 A.2d at 1051 (emphasizing that the Rhode Island Supreme Court "will not countenance any system of permitting . . . that would be committed to the unfettered discretion of an executive agency"); *Montaquila*, 289 A.3d at 574 (reversing § 11-47-18 permit denial). The district court, therefore, properly rejected Plaintiffs' vagueness challenge based on the Due Process Clause.

## <u>CONCLUSION</u>

This Court should affirm summary judgment for Defendants.

Dated: January 5, 2026

Respectfully submitted,

Defendants-Appellees,
PETER F. NERONHA,
and the STATE OF RHODE ISLAND,

By,

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ James J. Arguin*
James J. Arguin (#39225)
*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (#1210551)
Special Assistant Attorneys General

150 South Main Street
Providence, RI 02903
(401) 274-4400, ext. 2078 | 2064
(401) 222-2995 (Fax)
jarguin@riag.ri.gov
pmeosky@riag.ri.gov

# <u>CERTIFICATE OF COMPLIANCE</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f):

   ✓ **this document contains 12,273 words.**

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ✓ This document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in size 14 Times New Roman font.


*/s/ Paul Meosky*
Attorney for Defendants-Appellees
Dated: January 5, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of January, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF filers and that they will be served by the CM/ECF system: Michael O'Neil; Joseph Patton; Richard Cook; Daniel Patterson; Peter Tremeentozzi; Donald Labriole; and Richard Laporte.

*/s/ Paul Meosky*